IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

OTHMANE MAHJOUBI,

    Petitioner,

v.

DANIELLE KATHRYN ROPER,

    Respondent.

Civ. No. 6:24-cv-01358-AA

**OPINION AND ORDER**

AIKEN, District Judge

    Petitioner Othmane Mahjoubi files this Petition pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Hague Convention")[1] and the International Child Abduction Remedies Act ("ICARA") 22 U.S.C. § 9001 et seq. This petition is brought to secure the return of his six-year-old son, A.M., and his three-year-old daughter, R.M., who Petitioner alleges were, without his consent, wrongfully retained from France in Oregon by the children's mother, Respondent Danielle Kathryn Roper ("Respondent"). Petitioner requests as provisional relief an Order to Show Cause, ordering Respondent to appear at an initial hearing, followed by an expedited evidentiary hearing on the merits of the petition for return of the children. For the reasons explained, the Court GRANTS Petitioner's request for provisional relief and ORDERS Respondent to appear before the Court at the time and place stated below.

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, reprinted in 51 Fed. Reg. 10493 (1986),

1    OPINION & ORDER

**FACTUAL BACKGROUND**

The parties are the parents of the subject Children who are citizens of France and the United States. Pet. ¶ 9. The father is a citizen of France. The mother is a citizen of the United States. *Id.* ¶ 10. The Children are acclimated, involved, and integrated in all aspects of daily life in France. *Id.* The Children went to school, received medical and dental care, and were engaged in activities in France. *Id.* ¶ 10. Petitioner has rights of custody to the Children in France and he had those same rights of custody on the date Respondent retained the Children from their habitual residence of France beginning in August 2024. *Id.* ¶ 11.

Petitioner was born and educated in France. After completing his master's in finance and management in 2006, he moved to New York for a job assignment in 2007. He met Respondent in New York in June 2008, and they entered into a romantic relationship that became on-and-off when Petitioner left New York in September 2008 to work in Casablanca, Morocco. *Id.* ¶ 12.

The parties reconnected and entered into a long-distance relationship in or around 2014 to 2018 while Petitioner lived and worked in France and Respondent lived and worked in New York. *Id.* ¶ 13. Respondent became pregnant in August 2017 and they were married in September 2017 in New York. *Id.* The marriage was formalized in France and the parties lived together in Petitioner's apartment in Paris with the intention of starting a family. Id ¶ 14. Respondent worked between Paris and New York from the wedding until early 2018, when she relocated to France to live with the Petitioner and began working remotely. *Id.* ¶ 15. A.M. was born in 2018 in France. R.M. was born in 2020 in France. *Id.* Both Children have lived in France since their birth and it is their habitual residence. Petitioner lost his job in 2019 and

thereafter acted as a "stay at home dad" while Respondent pursued her career while living in France  *Id*. ¶ 17.

The parties decided to spend the summer of 2024 in the United States with Respondent's family. Respondent left France with the Children at the end of June. Petitioner joined them in mid-July. *Id*. ¶ 18.  The family traveled together to Chicago and Florida before arriving in Oregon in early August with plans to return to Paris on August 15, 2024.  Respondent had Petitioner sign an authorization form permitting the children to travel outside of France until August 30, 2024, despite the agreed upon return date of August 15, 2024.  Respondent purchased the flight tickets for the entire family; nonetheless, Petitioner only ever saw his own ticket. *Id*. ¶ 18.

Starting August 3, 2024, the family resided at Respondent's brother Zachary Roper's home, which is located at 13237 Wickiup Dr., Oregon City, Oregon 97045. *Id*. ¶ 19.  On the afternoon of August 6, 2024, Respondent left with the Children, saying that they were going to play in a park. *Id*.  Shortly afterwards Mr. Roper suggested that Petitioner go with him to the park to meet the Children.  They walked together to a nearby park and were met by Respondent's sister, Respondent's brother-in-law, and a third party who handed him a Petition for Unlimited Legal Separation filed by Respondent in the Circuit Court of the State of Oregon for the County of Marion. *Id*. ¶ 20.  This included a request for custody of the Children. *Id*.

Petitioner remained in Oregon until August 15, 2024 and then returned home to France as previously planned. Petitioner did not at any point consent for the Children to remain in Oregon. *Id*. ¶ 21.

## LEGAL STANDARDS

The Hague Conference on Private International Law adopted the Hague

Convention in 1980 to address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (quotation omitted). "The International Child Abduction Remedies Act (ICARA), 102 Stat. 437, as amended, 22 U.S.C. § 9001 et seq., implements [the United States'] obligations under the Convention." *Id*. at 72. "It is the Convention's core premise that 'the interests of children ... in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Id*. at 71-72 (quoting Convention Preamble, Treaty Doc., at 7; and citing *Abbott v. Abbott*, 560 U.S. 1, 20 (2010)). "To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which [he] habitually resides." *Id*. (citation omitted).

"[T]he party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained." *Golan v. Saada*, 596 U.S. 666, 671–72 (citing 22 U.S.C. § 9003(e)(1)). "A child is wrongfully removed whe[n] removal occurs 'in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention' and 'at the time of removal or retention those rights were actually exercised ... or would have been so exercised but for the removal or retention.'" *Harvey v. Means*, No. 2:23-CV-1712, 2023 WL 8360021, at *2 (W.D. Wash. Dec. 1, 2023) (quoting Convention, arts. 1, 3).

## DISCUSSION

This opinion should not constitute a decision on the merits whether Respondent wrongfully removed the Children—it is a discussion aimed at providing reasoning underlying a decision on issuance of an order to show cause and appear. From the

4   OPINION & ORDER

standard above, the general framework to establish a case for return under ICARA is to prove by the preponderance of the evidence, that a child has been wrongfully retained within the meaning of the Hague Convention. Petitioner must set forth the child's (1) habitual residence; (2) wrongful removal or retention; and (3) that the petitioner was or would have been exercising their rights of custody if not for the wrongful removal or retention. *Id*.

## I.     Habitual Residence

The first inquiry in any case under the Hague Convention is the habitual residence of the child. The habitual residence in turn dictates the local law to be applied in determining the question of custody rights in the habitual residence. The Children's habitual residence at the date of removal, within the meaning of the Hague Convention, was France. The habitual residence is determined at the point in time "immediately before the removal or retention." Convention, art. 3. The Supreme Court noted that the habitual residence inquiry is fundamentally one of "[c]ommon sense." *Monasky*, 140 S.Ct. at 727. Facts relevant to the question of habitual residence include the child's age, the immigration status of the child and parents, the child's academic activities, social engagements, participation in sports, meaningful connections with people and places, language proficiency, and the location of the child's personal belongings. *Id*. at 78 n.3.

Here, according to the Petition, the Children resided in France until their summer 2024 family vacation. The Children have never resided in the United States. France was the Children's habitual residence at the time of the removal and retention and remains as such.

## II.     Wrongful Removal or Retention

5     OPINION & ORDER

The second part of the prima facie analysis is determining whether the Children's removal or retention in another country is wrongful by the law of the country where the Children are from, not where they been abducted to. Specifically, the Hague Convention provides that the removal or retention is wrongful where "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention." Convention, art. 3(a). Simply put, the left behind parent must have rights relating to the care of the child or the right to determine where the child lives, and they do not need to be exclusive to the parent.

In this case, Petitioner had rights of custody pursuant to French law. As stated in the Petition, Petitioner's custody rights under French law are conferred by Article 372 of the French Civil Code. See ECF No. 1. ¶ 32. Under Article 372 of the French Civil Code, both parents have joint legal custody (parental authority) rights, and the Respondent cannot relocate them without the consent of the Petitioner or the authorization of the French court. Article 372-2 further states that the separation of parents has no effect on the rules of parental authority. As both parents are the joint legal guardians of their minor children, Petitioner has some right to custody including the right to determine his children's place of residence.

### III. Exercise of Custodial Rights

Petitioner must demonstrate that he was exercising his rights of custody or would have been if not for the wrongful removal or retention.

The parties resided together in an intact home until the summer of 2024. On the afternoon of August 6, 2024, Respondent left with the Children and said they were going to the park, and Petitioner was served with a Petition for Unlimited Legal

Separation filed by Respondent. Petitioner went back to France on the date the family scheduled to return. Respondent and the Children have remained in the United States without Petitioner's consent. Petitioner was clearly exercising his rights of parental authority and would have continued to do so if not for Respondent's actions. "In the context of custody, the term 'exercise' is liberally construed and will be found 'whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'" *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996).

The Court is satisfied that an Order to Show Cause should issue where the parties shall appear before the Court. At that time, the parties shall determine an expedited date for an evidentiary proceeding at which both parties will be able to present evidence in their case.

## ORDER

1. Respondent IS ORDERED not to remove children from the District of Oregon, District of Eugene while the petition is pending.

2. Respondent is ORDERED to appear before the Court at the time and place stated:

   DATE:      SEPTEMBER 24, 2024
   TIME:      10:00AM
   DIVISION:  WAYNE L. MORSE U.S. COURTHOUSE
              405 EAST EIGHTH AVE.
              EUGENE, OR 97401
              COURTROOM 1
              DISTRICT JUDGE ANN AIKEN

It is so ORDERED and DATED this ___12th___ day of September 2024.

/s/Ann Aiken
ANN AIKEN
United States District Judge