Katelyn D. Skinner, OSB No. 105055
Katrina Seipel, OSB No. 164793
Buckley Law, P.C.
5300 Meadows Road, Suite 200
Lake Oswego, OR  97035
Telephone:  503-620-8900
Fax:  503-620-4878
Emails:  kds@buckley-law.com
         kas@buckley-law.com
Of Attorneys for Respondent Danielle Roper

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

Eugene Division

In re: the Application of:

OTHMANE MAHJOUBI,

       Petitioner,

  v.

DANIELLE KATHRYN ROPER,

       Respondent.

Case No.: 6:24-cv-01358-AA

ANSWER AND AFFIRMATIVE DEFENSES

---

The Convention on the Civil Aspects of International Child Abduction
Done at the Hague on 25 Oct 1980
International Child Abduction Remedies Act, 22 USC § 9001 *et seq.*

COMES NOW, Respondent Danielle Roper, by and through her attorneys of record, Katelyn D. Skinner and Katrina Seipel, and except as specifically admitted herein, denies each and every allegation alleged in the Verified Petition for Return of the Children to France, filed August 19, 2024. Using like-numbered paragraphs and responding only to paragraphs containing substantive allegations, Respondent answers as follows:

1.     Respondent admits that Petitioner filed a Petition for Return. Respondent can neither admit nor deny Petitioner's motivations in filing the Petition for Return.

Respondent admits that the children are physically present within the state of Oregon. Respondent denies that the children are being wrongfully retained from France. Respondent admits that Petitioner did not consent or acquiesce to the children remaining in Oregon indefinitely.

2.    Petitioner's allegations in paragraph 2 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

3.    Petitioner's allegations in paragraph 3 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

4.    Petitioner's allegations in paragraph 4 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

5.    Petitioner's allegations in paragraph 5 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

6.    Respondent can neither admit nor deny what Petitioner requests. Respondent admits that, prior to coming to the United States in the summer of 2024, France was the children's habitual residence.

7.    Respondent admits that this Court has jurisdiction pursuant to 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331.

8.      Respondent admits that Petitioner's stated venue is proper. Respondent denies the remaining allegations in paragraph 8 to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.  Respondent admits the children of the parties are under the age of 16.

9.      Respondent admits paragraph 9.

10.     Until arriving in the United States in the summer of 2024, Respondent admits the allegations contained in paragraph 10.  Respondent denies the remaining allegation(s).

11.     Respondent admits that Petitioner has rights of custody to the children. Respondent denies the remaining allegations in paragraph 11 to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

12.     Respondent can neither admit nor deny facts about Petitioner's life prior to Petitioner and Respondent meeting. Respondent admits that the parties met in New York in June 2008 and that they were in a romantic relationship. Respondent further admits that, to the best of her knowledge, Petitioner left New York in September 2008.

13.     Respondent admits that she and Petitioner reconnected in 2014. The remainder of facts in paragraph 13 are inaccurate and, therefore, denied.

14.     Respondent admits paragraph 14.

15.     Respondent admits paragraph 15.

16.    Respondent denies that France is currently the children's habitual residence. Respondent denies that the children lived in France since arriving in the United States in the summer of 2024.  Respondent admits the remainder of paragraph 16.

17.    Respondent admits that she continued her career while living in France. Respondent denies the remaining allegations in paragraph 17.

18.    Respondent admits that the parties planned to spend the summer of 2024 in the United States with Respondent's family. Respondent admits that she and the children came to the United States in June 2024, and that Petitioner joined them in July 2024. Respondent admits that the family spent time in Chicago and Florida before coming to Oregon in August 2024. Respondent denies a mutual intention to return to France on August 15, 2024. Respondent admits that Petitioner signed an authorization form permitting the children to be outside of France until August 30, 2024. Respondent can neither admit nor deny what Petitioner did and did not see.

19.    Respondent admits paragraph 19.

20.    Respondent admits that she filed a Petition for Unlimited Legal Separation, wherein she requests custody of the children, and had Petitioner served with it. Respondent can neither admit nor deny the remaining allegations in paragraph 20.

21.    Respondent can neither admit nor deny when Petitioner returned to France. Respondent denies that Petitioner did not *at any point* consent to the children being in Oregon.

22.    Petitioner's allegations in paragraph 22 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

23.    Respondent denies that the children's habitual residence is currently France. Respondent admits that, previously, the children were habitually resident in France. Respondent denies that her retention of the children in Oregon is wrongful. Respondent denies that her retention of the children in Oregon began on August 6, 2024.

24.    Respondent denies paragraph 24.

25.    Paragraph 25 is a legal conclusion that Respondent can neither admit nor deny.

26.    Respondent denies paragraph 26.

27.    Respondent denies paragraph 27.

28.    Respondent admits paragraph 28.

29.    Petitioner's allegations in paragraph 29 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

30.    Petitioner's allegations in paragraph 30 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

31.    Petitioner's allegations in paragraph 31 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

32.    Petitioner's allegations in paragraph 32 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and

the International Child Abduction Remedies Act require this Court to order the children returned to France.

33. Petitioner's allegations in paragraph 33 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

34. Respondent denies the legal citations and conclusions in paragraph 34 to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France. Respondent admits that Petitioner is the children's father. Respondent denies that Petitioner is the children's primary caretaker.

35. Respondent admits that AM was born in 2018 and will be 16 years old in 2034. Respondent denies the remainder of paragraph 35.

36. Respondent admits that RM was born in 2020 and will be 16 years old in 2036. Respondent denies the remainder of paragraph 36.

37. Respondent denies paragraph 37 to the extent it implies the parties and the children have only resided in France during the last 5 years.

38. Respondent can neither admit nor deny what Petitioner does and does not know.

39. Respondent admits that the children are currently located in Marion County, Oregon. Respondent denies the remaining allegations in paragraph 39.

40. Respondent admits that the children are 6 and 3 years old. Respondent denies the legal citations and conclusions in paragraph 40 to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France. Respondent admits

that Petitioner did not consent or acquiesce to the children remaining in Oregon indefinitely.

41.   Petitioner's allegations in paragraph 41 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

42.   Respondent admits that Petitioner is requesting what he states he is requesting. Respondent denies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

43.   Respondent can neither admit nor deny what Petitioner's and the children's interests are. Respondent denies that the children's habitual residence is currently France.

44.   Petitioner's allegations in paragraph 44 are legal citations and conclusions and, as such, are denied to the extent Petitioner implies that the Hague Convention and the International Child Abduction Remedies Act require this Court to order the children returned to France.

45.   Respondent admits that Petitioner is requesting what he states he is requesting.

46.   Respondent admits that Petitioner is requesting what he states he is requesting.

47.   Respondent can neither admit nor deny paragraph 47.

48.   Respondent denies that this Court should award Petitioner any fees or costs incurred by him in this matter. Respondent further denies that 22 U.S.C § 9007 requires such an award to Petitioner.

49.   Respondent can neither admit nor deny what Petitioner says he will provide the Court with.

50.    Respondent can neither admit nor deny what Petitioner will or will not do in this proceeding.

## AFFIRMATIVE DEFENSES

Respondent Danielle Roper requests that this Court exercise its discretion and decline to return the children to France pursuant to Article 13 of the Hague Convention on the Civil Aspects of International Child Abduction.  Respondent incorporates by reference all her assertions set forth above.

**1.    France is not the children's habitual residence.**

A. The children resided in France from the time of their birth until June 2024, when they travelled with Respondent to the United States. The children, with Petitioner and Respondent, arrived in Oregon on August 3, 2024. Petitioner consented to the children remaining in the United States and Oregon until August 30, 2024. When the children did not return to France on August 31, 2024, they were habitually resident in Oregon. See Exhibits 1 – 11.

**2.    AM has attained an age and degree of maturity at which it is appropriate to take account of his views, and he objects to being returned.**

A. AM is 6 years old, and he has a degree of maturity unlike most other 6-year-old children. See Exhibits 12, 13, and 14. AM has expressed not wanting to return to Paris and being fearful of returning to Petitioner's care. AM has disclosed multiple incidents of Petitioner striking and/or hitting him in the head, and he clearly articulates why such incidents cause him to not want to return to Petitioner in Paris.

**3.    There is a grave risk that the children's return would expose them to physical or psychological harm or otherwise place them in an intolerable situation.**

A.      As stated above, AM has disclosed multiple incidents of abuse and a fear of Petitioner. Similarly, Petitioner exerts extensive power over Respondent by way of manipulation, coercion, and control, to which both children have been directly exposed to. Returning the children to such an environment of abuse would place the children at grave risk of being exposed to and/or directly subject to both psychological and physical harm, or an otherwise intolerable situation. See Exhibits 15, 16, and 17.

WHEREFORE, Respondent prays this Court denies the relief as requested in the Petition, and asks for relief in accordance with this Answer and Affirmative Defenses, and such other relief as the Court deems equitable and just.

DATED: October 29, 2024

_____
Katrina Seipel, OSB #164793
Of Attorneys for Respondent

CERTIFICATE OF SERVICE

I certify that this document was served by electronic service through the CM/ECF system, and by e-mail upon counsel for Petitioner, Richard Min, to rmin@gkmrlaw.com, Michael Banuchis, to mbanuchis@gkmrlaw.com, Tammy Dentinger, to tdentinger@ghrlawyers.com, on this 29th day of October, 2024.

_____
Katrina Seipel, OSB # 164793
Of Attorneys for Respondent
kas@buckley-law.com



# Oregon
Tina Kotek, Governor

**Department of Transportation**
Driver and Motor Vehicle Services
1905 Lana Avenue NE
Salem, OR 97314
www.OregonDMV.com
(503) 945-5000

Letter ID

Date Issued

## Online Driver Pre-Application Checklist

**Confirmation Number:**  0-013-064-477                    **Submitted**    07-Aug-2024

Your Driver Pre-Application was successfully submitted. You applied for a **Real ID Driver's License**. Below is a checklist that will help you ensure that you bring everything you will need to complete your application at your local DMV.

You chose to bring the following documents:

| Proof of... | Document |
| --- | --- |
| Identity | |
| Residence Address | |
| Residence Address | |

Before you can receive your new license/permit/ID card, you will need to satisfy the following requirements:
- Pass a knowledge test
- Pass a drive test

Be sure to also bring the following items with you on your visit:
- Your corrective lenses (eyeglasses or contacts)
- Your current out of state license/permit/ID

EXHIBIT 1
Page 1 of 1

# RENTAL AGREEMENT

This Lease Agreement (this "Lease") is dated **August 1, 2024** by and between **Gary Grossen Properties, LLC** ("Landlord"), and **Danielle Kathryn Roper** ("Tenants"). Subject to the terms and conditions stated below the parties agree as follows:

**1. PREMISES.** Landlord, in consideration of the lease payments provided in this Lease, leases to Tenant the following: 3 bedroom home (single level) 2 baths with detached garage (the "Premises") located at **20845 Ernst St. NE | Donald, OR 97020**. No other portion of the building (hereinafter, the Building), wherein the Premises is located is included unless expressly provided for in this Agreement.

**2. TERM.** The lease term will begin on **August 1, 2024** ("Commencement Date") and shall continue as a month-to-month tenancy. Tenant may terminate the tenancy by giving Landlord written notice of at least 30 days prior to the desired termination date. Landlord may terminate the tenancy by giving written notice as provided by law.

Tenant shall vacate the Premises upon termination of the Agreement, unless: (i) Landlord and Tenant have extended this Agreement in writing or signed a new agreement; (ii) mandated by local rent control law; or (iii) Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month tenancy shall be created which either party may terminate as specified above. Rent shall be at a rate agreed to by Landlord and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full force and effect.

**3. MANAGEMENT.** The Tenant is hereby notified that Gary Grossen Properties, LLC is the property manager/ owner in charge of the Property. Should the tenant have any issues or concerns the Tenant may contact Gary Grossen Properties, LLC at PO Box 331| Donald, OR 97020, 503-807-1366. Other points of contacts: Jeanna Grossen 503-807-1368 or Yvette Carrazco 503-678-5525.

**4. RENT; LEASE PAYMENTS.** "Rent" shall mean all monetary obligations of Tenant to Landlord under the terms of this Agreement, except the Security Deposit.

    (a) Tenant shall pay to Landlord lease payments of **$1,800.00**, payable in advance on the **first day** of **each calendar month**, and is delinquent on the next day. Lease payments shall be made to Landlord at the address of Landlord noted in the Notices provision of this Lease which may be changed from time to time by Landlord.

    (b) Rent shall be paid by the following method(s):

        Cash
        Personal Check
        Money Order
        Cashier's Check

EXHIBIT 2
Page 1 of 10

If any payment is returned for non-sufficient funds or because Tenant stops payments, then, after that, (i) Landlord may, in writing, require Tenant to pay Rent in cash for three months and (ii) all future Rent shall be paid by money order or cashier's check.

**5. POSSESSION.** Tenant shall be entitled to possession on the first day of the term of this Lease, and shall yield possession to Landlord on the last day of the term of this Lease, unless otherwise agreed by both parties in writing. At the expiration of the term, Tenant shall remove its goods and effects and peaceably yield up the Premises to Landlord in as good a condition as when delivered to Tenant, ordinary wear and tear excepted.

**6. USE OF PREMISES/ABSENCES.** Tenant shall occupy and use the Premises as a full-time residential dwelling unit. Tenant shall notify Landlord of any anticipated extended absence from the Premises not later than the first day of the extended absence.

No retail, commercial or professional use of the Premises is allowed unless the Tenant receives prior written consent of the Landlord and such use conforms to applicable zoning laws. In such case, Landlord may require Tenant obtain liability insurance for the benefit of Landlord. Landlord reserves the right to refuse to consent to such use in its sole and absolute discretion.

The failure to abide by the provisions of this section shall constitute a material breach of this Agreement and is a just cause for eviction.

**7. OCCUPANTS.** No more than 6 person(s) may reside on the Premises unless the prior written consent of the Landlord is obtained.

This Lease and occupancy of the premises is binding, individually and severally, on each person(s) specifically named and who signs this Lease, regardless of the named person's occupancy of the Premises.

Authorized Tenants/Occupants (List names below):
Danielle Roper, A    M     and R    M

Tenant may have guests on the Premises for not over 14 consecutive days or 56 days in a calendar year, and no more than two guests per bedroom at any one time. Persons staying more than 14 consecutive days or more than 56 days in any calendar year shall NOT be considered original tenants of the Premises. Tenant must obtain the prior written approval of Landlord if an invitee of Tenant will be present at the Premises for more than 14 consecutive days or 56 days in a calendar year.

**8. FURNISHINGS.** The following furnishings or appliances will be provided by Landlord: stove, refrigerator, and dishwasher. Tenant shall return all such items at the end of the lease term in a condition as good as existed at the beginning of the lease term, normal wear and tear excepted.

EXHIBIT 2
Page 2 of 10

**9. DAMAGES.** Any damages to the following items of property located in or on the premises will result in a charge to the Tenant as indicated herein:

| Item | Charge |
|------|--------|
| Stove | $600.00 |
| Refrigerator | $1,000.00 |
| Dishwasher | $400.00 |

**10. PETS.** No pets, dogs, cats, birds, fish or other animals shall be allowed on the Premises, even temporarily or with a visiting guest, without prior written consent of Landlord. As required by law, Service Animal(s) are the only exception to this rule. Landlord's consent is also conditioned upon Tenant completing and signing Landlord's Pet Addendum which shall become part of this Agreement. If a pet has been in a Tenant's apartment or allowed into the building, even temporarily (with or without Landlord's permission) Tenant may be charged for cleaning, de-fleeing, deodorizing or shampooing any portion of the building or Premises at the discretion of Landlord.

Strays shall not be kept or fed in or about the Premises. Strays can be dangerous and Landlord must be notified immediately of any strays in or about the Premises

**11. KEYS.** Tenant will be given 2 key(s) to the Premises. If all keys are not returned to Landlord following termination of the Lease, Tenant shall be charged $25.00. Tenant is not permitted to change any lock or place additional locking devices on any door or window of the Premises without Landlord's approval prior to installation. If allowed, Tenant must provide Landlord with keys to any changed lock immediately upon installation.

**12. LOCKOUT.** If Tenant becomes locked out of the Premises, Tenant will be charged $25.00 to regain entry.

**13. SMOKING.** Smoking is not permitted inside the leased Premises. Smoking is authorized only in designated smoking areas specifically identified throughout the Property, including:

OUTSIDE ON THE STREET **(ONLY)**

The Tenant will be liable for any damages caused to the Premises or Property due to Tenant or Tenant's visitors or guests smoking in the Premises or Property.

**14. STORAGE.** Storage is permitted as follows: tenant shall be entitled to store items of personal property in shed during the term of this Lease. The right to storage space is included in the Rent charged pursuant to "Rent; Lease Payments." Tenant shall store only personal property Tenant owns, and shall not store property claimed by another or in which another has any right, title or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances. Landlord shall not be liable for loss of, or damage to, any stored items.

EXHIBIT 2
Page 3 of 10

**15. PARKING.** Parking is permitted as follows: tenant shall be entitled to use 2 parking space(s) for the parking of motor vehicle(s). The parking space(s) provided are identified as the driveway. The right to parking is included in the Rent charged pursuant to "Rent; Lease Payments." Parking space(s) are to be used for parking properly licensed and operable motor vehicles, except for trailers, boats, campers, buses or trucks. Tenant shall park in assigned space(s) only. Parking space(s) shall be kept clean at all times. Vehicles leaking oil, gas, or other motor vehicle fluids shall not be parked on the Premises. Mechanical work or storage of inoperable vehicles is not permitted in parking space(s) or elsewhere on the Premises.

**16. MAINTENANCE.** Landlord shall have the responsibility to maintain the Premises in reasonably good repair at all times and perform all repairs reasonably necessary to satisfy any implied warranty of habitability except that Tenant will be responsible for: landscaping and keeping outside area clean and free of garbage/debris, as well as keeping the sidewalks free of snow and ice. Laminate wood floors must be dry mop as per manufacture floor instructions left at the home.

Except in an emergency, all maintenance and repair requests must be made in writing and delivered to Landlord or its Agent. A repair request will be deemed permission for the Landlord or its Agent to enter the Premises to perform such maintenance or repairs in accordance with ACCESS BY LANDLORD TO PREMISES herein unless otherwise specifically requested, in writing, by Tenant. Tenant may not place any unreasonable restrictions upon Landlords or Landlord's Agents access or entry. Landlord shall have expectation that the Premises is in a safe and habitable condition upon entry.

**17. UTILITIES AND SERVICES.** Tenant shall be responsible for all utilities and services incurred in connection with the Premises.

> GARBAGE
> ELECTRICTY
> WATER AND SEWER
> GAS
> HEATING
> TELEPHONE SERVICES
> CABLE
> INTERNET

Tenant acknowledges that Landlord has fully explained to Tenant the utility rates, charges and services for which Tenant will be required to pay (if any), other than those to be paid directly to the utility company furnishing the service.

**18. PROPERTY INSURANCE.** Tenant shall each be responsible to maintain appropriate insurance for their respective interests in the Premises and property located on the Premises. The Tenant agrees to obtain renter's insurance at his own expense and with adequate coverage for the duration of the lease agreement. The Tenant acknowledges and agrees that in the event that he does not have renter's insurance or if his policy provides insufficient coverage, then the Tenant

EXHIBIT 2
Page 4 of 10

shall be personally liable to all damages and losses that would normally be covered under a renter's insurance policy.

**19. OTHER.** Smoke alarms and carbon monoxide detector batteries need to be check/switch twice a year.

**20. NON-SUFFICIENT FUNDS.** Tenant shall be charged **$75.00** as reimbursement of the expenses incurred by Landlord for each check that is returned to Landlord for lack of sufficient funds. In addition, a check returned due to insufficient funds will be subject to any and all Late Payments provisions included in this lease. All charges will be immediately due from Tenant and failure to make immediate payment will constitute a default under the terms of this Lease.

Landlord reserves the right to demand future payments by cashier's check, money order or certified funds on all future payments in the event of a check returned for insufficient funds. Nothing in this paragraph limits other remedies available to the Landlord as a payee of a dishonored check. Landlord and Tenant agree that three returned checks in any twelve-month period constitutes frequent return of checks due to insufficient funds and may be considered a just cause for eviction.

**21. LATE PAYMENTS.** For any payment that is not paid within 4 days after its due date, Tenant shall pay a late fee of **$75.00**.

**22. DEFAULTS.** Tenant shall be in default of this Lease if Tenant fails to fulfill any lease obligation or term by which Tenant is bound. Subject to any governing provisions of law to the contrary, if Tenant fails to cure any financial obligation within 4 days (or any other obligation within 10 days) after written notice of such default is provided by Landlord to Tenant, Landlord may elect to cure such default and the cost of such action shall be added to Tenant's financial obligations under this Lease, including reasonable attorneys' fees. All sums of money or charges required to be paid by Tenant under this Lease shall be additional rent, whether or not such sums or charges are designated as "additional rent". The rights provided by this paragraph are cumulative in nature and are in addition to any other rights afforded by law.

**23. TERMINATION UPON SALE OF PREMISES.** Notwithstanding any other provision of this Lease, Landlord may terminate this lease upon 30 days' (and if other conditions are met as required by Oregon law) written notice to Tenant that the Premises have been sold.

**24. MILITARY TERMINATION CLAUSE.** In the event the Tenant is, or hereafter becomes, a member of the United States Armed Forces on extended active duty and hereafter the Tenant receives permanent change of station orders to depart from the area where the Premises are located; is relieved from active duty, retires or separates from the military; or is ordered into military housing, the Tenant may terminate this lease upon giving thirty (30) days' written notice to the Landlord. The Tenant shall also provide to the Landlord a copy of the official orders or a letter signed by the Tenant's commanding officer reflecting the change that warrants termination under this clause. The Tenant will pay prorated rent for any days he or she occupies the dwelling past the first day of the month. Any security deposit will be promptly returned to the Tenant, provided there are no damages to the Premises.

EXHIBIT 2
Page 5 of 10

**25. HABITABILITY.** Tenant has inspected the Premises and fixtures (or has had the Premises inspected on behalf of Tenant), and acknowledges that the Premises are in a reasonable and acceptable condition of habitability for their intended use, and the agreed lease payments are fair and reasonable. If the condition changes so that, in Tenant's opinion, the habitability and rental value of the Premises are adversely affected, Tenant shall promptly provide reasonable notice to Landlord.

**26. CUMULATIVE RIGHTS.** The rights of the parties under this Lease are cumulative, and shall not be construed as exclusive unless otherwise required by law.

**27. REMODELING OR STRUCTURAL IMPROVEMENTS.** Tenant shall be allowed to conduct construction or remodeling (at Tenant's expense) only with the prior written consent of the Landlord which shall not be unreasonably withheld. At the end of the lease term, Tenant shall be entitled to remove (or at the request of Landlord shall remove) any such fixtures, and shall restore the Premises to substantially the same condition that existed at the commencement of this Lease.

**28. ACCESS BY LANDLORD TO PREMISES.** Subject to Tenant's consent (which shall not be unreasonably withheld), Landlord shall have the right to enter the Premises to make inspections, provide necessary services, or show the unit to prospective buyers, mortgagees, tenants or workers. Landlord will provide reasonable notice of its intention to enter the Premises. If Tenant has, after written notice to cease, continued to deny Landlord access to the unit, as required by State law, such failure is a substantial breach of this agreement and is a just cause for eviction. However, Landlord does not assume any liability for the care or supervision of the Premises. As provided by law, in the case of an emergency, Landlord may enter the Premises without Tenant's consent. During the last three months of this Lease, or any extension of this Lease, Landlord shall be allowed to display the usual "To Let" signs and show the Premises to prospective tenants.

**29. INDEMNITY REGARDING USE OF PREMISES.** To the extent permitted by law, Tenant agrees to indemnify, hold harmless, and defend Landlord from and against any and all losses, claims, liabilities, and expenses, including reasonable attorney fees, if any, which Landlord may suffer or incur in connection with Tenant's possession, use or misuse of the Premises, except Landlord's act or negligence. Tenant hereby expressly releases Landlord and/or Agent from any and all liability for loss or damage to Tenant's property or effects whether in the Premises, garage, storerooms or any other location in or about the Premises, arising out of any cause whatsoever, including but not limited to rain, plumbing leakage, fire or theft, except in the case that such damage has been adjudged to be the result of the gross negligence of Landlord, Landlord's employees, heirs, successors, assignees and/or Agents.

**30. ACCOMMODATION.** Landlord agrees to and is committed to complying with all applicable laws providing equal housing opportunities. To ensure compliance, Landlord will make reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or a tenant, unless undue hardship would result. It is the applicant or tenant's responsibility to make Landlord aware of any required

EXHIBIT 2
Page 6 of 10

accommodation. In writing, the individual with the disability should specify the nature and effect of the disability and any accommodation he or she needs. If after thoughtful consideration and evaluation, the accommodation is reasonable and will not impose an undue hardship, Landlord will make the accommodation. Landlord reserves the right to require appropriate medical verification of the disability.

**31. DANGEROUS MATERIALS.** Tenant shall not keep or have on the Premises any article or thing of a dangerous, flammable, or explosive character that might substantially increase the danger of fire on the Premises, or that might be considered hazardous by a responsible insurance company, unless the prior written consent of Landlord is obtained and proof of adequate insurance protection is provided by Tenant to Landlord.

**32. COMPLIANCE WITH REGULATIONS.** Tenant shall promptly comply with all laws, ordinances, requirements and regulations of the federal, state, county, municipal and other authorities, and the fire insurance underwriters. However, Tenant shall not by this provision be required to make alterations to the exterior of the building or alterations of a structural nature.

**33. MECHANICS LIENS.** Neither Tenant nor anyone claiming through the Tenant shall have the right to file mechanics liens or any other kind of lien on the Premises and the filing of this Lease constitute notice that such liens are invalid. Further, Tenant agrees to (1) give actual advance notice to any contractors, subcontractors or suppliers of goods, labor, or services that such liens will not be valid, and (2) take whatever additional steps that are necessary in order to keep the premises free of all liens resulting from construction done by or for the Tenant.

**34. SUBORDINATION OF LEASE.** This Lease is subordinate to any mortgage that now exists, or may be given later by Landlord, with respect to the Premises.

**35. ASSIGNABILITY/SUBLETTING.** Tenant may not assign or sublease any interest in the Premises, nor assign, mortgage or pledge this Lease. This is a blanket prohibition, meaning no replacement tenant(s) will be permitted and no additional tenant or occupant will be allowed in the Premises even if a Tenant leaves the Premises. This prohibition applies to each and every term of this Lease in regard to space leased to Tenant. Any waiver of this prohibition must be secured from the Landlord in writing, and the consent of which Landlord may withhold in its sole and absolute discretion. In the event the prohibition is invalidated or lifted, Tenant, Landlord and any subtenant or assignee agrees to be bound by each and every provision contained in this Lease.

**36. NOTICE.** Notices under this Lease shall not be deemed valid unless given or served in writing and forwarded by mail, postage prepaid, addressed to the party at the appropriate address set forth below. Such addresses may be changed from time to time by either party by providing notice as set forth below. Notices mailed in accordance with these provisions shall be deemed received on the third day after posting.

EXHIBIT 2
Page 7 of 10

**LANDLORD:**

Gary Grossen Properties, LLC
PO Box 331
Donald, OR 97020

**TENANT:**

Name:      Danielle Kathryn Roper
Address:   PO Box 706
           Donald, OR 97020

Such addresses may be changed from time to time by either party by providing notice as set forth above.

**37. GOVERNING LAW.** This Lease shall be construed in accordance with the laws of the State of Oregon.

**38. ENTIRE AGREEMENT/AMENDMENT.** This Lease contains the entire agreement of the parties and there are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Lease. This Lease may be modified or amended in writing, if the writing is signed by the party obligated under the amendment.

**39. SEVERABILITY; WAIVER.** If any portion of this Lease shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Lease is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited. The failure of either party to enforce any provisions of this Lease shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Lease.

**40. TIME OF ESSENCE.** Time is of the essence with respect to the execution of this Lease.

**41. ESTOPPEL CERTIFICATE.** Tenant shall execute and return a tenant estoppel certificate delivered to Tenant by Landlord or Landlord's agent within 3 days after its receipt. Failure to comply with this requirement shall be deemed Tenant's acknowledgment that the estoppel certificate is true and correct, and may be relied upon by a lender or purchaser.

**42. TENANT REPRESENTATION; CREDIT.** Tenant represents and warrants that all statements in Tenant's rental application are accurate. Tenant authorizes Landlord and any broker to obtain Tenant's credit report periodically during the tenancy in connection with the modification or enforcement of this Lease. Landlord may cancel this Lease (i) before occupancy begins, (ii) upon disapproval of the credit report(s), or (iii) at any time, upon discovering that information in Tenant's application is false.

**43. BINDING EFFECT.** The provisions of this Lease shall be binding upon and inure to the benefit of both parties and their respective legal representatives, successors and assigns.

EXHIBIT 2
Page 8 of 10

**44. DISPUTE RESOLUTION.** The parties will attempt to resolve any dispute arising out of or relating to this Agreement through friendly negotiations amongst the parties. If the matter is not resolved by negotiation, the parties will resolve the dispute using the below Alternative Dispute Resolution (ADR) procedure.

Any controversies or disputes arising out of or relating to this Agreement will be submitted to mediation in accordance with any statutory rules of mediation. If mediation is not successful in resolving the entire dispute or is unavailable, any outstanding issues will be submitted to final and binding arbitration under the rules of the American Arbitration Association. The arbitrator's award will be final, and judgment may be entered upon it by any court having proper jurisdiction.

**LANDLORD:**
Gary Grossen Properties, LLC


Property Manager/ Owner

**TENANT:**


Signature:
Print Name:     Danielle Kathryn Roper

EXHIBIT 2
Page 9 of 10

# RESIDENTIAL LEASE
## INSPECTION CHECKLIST

Tenant has inspected the Premises and states that the Premises are in satisfactory condition, free of defects, except as noted below:

Codes:  A=Acceptable D=Deficiency (specify) M=Missing N/A=Not Applicable

|  | SATISFACTORY | COMMENTS |  | SATISFACTORY | COMMENTS |
|---|---|---|---|---|---|
| Bathrooms | _____ | _____ | Cabinets | _____ | _____ |
| Carpeting | _____ | _____ | BTH Sink | _____ | _____ |
| Ceilings | _____ | _____ | Sink/Vanity | _____ | _____ |
| Closets | _____ | _____ | Toilets | _____ | _____ |
| Countertops | _____ | _____ | Tub/Shower | _____ | _____ |
| Dishwasher | _____ | _____ | Mirrors | _____ | _____ |
| Disposal | _____ | _____ | Plumbing | _____ | _____ |
| Doors | _____ | _____ | Heating | _____ | _____ |
| Wood/Linoleum | _____ | _____ | Electricity | _____ | _____ |
| Lights Fixtures/Bulbs | _____ | _____ | Hot water | _____ | _____ |
| Knobs/ Locks | _____ | _____ | Floors | _____ | _____ |
| Refrigerator | _____ | _____ |  |  |  |
| Screens | _____ | _____ |  | COMMENTS |  |
| Stove | _____ | _____ |  |  |  |
| Walls | _____ | _____ |  | _____ |  |
| Windows | _____ | _____ |  | _____ |  |
| Shades | _____ | _____ |  | _____ |  |
| Electrical Outlets | _____ | _____ |  | _____ |  |

COMMENTS

_____

_____

_____

_____

**Tenant:**

Signature: _____

Print Name: _____        Date _____

**Acknowledged by Landlord:**

_____        Date _____

Gary Grossen, Property Manager/Owner

PAGE | 10

EXHIBIT 2
Page 10 of 10



```
CS0025P                          N. MARION REC. & DISPOSAL                        7/30/24      Page:    1
User: L3KAMBRIA                     Customer Profile                             15:47:32    Dataset: L3

Customer#: 02-2002126 5  Start: 7/30/24  Stop: 0/00/00   MthChg:      38.00   Bal Due:      8.77-  SalesID:
==============  Service Info  ==============            ==============  Billing Info  ==============
Name....1....: DANIELLE ROPER                          Name.........: DANIELLE ROPER
Address 1....: 20845 ERNST ST NE                       Address 1....: 15080 PARK AVE NE
Address 2....:                                         Address 2....:
City/St/Zip..: DONALD, OR 97020                        City/St/Zip..: AURORA, OR 97002
Tax Body.....: DONALD        Fee Code:                 Country......:
Contact......:
Phone 1......: 971 405-9693 D                          Price List...: DONA          Cycle........: D2
Phone 2......: 515 231-9342 C                          Credit Limit:                Available....:
WO Route.....: NM2                                     Bal Fwd......:        .00    Cur Pmts.....:        .00
Deposit Amt:         .00                               Cur Chgs.....:      8.77-    Pending Pmts:     76.00

Special Instructions: 1)                                           2)
                      3)                                           4)

Vars: 1) **NOT USED**      2) **NOT USED**      3) **NOT USED**      4) **NOT USED**

Services:                  Mon          Tue          Wed          Thu          Fri          Sat          Sun
Tp Res  Qty Sz/Cg Serial#  Dly Date Rte/Fq/Seq# Rte/Fq/Seq# Rte/Fq/Seq# Rte/Fq/Seq# Rte/Fq/Seq# Rte/Fq/Seq# Rte/Fq/Seq# MiscChgs Pr   Monthly$
 Y      1   35 RE          7/30/24              NM2                                                                                    38.00
 Y      1   95 RR          7/30/24              RC2                                                                                        .00

Work Orders:    W/O#    Date    Description                   Route    Vehl    Drvr    Status  WOType  Serial#
          No Open or Inv-Pending W/O's for this Customer

A/R History:  Inv/Chk#    Trans Date  Description             Type        Amount          Bal Due
              000000000   7/30/24     PRORATE                   R          8.77-           8.77-

NotePad:    Note Date  Note Time  Code   Note                                    Date Added   Time Added   Added By
            7/30/24    8:29:00    NOTE   NM2, 35 R-Y, $76, ONLINE REQUEST IN CUST DOCS  7/30/24    8:29:28    L3CRISTIE
```

EXHIBIT 4
Page 1 of 1

7/29/24, 9:48 PM                                    RoperWeb Mail - PGE - Start Service Confirmation

                                                    Danielle Roper <danielle@roperweb.com>

---

**PGE - Start Service Confirmation**

---

**Portland General Electric NoReply@PortlandGeneral.com** <customer.service@pgn.com>    Mon, Jul 29, 2024 at 7:01 PM
To: danielle@roperweb.com

# Start Service Confirmation



Your request to start electric service has been processed by PGE.

Start Date:
**07/29/2024**

Address:
**20845 Ernst St NE
Donald, OR 97020**

You can now use PGE's online services to make payments, view your bill and sign up for convenient options such as paperless bills. To access your account online, sign in with your email address and password at:
https://portlandgeneral.com

If you have questions, you can reply to this email. To change or cancel this request, please call us at 800-542-8818 between 7 a.m. and 7 p.m., Monday through Friday.

Thank you,
**PGE Customer Service**

This email was sent by: Portland General Electric
121 S.W. Salmon St. Portland, OR, 97204

Privacy Policy | Update your email address

EXHIBIT 4
Page 1 of 1



# CITY OF DONALD

**10710 Main Street N.E. • P.O. Box 388 • Donald, OR 97020-0388**
Phone 503-678-5543 • Fax 503-678-2750
www.DonaldOregon.gov
Emergency pager for Water and Sewer: 503-301-6479

## APPLICATION FOR WATER AND SEWER SERVICE

**Please allow 24 business hours for new Water & Sewer connections.**
Public Works hours are Monday through Friday, 7 am to 3 pm.

Billing Name(s): DANIELLE ROPER

Connection Date: 7/30/2024

Service Address: 20845 Ernst St NE, Donald, OR 97020

Connection Time: 4:00    AM / ✔

Mailing Address: 15080 Park Ave NE, Aurora, OR 97002

Cell: 971-405-9693     Cell: _____     Email: danielle@roperweb.com

| Rental housing?  Yes / No | If Yes, **Property Owner's Information** |
|---|---|
| Name: GARY GROSSEN PROPERTIE! | Would you like copies of late/shut-off notices? YES |
| Phone Number: 503-678-5525 | Cell Number: |
| Mailing Address: PO Box 331, Donald, OR | Email Address: |

As a condition of the City providing water and sewer service, I hereby agree to a lien on the above real property for any delinquent charges or assessments. In the case of a rental property, as the property owners, I hereby agree to assume responsibility for and pay to the City any unpaid water and/or sewer charges from each tenant prior to the City turning the water on for a succeeding tenant.

**Property Owner's Signature:** _Gary Grossen_     **Date:** 7/30/2024

### Water and Sewer Department Rules:

A $50.00 account set-up/hookup fee shall be charged to all new accounts, regardless of whether or not the water has been physically turned on/off. A full list of the charges and fees associated with water and sewer is available at City Hall or on the City's website at www.DonaldOregon.gov.

All bills for water and sewer service are due and payable by the 15th of each month. On the 16th, a 48 hour Shut Off door tag will be issued for a balance 45 days past due. Water service may be disconnected for non-payment and a fee applied. A late fee of $5.00 will be applied on the morning of the 21st for accounts with an outstanding balance.

Unless authorized by the City of Donald or its appointed representative, no person shall tap, change, obstruct or damage the City water and sewer mains, or any part of the City water and sewer systems, or make any alterations in the conduit, pipe or other fixtures connected therewith, between the water meter and/or holding tank and the mains.

THE UNDERSIGNED HEREBY AGREES TO COMPLY WITH THE WATER AND SEWER RULES AND REGULATIONS AS DEFINED BY CITY ORDINANCE.

**Applicant's Signature:** _____     **Date:** 7/30/2024

Office Use Only:

Account # _____     Date Setup Fee Paid: _____     Date Disconnected: _____

EXHIBIT 5
Page 1 of 1



**Emily Brems, LMFT**

**Living Well counseling Center**

**10580 SW McDonald St. Suite 102, 202**

**Tigard, OR 97224**

**971-242-4155**

**admin@livingwell-counselingcenter.com**

Informed Consent for Psychotherapy

General Information

The therapeutic relationship is unique in that it is a highly personal and at the same time, a contractual agreement. Given this, it is important for us to reach a clear understanding about how our relationship will work, and what each of us can expect. This consent will provide a clear framework for our work together. Feel free to discuss any of this with me. Please read and indicate that you have reviewed this information and agree to it by filling in the checkbox at the end of this document.

The Therapeutic Process

You have taken a very positive step by deciding to seek therapy. The outcome of your treatment depends largely on your willingness to engage in this process, which may, at times, result in considerable discomfort. Remembering unpleasant events and becoming aware of feelings attached to those events can bring on strong feelings of anger, depression, anxiety, etc. There are no miracle cures. I cannot promise that your behavior or circumstance will change. I can promise to support you and do my very best to understand you and repeating patterns, as well as to help you clarify what it is that you want for yourself.

Confidentiality

The session content and all relevant materials to the client's treatment will be held confidential unless the client requests in writing to have all or portions of such content released to a specifically named person/persons. Limitations of such client held privilege of confidentiality exist and are itemized below:

1. If a client threatens or attempts to commit suicide or otherwise conducts him/her self in a manner in which there is a substantial risk of incurring serious bodily harm.

2. If a client threatens grave bodily harm or death to another person.

3. If the therapist has a reasonable suspicion that a client or other named victim is the perpetrator, observer of, or actual victim of physical, emotional or sexual abuse of children under the age of 18 years.

4. Suspicions as stated above in the case of an elderly person who may be subjected to these abuses.

5. Suspected neglect of the parties named in items #3 and # 4.

6. If a court of law issues a legitimate subpoena for information stated on the subpoena.

Alannah Purdie License AMFT #R9239 Living Well Counseling Center 10580 SW McDonald St. Suite 202 Portland,     Page 1 of 2
OR 97224-4800 (971) 242-4155

EXHIBIT 6
Page 1 of 2

7. If a client is in therapy or being treated by order of a court of law, or if information is obtained for the purpose of rendering an expert's report to an attorney.

Occasionally I may need to consult with other professionals in their areas of expertise in order to provide the best treatment for you. Information about you may be shared in this context without using your name.

If we see each other accidentally outside of the therapy office, I will not acknowledge you first. Your right to privacy and confidentiality is of the utmost importance to me, and I do not wish to jeopardize your privacy. However, if you acknowledge me first, I will be more than happy to speak briefly with you, but feel it appropriate not to engage in any lengthy discussions in public or outside of the therapy office.

BY CLICKING ON THE CHECKBOX BELOW I AM AGREEING THAT I HAVE READ, UNDERSTOOD AND AGREE TO THE ITEMS CONTAINED IN THIS DOCUMENT.

**Parent**

*Danielle Roper*

Signed by Danielle Roper
August 16, 2024 at 3:32 pm

IP address: 216.243.12.51

EXHIBIT 6
Page 2 of 2



**Danielle Roper <danielle@roperweb.com>**

## North Marion School District -- Submission Confirmation

**PowerSchool Enrollment** <noreplyenrollment@powerschool.com>                    Thu, Aug 15, 2024 at 1:23 AM
To: danielle@roperweb.com

# Submission Confirmation

Dear Danielle Roper,

The Registration for *A⬜* has been submitted to North Marion School District.

Should you wish to view or print a copy of the submitted information, click here and sign in using your email address and password.

The PowerSchool Registration Support Team

EXHIBIT 7
Page 1 of 1

10/28/24, 5:04 PM                     RoperWeb Mail - North Marion School District -- Submission Confirmation

 Gmail

**Danielle Roper <danielle@roperweb.com>**

## North Marion School District -- Submission Confirmation

**PowerSchool Enrollment** <noreplyenrollment@powerschool.com>          Thu, Aug 15, 2024 at 6:32 PM
To: danielle@roperweb.com

# Submission Confirmation

Dear Danielle Roper,

The Registration for *R* has been submitted to North Marion School District.

Should you wish to view or print a copy of the submitted information, click here and sign in using your email address and password.

The PowerSchool Registration Support Team

EXHIBIT 8
Page 1 of 1

# venmo



**You** paid **Ta Adams Keller**

A⬛⬛ and R⬛ M⬛⬛⬛ - August tuition

Transfer Date and Amount:

Aug 13, 2024 PDT · 🔒  - $784.00

**Like**     **Comment**

Completed via a bank transfer from your CAPITAL ONE N.A. account ending in 0246.

Payment ID: 4133987383686850550

**Invite Friends!**

For any issues, including the recipient not receiving funds, contact us at our Help Center at help.venmo.com or call 1-855-812-4430.

EXHIBIT 9
Page 1 of 1

**Family:** Danielle Roper
**Family Phone:** 9177034751
**Family Email:** Danielle@roperweb.com

**Jewart's Gymnastics NorthWest**
9750 SW Wilsonville Rd
Suite 330
Wilsonville, OR 97070
503-482-5776
Jewartsgymnasticsnw.com

## Purchases

| Description | Price | Paid |
|---|---|---|
| Registration Fee :: M▒▒▒ , R▒▒▒ | $50.00 | $50.00 |

## Payment

| Date | Transaction | Approval Code | Paid |
|---|---|---|---|
| 08/18/2024 | Credit Card American Express (5004) | 221110 | $50.00 |

| | | |
|---|---|---|
| Paid Charges: | $50.00 |
| **Total Payments:** | **$50.00** |

**Customer Copy**

EXHIBIT 10
Page 1 of 1

10/28/24, 4:57 PM                                   RoperWeb Mail - Thank you for signing up for soccer

 Gmail                                    **Danielle Roper <danielle@roperweb.com>**

## Thank you for signing up for soccer

**SportsEngine** <goplay@se.sportsengine.com>                              Fri, Aug 16, 2024 at 6:03 PM
Reply-To: SportsEngine <reply-febd17767d63037e-20_HTML-138216658-7318003-1868@se.sportsengine.com>
To: danielle@roperweb.com



# Hi Danielle,
You've successfully registered A▮▮▮ to play soccer with North
Marion Youth Athletics this season. Now, let's get them ready to
play while you wait to hear back from the team.

 **NOTE:** If you are on a waitlist, you have not been removed. North Marion
Youth Athletics will reach out to you directly regarding your status
this season.



EXHIBIT 11
Page 1 of 5

Plan for tomorrow, today. As part of our squad, you get access to exclusive content from the Premier League. We teamed up to highlight their stars so the next generation of youth athletes can learn from the best.





## Here's what to do:

1) Take a photo of your team or record yourself showing off your soccer skills

EXHIBIT 11
Page 2 of 5

2) Post it to social media with #MyPLMorning and tag us:

 @NBCSportsSoccer    @SportsEngine
@NBCSportsSoccer

3) Tune in to Premier League Mornings every weekend



## Soccer 101: Rules of Play

Get up to speed on the basics of the game with these helpful tips.

**Read more >**

EXHIBIT 11
Page 3 of 5

10/28/24, 4:57 PM                                    RoperWeb Mail - Thank you for signing up for soccer





## Soccer 101: Terms to Know

Make sure you can talk the talk with this handy guide.

Read more >

## Soccer 101: Dress to Play

Get in gear with tips to make sure your athlete is dressed for success.

Read more >

See more articles



EXHIBIT 11
Page 4 of 5



## More ways to improve your sports life

SportsEngine.com is the Home of Youth Sports™ and your go-to place for training videos, new and used gear, expert advice, sports sign ups, and more.



Keep an eye on your inbox for more helpful tips to get ready for your Soccer season.



### sportsengine

807 Broadway Street Suite 300
Minneapolis, MN 55413

View email in browser.

This email was sent to danielle@roperweb.com because you signed A___ up for Soccer with North Marion Youth Athletics using SportsEngine. The contents of this email are wholly owned by NBC Sports NEXT and not affiliated with North Marion Youth Athletics.

To opt-out of this series of emails, click here or you can unsubscribe from all of SportsEngine communications

EXHIBIT 11
Page 5 of 5



**_Lee's Martial Arts Academy_**
8263 SW Wilsonville Road, Suite A
Wilsonville, OR 97070
(503) 682-2318
LMAA.Wilsonville@gmail.com
www.LeesMartialArtsAcademy.com

October 23, 2024

To Whom it may concern,

My name is C. Y. Lee, head instructor at Lee's Martial Arts Academy. I have been teaching Taekwondo and Hapkido for over 30 years and hold 6th Degree Black Belt from World Taekwondo Federation in both Taekwondo and Hapkido. I graduated from Yong-In University in South Korea with degree in Combative Martial Arts and have taught and led teams in both the Korean military and national martial arts programs.

At Lee's Martial Arts Academy, I teach children and adults the important values of respect, self-discipline, self-control, perseverance, integrity, and confidence. These are the core principles of Taekwondo. Through practicing martial arts, students learn how to show respect, focus on their goals, make good choices, and have control in their actions. This is the environment that we promote at our academy, to have healthy mind and positive attitudes.

A___ M_____ has been attending our Taekwondo training for almost two months. In that time, we have observed and witnessed his growth in following instructions, paying attention, having respectful and positive attitude towards peers and instructors. Whether if we are having group activities or individual drills, A___ is ready to engage with full focus and enthusiasm. His friendly charm is welcomed by many peers and instructors

In my experience, martial arts help children like A___ develop the maturity needed to manage their emotions, stay focused on their goals, and show respect in all aspects of life. I believe these skills are important for children's personal growth and foundation.

Please feel free to contact me if you need more information.

Sincerely,

Grand Master C. Y. Lee

_Lee's Martial Arts Academy_
_Wilsonville, OR since 2005_

EXHIBIT 12
Page 1 of 1

A___ M
Parent–Teacher Conference Notes
Mrs. Robles' First Grade Class, Fall 2024

Overall, A___ is doing a wonderful job at North Marion. He has settled into the new school environment and shares often that he loves school. He has made outstanding progress in the seven weeks we have been in school. I have seen positive social, emotional, behavioral and academic growth. A___ has already learned so much about the rules and routines at our school and in our classroom. He has made many friends and is an active class participant. A___ loves to share his background knowledge around topics we are discussing. I am looking forward to supporting A___ and watching his continued progress in the areas of classroom behavior, social interactions, and academics.

**Classroom Behavior**

| Initial | Current |
|---|---|
| • Happy to be at school. | • Continues to be happy at school, expresses that he loves NM. |
| • Ready to take on new tasks. | • Continues to show interest in new things in the classroom and reminds the teacher of upcoming things he is looking forward to. |
| • Wanders around the room at times he is expected to be at his desk or on carpet with the class.. | • Remains in expected spot throughout most of the day. A___ does occasionally leave the carpet area to sit at his desk or get water his bottle out of his backpack without teacher permission. |
| • Repeated reminders needed for on-task behaviors. | • Very few reminders needed to maintain on-task behavior. The most off task behavior is chatting with a friend during teacher instruction time. (He is friendly and social). A___ is working to control blurting out prior to raising his hand. |
| • Curious. Sometimes getting into places and things without permission or that do not belong to him. | • A___ has not been into teacher things and supplies in the classroom without permission since the first couple weeks of school. Now uses curiosity during learning and play time. |
| • Voice level high in comparison to peers. | • A___ no longer needs solo reminders about voice level. He understands that there is a difference between inside and outside voices. |
| • Loves to please the teacher by being helpful. | • Positive praise is a big motivator for A___. Continues to help the teacher when asked. |

EXHIBIT 13
Page 1 of 3

**Social Behavior**

| Initial | Current |
|---|---|
| • *Friendly and kind spirit.* | • A___ continues to have a friendly spirit. Other students are naturally drawn to him with his friendly, fun and playful energy. |
| • *A___ shows kindness and is helpful towards others.* | • Kind and caring continue to be words that describe A___. He is empathetic and always willing to lend a hand. |
| • *Interested in peer interactions* | • A___ initiates peer interactions when looking for a playmate at recess or partner to do assigned work within the classroom. |
| • *Pushes and shoves to obtain space in line, at recess and at carpet time.* | • A___ has learned that pushing and shoving is not safe or kind. I have seen him initiating conflict resolution (Kelso's Choices) strategies to solve minor problems while lining up and while moving around the room. |
| • *Places body and hands-on peers without permission. (Tapping, wrapping arms around, leaning on, laying over others legs)* | • The unwanted body and hands-on behavior is no longer being reported by classmates. |
| • *Unsure how to resolve conflict with peers.* | • A___ quickly learned the rules to be safe, respectful and responsible at NM. He understands the Kelso's Choices wheel and uses these strategies. He is also requesting adult help when necessary. |
| • *Loses temper. yells and screams to obtain attention or to stop a classmate's behavior that he does not like. (Classmates had been scared by the angry yelling)* | • After a couple one-on-one teacher/A___ talks and a call home, A___ has not used yelling/screaming at classmates to obtain what he wants. I believe that when we let him know that this behavior scared his classmates, he understood and felt sad that he had caused others to feel that way. A___ has used Kelso's choices and requests teacher help rather than yelling/screaming. |
| • *A___ reaches out to meet and interact with kids from other classrooms.* | • A___ knows more students in other classrooms than even I do. He meets kids at recess, on the bus, and in the cafeteria. All friends no matter their homeroom are important to A___ |
| • *Active participant at recess, PE & music.* | • A___ is active in classes outside the homeroom. He is now active and excited about Walk-to-Read that recently began. |

EXHIBIT 13
Page 2 of 3

**Academics**

| Initial | |
|---|---|
| • *Slow to start.* | • A⬛ has become a leader in completing assignments. If he does not finish a task, he will ask at what time will he be permitted to finish it. |
| • *Hesitant and unsure of what is expected.* | • It is clear that A⬛ has picked up our routine. He understands how to get learning tools, where to find his supplies and how to organize his own space. He advocates for himself by asking questions and by observing classmates when he is unsure. |
| • *At times, did not listen fully to instructions.* | • Listening carefully to all instructions continues to be an area to grow. As many young ones do, A⬛ is eager to start and gets going without hearing all of the directions. |
| • *Short attention span for a task that takes focus and concentration.* | • A⬛'s attention and concentration are now similar to the average student in our class. |
| • *Body moves, rolls and lays during instruction time.* | • A⬛ still lays occasionally on the rug during instruction. He no longer rolls or gets too close to classmates. He is generally sitting when all are asked to sit and does manage his wiggles much better. He is building stamina. |
| • *Struggled with patiently waiting for help.* | • A⬛ does like to be heard and communicates his needs well. It is sometimes difficult to wait for the teacher's help. When it takes too long, A⬛ occasionally gets involved in off-task (although usually playful) behavior. |
| • *Identified as needing extra reading support.*<br>    ○ *On 9/5 identified 15/26 letter names and 5/26 letter sounds.* | • A⬛ was placed in a small reading group 4X a week for students needing extra support. He is making daily progress. He meets with Mrs. Robles an additional 3X a week to practice reading & math skills during our morning WIN time. A⬛ participates in Walk to Read 5X a week.<br>    ○ On 10/22 identified 24/26 letter names and 24/26 letter sounds.<br>    ○ Progressed to a new Walk to Read group to meet his needs. |

EXHIBIT 13
Page 3 of 3

**Ryan Still**
Cubmaster - Pack 199
Wilsonville, Oregon

To Whom it may concern,

My name is Ryan Still and I have been involved with Scouts BSA for most of my life. First as a youth, Summer camp staff, and as an adult leader for my son's den and Cubmaster for the past 6 years. I currently serve as the Cubmaster for Pack 199 in Wilsonville, Oregon, where I lead a group of Cub Scouts aged 5 to 11. Both of my children (son 10, Webelos Den, and daughter 6, Tiger Den). Over the course of my involvement with Scouts, I have gained experience in working with children, helping them develop essential skills in leadership, responsibility, and teamwork. Additionally, as part of my role, I have completed the Scouts BSA Youth Protection Training, which emphasizes child safety, development, and well-being.

My experience with youth programs and development is extensive. I am the Camp Director for the 4 H Wildlife Stewards Camp - a program that I have been involved with since 2003, serving thousands of children and their families each year. As a Director, it has been first and foremost my responsibility to ensure the safety and well-being of our campers, teen counselors, and staff. Taking and leading required training around physical, mental, and emotional support and mandatory reporting.

I have had the opportunity to observe A___ M_____, a 6-year-old Tiger Cub Scout, since he joined our Pack in August 2024. During this time, I have seen him participate in numerous activities and interact with other Scouts - including my daughter who is in the same group as A___. Early on, I observed noticeable emotional struggles in A___ that appeared to affect his engagement in Pack activities, but I have since seen significant development in his maturity and his ability to express his thoughts and preferences. He has participated in the following Pack events:

- 8/25/2024: Pack Event - Ducky Derby
- 9/9/2024: Pack Meeting - Popcorn Kickoff (practiced selling popcorn to adult leaders)
- 9/16/2024: Tiger Den Meeting (set up a tent with Troop 199)
- 9/23/2024: Pack Meeting - Hike at Graham Oaks Nature Park
- 10/7/2024: Tiger Den Meeting (Scout Law / Trustworthy / led through a maze)
- 10/14/2024: Tiger Den Meeting (Technology / Storybook)
- 10/19/2024: Pack Event (Fishing at Canby Pond)

When A___ first joined the Pack, he seemed hesitant and occasionally withdrew during group activities. I noticed he had moments of emotional difficulty, especially in responding to challenges or interactions with other Scouts. He would sometimes get frustrated or upset and needed additional support from leaders to help him navigate these situations.

For example, at our annual kickoff event (the Ducky Derby at Wilsonville's Korean War Memorial), A___ had extreme difficulty listening to leaders and other adults. He became visibly upset several times during the event and required reassurance and guidance from adults. What stood out to me was that A___ seemed unsure of how to express his feelings in a constructive manner, particularly in comparison to many of the other Scouts, some of whom were his age, who had little difficulty managing their emotions during the event.

EXHIBIT 14
Page 1 of 2

Over time, however, I have observed significant growth in A⬛'s behavior. As he became more comfortable within the group, he began to engage more fully and take on responsibilities. For instance, during our Pack's popcorn kickoff on 9/9/2024, A⬛ initially had difficulty listening to adults and following directions. At times, he didn't move onto the next station when the other Scouts and adults had already moved on. However, when he reached the final station, where Scouts practiced selling popcorn to adult leaders, A⬛ showed no struggle in engaging with several different adults. He confidently answered their questions, even when they asked difficult or direct questions like, "Why is the popcorn so expensive?" or "Which popcorn is your favorite?" A⬛ demonstrated clearer communication and the ability to express his feelings thoughtfully, which showed a significant shift in his ability to handle responsibility and engage more maturely.

While there are still moments when A⬛ needs support, particularly in emotionally charged situations, his ability to self-regulate has improved. He has shown that he can navigate challenging situations with more composure and maturity. For example, during a maze activity at the Tiger den meeting on 10/7/2024 where frustration arose, A⬛ calmly asked for help rather than reacting impulsively, a marked improvement from his earlier behavior.

Based on my observations, A⬛ has shown noticeable emotional growth since joining the Pack. Though he initially struggled with emotional regulation and communication, I have seen him develop into a child who is increasingly capable of expressing his feelings and preferences. He has shown signs of maturity, particularly in his interactions with other scouts and in his ability to handle responsibilities, even in challenging moments.

Importantly, I believe A⬛ is developing the ability to express his opinions in a thoughtful and well-reasoned manner. Although he faced significant emotional challenges in his first Pack event, I believe his voice should be considered when decisions regarding his well-being are made, as he has shown enormous growth in his ability to advocate for himself.

**Ryan Still**
Dated: 10/24/2024

EXHIBIT 14
Page 2 of 2



**HAGUE** *Mothers*

Hague Domestic Violence Forum
**Expert Paper #2**

# The 'grave risk' exception and domestic violence.

**Miranda Kaye**
**Associate Professor, Faculty of Law, UTS**

**Adrienne Barnett**
**Reader at Brunel University London**

**Merle Weiner**
**Philip H. Knight Professor of Law, University of Oregon**

**Biographies**

Adrienne Barnett is a Reader in Law at Brunel University London, and Divisional Lead, Private and Commercial Law. She practised as a Family Law barrister in London for over 25 years. Her current research projects include domestic abuse and parental alienation in family court proceedings, and Hague Convention judgments in England and Wales. She has published widely on these issues and has presented papers at numerous academic and professional conferences in the UK and abroad.

Miranda Kaye is an Associate Professor at UTS law school in Sydney. Her research is interdisciplinary, drawing on socio-legal research methods to investigate real world impacts of family law principles and procedures. Miranda researched the Hague Convention and its impact on victims of domestic violence in the late 1990s. She is currently investigating the issue of financial abuse as it relates to property division in the family courts as well as revisiting Hague Abduction matters involving domestic or family violence.

Merle Weiner is the Philip H. Knight Professor and the founder of the Domestic Violence Clinic at the University of Oregon School of Law. She is an expert in domestic abuse law, family law, international and comparative family law, family law policy and the Hague Abduction Convention. She co-wrote the first US casebook on international and comparative family law, entitled *'Family Law in the World Community'.* Her article, *'You Can and You Should',* was written to help trial courts apply the Hague Abduction Convention justly when the respondent is a domestic violence survivor.

EXHIBIT 15
Page 1 of 9

Introduction

The drafters of the Convention had the foresight in 1980 to predict that there may be situations that would preclude the return of children to their habitual residences and specifically laid out several exceptions or defences. Article 13(1)(b) of the Convention, the focus of the Forum, addresses dangerous situations and stipulates that:

'...the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution, or other body which opposes its return establishes that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.'

The Convention makes no explicit reference to domestic violence. However, Article 13(1)(b) is 'particularly pertinent to abductions committed against the backdrop of domestic violence' (Weiner, 2000, p. 651; Trimmings & Momoh, 2021, p. 3) because extensive social and clinical science links domestic violence in the home to psychological and physical harm to children.[1] Although children have sometimes been referred to as the 'hidden victims' of domestic violence, this 'fails to capture the severity of the harm that children who experience domestic violence directly suffer' (Ho, 2022). Children are often caught in the middle of physical violence and become indirect or direct targets (see, Lisa Fischer-Wolovick, *Expert Paper #1 The definition, prevalence, and identifying features of domestic violence)*. Children can also be harmed by coercive and controlling abuse perpetrated by a parent against another, and can suffer debilitating coercive control directly themselves (Katz, 2022; Callaghan et al., 2018; Katz, Nikupeteri and Laitinen, 2020; Stark, 2023). This harm to children living with domestic violence has been recognised in various jurisdictions' domestic legislation[2] Given gendered patterns of caregiving for children and for domestic abuse, it is typically mothers who raise the Article 13(1)(b) exception.

This briefing paper considers the history of Article 13(1)(b) and its current use in cases that raise allegations of domestic violence. It demonstrates that there has always been a stringent emphasis on return in these cases, even after considerable attention to the issue by the Permanent Bureau and State Parties. This orientation has been, and is, fuelled by an unfounded fear that otherwise the Convention will be undermined, and a belief that legal systems can protect survivors (Kaye, 1999, pp. 196–198). The paper asks the Forum to consider, inter alia, whether courts should find that, 'where serious spousal abuse has been shown, it should be presumed that the grave risk exception is established'. (Schuz, 2018, p. 323)

The history of Article 13(1)(b)

The drafters of the Convention did not anticipate that the great majority (75%) of taking parents would now be mothers, almost all of whom (94%) are the primary or joint-primary carers of their children (Lowe and Stephens, 2023, [41–47]). We set out a lengthy extract from a recent interview with the special rapporteur of the Convention, Professor Elisa Perez-Vera - it illustrates how the drafters did not anticipate that these "abductors" might be fleeing for reasons of safety and her acknowledgement that the Convention fails to protect children when it does not take account of violence against mothers (Alvares, 2024).

*'... I believe that, almost 50 years later, we need to reinterpret the letter of the Convention in light of the new social realities in which it has to be applied. Because it is true indeed that the social reality to which we tried*

EXHIBIT 15
Page 2 of 9

*to respond was one of kidnappers, mostly fathers, who were not also holders of custody rights, and who took children away from their mothers. **Now, on the contrary, several decades later, what we have is that most of the abductors are women who have the official rights of guardianship over their children but who are fleeing from an abuser.***

*I believe that the **fundamental element of change that was not taken into account was gender-based violence** … We had not been aware that it was a phenomenon that was going to have such an impact on the lives of women and minors. So I do believe **this is a fact that should make those applying the Convention think about the need to reinterpret the essential idea that those who are best placed to decide who should have the custody and guardianship of the child are the judges of the habitual residence before the displacement, the abduction, takes place.** The problem is: if those judges happen to be in the same place where the abuser is, is it reasonable to request that the authority of the country where the mother has taken refuge with the child return both mother and child to the place where the abuser is? Or, on the contrary, can it be understood that such a return would place the child in an intolerable situation within the meaning of the Convention's Article 13?'*

Intolerable situation

Throughout State Parties and the Permanent Bureau's consideration of Article 13(1)(b), insufficient attention has been given to whether returning a child would place them in an 'intolerable situation.' These words were specifically added to the Convention to address the topic of domestic violence (Permanent Bureau, 2011 Reflection Paper, p. 12, citing Fourteenth Session of the Hague Conference on Private International Law (1980), *Actes et documents de la Quatorzième session*, Tome III, *Enlèvement d'enfants, Child abduction*, pp. 302). They enable courts to focus on the specific child's circumstances even when the child won't experience physical or psychological risk from return, thereby recognizing that return should not occur at any cost (consistent with Article 12's approach to the well-settled child and Article 13's approach to the mature child's views). As Baroness Hale (as then was) said: ''Intolerable' is a strong word, but when applied to a child must mean 'a situation which this particular child in these particular circumstances should not be expected to tolerate'.' (Re D (Abduction: Rights of Custody) [2007] 1 AC 619 [52]) This more flexible prong allows a court to reject an order for return in light of the hardship the child and the taking parent would face upon return, the likelihood the child would be separated from the taking parent in a custody proceeding because the taking parent is often seen as an 'abductor,' and the message conveyed to the child that the legal system sides with the batterer instead of the survivor.

Assessing risk: children and post-separation abuse

Assessing the risk to the child on return is key to the safe operation of Article 13(1)(b). This requires an understanding of the nature, prevalence, and impact of post-separation domestic violence. Until relatively recently, domestic violence was generally considered to encompass acts of physical violence. It is now recognised that the most prevalent and harmful form of domestic violence is coercive and controlling abuse, which can include physical violence as well as intimidation, isolation and control (Stark, 2007). The dangers of coercive control cannot be underestimated. Coercive control is one of the strongest indicators of female homicides (McLeod, 2018; Smith, 2018). Coercive controlling abuse has a more severe impact on victims compared with physical violence alone and can be experienced by women as more frightening and debilitating than physical violence (Nevala, 2017, a study across 28 EU member states). It is important, therefore, that those implementing the Convention appreciate the

EXHIBIT 15
Page 3 of 9

well-founded fear that can be sustained by mothers who have suffered coercive controlling abuse and are expected to return to the jurisdiction of their abuser. Recent Convention jurisprudence in England and Wales has confirmed that our increasing awareness of coercive and controlling abuse 'should also inform the exercise under Article 13(b)' *(TKJ, Re (Abduction: Hague Convention (Italy))* [2024] EWHC 198 (Fam) [35], and that 'the court must be astute to recognise" conduct which forms part of a pattern of controlling or coercive behaviour' *(Re A-M (A Child: 1980 Hague Convention)* [2021] EWCA Civ 998 [49, 56]).

It is often assumed that domestic violence stops when the relationship ends. However, numerous statistics and studies across a broad range of methodologies and populations reveal that domestic violence can start, continue and increase in severity on and after separation (Brownridge, 2006; Edleson, 2023; Spearman et al., 2023). Coercive controlling behaviour by the perpetrator during the relationship is the main predictive factor for post-separation domestic violence (Brownridge, 2006; Macleod, 2018; Spearman et al., 2023). These findings demonstrate the importance of appreciating that many women who flee domestic violence across borders are already in a high-risk category, as are their children. Most of the 22 women interviewed by Edleson et al. (2010, p.181) 'reported new domestic violence committed against them by their abusive husbands once they returned to the other country' including severe physical and sexual assaults, and children were often physically assaulted or exposed to severe violence against their mothers.

Studies have attested to the profound combined effects of past and continuing abuse on mothers' parenting and mental health (Thiara and Humphreys, 2017; Holt, 2017). The most important factor for enabling mothers to rebuild their lives, recover their physical, emotional and mental health and parenting capacities, and support their children's recovery is freedom from further abuse (Holt et al., 2008; Katz, 2022). Ongoing abuse can substantially impede that recovery (Davies et al., 2009).

The court's risk assessment exercise under Article 13(1)(b) has to take into account the likelihood and impact of the perpetrator parent's involvement with the child and victim parent on return. Children returned under the Convention may be compelled to live with, or live in a shared care arrangement with, a perpetrator father (Edleson et al., 2010). This is concerning given the substantial research demonstrating that shared care/contact is the key site for the perpetration of continued, more serious, abuse (see, eg, Brownridge, 2006; Edleson et al., 2010; Holt, 2017; McLeod, 2018), and at worst, fathers' homicide of mothers and children (Brandon et al., 2009; Women's Aid, 2016). The effects on and outcomes for children are poorest when children have contact with a perpetrator parent post-separation (Cafcass and Women's Aid, 2017; Spearman et al., 2022). The problems of post-separation abuse are exacerbated for women and children returned in Convention proceedings, whose vulnerability may be increased through language difficulties, absence of a support network, poverty and homelessness (Masterton et al., 2022). On any level, the research discussed in this Briefing demonstrates that the child is likely to suffer a grave risk of harm **and** be placed in an intolerable situation in these circumstances. Children can recover from the impact of domestic violence when they are in a safer environment, but ongoing involvement with the abusive parent can create problems for children's ability to recover and sustain recovery (Humphreys, 2006; Katz, 2022).

Approaches to Article 13(1)(b)

The courts of most contracting states have taken the approach that Article 13(1)(b) should be interpreted restrictively (HCCH, 2011 p.17; European Parliament, 2016). However, as the UK Supreme Court said, there is no need for Article 13(1)(b) to be narrowly construed because, by its terms, it is of restricted application.

EXHIBIT 15
Page 4 of 9

The words of Article 13(1)(b) are plain and need no further elaboration or gloss *(Re E (Children) (Abduction: Custody Appeal)* [2011] UKSC 27 [31]).

The Guide to Good Practice to Article 13(1)(b)

Over the last twenty-five years or so, the response by the Permanent Bureau and State Parties to this reality has always been to emphasize return with an effort to mitigate the risks involved from return. For example, when Special Commissions started addressing the topic, State Parties emphasized returning the child with protection for the child which 'also sometimes require steps to be taken to protect an accompanying parent.' (HCCH, 2001 Conclusions and Recommendations, §5.1.1; Special Commission, 2002, ¶. 76; Conclusions and Recommendations, 2006, §1.1.12). The Permanent Bureau's 2011 Reflection Paper on the topic noted the wide variety of State practices and suggested that a future Guide might increase uniformity and might 'balance' the Convention's objectives (including 'to reinforce the legitimate and appropriate custody and access rights of parents across jurisdictions') with 'the strong censure of family violence and intimate partner abuse found in current international and regional law.' ([148-151]). A Working Group, established in 2012 to develop a *Guide to Good Practice* on the interpretation and application of Article 13(1)(b), produced a *Guide* in 2020 with this same emphasis (Permanent Bureau, 2020).

In a major step forward, that *Guide* did recognize that domestic violence against a parent can give rise to the Article 13(1)(b) exception, despite Article 13(1)(b)'s focus being on grave risk of exposure to the child, not the parent [57]. The *Guide* does not require that the child be the direct or primary victim of harm if there is sufficient evidence that, because of a risk of harm directed to a taking parent, there is a grave risk to the child [33]. The *Guide* also recognizes that the primary carer's circumstances are highly relevant to the child's situation, and that some taking parents may be so debilitated by return that the child would suffer too [26].

Protective measures

Nonetheless, the *Guide*, consistent with the historic approach to the topic, suggests return is often appropriate because the risks of return can be mitigated (even where a grave risk would otherwise be evident). Most notably, it admonishes courts to examine protective measures to mitigate risks and facilitate return. This approach — absent from the Convention itself — continues to prioritize return over safety for children and their taking parents. The inadvisability of the 'protective measures' approach is discussed by Professor Merle Weiner in Expert Paper #6, *Briefing on Protective Measures*, and in Expert Paper #5 *Protective Measures and their inability to protect against domestic violence* by Professor Jeffrey Edleson and attorney Valentina Shaknes.

The way forward

State Parties to the Convention are at an important juncture. They can continue to promote return with protective measures, despite the fact that this approach minimizes the risks from domestic violence, treats domestic violence victims and their children unjustly by requiring additional components to an Article 13(1)(b) defence, and serves as a tool for domestic violence perpetrators. Or they can apply the Convention's Article 13(1)(b) faithfully, acknowledging that return is inappropriate and dangerous in cases of domestic violence.

EXHIBIT 15
Page 5 of 9

There have been cases in civil countries that have indicated that this latter approach is appropriate. For example, *H 28 (1827) (Germany – Spain)*[3] in which the Spanish court noted that the court must be sure that the return will be safe and protections are 'real and effective,' noting that 'generic protection or existing legal coverage is not enough, even if it's abundant on paper' (Soto Moya, 2021). In the Inner House Scottish case of *AD v SD* [2023] CSIH 17, the court concluded that the severity of the risk to the children should have been considered before considering the adequacy of protective measures. The father had repeatedly breached the Illinois court orders and he would not agree to further measures beyond 30 days. The Scottish court refused to order the return. Courts in common law countries, these authors' homes, have also recently made decisions that appear to align with the *Guide to Good Practice's* advice to focus on 'the effect of domestic violence on the child upon his or her return' (HCCH 2020, [58]). The following cases are selected as examples:

**United States:** in holding that consideration of protective measures in cases of domestic violence was discretionary, not mandatory, the U.S. Supreme Court, in *Golan v. Saada* 142 S. Ct. 1880, 1893-94 (2022), emphasized that a court 'must prioritize the child's physical and psychological safety.' The Court specifically mentioned protective measures would not be appropriate in some cases 'where it is clear they would not work because the risk is so grave,' including cases of prior sexual abuse, 'physical or psychological abuse, serious neglect, and domestic violence,' as well if a court 'reasonably expects they will not be followed.' The Court also noted that a hearing on ameliorative measures should not usurp the role of a judge in the custody trial or impede the expeditious nature of the return proceedings.

**Australia:** the appeal court in *Walpole v Secretary, Department of Communities & Justice* (2020) 60 Fam LR 409 found that no protective measures would be effective at ameliorating the grave risk of harm posed by the history of domestic violence despite New Zealand having 'sophisticated systems in place to protect victims of family violence', in this case, a return order was refused based on the grave risk of the children's exposure to an 'intolerable situation' arising from the risks of the children's exposure to violence, the well-founded fears of the mother and consequent impact on the children, and their precarious living circumstances, exacerbated by the effect of poverty.

**New Zealand:** *LRR v COL* (2020) NZCA 209, the Court of Appeal investigated the true impacts of returning the child. The judges asked questions about the mother's access to support, mental health and parenting capacity if she returned to Australia and how those factors would affect her child (Henaghan et al., 2023). The father's previous breaches of Australian family violence orders and bail conditions led the court to state that, '[t]he unfortunate reality is that where a perpetrator of family violence is not willing to respect court orders, there is only so much that any legal system can do to protect the victim.' [135]

**England and Wales:** *In B (A Child Abduction Article 13(B))* [2020] EWCA Civ 1057, the father had been violent and controlling of the mother and a restraining order had been made against him by a Bosnian court. The Court of Appeal set aside the return order made by the trial judge and criticised her disregard of the father's breaches of undertakings made against him. The trial judge had also not conducted an assessment based on all the material for the purpose of deciding whether the exception under Article 13(1)(b) was established. In the recent case of *TKJ, Re (Abduction: Hague Convention (Italy))* [2024] EWHC 198 (Fam) the judge found a grave risk of harm due to the mother being a victim of domestic abuse comprising violent, coercive and controlling behaviour by the father and that her flight to the UK was 'in order to escape that abuse' [47]. The judge also found that the child would be placed in an intolerable situation if returned due to the risk that the mother's parenting ability would deteriorate if returned to

6

EXHIBIT 15
Page 6 of 9

Italy due to the impacts of the abuse. The court found that the risks could not be mitigated by protective measures, despite the Italian legal system having similar protective powers to those of the UK. This was because the father had shown he was willing to continue his abusive behaviour even when orders were in force and also that even if objectively adequate protective measures were put in place, the mother's subjective fear that the father would harm her or the child meant the grave risk could not be mitigated.

Conclusion

While neither this paper nor the Forum have focused on the Convention's Article 20 exception, the *right* of individuals to have States protect them from violence is relevant to the interpretation of Article 13(1)(b). The Guide to Good Practice itself recognized this fact by including Annex II, which mentioned that international law gives individuals the right to be safe from gender-based violence. Additionally, the European Court of Human Rights (ECtHR) in *X v Latvia (No. 27853/09)* emphasised that the assessment is in relation to the individual child rather than the interests of children generally. The Grand Chamber also implied that the European Convention on Human Rights takes precedence over the Hague Convention for those states that are parties to the ECHR. Consideration should therefore be given to the engagement of the rights of victims of domestic violence under Article 3 ECHR, an absolute right. In *Opuz v Turkey* (2010) 50 EHRR 28, *Affaire Buturuga v Romania (App No. 56867/15)* and *Volodina v Russia (App No. 41261/17)*, the ECtHR confirmed that domestic violence could amount to degrading and inhumane treatment within the meaning of Article 3 ECHR. In *TKJ, Re (Abduction: Hague Convention (Italy))* [2024] EWHC 198 (Fam) the court confirmed that the risk of a breach of Article 3 should be determined indirectly through the operation of Article 13(1)(b). Therefore, the approach to Article 13(1)(b) should be the one that best protects children and their caregivers in cases of domestic abuse without unnecessary and unrealistic obstacles and in conformity with states' international obligations. This aligns with best practice in holding perpetrators accountable for the abuse rather than placing the onus on the victim to keep herself and the child/children safe.

Finally, while removing obstacles to the availability of the exception is the most necessary reform to make the Convention just and safe for survivors and their children, it is not the only reform required. Effective use of the exception requires that survivors of domestic violence have counsel. It requires that decision makers reject myths about domestic violence when adjudicating these cases. It requires Central Authorities' sensitivity to safety issues throughout the proceedings, including at the front end.

.

---

1.   Edleson et al. (2023) describe a systematic review of 26 studies demonstrating that children exposed to domestic violence show lower social and emotional competence and fewer empathetic skills than non-exposed children (Bender *et al.*, 2022). It is well-documented that children who experience domestic violence have a higher risk of living with mental health difficulties (Peltonen et al., 2010), physical health impediments (Bair-Merritt et al., 2012) and educational challenges (Byrne and Taylor, 2007). A review of 23 studies found that exposure to domestic violence was associated with a variety of negative physiological impacts (Berg *et al.*, 2022).

2.   Section 3, *Domestic Abuse Act 2021* (England & Wales) includes children as victims in their own right. See also s4AB Australian *Family Law Act 1975* (Cth); s11(2) *Family Violence Act 2018* (NZ).

3.   See further: https://www5.poderjudicial.es/CVsm/Ponencia_6_EN.pdf.

EXHIBIT 15
Page 7 of 9

# References

Alvares, P. (2024) 'Rapporteur of the 1980 Hague Convention proposes "reinterpreting" the treaty to take GBV into account' (Translation of La Diaria article, 10 February 2024). Available at: https://haguepapers.net/rapporteur-of-the-1980-hague-convention-proposes-reinterpreting-the-treaty-to-take-gbv-into-account/

Bair-Merritt, M.H., Blackstone, M. and Feudtner, C. (2006) 'Physical health outcomes of childhood exposure to intimate partner violence: a systematic review', *Paediatrics*, 117(2), pp. 278-290.

Bender, A.E. et al. (2022) 'Childhood Exposure to Intimate Partner Violence and Effects on Social-Emotional Competence: A Systematic Review', *Journal of Family Violence*, 37(8), pp. 1263–1281.

Berg, K.A. et al. (2022) 'Exposure to Intimate Partner Violence and Children's Physiological Functioning: A Systematic Review of the Literature', *Journal of Family Violence*, 37(8), pp. 1321–1335. Available at: https://doi.org/10.1007/s10896-022-00370-0.

Brandon, A., Bailey, S., Belderson, P., Gardner, R., Sidebotham, P., Dodsworth, J., Warren, C., Black, J. (2009) Understanding Serious Case Reviews and their Impact: *A biennial analysis of serious case reviews 2005–07.* London: Department for Children, Schools and Families. Available at: https://dera.ioe.ac.uk/id/eprint/11151/1/DCSF-RR129(R).pdf

Brownridge, D. (2006) 'Violence against women post-separation', *Aggression and Violent Behaviour*, 11, pp. 514–530.

Cafcass and Women's Aid (2017) *Allegations of domestic abuse in child contact cases.* London: Cafcass and Women's Aid. Available at: https://www.cafcass.gov.uk/sites/default/files/migrated/Allegations-of-domestic-abuse-in-child-contact-cases-2017.pdf

Callaghan, J.E.M. et al. (2018) 'Beyond "Witnessing": Children's Experiences of Coercive Control in Domestic Violence and Abuse - Jane E. M. Callaghan, Joanne H. Alexander, Judith Sixsmith, Lisa Chiara Fellin, 2018', *Journal of Interpersonal Violence*, 33(10), pp. 1551–1581.

Davies, L., Ford-Gilboe, M. and Hammerton, J. (2009) 'Gender Inequality and Patterns of Abuse Post Leaving', *Journal of Family Violence*, 24(1), pp. 27–39.

Edleson, J.L., Lindhorst, T., Mehrotra, G., Vesneski, W., Lopez, L. and Shetty, S. (2010) *Multiple Perspectives on Battered Mothers and their Children Fleeing to the United States for Safety: A Study of Hague Convention Cases.* US Department of Justice. Available at: https://www.ojp.gov/pdffiles1/nij/grants/232624.pdf

Edleson, J.L., Shetty, S. and Fata, M. (2023) 'Fleeing for Safety: Helping Battered Mothers and Their Children Using Article 13(1)(b)' in I.M. Freeman and N. Taylor (eds) *Research Handbook on International Child Abduction.* Camberley, UK: Edward Elgar Publishing Limited.

Hague Conference on Private International Law (2001) *Conclusions and Recommendations of the Fourth Meeting of the Special Commission to Review the Operation of the Hague Convention on 25 October 1980 on the Civil Aspects of International Child Abduction* (March 22-28, 2001) available at: http://hcch.e-vision.nl/upload/concl28c4_e.pdf.

Hague Conference on Private International Law (2003) *Report and Conclusions of the Special Commission Concerning the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction* 27 September-10 October 2002 (March 2003).

Hague Conference on Private International Law (2006) *Conclusions and Recommendations of the Fifth Meeting of the Special Commission to Review the Operation of the Hague Convention of 25 Oct. 1980 on the Civil Aspects of International Child Abduction* and the Practical Implementation of the Hague Convention of 1 October 1996 on Jurisdiction, Applicable Law, Recognition, Enforcement and Co-operation in Respect of Parental Responsibility and Measures for the Protection of Children, (Oct. 30 -Nov. 9, 2006)

Hague Conference on Private International Law (2011) *Domestic and Family Violence and the Article 13 "grave risk" exception in the operation of the Hague Convention of 25 October 1980 on the Civil Aspects of  International Child Abduction: A Reflection Paper* (HCCH, 2011)

Henaghan, M., Poland, C. and Kong, C. (2023) 'Abducted Child's Best Interests versus the Theoretical Child's Best Interests: Australia, New Zealand and the Pacific', *Laws*, 12(4), p. 63. Available at: https://doi.org/10.3390/laws12040063.

Ho, N.G. (2022) 'Children – the hidden or direct victims of domestic abuse?', *Journal of Social Welfare and Family Law*, 44(4), pp. 1–17.

Holt, S. (2017) 'Domestic Violence and the Paradox of Post-Separation Mothering', *British Journal of Social Work*, 47, pp. 2049–2067.

Holt, S., Buckley, H. and Whelan, S. (2008) 'The impact of exposure to domestic violence on children and young people: A review of the literature, *Child Abuse and Neglect*, 32, pp. 797–810.

Humphreys, C. (2006) 'Relevant Evidence for Practice' in Humphreys, C. and Stanley, N. (eds) *Domestic Violence and Child Protection Directions for Good Practice.* London and Philadelphia: Jessica Kingsley Publishers.

Katz, E. (2022) Coercive Control in Children's and Mothers' Lives. Oxford: Oxford University Press.

Katz, E., Nikupeteri, A. and Laitinen, M. (2020) 'When Coercive Control Continues to Harm Children: Post-Separation Fathering, Stalking and Domestic Violence', *Child Abuse Review*, 29(4), pp. 310–324.

Kaye, M. (1999) 'The Hague convention and the flight from domestic violence: how women and children are being returned by coach and four', *International Journal of Law, Policy and the Family*, 13(2), pp. 191–212.

EXHIBIT 15
Page 8 of 9

Lowe, N. and Stephens, V. (2023) *Statistical study of applications made in 2021 under the 1980 Child Abduction Convention*. The Hague: HCCH.

McLeod, D. (2018) *Coercive Control: Impacts on Children and Young People in the Family Environment. Totnes: Research in Practice.* Available at: https://www.researchinpractice.org.uk/children/publications/2018/december/coercive-control-impacts-on-children-and-young-people-in-the-family-environment-literature-review-2018/

Masterton, G., Rathus, Z., Flood, J. and Tranter, K. (2022) 'Dislocated lives: the experience of women survivors of family and domestic violence after being 'Hagued', Journal of Social Welfare and Family Law, 44(3), pp. 369-390.

Nevala, S. (2017) 'Coercive Control and Its Impact on Intimate Partner Violence Through the Lens of an EU-Wide Survey on Violence Against Women', *Journal of Interpersonal Violence,* 32(12), pp. 1792–1820.

Peltonen, K., Ellonen, N., Larsen, H.B. and Helweg-Larsen, K. (2010) 'Parental violence and adolescent mental health', *European Child Adolescent Psychiatry,* 19(11), pp. 813-822.

Permanent Bureau of the Hague Conference on Private International Law (2011) *Domestic and Family Violence and The Article 13 "Grave Risk" Exception In The Operation Of The Hague Convention Of 25 October 1980 On The Civil Aspects Of International Child Abduction: A Reflection Paper* Preliminary Document No 9 of May 2011 for the attention of the Special Commission of June 2011 on the practical operation of the 1980 Hague Child Abduction Convention and the 1996 Hague Child Protection Convention.

Permanent Bureau of the Hague Conference on Private International Law (2020) 1980 *Child Abduction Convention Guide to Good Practice: Part VI – Article 13(1)(b).*

Schuz, R. (2018) 'The Hague Child Abduction Convention in a Changing World', in G. Douglas, M. Murch and V. Stephens (eds) *International and National Perspectives on Child and Family Law: Essays in Honour of Nigel Lowe.* Cambridge: Intersentia, pp. 315–328.

Smith, L. (2018) *Children experiencing inter-parental coercive control.* Glasgow: The Institute for Research and Innovation in Social Services (IRISS). Available at: https://www.iriss.org.uk/sites/default/files/2018-04/iriss-esss-outline-children-experiencing-interparental-coercive-control-2018-3-19.pdf

Soto Moya, M., (2021) 'Retorno de menores sustraidos por sus madres victimas de violencia de géneroalgunos apuntes de Derecho comparado' in F. J.  Durán Ruiz, J. C. Revilla & A. N. Ortega (eds) *Retos de las migraciones de menores, jóvenes y otras personas vulnerables en la UE y España: respuestas jurídicas desde la perspectiva de género.* Thompson Reuters, pp. 313-332.

Spearman, K.J., Hardesty, J.L. and Campbell, J. (2022) 'Post-separation abuse: A concept analysis', *JAN,* 79(4), pp. 1225-1246.

Stark, E. (2007) *Coercive Control: The Entrapment of Women in Personal Life.* New York: Oxford University Press.

Stark, E. (2023) *Children of Coercive Control.* United States: Oxford University Press.

Thiara, R. and Humphreys, C. (2017) 'Absent presence: the ongoing impact of men's violence on the mother-child relationship', *Child and Family Social Work,* 22, pp. 137–145.

Trimmings, K. and Momoh, O. (2021) 'Intersection between Domestic Violence and International Parental Child Abduction: Protection of Abducting Mothers in Return Proceedings', *International Journal of Law, Policy and the Family,* 35(1).

Weiner, M.H. (2000) 'International Child Abduction and the Escape from Domestic Violence', *Fordham Law Review,* 69(2), pp. 593–706.

Women's Aid (2016) *Nineteen Child Homicides: What must change so children are put first in child contact arrangements and the family courts.* Bristol: Women's Aid. Available at: https://www.womensaid.org.uk/wp-content/uploads/2016/01/Child-First-Nineteen-Child-Homicides-Report.pdf

---

**FiLiA Hague Mothers**

FiLiA Hague Mothers is a MVAWG project. Our overarching aim is to end the injustices created by The Hague Convention on the Civil Aspects of International Child Abduction, specifically for mothers and children who are victims of domestic abuse.

EXHIBIT 15
Page 9 of 9

**HAGUE** *Mothers*



### Hague Domestic Violence Forum
### **Expert Paper #3**

## The impact of domestic violence and coercive control on children: applying evidence-based assessments of children to 'the grave risk exception'

Stephanie Brandt, MD

**Biography**

Stephanie Brandt, MD, is a board-certified adult and child psychiatrist in private practice in Manhattan. She has over 40 years of experience in diagnosing and treating adults, children, and their families before and after complex child-focused litigation. Her specialty is in childhood trauma syndromes. She is a respected forensic expert witness in domestic and international litigation, often appointed where domestic violence, child maltreatment, and parental alienation are ed. These are cases where the differential diagnosis of PTSD, malingering, narcissism, and psychosis can be essential. She has testified in multiple federal cases Hague Convention cases. As Ethics Chair at NYPSI, she has extensive knowledge of the legal and ethical aspects of her profess on. She is an assistant professor at Weill Cornell New York Presbyterian Hospital and a faculty member at the New York Psychoanalytic Institute. She is a member of AACAP, APSAC, the AFCC, and the Shera research group, and she is on the international strategy group of The Hague Mothers Legacy Project. Dr Brandt frequently presents and is widely published about the assessment and treatment of childhood traumatic syndromes due to various causes, including medical illness, sex trafficking, abuse, and neglect.

EXHIBIT 16
Page 1 of 19

'It is easier to build strong children than to repair broken men' - Frederick Douglas

This paper will summarize the evidence-based research that provides our scientific understanding of the dangerous impact on children of exposure to domestic violence. A massive body of research now undergirds our recognition of the harmful, often irreversible effects of domestic violence ('DV') on the course of a child's development. Lack of recognition or misinformed views about DV and the irreversible and even life-threatening damage this imposes on a growing child often results in an inadequate evaluation of the child's safety and inadequate protection from preventable ongoing harm. Sadly, this is the literal opposite of the purpose of the Hague Convention.

In recent decades, there has been an explosion of research on the nature and consequences of domestic violence. In 2007 Stark formulated the definition of domestic violence, coining the term 'coercive control '(Stark 2007). His redefinition brought about the diagnostic clarity and precision that allowed for interdisciplinary consensus on terminology and produced a wealth of scientifically valid studies on all aspects of DV. Coercive control ('CC') is defined as a complex multi-vehicle strategy deployed consciously and intentionally by a perpetrator to intimidate and control a victim (including a child) in an intimate, usually a family relationship. Physical violence itself is not centered nor even necessary as a defining feature. The public knows this dynamic differs from a 'communication problem'. It is understood now that DV (or CC) is a quite malignant dynamic in a relationship that is often hidden from public view, difficult to interrupt, and sometimes does not end. Social scientists in many academic fields have established bodies of specialized clinically useful knowledge about the incidence, nature, course, and treatment options, as well as the lasting impact on adults and children. Nowadays, professional expertise, especially if offered in litigation, should be based only on studies that meet the very high standards of valid scientific methodology, i.e., standards that meet Daubert's requirements. Subjective opinion has no place in that context.

Other researchers renewed their interest in studying trauma within the same period. Though it is hard to imagine now, before the 80s, there was almost no recognition of the difference between severe distress and the more complex processes that are the result of indisputably traumatic events. Some think the term has been so broadened to be no more than jargon. (Haslam and McGrath, 2020). Though overstated, it is true that terms associated with trauma treatment are sometimes clinically imprecise and may result in simplistic and misguided applications. Something as common as an incident of parental misunderstanding is too easily labeled as childhood trauma. (Amaya-Jackson et al., 2021; Brandt, 2023; D'Andrea et al,2012; Friedman, 2004; NCTSN, 2023; Tronick, 2021)

A massive epidemiological study on the consequences of Adverse Childhood Experiences' (ACEs) also produced substantial information on factors that cause harm to the growing child. (Felitti et al., 1998; Marks, 1998) These items included what we would refer to as abuse and neglect but also included societal factors such as racism and poverty. Not surprisingly, multiple ACES compound the harmful effect of each one on a child, and the use of the term Ace Score is standard. But in the specific context of Hague litigation, it is ESSENTIAL to understand that not all ACES imply traumatic exposure, nor are they likely to result in the consequences of traumatization discussed here. Adversity is not always trauma and does not always result in the severe consequences to a child described here. As stated by the National Child Traumatic Stress Network (NCTSN, 2023):

'Traumatic events can evoke strong negative emotions and physical reactions, including terror, powerlessness, and intense physiological arousal. Traumatic experiences overwhelm the capacity to

EXHIBIT 16
Page 2 of 19

cope with intense feelings, which persist long after the event and can be triggered by reminders. In contrast, 'adversity' is a broader term used to describe serious hardship or misfortune that requires significant adaptation by a child in terms of psychological, social, and neurodevelopmental systems, and which are outside the normally expected environment and which may or may not be a traumatic event or lead to traumatic stress reactions.'

The term 'trauma' as it is used in valid studies, is defined by the experience of the person impacted, not by an observer's assessment of the event. Although some experiences will traumatize most children, the term 'trauma' 'means that the child is experiencing something that is beyond his ability to manage. It is an experience that, in a phrase, 'blows his fuses and results in a mental state that is way beyond distress.' In our current nomenclature, trauma is defined by both American and worldwide groups as follows:

'The person was exposed to death, threatened death, actual or threatened injury, or actual or threatened sexual violence, as follows: 1. Direct exposure 2. Witnessing, in person 3. Indirectly, by learning that a close relative or close friend was exposed to trauma 4. Repeated or extreme indirect exposure to aversive details of the event(s), usually in the course of the professional duties: for children under 6, the criteria are exposure to actual or threatened death, serious injury, or sexual violence, as follows: 1. Direct exposure 2. Witnessing, in person, especially as the event occurred to the primary caregiver)  3. Indirect exposure learning that a parent or caregiver was exposed.' The authors *especially emphasize the importance of witnessing an attack on a caregiver* (Kitzmann et al., 2003)

The criteria for the diagnosis of PTSD,[1] PTSD Dissociative Type,[2] Childhood PTSD,[3] and Complex PTSD[4] (the last two being more relevant here) are in the Endnote section. We recognize a form of PTSD in childhood that is the nearly inevitable result of repeated traumatic exposure such as occurring to children exposed to ongoing domestic violence, which includes being the direct object (i.e., child abuse) or witnessing DV perpetrated on a caregiver, usually the mother. (Maerker, 2022) Childhood PTSD is easily overlooked by those who are not familiar with child abuse. It is well known, however, that PTSD in childhood is more severe and unremitting, carries a significant risk of relapse when triggered by what may seem like a benign setting, and the greater the frequency and duration of exposure or relapse, the more likely it is that the child's ENTIRE development will be impacted permanently and at all biological levels. These are genuinely life-altering, potentially lethal physical and psychological health consequences that should never be minimized because they are invisible to an observer and may have delayed onset. Childhood PTSD puts that child at risk of early death. (Gordon, 2021; Teicher, 2018; Teicher, 2022)

Post-traumatic stress disorder is a normal reaction to an abnormal situation – a traumatic one. Although many people may recognize the effects of this on adults, e.g., fight /flight and freeze and shut down actions, it is often overlooked in children.

Other childhood experiences that are universally traumatizing include: 1) being separated indefinitely from a primary caretaker for any reason (Teicher, 2018); 2) being exposed to relentless and severe interparental conflict; 3) being denied a stable adult attachment figure, i.e. a reliable loving parent (sometimes that is referred to as a 'good enough mother '-though the gender is not necessarily female). We know that anything that disrupts the stability and security of that early relationship is extremely dangerous. Normal child development can and often does occur in the context of only one reliable consistently present adult caretaker. (Goldstein, 1996) On the other hand, we also know, that it is not necessarily traumatic, though certainly distressing, disappointing and suboptimal for a child to lack a

EXHIBIT 16
Page 3 of 19

relationship with both parents. To determine if that absence is actually traumatic would mean assessing the quality of that relationship, not its wished-for potential. It is also not necessarily traumatic, though certainly a disadvantage for a child, to experience various other kinds of adversity such as poverty, racism, parental illness, various disruptions in the environment. However, what is truly essential for a child is the stability and security of at least one parent who is attuned and attached to that child over him or herself. Often the public does not readily believe that one parent can be sufficient for normal development though examples are all around us. This assumption, i.e. the need for both biological parents of opposite sex, is based solely on a certain heteronormative and even prescriptive standard of Western childrearing which tends to inform much of family law policy. Unfortunately, in practice, the prioritization of the relationship with both parents as if a necessity rather than a preference can obscure a realistic assessment of the child's needs for the safety, security and stability of one reliable parent. In reality, and often in cases where there is DV and child abuse, there is only one adult who functions as a parent. Not all parents want to be nor can be parents and no judicial order makes that happen. (Brandt, 2023; Meier, 2021; Goldstein et al., 1996)

Another false assumption about the impact of DV on children is that it simply ends when the parents separate. There is an extensive body of research that reveals that there is a large overlap between children exposed to DV and those who become victims of direct child abuse, often post-separation. Edelson has done groundbreaking work in this area, showing that the rate of overlap between domestic violence and child abuse is both alarming and significant. Research consistently demonstrates that children who reside in households where domestic violence occurs are at a markedly higher risk of experiencing abuse themselves. Studies estimate that between 30% to 60% of families experiencing intimate partner violence also report concurrent child maltreatment. (Edleson,1999; Edleson,1999; Edleson,2007; Edleson,2008) Moreover, it is important to recognize that domestic violence and child abuse are not isolated incidents, but rather pervasive issues deeply rooted in societal structures and cultural attitudes. Both forms of abuse thrive in environments where power imbalances and gender inequality are tolerated or even perpetuated. (Davis et al., 2018; Spearman et al., 2023; Zolotor et al., 2007) The impact of child abuse itself, in addition to witnessing the abuse of a parent, has quite predictable consequences as described above and is, thus, often combined in the lives of these children. The American Professional Society on the Abuse of Children (APSAC) has written protocols for the assessment of child maltreatment in the context of domestic violence, as well as many other useful position papers on the nature of child maltreatment and neglect. Their list of items that qualify as maltreatment is in this Endnote.[5] Often, children exposed to DV also suffer various kinds of neglect. Although it may be harder for both adults and children to recognize the *absence* of caretaking, neglect has equally traumatic effects on children, sometimes even worse. The betrayal trauma of a child having to accept indifference or the absence of parental love by an adored parent is usually a lifelong struggle. Neglect has the same devastating consequences as abuse but also tends to fly under the radar even of the most well-intentioned adults. (APSAC, 2008; Davies et al., 2010; National Scientific Council on the Developing Child., 2012)

It is also well known that child protective agencies' evaluation of children is quite differently focused than an ordinary custody evaluation (the common but incorrect standard for Hague litigation). These two fields often do not agree or coordinate – sometimes leaving a child at risk. After a literature review of Canadian cases, Shlonsky and Friend discussions with experts across Canada, suggested that a significant challenge rests with competing ideas on appropriate risk assessment tools to assess child risk for psychological and physical harm including, child homicide. The domestic violence and child abuse areas have unique histories that led to the development of different risk assessment tools that

4

EXHIBIT 16
Page 4 of 19

may fall short in assessing both child and adult risk of lethal violence, particularly in the context of family violence. To address these issues, there is a need for more research on assessment strategies, promising case management strategies, information sharing, and collaboration between criminal and family courts. (Shlonsky, A., & Friend, S., 2007).  They explain:

'The history of risk assessment in child welfare is very different from its history in the domestic violence field. Whereas in criminal justice and social services addressing domestic violence, there has been a fairly steady progression towards the development, application, and confidence in risk assessment tools and technologies, in child welfare, there has been no such gradual linear process. Instead, ideas regarding the most effective methods for assessing risk have been heavily debated, escalating at times into what has been described as 'risk assessment wars.'

In Hague Convention cases where the question is primarily about safety of the return, the APSAC evaluation protocols and the standards used in emergency room evaluations of children are more appropriate and valuable ways to assess a child's mental state and relevant circumstance adequately but rapidly. (APSAC, 2020; APSAC 2022; APSAC, 2023; Butala et al., 2023; Jain, 2023; Leetch, 2013). Nonetheless, recent studies on the use of various instruments designed to determine 'immediate safety' used by child welfare agencies do not sufficiently reveal danger, and there are no current instruments that are normed for use in the context of DV. (Vial, et al., 2020)

In addition, it is well known that undermining the relationship with the protective parent in the context of domestic violence quickly becomes a favored vehicle of abuse post-separation when contact with the other parent is not prohibited. Emma Katz described this in detail in her writing (Katz, 2019; Katz, 2023). The legal system is also often used as a means of jeopardizing the protective parent via financial and custodial threats that unwittingly enable persistent abuse. (Duron et al., 2020; Douglas and Fell, 2020)

A summary of the effects of domestic violence on children at different ages, presented by the Government of Canada, Department of Justice. Risk Factors for Children in Family Violence During Separation. 5. Risk Assessment Strategies and Tools - Risk Factors for Children in Situations of Family Violence in the Context of Separation and Divorce, 12 2021, www.justice.gc.ca/eng/rp-pr/cj-jp/fv-vf/rfcsfv-freevf/p7.html#se 58 is available in this Endnote.[6]

Exposure to DV and the catastrophic consequences to the entire trajectory of development have been studied at the most basic cellular level. We now know unequivocally that trauma due to DV exposure that is severe enough to cause PTSD and other delayed and damaging changes can result in a change in the genetic makeup of the victim child. There are 'epigenetic' changes that are documented and are, of course, irreversible. These alterations occur in the DNA of the exposed child. These are not inherited traits but rather are changes in a child's genetic makeup that are due to the trauma exposure itself. These changes cause related changes in the child's development depending on the sites involved, and they are also passed on. They are a vehicle of intergenerational trauma transmission that does not rely on the environment. This is a profoundly disturbing discovery and should not be underestimated in its impact. (Tronick, 2016; Tronick, 2007; Anda, 2006; Lester et al., 2011)

At the next level, we can show brain scans that show the specific sites of permanent changes determined by the nature of the abuse. For example, 'witnessing DV' can cause changes in a different area than sexual abuse.

EXHIBIT 16
Page 5 of 19

It is the work of Marin Teicher and his group that have done these elegant studies on the brain. They have also discovered sensitive periods for specific types of abuse when the damage is most significant and have also completed a host of other studies on the alterations in brain mechanisms that control the entire body's homeostatic mechanisms, including emotional responses of the limbic system, which are unregulated, i.e., the hypothalamic-pituitary. This results in a sustained level of heightened reactivity or its opposite, i.e., a shutdown. Suffice it to say if a child's entire emotional regulatory system is hijacked, there is little option for ordinary development. Thus, clinically, we see the acute effects of PTSD and, later, the long-term sequelae of increased psychopathology and medical illness.

Below are some graphics from Teicher's basic science lab studies that clearly show an impact that is so broad-based that the devastating effect is potentially on every organ system.





EXHIBIT 16
Page 6 of 19

In the context of Hague Convention litigation where DV is alleged, now the majority of cases (Finkelhor, 2017), it is quite imperative to obtain a detailed child and case specific understanding of the prior, ongoing and potential damage that can result from a return, *i.e.* whether the child qualifies for the 'Grave Risk Exception.' The ability for a judge to make that determination is much enhanced by providing a professional assessment of that child's mental status, psychiatric vulnerabilities and strengths. With this kind of specific data, it is much more likely that an informed opinion about that child's safety if returned, or not, will be made.

Also, an understanding of the child's mental status automatically pertains to any attempt at ameliorative measures which, as noted by many, including the unanimous U.S. Supreme Court in *Golan v Saada* (2022), are almost impossible to fashion reliably and effectively in such cases, and especially not on an expedited timeline.

The use of a qualified forensic clinician to examine the child can occur rapidly and with precision despite the short time frame, as that is similar to any risk assessment of a child that often is done by child trained clinicians in an emergency. An evaluation by child protective workers is not a substitute for providing a professional level diagnostic and prognostic assessment that addresses the question posed in a Hague Convention litigation. Child welfare workers and even forensics who are not trained in the assessment of children are not competent to provide a child focused assessment. There are numerous protocols available to use for this purpose, and much research on the quality of risk assessment in the context of domestic violence. Regardless of the debate over the details of how this is accomplished, it should be clear that this kind of evaluation can provide very critical data that supports or may refute a claim of 'Grave Risk.' Given that this can be done within the expedited time frame and is often done in the US on a pro bono basis, it is puzzling that this kind of information is not routinely requested in the same way that a standard medical evaluation would be when relevant. Many cases that have qualified for a Grave Risk exception in the U.S. hinged largely on the very specific data that flowed from these kinds of assessments.

There is a large literature about risk assessment in the context of DV (Cunha et al., 2024; Campbell et al., 2003; Campbell et al., 2009; Ericksson et al., 2022; Trimmings et al., 2023, Reece, 2022) Much of this research stems from assessment of the 'taking' parent or, in these cases, the presumptive protective parent. Instruments such as the Danger Assessment and other ways to assess risk of homicide are crucial in this context. Although the Convention does not address the safety issues for the parent if the child is returned, it is not beyond my scope as a child psychiatrist to state that it is undeniably and plainly traumatic to separate a child from a primary parent if that is the situation.  The harm that does occur must be factored into any decision. It is that early and stabilizing attachment that has an ameliorating effect on any other ongoing traumatic state already present. If that parent cannot or will not accompany the child, then any decision to separate that child from the primary parent will do intolerable damage to an already overburdened child by destroying a primary attachment. This is a standard principle of child development that has been acknowledged worldwide for decades. Although the law in this situation is complex and not within my professional expertise, it is not at all complicated to state unequivocally that a forced separation from a primary and presumably protective parent is one of the most traumatic and dangerous experiences any child could endure. The level of trauma that would cause would ensure the immediate development of all the terrible consequences of childhood trauma that have been described in this paper.

EXHIBIT 16
Page 7 of 19

Applying evidence-based assessments of children to 'the grave risk exception'

The following is a summary of the information on the impact of domestic violence on children as it pertains to the overarching, complex legal question of establishing the 'Grave Risk Exception' in Hague Convention litigation. It is imperative to understand that a child is equally, if not more, damaged by witnessing severe domestic violence than by being a direct object. As discussed, both kinds of abuse are very likely to cause significant PTSD of a chronic complex kind and will deform an entire developmental trajectory of that child. Having explained the type of irreversible damage to the brain, body, mind, and future health that occurs if the child is not protected from relapse or ongoing traumatization, it is fundamental that any judge in a Hague litigation understands that being a witness to DV is abuse and is highly traumatic. Unfortunately, the myth that children, especially very small children, are unaffected by witnessing DV remains a widespread belief that, in this context, can result in minimizing and even ignoring the safety needs of the child. (Barnett, 2014; Barnett, 2019; Barnett, 2020; Barnett, 2020; Barnett, 2020; Barnett, 2020; Barnett, 2020; Barnett, 2020; Barnett, 2021, Dalgarno, 2023)

- A wealth of potentially critical data is obtained by a professional psychological or psychiatric examination of the child - if done by a qualified expert trained in assessing children. Adult observations of the child, reviewing the child's history and circumstances, digesting volumes of documentary evidence, using non-normed checklists and other 'testing,' reviewing evidence that is disputed, having a deep knowledge of the body of science described above, and even having natural competence in the treatment of traumatic syndromes does not replace the case-specific factual data that is revealed by examining the child. This kind of evaluation is not a lengthy custody evaluation and is easily tailored to the context of this kind of expedited litigation. A psychiatric mental status evaluation of the child provides a diagnosis (or not) and a prognosis. It is the only way to address the internal safety needs of the child credibly. That kind of child-focused, case-specific data is especially relevant to any decision about safety on return and/or any effort at ameliorative measures. PTSD has enormous implications in this context but recognizing other disorders of childhood and the related vulnerabilities, such as autism or other disabilities, may well impact decisions about the safety of a child. If the child had a severe chronic medical illness, such as cancer or leukemia, that child would be examined by a professional, and the prognosis and recommendations for treatment would be part of any evaluation about the safety of a return. PTSD and other childhood disorders are no less dangerous to the life of a child than other illnesses. Often, these are children who can be so impaired that they never function despite adequate potential. Frequently, they are condemned to a state of constant panic. Often, they can become chronically suicidal.
- A layperson cannot make the diagnosis of childhood PTSD. Even if it is suspected, a diagnosis by a lawyer, parent, or judge will not be scientifically reliable. PTSD is often complex to diagnose, especially in a tiny child. Nonetheless, very small children are often the subjects of this kind of litigation, and they are likely to suffer the worst sequelae. Once a child has childhood PTSD, it can be as dangerous to overlook as any ordinary medical diagnosis is. PTSD has symptoms that can be triggered by a context that seems benign to an adult. Without a knowledge of the child's mental state, it is easy to imagine that the adult perspective on safety is all that matters. In these cases, nothing could be further from the truth. Even the idea of return is often a trigger for relapse. And the more one relapses, the more likely the disorder is permanent. What matters is that child's entirely predictable relapse, which often occurs even during an interview at the mention of a return. In *Elyashiv v. Elyashiv,* 353 F. Supp. 2d 394, 409 (E.D.N.Y. 2005), two of the children had PTSD and were thrown into panic states and became suicidal. The same was true in *Reyes Olguin v Santana. (Reyes Olguin v. Cruz Santana*, No. 03-CV-6299, 2005 WL 67094, at *7 (E.D.N.Y. Jan. 13, 2005)

EXHIBIT 16
Page 8 of 19

- It should be known that evaluation of younger, even nonverbal children is entirely possible. The Zero-to-Three population is a specialty of many child-trained clinicians. Precluding evaluation of the very young child, who honestly cannot speak for themselves, is an incredibly misguided decision that can exclude crucial information. Evaluation of the very young children in *Davies v. Davies*, 16 CV 6542, 2017 WL 361556 , (S.D.N.Y., January 25, 2017), and in *Saada v Golan (Saada v. Golan*, 18-CV-5292 (AMD) (LB), 2019 WL 1317868 (E.D.N.Y. Mar. 22, 2019); *Golan v. Saada,* 142 S. Ct. 1880 (2022); *Saada v. Golan,* 18-CV-5292 (AMD) (RML), 2024 WL 262951 (E.D.N.Y., Jan. 24, 2024)) provided essential information in both those cases. (Fernando, 2023; Kaye, 2023; Maxwell, 2023; Masterson, 2022; Hague Mothers Briefing Paper n/d)

- Although the scope of what is included under the 'Grave Risk Exception' is determined by many factors far beyond my area of competence, I hope this presentation on the traumatic impact of domestic violence on the child and the critical data a professional assessment brings to the court will inform and improve the difficult process of decision making that falls to the judge. Child protective determinations are always painful and fraught. Still, all participants must remember that the outcome —returned or not—, is lived by the innocent children involved. For that reason, the purpose of the Hague Convention is to prioritize the child's safety over any other conditions. (Edleson, 2010)

9

EXHIBIT 16
Page 9 of 19

# References

Amaya-Jackson, L., Absher, L.E., Gerrity, E.T., Layne, C.M., Halladay Goldman, J. (2021). Beyond the ACE Score: Perspectives from the NCTSN on Child Trauma and Adversity Screening and Imp ct. Los Angeles, CA & Durham, NC: National Center for Child Traumatic Str ss. National Child Traumatic Stress Network.

Anda, R. F., Felitti, V. J., Bremner, J. D., Walker, J. D., Whitfield, C., Perry, B. D., Dube, S. R., & Giles, W. H. (20 6). The enduring effects of abuse and related adverse experiences in Childhood. A convergence of evidence from neurobiology and epidemiology, European archives of psychiatry and clinical neuroscience, 256(3), 174–186.

APSAC Task force. (2018). Challenges in the Evaluation of Child Neglect. The American Professional Society on the Abuse of Children (APSAC).

APSAC Taskforce. (2022). Forensic Mental Health Evaluations When Child Maltreatment Is at Is issue. The American Professional Society on the Abuse of Children (APSAC).

APSAC Taskforce. (2023). Forensic Interviewing of Children. The American Professional Society on the Abuse of Children (APSAC).

APSAC Taskforce. (2020). The Investigation and Determination of Suspected Psychological Maltreatment in Children and Adolescence. The American Professional Society on the Abuse of Children (APSAC).

Barnett, A., Riley, A. and Katherine. (2021) 'Experiences of Parental Alienation Interventions', in Mercer, J. and Drew, M. (eds.) *Challenging Parental Alienation New Directions for Professionals and Parents*. New York; London : Routledge.

Barnett, A. (2020) 'A genealogy of hostility: parental alienation in England and Wales'. *Journal of Social Welfare and Family Law*, 42 (1). pp. 18 - 29.

Barnett, A. (2020) 'A genealogy of hostility: parental alienation in England and Wales'. *Journal of Social Welfare and Family Law*, 42 (1). pp. 18 - 29.

Barnett, A., and Matthews, L. (2020) 'Legal responses to psychological abuse in familial settings', *Journal of Family Law*, 32 (2), pp. 213-230.

Barnett, A., and Thompson, J. (2019) 'The implications of child advocacy in domestic violence cases', *International Journal of Law, Policy and the Family*, 33 (1), pp. 46-67.

Barnett, A. (2014) 'Contact at all costs? Domestic violence and children's welfare'. *Child and Family Law Quarterly*, 26 (4). pp. 439 -

Brandt, S. (20 3). The myth of gender neutrality in family court: clinicians' perspective on determinations of 'the best interest of the child.' *International Journal of Applied Psychoanalytic Studies* 20(3), 403–434.

Butala, N., Asnes, A., Gaither, J., et al. (2013). Child safety assessments during caregivers' evaluation in emergency departments after intimate partner violence. Acad Emerg Med. 30, 23-31. doi: 10.1111/acem.14614

Campbell, J. C., Webster, D., Koziol-McLain, J., Block, C., Campbell, D., Curry, M.A., … Laughon, K. (20 3). Risk factors for femicide in abusive relationships: Results from a multisite case control study. *American Journal of Public Health*, 93(7), 1089–1097.

Campbell, J. C., Webster, D. W., & Glass, N. (20 9). The danger assessment: validation of a lethality risk assessment instrument for intimate partner femic de. J. Interpers Violence 24, 653– 74. doi: 10.1177/0886260508317180.

Center for Substance Abuse Treatment (Trauma-Informed Care in Behavioral Health Servi es. Rockville (MD): Substance Abuse and Mental Health Services Administration (US); 2 14. (Treatment Improvement Protocol (TIP) Series, No. 57.) Exhibit 1.3-4, DSM-5 Diagnostic Criteria for PTSD.

Cunha, D.R.R., Leitão, M.E., & Sani, A.I. (2024). Domestic Violence Victimization Risk Assessment in Children and Adolescents: A Systematic Review. Social Sciences, 13(5), p.259.

Dalgarno, E., Katz, E., Ayeb-Karlsson, S., Barnett, A., Motosi, P. and Verma, A. (2023) 'Swim, swim and die at the beach': family court and perpetrator induced trauma (CPIT) experiences of mothers in Brazil. *Journal of Social Welfare and Family Law*, 46 (1). pp. 11 - 38.

*Davies v. Davies*, 16 CV 6542, 2017 WL 361556 , (S.D.N.Y., January 25, 2017).

Davies, K.A., Billings, J.R., & Hood, K. (20 0). Factors influencing the recognition of intimate partner violence by health care practitioners: A qualitative meta-synthesis. Trauma, Violence, & Abuse, 11(3), 162– 75. doi: 10.1177/1524838010376001.

Davis, M.C., Parks, SE, & Cohen, L.R. (2018). The intersection of intimate partner violence and child maltreatment: Implications for policy and practice. Child Abuse & Neglect, 77, 187–192. doi: 10.1016/j.chiabu.2018.01.021

D'Andrea, W., Ford, J., Stolbach, B., Spinazzola, J. and van der Kolk, B.A., Understanding Interpersonal Trauma in Children: Why We Need a Developmentally Appropriate Trauma Diagnosis. (2012) The New School, University of Connecticut, La Rabid Children's Hospital, The Trauma Center at Justice Resource Institute.

Douglas, H., Fell, E. Malicious Reports of Child Maltreatment as Coercive Control: Mothers and Domestic and Family Violence. *J Fam Viol* 35, 827–837 (2020).

Duron, Hoge, et al. (2020) Observing Coercive Control Beyond Intimate Partner Violence: Examining the Perceptions of Professionals About Common Tactics Used in Victimization.

Edleson, J. L. (1999). The overlap between child maltreatment and woman battering. Violence Against Women, 5(2),

EXHIBIT 16
Page 10 of 19

134–154.

Edleson, J.L. Children's's Witnessing of Adult Domestic Violence, 15 J. Interpersonal Violence 8 39 (Aug. 1999)

Edleson et al. (2007) 'Assessing Child Exposure to Adult Domestic Violence,' *Children and Youth Services Review*, 29(8), pp. 961-971.

Edleson et al. (2008) 'Measuring Children's Exposure to Domestic Violence: The Development and Testing of the Child Exposure to Domestic Violence (CEDV) Scale,' *Journal of Children and Youth Services Review*, 30(5), pp. 502-511.

Edleson et al. (2010) *Multiple Perspectives on Battered Mothers and Their Children Fleeing to the United States for Safety: A Study of Hague Convention Cases.* National Institute of Justice Final Report.

*Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 409 (E.D.N.Y. 2005)

Eriksson, Maria & Broberg, Anders & Hultmann, Ole & Chawinga, Emma & Axberg, Ulf. (2022). Safeguarding Children Subjected to Violence in the Family: Child-Centered Risk Assessment International Journal of Environmental Research and Public Health. 19 Int'l J. of Environmental Research and Public Health. 13779. 10.3390/ijerph192113779.

Felitti, V. J., Anda, R. F., Nordenberg, D., Williamson, D. F., Spitz, A. M., Edwards, V., & Marks, J. S. (1998). Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults: The adverse childhood experiences (ACE). American Journal of Preventive Medicine, 14(4), 245-258.

Fernando, Michelle, and Mant, Jessica. (2023). Hearing Children's Objections in Hague Child Abduction Proceedings in England and Wales, Australia, and the SA. Laws, 12: 69. https://doi.org/10.3390/laws12040069.

Freeman, M., & Taylor, N. (20 3). Contemporary nurturing of the 1980 Hague Convent. Laws, 12, 65. https://doi.org/10.3390/laws12040065.

Friedman, M. (2014). The so-called high-conflict couple: A closer look. *The American Journal of Family Therapy*, 32(2), 101- 17. DOI: 10.1080/01926180490424217.

Goldstein, J., Solnit, A. J., Goldstein, S., & Freud, A. (1996) The best interests of the child—the least detrimental alternative. The Free Press.

Government of Canada, Department of Justice '' 'Risk Factors for Children in Family Violence During Separation.' 5. Risk Assessment Strategies and Tools - Risk Factors for Children in Situations of Family Violence in the Context of Separation and Divorce, December 8, 2021, www.justice.gc.ca/eng/rp-pr/cj-jp/fv-vf/rfcsfv-freevf/p7.html#sec58.

*Golan v. Saada*, 596 U.S. 666 (2022)

Gordon, J. B. (2021). The importance of child abuse and neglect in adult medic ne. *Pharmacology, Biochemistry, and Behavior,* 211, 173268.

Hague Mothers Briefing Paper. The 1980 Hague Convention & the flight from domestic abuse.

Haslam, N., & McGrath, M. (2020). The creeping concept of trauma. *Social Research*, 87, 509-531.

Hunter, RC., Barnett, A., Kaganas, F. and Choudhry, S. (2020) *'Domestic Abuse and Child Contact International Experience'*. Abingdon-on-Thames: Routledge.

Hunter, RC., Barnett, A., Kaganas, F. and Choudhry, S. (2020) *'Domestic Abuse and Child Contact International Experience'*. Abingdon-on-Thames: Routledge. ISSN 10: 1-003-12555-7 ISSN 13: 978-0-367-64538-0

Jain, A. (2023). Emergency Assessments of Domestic Violence, Sexual Dangerousness, and Elder and Child Abuse. Harvard University Press.

Katz, E. (2019). Coercive Control, Domestic Violence, and a Five-Factor Framework: Five Factors That Influence Closeness, Distance, and Strain in Mother-Child Relationship ps. *Violence Against Women*, 25(15), 1829–1853.

Katz, E. (2023). Dr. Emma Katz on Children and Coercive Control. PowerPoint presentation, Liverpool Hope University.

Kaye, M. (2023). Redressing the balance: Australia's approach under the Hague Abduction Convention is still endangering victims of domestic violence. *International Journal of Law, Policy, and The Family*, 37, ebac 21. https://doi.org/10.1093/lawfam/ebac021.

Kitzmann, K.M., Gaylord, N.K., Holt, A.R., & Kenny, E.D. (2003). Child witnesses to domestic violence: A meta-analytic review. J Consult Clin Psychol, 71(2), 339–352. doi: 10.1037/0022-006X.71.2.339

Leetch, E. (2023). Emergency Dept Evaluation of Child Abuse. *Emergency Medicine Clinics of North America*, 31, 853–73. http://dx.doi.org/10.1016/j.emc.2013.04.003

Lester, B., Tronick, E., Nestler, E., Abel, T., Kosofsky, B., Kuzawa, C. and Wood, M. (2011) 'Behavioral epigenetics,' *Annals of the New York Academy of Sciences*, 1226, pp. 14–33.

Maerker, A. et al (2022) Complex PTSD Lancet 400, p 60-72

Marks, J. (19 8). Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults: The Adverse Childhood Experiences (ACE) St dy. *American Journal of Preventative Medicine,* 14(4), 245–258.

Masterton, G., Rathus, Z., Flood, J., and Tranter, K. (2022) 'Experience of women survivors of family and domestic violence after been' 'Hague'd', Journal of Social Welfare and Family Law, 44(3), pp. 369–390. doi: 10.1080/09649069.2022.2102765.

Maxwell, H. (2017). The Hague Convention on the Civil Aspects of International Child Abduction 1980: The New Zealand Courts' Approach to the 'Grave Risk' Exception for Victims of Domestic Violence. Victoria U. Wellington L. Rev. 7.

Meier, J. (2020). US Child custody outcomes in cases involving parental alienation and abuse allegations: What do the

EXHIBIT 16
Page 11 of 19

data show? Journal of Social Welfare and Family, 42(1), 92– 05. Routledge.

Meier, J. S. (2021). Denial of family violence in court: An empirical analysis and path forward for family law. 110 Geo. L. Rev. 83

National Child Traumatic Stress Network (NCTSN) (2023) Beyond the ACE Score: *Perspectives from the NCTSN on child trauma and adversity screening and imp ct.* National Child Traumatic Stress Network.

National Scientific Council on the Developing Ch ld. (2022). *The Science of Neglect: The Persistent Absence of Responsive Care Disrupts the Developing Brain: Working Paper 12.* http://www.developingchild.harvard.edu

*Reyes Olguin v. Cruz Santana,* No. 03-CV-6299, 2005 WL 67094, at *7 (E.D.N.Y. Jan. 13, 2005)

Reece, D. (2022')Exposure to family violence in Hague child abduction cases,' *Emory International Law Review,* 36, pp. 81.

*Saada v. Golan,* 18-CV-5292 (AMD) (LB) (E.D.N.Y. Mar. 22, 2019).

*Saada v. Golan,* 18-CV-5292 (AMD) (RML) (E.D.N.Y. Jan. 24, 2024).

Shlonsky, A. and Friend, C. (2007) 'Child maltreatment and domestic violence editorial: current state of knowledge and emerging strategies for policy and practice,' *Brief Treatment and Crisis Intervention*

Stark, E. (2007) *Coercive control: How men entrap women in personal life.* Oxford University Press.

Spearman, K. J., Hardesty, J. L. and Campbell, J. (2023) 'Post-separation abuse: A concept analysis,' *Journal of Advanced Nursing,* 79(4), pp. 1225-1246. https://doi.org/10.1111/jan.15310.

Teicher, M. H. (2018) 'Childhood trauma and the enduring consequences of forcibly separating children from parents at the United States border,' *BMC Medicine,* 16(1), p. 146.

Teicher, M. H., Gordon, J. B. and Nemeroff, C. B. (2022) 'Recognizing the importance of childhood maltreatment as a critical factor in psychiatric diagnoses, treatment, research, prevention, and education,' *Molecular Psychiatry,* 27, pp. 1331–1338.

Teicher, M. H. and Samson, J. A. (2016) 'Annual research review: Enduring neurobiological effects of childhood abuse and neglect,' *Journal of Child Psychology and Psychiatry,* 57(3), pp. 241–266.

Teicher, MH.(N/D) Windows of Vulnerability: Neurobiology of Childhood Abuse (attached PowerPoint by author).

Trimmings, K., Momoh, O. and Kalaitsoglou, K. (2023) 'The interplay between the 1980 Hague Convention on the Civil Aspects of International Child Abduction and Domestic Violence', Laws, 12, p. 78. https://doi.org/10.3390/laws12050078.

Tronick, E. and Hunter, R. G. (2016) 'Waddington, dynamic systems, and epigenetics,' *Frontiers in Behavioral Neuroscience,* 10, p. 107.

Tronick, E. (ed.) (2007) *The neurobehavioral and social-emotional development of infants and children*, W.W. Norton & Co.

Tronick, E., and Hunter, R. (2021) 'Keeping complexity in mind,' *Developmental Human Behavioral Epigenetics*, pp. xi– vi. Elsevier.

Vial, Annemiek & Assink, Mark & Stams, Geert Jan J.M. & van der Put, Claudia (2020) 'Safety assessment in child welfare: A comparison of instrument'' Children and Youth Services Review, Elsevier, vol. 108(C).

Zolotor, A. J., Theodore, A. D., Coyne-Beasley, T. and Runyan, D. K. (2007) 'Intimate partner violence and child maltreatment: Overlapping risk,' *Brief Treatment and Crisis Intervention: A Journal of Evidence-Based Practice.*

---

**FiLiA Hague Mothers**

FiLiA Hague Mothers is a MVAWG project. Our overarching aim is to end the injustices created by The Hague Convention on the Civil Aspects of International Child Abduction, specifically for mothers and children who are victims of domestic abuse.

EXHIBIT 16
Page 12 of 19

Endnotes

1. DSM-5 Diagnostic Criteria for PTSD

Note: The following criteria apply to adults, adolescents, and children older than 6 years. For children 6 years and younger, see the DSM-5 section titled 'Posttraumatic Stress Disorder for Children 6 Years and Younger' (APA, 2013a).

A. Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:

1. Directly experiencing the traumatic event(s).
2. Witnessing, in person, the event(s) as it occurred to others.
3. Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental.
4. Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains; police officers repeatedly exposed to details of child abuse). Note: Criterion A4 does not apply to exposure through electronic media, television, movies, or pictures, unless this exposure is work related.

B. Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:

1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s). Note: In children older than 6 years, repetitive play may occur in which themes or aspects of the traumatic event(s) are expressed.
2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s). Note: In children, there may be frightening dreams without recognizable content.
3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.) Note: In children, trauma-specific reenactment may occur in play.
4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).
5. Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

C. Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:

1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).
2. Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

D. Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1. Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia, and not to other factors such as head injury, alcohol, or drugs).
2. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., 'I am bad,' 'No one can be trusted,' 'The world is completely dangerous,' 'My whole nervous system is permanently ruined').
3. Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others.
4. Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame).
5. Markedly diminished interest or participation in significant activities.
6. Feelings of detachment or estrangement from others.
7. Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings).

EXHIBIT 16
Page 13 of 19

E. Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1. Irritable behavior and angry outbursts (with little or no provocation), typically expressed as verbal or physical aggression toward people or objects.
2. Reckless or self-destructive behavior.
3. Hypervigilance.
4. Exaggerated startle response.
5. Problems with concentration.
6. Sleep disturbance (e.g., difficulty falling or staying asleep or restless sleep).

F. Duration of the disturbance (Criteria B, C, D and E) is more than 1 month.

G. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

H. The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition.

2. DSM Criteria for PTSD Dissociative Type

**With dissociative symptoms:** The individual's symptoms meet the criteria for posttraumatic stress disorder, and in addition, in response to the stressor, the individual experiences persistent or recurrent symptoms of either of the following:

1. **Depersonalization:** Persistent or recurrent experiences of feeling detached from, and as if one were an outside observer of, one's mental processes or body (e.g., feeling as though one were in a dream; feeling a sense of unreality of self or body or of time moving slowly).
2. **Derealization:** Persistent or recurrent experiences of unreality of surroundings (e.g., the world around the individual is experienced as unreal, dreamlike, distant, or distorted). Note: To use this subtype, the dissociative symptoms must not be attributable to the physiological effects of a substance (e.g., blackouts, behavior during alcohol intoxication) or another medical condition (e.g., complex partial seizures).

3. DSM Criteria for Childhood PTSD (under age 6)

Diagnostic Criteria for Posttraumatic Stres Disorder for Children 6 Years of Age and Younger:

Criterion A: Stressor

In children 6 years and younger, exposure to actual or threatened death, serious injury, or sexual violence in 1 (or more) of the following ways:

• Directly experiencing the traumatic event(s)
• Witnessing, in person, the event(s) as it occurred to others, especially primary caregivers. This does not include events witnessed only in electronic media, television, movies, or pictures.
• Learning that the traumatic event(s) occurred to a parent or caregiving figure.

EXHIBIT 16
Page 14 of 19

Criterion B: Intrusion Symptoms

Presence of 1 (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred as follows:

- Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s)
- Recurrent distressing dreams in which the content and/or effect of the dream are related to the traumatic event(s)
- Dissociative reactions in which the child feels or acts as if the traumatic event(s) were recurring
- Intense or prolonged psychological distress on exposure to internal or external clues that symbolize or resemble an aspect of the traumatic event(s)
- Marked physiological reactions to reminders of the traumatic event(s)

Criterion C: Avoidance

One (or more) of the following symptoms, representing either persistent avoidance of stimuli associated with the traumatic event(s) or negative alterations in cognitions and mood associated with the traumatic event(s), must be present, beginning after the event(s) or worsening after the event(s).

- Persistent Avoidance of Stimuli
- Avoidance of or efforts to avoid activities, places, or physical reminders that arouse recollections of the traumatic event(s)
- Avoidance of or efforts to avoid people, conversations, or interpersonal situations that arouse recollections of the traumatic event(s)
- Negative Alterations in Cognitions
- Substantially increased frequency of negative emotional states
- Markedly diminished interest or participation in significant activities, including constriction of play
- Socially withdrawn behavior
- Persistent reduction in the expression of positive emotions

Criterion D: Alterations in Arousal and Reactivity

Alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by 2 (or more) of the following:

- Irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects (including extreme temper tantrums)
- Hypervigilance
- Exaggerated startle response
- Problems with concentration
- Sleep disturbance

Criterion E: Duration

Persistence of symptoms in Criterion A, B, C, and D for more than 1 month.

Criterion F: The disturbance causes significant functional impairment or distress in various areas of life, such as social or educational.

EXHIBIT 16
Page 15 of 19

4.  ICD 11 Criteria for Complex PTSD

Complex post traumatic stress disorder (Complex PTSD) is a disorder that may develop following exposure to an event or series of events of an extremely threatening or horrific nature, most commonly prolonged or repetitive events from which escape is difficult or impossible (e.g. torture, slavery, genocide campaigns, prolonged domestic violence, repeated childhood sexual or physical abuse). All diagnostic requirements for PTSD are met.

In addition, Complex PTSD is characterised by severe and persistent 1) problems in affect regulation; 2) beliefs about oneself as diminished, defeated or worthless, accompanied by feelings of shame, guilt or failure related to the traumatic event; and 3) difficulties in sustaining relationships and in feeling close to others.

- Severe and pervasive problems in affect regulation. Examples include heightened emotional reactivity to minor stressors, violent outbursts, reckless or self-destructive behaviour, dissociative symptoms when under stress, and emotional numbing, particularly the inability to experience pleasure or positive emotions.
- Persistent beliefs about oneself as diminished, defeated or worthless, accompanied by deep and pervasive feelings of shame, guilt or failure related to the stressor. For example, the individual may feel guilty about not having escaped from or succumbing to the adverse circumstance, or not having been able to prevent the suffering of others.
- Persistent difficulties in sustaining relationships and in feeling close to others. The person may consistently avoid, deride or have little interest in relationships and social engagement more generally. Alternatively, there may be occasional intense relationships, but the person has difficulty sustaining them.
- The disturbance results in significant impairment in personal, family, social, educational, occupational or other important areas of functioning. If functioning is maintained, it is only through significant additional effort.

Additional Clinical Features:  Suicidal ideation and behaviour, substance abuse, depressive symptoms, psychotic symptoms, and somatic complaints may be present.

Course Features: The onset of Complex Post-Traumatic Stress Disorder symptoms can occur across the lifespan, typically after exposure to chronic, repeated traumatic events and/or victimization that have continued for a period of months or years at a time.

Symptoms of Complex Post-Traumatic Stress Disorder are generally more severe and persistent in comparison to Post-Traumatic Stress Disorder. Exposure to repeated traumas, especially in early development, is associated with a greater risk of developing Complex Post-Traumatic Stress Disorder rather than Post-Traumatic Stress Disorder Read more: http://traumadissociation.com/complexptsd

EXHIBIT 16
Page 16 of 19

5. APSAC PSYCHOLOGICAL MALTREATMENT

According to the Federal Child Abuse and Treatment Act of 2010 [10, 11], Child abuse and neglect means, at a minimum, 'any recent act or failure to act on the part of a parent or caretaker which results in death, serious physical or emotional harm, sexual abuse or exploitation, or an act or failure to act which presents an imminent risk of serious harm.' Child abuse and neglect, also referred to as child maltreatment, includes all forms of violence against children. There is no uniform legal definition of each type of child abuse, including psychological maltreatment (PM), across state child abuse statutes [12], which are found in one or more of civil or criminal statutes.

The term psychological is used because PM is (a) a symbolic, sometimes verbal, communication from the perpetrator to the child and (b) unless the child dies immediately from maltreatment, the most prominent lasting features, central meanings, and impact of the victim's maltreatment experience are mental, affecting the thoughts and feelings the child has in response to the abuse or neglect. The major psychological domains affected are thinking (cognitive), feeling/emotion (affective), and from these, impulse or will to action (conative/volitional). Human beings are constantly searching for meaning and understanding. As developmentally possible, they interpret what is being done to them and around them, which then shapes efforts to have their needs met [13, 14, 15]. PM includes acts of commission (e.g., verbal attacks on the child by a caregiver) and acts of omission (e.g., emotional unresponsiveness of a caregiver). Most of the state legal definitions of PM (often labeled in state laws as 'emotional abuse' or 'mental injury') refer to the impact on the child as opposed to the caregiver behaviors. In contrast, these guidelines define PM as caregiver behavior that is likely to harm or has harmed a child.

Psychological maltreatment is defined as a repeated pattern or extreme incidents) of caretaker behavior that thwart the child's basic psychological needs (e.g., safety, socialization, motional and social support, cognitive stimulation, respect) and convey a child is worthless, defective, damaged goods, unloved, unwanted, endangered, primarily useful in meeting mother's needs, and/or expendable. Its subtypes and their forms follow.

Spurning embodies verbal and nonverbal caregiver acts that reject and degrade a child, including the following:
1.  belittling, degrading, and other nonphysical forms of hostile or rejecting treatment;
2.  shaming and or ridiculing the child, including the child's physical, psychological, and
3.  behavioral characteristics, such as showing normal emotions of affection, grief, anger, or fear;
4.  consistently singling out one child to criticize and punish, to perform most of the household chores, and/or to receive fewer family assets or resources (e.g., food, clothing);
5.  humiliating, especially when in public;
6.  any other physical abuse, physical neglect, or sexual abuse that also involves spurning the child, such as telling the child that he or she is dirty or damaged due to or deserving sexual abuse; berating the child while beating him or her; telling the child that he or she does not deserve to have basic needs met.

Terrorizing is caregiver behavior that threatens or is likely to physically hurt, kill, abandon, or place the child or child's loved ones or objects in recognizably dangerous or frightening situations. Terrorizing includes the following:
1.  subjecting a child to frightening or chaotic circumstances;
2.  placing a child in recognizably dangerous situations;
3.  threatening to abandon or abandoning the child;'
4.  setting rigid or unrealistic expectations with threat of loss, harm, or danger if they are not met;
5.  threatening or perpetrating violence (which is also physical abuse) against the child;
6.  threatening or perpetrating violence against a child's loved ones, pets, or objects, including domestic/intimate partner violence observable by the child;
7.  preventing a child from having access to needed food, light, water, or access to the toilet;
8.  preventing a child from needed sleep, relaxing, or resting;
9.  any other acts of physical abuse, physical neglect, or sexual abuse that also involve terrorizing the child (e.g., forced intercourse; beatings and mutilations).

Exploiting/corrupting are caregiver acts that encourage the child to develop inappropriate behaviors and attitudes (i.e., self-destructive, antisocial, criminal, deviant, or other maladaptive behaviors). While these two categories are conceptually distinct, they are not empirically distinguishable and, thus, are described as a combined subtype. Exploiting/corrupting includes the following:
1.  modeling, permitting, or encouraging antisocial behavior (e.g., prostitution, performance in pornography, criminal

EXHIBIT 16
Page 17 of 19

activities, substance abuse, violence to or corruption of others);
2.  modeling, permitting, or encouraging betraying the trust of or being cruel to another person;
3.  modeling, permitting, or encouraging developmentally inappropriate behavior (e.g., parentification, adultification, infantilization);
4.  subjecting the observing child to belittling, degrading, and other forms of hostile or rejecting treatment of those in significant relationships with the child such as parents, siblings, and extended kin;
5.  coercing the child's submission through extreme over-involvement, intrusiveness, or dominance, allowing little or no opportunity or support for child's views, feelings, and wishes; forcing the child to live the parent's dreams, manipulating or micromanaging the child's life (e.g., inducing guilt, fostering anxiety, threatening withdrawal of love, placing a child in a double bind in which the child is doomed to fail or disappoint, or disorienting the child by stating something is true (or false) when it patently is not);
6.  restricting, interfering with, or directly undermining the child's development in cognitive, social, affective/ emotional, physical, or cognitive/volitional (ie., acting from emotion and thinking; choosing, exercising will) domains, including Caregiver Fabricated Illness also known as medical child abuse;
7.  any other physical abuse, physical neglect, or sexual abuse that also involves exploiting/corrupting the child (such as incest and sexual grooming of the child).

**Emotional Unresponsiveness** (ignoring) embodies caregiver acts that ignore the child's attempts and needs to interact (failing to express affection, caring, and love for the child) and showing little or no emotion in interactions with the child. It includes the following:
1.  being detached and uninvolved;
2.  interacting only when absolutely necessary;
3.  failing to express warmth, affection, caring, and love for the child;
4.  being emotionally detached and inattentive to the child's needs to be safe and secure, such as failing to detect a child's victimization by others or failing to attend to the child's basic needs;
5.  any other physical abuse, physical neglect, or sexual abuse that also involves emotional unresponsiveness.

**Isolating** embodies caregiver acts that consistently and unreasonably deny the child opportunities to meet needs for interacting/communicating with peers or adults inside or outside the home. Isolating includes the following:
1.  confining the child or placing unreasonable limitations on the child's freedom of movement within his or her environment;
2.  placing unreasonable limitations or restrictions on social interactions with family members, peers, or adults in the community;?
3.  any other physical abuse, physical neglect, or sexual abuse that also involves isolating the child, such as preventing the child from social interaction with peers because of the poor physical condition or interpersonal climate of the home.

**Mental Health, Medical, and Educational Neglect** embodies caregiver acts that ignore, refuse to allow, or fail to provide the necessary treatment for the mental health, medical, and educational problems or needs of the child. This includes the following:
1.  ignoring the need for, failing, or refusing to allow or provide treatment for serious emotional/behavioral problems or needs of the child;
2.  ignoring the need for, failing, or refusing to allow or provide treatment for serious physical health problems or needs of the child;
3.  ignoring the need for, failing, or refusing or allow or provide treatment for services for serious educational problems or needs of the child;
4.  any other physical abuse, physical neglect, or sexual abuse that also involve mental health, medical, or educational neglect of the child.

EXHIBIT 16
Page 18 of 19

6. Summary of impact of DV at different ages

**Pregnancy:** Due to the heightened risk to pregnant mothers, unborn children are also at an increased risk for mortality.

**Ages 0-3:** Highly vulnerable time as this is when early attachment security is so essential. Impact is seen in the development of PTSD, aggressive behavior, psychosomatic symptoms, a lower IQ and even an effect on the genetic material of the child (telomeres) that result in more rapid cellular aging.

**Ages 4-12:** PTSD as well as self blame, internalizing symptoms'of anxiety and depression, social withdrawal or acting out.

**Adolescence:** Onset of serious depression, suicidal and self-harm states, avoidance of attachments to others, anti-social behavior, eating disorders.

EXHIBIT 16
Page 19 of 19

# YOU CAN AND YOU SHOULD:

## How Judges Can Apply the Hague Abduction Convention to Protect Victims of Domestic Violence

### Merle H. Weiner

ABOUT THE AUTHOR

Philip H. Knight Professor of Law, University of Oregon. This article is dedicated to Ray Calamaro, an attorney at Hogan Lovells who worked with this author to try to change the International Child Abduction Remedies Act in ways that would have benefited survivors. I also thank the following individuals for their helpful comments on an earlier draft of this article: Jeffrey Brand (formerly Brand-Ballard), Pam Brown, Jeff Edleson, Taryn Lindhorst, Tom Lininger, Joan Meier, Lynn Hecht Schafran, and Maria Jose Vallejo. A special thanks to Brian Ogolsky for inviting me to present part of this work at the National Council on Family Relations' annual meeting. I appreciated the comments from my co-panelists and the commentator, Robin Wilson. As always, I could not have completed this article without the help of my research assistants; thank you Rowan Bond, Zack Johnson, Kaitlyn Lindaman, Mackenzie Lang, Madeline Monien, and Ben Molloy. Finally, I want to thank Gabriella Kamran at the *UCLA Women's Law Journal* for her excellent editing.

### TABLE OF CONTENTS

INTRODUCTION ....................................................................... 224

I.   JUDGES OFTEN FEEL CONFLICTED WHEN ADJUDICATING A
     HAGUE CONVENTION CASE INVOLVING DOMESTIC VIOLENCE ... 231
     A. *Domestic Violence Is Not Expressly Relevant
        to the Hague Convention* .................................................. 233
     B. *Return of a Child Can Harm the Child,
        the Taking Parent, and Other Survivors* ........................... 236
     C. *It's Up to Judges to Reach Just Results in These Cases* ... 243

II.  ARTICLE 13(B) IS MORE HELPFUL THAN JUDGES MAY THINK. 250

© 2021 Merle H. Weiner. All rights reserved.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 1 of 110

A. *The Child Need Not Be the Target of the Violence* .......... 251
B. *All Types of Domestic Violence Are Relevant* ................. 257
    1. A Danger of Physical Harm Can Exist Even
       Without a History of Severe and Frequent
       Physical Violence .......................................... 263
    2. All Forms of Domestic Violence Can Cause
       Harm to the Taking Parent and Child ........................ 267
C. *The Domestic Violence Need Not Recur in the Future* ... 270
D. *An Intolerable Situation Differs From Physical
   or Psychological Harm* ...................................... 272
E. *The Harm Caused By Separating the Child From
   the Taking Parent Is Relevant* .............................. 278
F. *Protective Measures Are Generally Unhelpful* ............... 282
    1. Protective Measures Do Not Eliminate the Risk
       of Exposure to Harm ........................................ 282
    2. Protective Measures Need Not Necessarily Be
       Canvassed .................................................. 290
    3. Experts Can Help, But Not By Assessing
       the Effectiveness of Protective Measures ................... 296
G. *Survivors are Usually Truthful Despite Credibility
   Concerns* ................................................... 301
H. *Clear and Convincing Evidence Only Needs to Exist
   for the Ultimate Issue, Not for Predicate Facts* ............ 312
I. *Only a Grave Risk of Exposure, Not a Grave Risk
   of Harm or a Grave Harm, Is Required* ....................... 316
III. JUDGES SHOULD OFTEN GRANT THE ARTICLE 13(B)
     DEFENSE EVEN WHEN THE LAW REQUIRES OTHERWISE .......... 321
     A. *The Justification for Deviation* ........................ 323
     B. *The Method of Deviating* ............................... 330
CONCLUSION ....................................................... 332

## INTRODUCTION

This Article is written for trial judges who adjudicate cases pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention),[1] although appellate judges, lawyers, and scholars may also find it of interest. Trial judges are my target audience because they are the best defense against the potential injustice that the Hague Convention creates for domestic violence victims who flee transnationally with their children for safety, then face their batterers' petitions for the children's return.

---

1.    Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, *opened for signature* Oct. 25, 1980, T.I.A.S. 11670, 1343 U.N.T.S. 89 (entered into force Dec. 1, 1983).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 2 of 110

The trial judge decides whether a child is returned to the place from which the domestic violence victim fled or whether a child is allowed to remain in the United States pursuant to an exception to the Hague Convention's remedy of return.

While the Hague Convention permits the trial judge to refuse to return a child when the taking parent is a domestic violence victim, and while more people than ever before recognize the appropriateness of nonreturn in this context,[2] the law limits the nonreturn option. In fact, many judges complain that the law is too confining; they lament having to return the child but feel as though the law gives them no choice.[3] Legislators have refused to make the judges' job any easier.[4] While judges now have helpful authority in some appellate decisions and the Hague Conference on Private International Law's new *Guide to Good Practice on Article 13(b),*[5] these sources are uneven and still insufficient. In light of this reality, this Article aims to provide trial judges, as well as their law clerks, the tools and encouragement to promote justice and safety in these cases, even when the legal doctrine may be problematic.

Alleviating judicial discomfort is not my sole purpose, however. Judge Alex Kozinski once wrote, "A troubled [judicial] conscience is certainly not pleasant, but the real-life, brutal consequences of an unjust judicial decision are suffered by others."[6] My chief objective is to change outcomes for domestic violence victims and their children who might otherwise lose. Trial judges too often return children even when the result is detrimental to children and unjust, and even when the law affords them the ability to do otherwise. In 2010, the Department of State admitted that "many" judges in the United States hearing these cases are "disinclined" to rule that domestic violence perpetrated against a parent is sufficient for an exception to the remedy of return and instead issue return orders.[7] The State Depart-

---

2. *In re* M.V.U., 2020 IL App (1st) 191762, ¶ 40 ("Since the adoption of the Hague Convention, there has been a shift toward recognizing domestic violence as posing a grave risk toward the child.").

3. *See infra* text accompanying notes 33–35.

4. *See infra* text accompanying notes 84–86.

5. Hague Conference on Private International Law, 1980 Child Abduction Convention Guide to Good Practice, Part VI–Article 13(1)(b)(2020) [hereinafter Guide to Good Practice], *available at* https://www.hcch.net/en/publications-and-studies/details4/?pid=6740 [https://perma.cc/Y9Y3-276B].

6. Alex Kozinski, *The Real Issues of Judicial Ethics*, 32 Hofstra L. Rev. 1095, 1102 (2004).

7. Hague Conference on Private International Law, U.S. Response to Preliminary Doc. No. 1, Questionnaire Concerning the Practical Operation of the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction and the Hague Convention of 19

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 3 of 110

ment acknowledged that these cases raise "significant issues related to the safety of the child and the accompanying parent."[8]

A recent sample of appellate cases indicates that the State Department's conclusion is still valid. I analyzed all Hague Convention decisions issued by the U.S. Courts of Appeals from July 2017 through January 2018, a time period I call "T2."[9] The sample paralleled a set of cases from July 2000 through January 2001 that I analyzed for an earlier article,[10] a period I call "T1." A comparison of the cases decided in T1 and T2 reveals that the percentage of Hague Convention appellate cases involving allegations of domestic violence has remained the same: 78 percent.[11] However, domestic

---

OCTOBER 1996 ON JURISDICTION, APPLICABLE LAW, RECOGNITION, ENFORCEMENT AND CO-OPERATION IN RESPECT OF PARENTAL RESPONSIBILITY AND MEASURES FOR THE PROTECTION OF CHILDREN § 5.1 (Nov. 2010), *available at* http://www.hcch.net/index_en.php?act=publications.details&pid=5291&dtid=33 [https://perma.cc/2BT8-V976] (follow "United States" hyperlink).

8.   HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, U.S. RESPONSE TO PRELIMINARY DOC. NO. 2, QUESTIONNAIRE ON THE DESIRABILITY AND FEASIBILITY OF A PROTOCOL TO THE HAGUE CONVENTION OF 25 OCTOBER 1980 ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION, § 5.1 (Dec. 2010) [hereinafter U.S. RESPONSE TO PRELIMINARY DOC. NO. 2], *available at* http://www.hcch.net/index_en.php?act=publications.details&pid=5290&dtid=33 [https://perma.cc/8RGB-6F69] (follow "United States" hyperlink).

9.   The absolute number of appeals was eleven. The number was derived by searching LEXIS for "international w/3 child w/3 abduction." Timeline filters were then used to include only cases from "July 1, 2017 to Feb. 1, 2018." The cases were restricted to federal appellate courts by using the court filter. *See also* note 15 (explaining two cases were excluded from the analysis).

10.   Merle H. Weiner, *Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 33 COLUM. HUM. RTS. L. REV. 275, 276–78 (2002).

11.   The domestic violence allegations were evident in some T2 appellate opinions. *See, e.g.*, Soto v. Contreras, 880 F.3d 706 (5th Cir. 2018); Orellana v. Cartagena, No. 17-6520, 2018 U.S. App. LEXIS 1161, at *2 (6th Cir. Jan. 17, 2018); Davies v. Davies, 717 F. App'x 43 (2d Cir. 2017); Taglieri v. Monasky, 876 F.3d 868, 871–72 (6th Cir. 2017). In other cases, the allegations were evident in the trial court's or magistrate's opinion. *See, e.g.*, Rath v. Marcoski, 2016 U.S. Dist. LEXIS 167685 (M.D. Fla. Oct. 3, 2016); Cunningham v. Cunningham, 237 F. Supp. 3d 1246, 1279 (M.D. Fla. 2017). In still other cases, the allegations only emerged from the pleadings, and I sometimes made a judgment call when classifying the case as involving allegations of "domestic violence." *Compare* Respondent's Answer to Amended Verified Complaint and Petition for Return of Children § 16, Ahmed v. Ahmed, No. 3:16-CV-142, 2016 WL 4691599 (E.D. Tenn. Sept. 7, 2016), *aff'd*, 867 F.3d 682 (6th Cir. 2017) ("Father's ongoing emotional and verbal abuse was a factor in the deterioration of their marriage . . . .") (included in cases involving allegations of abuse) *with* Verified Answers and Defenses to Petition for Return of Child ¶ 32, Blackledge v. Blackledge, Civil Action No. 2:16–10004, (W.D. Penn. filed Aug. 1, 2016) ("Communication became difficult

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 4 of 110

violence victims had far less success in T2 than T1. In T2, abductors who alleged they were domestic violence victims were successful at trial only 29 percent of the time.[12] In contrast, the success rate at trial for alleged domestic violence victims in T1 was 43 percent.[13] In

---

between the parties as Petitioner/Plaintiff was calling Defendant/Respondent names.") (not included in cases involving allegations of abuse) *and* Cartes v. Phillips, 240 F. Supp. 3d 669 (S.D. Tex. 2017) ("[T]he marriage was 'in distress' almost from its inception. Discord and conflict marked the parties' entire relationship — escalating and plummeting from time-to-time, with discussions of divorce mentioned throughout.") (not included in cases alleging abuse because no article 13(b) defense raised). In only one of the cases was the father the abductor and the mother the alleged domestic violence perpetrator. *See Cunningham*, 237 F. Supp. 3d, *supra*.

Admittedly, the high percentage of appellate cases with domestic violence allegations tells us nothing about the actual percentage of Hague Convention cases that involve domestic violence. Domestic violence victims may be over-represented in the sample of appellate cases because they may appeal more often than other litigants, especially if they are concerned about the safety of their children. In fact, there were thirty Hague Convention trial court decisions issued during T2, but only four cases involved allegations of domestic violence, and only two involved the classic fact pattern of mothers who claimed to be fleeing with their children to avoid domestic violence. *See* Ischiu v. Garcia, 274 F. Supp. 3d 339 (D. Md. 2017) (mother respondent prevailed); Orellana v. Cartagena, No. 3:16-CV-444-CCS, 2017 WL 5586374 (E.D. Tenn. 2017) (father petitioner prevailed). The other two were cases in which the merits were not adjudicated, but rather a temporary restraining order (TRO) was sought pending the adjudication. *See* Arjouan v. Cabré, No. 17-CV-782, 2017 WL 5891760 (D. N.M. Nov. 28, 2017) (mother abductor); Muwakil-Zakuri v. Zakuri, 2017 U.S. Dist. LEXIS 205373 (D. Conn. Dec. 11, 2017) (father abductor). The thirty trial court decisions were derived using the following search in the federal court database on Westlaw: "international w/3 child w/3 abduction & DA(aft 06/2017) & DA(bef 02/2018) & PR(district)." Ten cases were discarded as duplicates or not involving petitions under the Hague Convention.

12.   This statistic is in line with Nigel Lowe's finding that a judicial return order was made in 65 percent of court decisions worldwide. Nigel Lowe & Victoria Stephens, A Statistical Analysis of Applications Made in 2015 Under the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction Part I–Global Report, 3 (Hague Conference on Private International Law, Feb. 2018), https://assets.hcch.net/docs/d0b285f1-5f59-41a6-ad83-8b5cf7a784ce.pdf [https://perma.cc/FJ66-Q9BH].

13.   Diorinou v. Mezitis, 237 F.3d 133, 136, 144 (2d Cir. 2001) (mother, who alleged domestic violence, won initially, and prevailed on appeal); Kanth v. Kanth, 232 F.3d 901 (10th Cir. 2000) (mother, who alleged domestic violence, won initially and prevailed on appeal) [*see also* Kanth v. Kanth, No. 20010718-CA, 2002 WL 31770985, at *4 (Ct. App. Utah Dec. 12, 2002)]; Blondin v. Dubois, 238 F.3d 153, 156 (2d Cir. 2001) (mother, who alleged domestic violence, won initially and prevailed on remand); *In re* Tsarboupoulos, 243 F.3d 550, No. CV-00–00083-AAM, 2000 WL 1721800, at *2 (9th Cir. 2000) (unpublished table decision) (mother, who alleged domestic violence, lost initially, but prevailed on appeal and won on remand); Whallon v. Lynn, 230 F.3d 450, 452 (1st Cir. 2000) (mother, who alleged domestic violence, lost initially and lost on appeal); Croll

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 5 of 110

addition, alleged domestic violence victims in T2 had much less success on appeal; in fact, they *always* lost on appeal, as did all other appellants in the sample.  In contrast, of the four victims who alleged domestic violence in T1 and lost at trial, three prevailed on appeal.[14]  Overall, domestic violence survivors were successful in 86 percent of the cases in T1, but only 29 percent of the cases in T2.

While the T2 cases are a small sample, they reveal that respondents who allege domestic violence in defense of a Hague Convention petition for the child's return are losing more often than they did approximately twenty years ago despite some improvements in the law.  The cases reveal new obstacles to domestic violence survivors' success in defending against a Hague Convention petition for return, including trial judges' misunderstandings about domestic violence, doubts about survivors' credibility, and unwarranted faith in protective measures.  The T2 cases also indicate that it is essential for trial judges to get the result right because appellate courts are unlikely to reverse.

Part I of this Article starts by acknowledging that these cases can be difficult for judges and describing why the black letter law leads to unjust outcomes.  It suggests that the definition of "wrongful removal or retention," coupled with a limited "grave risk" defense in article 13(b), causes judges to order children's return to their state of habitual residence even when, all things considered, that is the wrong outcome.  It substantiates the injustice of return by discussing what happens to survivors and children after the children are returned, pursuant to court order.  Part I also discusses the failure of Congress and the Hague Conference to eliminate this injustice through legislative changes, but notes the Hague Conference's development of a new soft-law instrument that may improve outcomes in these cases: the *Guide to Good Practice on Article 13(b)* (*Guide to Good Practice*) and its sanctioned *National Domestic and Family Violence Bench Book of Australia* (*Australian Bench Book*).

Part II then discusses how a judge can reach a just outcome by applying existing law.  It focuses on the Hague Convention's "grave risk" defense in article 13(b) as it is the most common defense raised by domestic violence victims.[15]  Article 13(b) allows a judge

---

v. Croll, 229 F.3d 133 (2d Cir. 2000) (mother, who alleged domestic violence, lost initially, but prevailed on appeal) [*see also* Croll v. Croll, 66 F. Supp. 2d 554, 561–62 (S.D. NY 1999)]; Walsh v. Walsh, 221 F.3d 204, 209 (1st Cir. 2000) (mother, who alleged domestic violence, lost at first instance, but won on appeal with directions that the petition be dismissed on remand).

14.    *Walsh*, 221 F.3d at 209.

15.    *See* Jeffrey L. Edleson & Taryn Lindhorst, Multiple Perspectives on Battered Mothers and their Children Fleeing to the United States for

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 6 of 110

to deny the child's return if "there is a grave risk" that the child's return "would expose the child to physical or psychological harm or otherwise put the child in an intolerable situation."[16]  This defense provides judges considerable discretion to make factual and normative determinations.  Yet, case law suggests judges face obstacles that inhibit their application of the article 13(b) defense.  Part II shares information, arguments, and insights, including from the *Guide to Good Practice* and the *Australian Bench Book,* that can help judges eliminate those obstacles.[17]

Finally, Part III acknowledges that judges may sometimes find the law too limiting even after the tools in Part II are used.  For example, a judge may feel compelled to return the child because the domestic violence is not serious enough, or the country of the child's habitual residence, to which the child will be returned, appears able to protect the mother and child upon return.  Part III argues that a judge should not return children in many of these cases, either.  Building on the work of Jeffrey Brand-Ballard,[18] I argue that judges should deviate from the law because return in these cases is a suboptimal outcome and often unjust.  I then recommend that the deviation be accomplished subversively.[19]  This recommendation is not as radical as it may sound.  Paul Butler argues that this practice "is far more common than is openly acknowledged."[20]  He suggests judg-

---

SAFETY: A STUDY OF HAGUE CONVENTION CASES 281, tbl.10.4 (2010) (reporting that grave risk defense was raised in 81 percent of the cases involving domestic violence and successful 26 percent of the time); LOWE & STEPHENS, *supra* note 12, at 15–16 (finding from worldwide data that when a court refuses to return a child, the two most common reasons are that the child was not habitually resident in the requesting state, and/or that the article 13(b)(1) defense exists). In the T2 sample, two issues predominated on appeal: the article 13(b) defense and the child's "habitual residence."  Nine of the eleven T2 cases contained one or both of these issues.  I excluded two cases from my analysis because courts resolved them on unusual grounds.  *See* Marks v. Hochhauser, 876 F.3d 416 (2017) (holding that the treaty did not apply when the mother's retention of the children occurred prior to the treaty's entry into force between Thailand and the United States); Silverman v. Silverman, 703 F. App'x 596 (2017) (rejecting attempt to remove case to federal court with erroneous claim that the Hague Convention was implicated).

16.  Hague Convention, *supra* note 1, at art. 13(b).

17.  Part II serves as a checklist that can decrease judicial mistakes.  *See generally* Chris Guthrie, Jeffrey J. Rachlinski & Andrew J. Wistrich, *Blinking on the Bench: How Judges Decide Cases*, 93 CORNELL L. REV. 1, 40–41 (2007).

18.  JEFFREY BRAND-BALLARD, LIMITS OF LEGALITY: THE ETHICS OF LAWLESS JUDGING (Oxford Univ. Press, 2010).

19.  *See* Paul Butler, *When Judges Lie (and When They Should)*, 91 MINN. L. REV. 1785, 1802–05 (2007).

20.  *Id.* at 1785.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 7 of 110

es can and do engage in "ethical subversion:"[21] they "us[e] their power responsibly and effectively"[22] by being "outcome-determinative and crafty"[23] and by writing a decision that will survive appellate review.[24] Butler suggests that trial judges, who are often factfinders, can do this best.[25]

This Article has two strands: one pragmatic and one theoretical. This Article is pragmatic because it is meant to function like an amicus brief. Most trial judges in the United States never hear more than one or two Hague Convention cases and may not know much of the information about the Hague Convention or domestic violence that this Article shares.[26] The information about domestic violence is meant to promote better outcomes because "[p]reconceptions matter" to factfinding[27] and many judges, like the general public, have misconceptions about domestic violence.[28] Judges will find that much of the information will be useful for adjudicating actual cases, as it will qualify as adjudicative facts beyond reasonable dispute of which a court can take judicial notice,[29] including *sua sponte*,[30] or will qualify

---

21.  *Id.* at 1819.

22.  *Id.* at 1811.

23.  *Id.* at 1818.

24.  *Id.* at 1809.

25.  *Id.* at 1818.

26.  Merle H. Weiner, *Shrinking the Bench: Should United States Federal Courts Have Exclusive or Any Jurisdiction to Adjudicate Icara Cases?*, 9 J. Comp. L. 192, 214–15 (2014).

27.  Richard A. Posner, How Judges Think 68 & n.15 (2008); *id.* at 69 (a judge's precepts are "shaped by [his] experience, temperament, ideology, or other personal, nonlegalist factors[,]" and sometimes it is "rational and . . . inevitable" that he relies on them "as a tiebreaker" in determining witness credibility).

28.  *See generally* Molly Dragiewicz, *Gender Bias in the Courts: Implications for Battered Mothers and Their Children*, *in* Domestic Violence, Abuse, and Child Custody: Legal Strategies and policy Issues § 5-1 (Mo Therese Hannah & Barry Goldstein eds., 2010); Laurie S. Kohn, *Barriers to Reliable Credibility Assessments: Domestic Violence Victim-Witnesses*, 11 Am. U. J. Gender Soc. Pol'y & L. 733 (2002) (discussing misconceptions about domestic violence and its impact on civil and criminal cases); Debra Pogrund Stark & Jessica M. Choplin, *Seeing the Wrecking Ball in Motion: Ex Parte Protection Orders and the Realities of Domestic Violence*, 32 Wis. J.L. Gender & Soc'y 13, 26–28 (2017) (discussing misconceptions about domestic violence and its impact on cases involving civil protection orders).

29.  *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

30.  *See id.* at 201(c) ("The court: (1) may take judicial notice on its own; or (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 8 of 110

as "legislative facts" also amenable to judicial notice.[31]  At a minimum, the information in Part II suggests questions that judges should ask in Hague Convention cases to reach just outcomes.

At the same time, this Article is meant to advance the conversation about justice and judging.  Judge Kozinski has bluntly stated that judges have the "power and authority to undermine unjust laws."[32]  When and how judges should exercise this power is the topic of scholarly discourse.  By engaging with that discourse, this strand reveals three important points: (1) judges have a moral reason to deviate from the law in these types of Hague Convention cases; (2) judges have a countervailing moral reason to adhere to the law, as deviation could broaden the article 13(b) defense and potentially undermine the deterrent effect of the Hague Convention; and (3) the moral reason to adhere to the law is weak in light of the structural features of the Hague Convention that make harm from deviation unlikely.

I.    JUDGES OFTEN FEEL CONFLICTED WHEN ADJUDICATING A HAGUE CONVENTION CASE INVOLVING DOMESTIC VIOLENCE

Some judges express unease when they adjudicate a Hague Convention petition if the respondent is a domestic violence victim.  These judges either criticize the law[33] or condemn the domestic

---

31.  *See* Robinson v. Liberty Mutual Ins. Co., 958 F.3d 1137, 1142 (11th Cir. 2020).

32.  Kozinski, *supra* note 6, at 1102.

33.  *See, e.g.*, Garcia v. Duarte Reynosa, No. 2:19-cv-01928-RAJ, 2020 WL 777247, at *4 (W.D. Wash. Feb. 18, 2020) *(*"This case is a difficult one.  The Court does not take Respondent's testimony regarding Petitioner's abuse lightly.  She describes incidents of brutality that, if true, are deeply disturbing.  Unfortunately, . . . [t]he Court's hands are tied—the children must be returned to Guatemala."); Taglieri v. Monasky, No. 1:15 CV 947, 2016 WL 10951269, at *13 (N.D. Ohio Sept. 14, 2016) ("While the court is deeply troubled by, and in no way discounts the seriousness of the physical abuse Monasky suffered—regardless of the frequency, severity, or duration—the Sixth Circuit has instructed that the grave risk exception is 'to be interpreted narrowly.'") (expressing regret that she was "[c]onstrained by the requirements of the law"); Pliego v. Hayes, 86 F. Supp. 3d 678, 703 (W.D. Ky. 2015) ("Much has been written regarding the difficulty victims of domestic abuse face in litigating ICARA cases.  Compounding this is the inherent difficulty of attempting [to] prov[e] rape and domestic abuse allegations in court.  Unfortunately, this leaves the Court in the uncomfortable position of both understanding why there is little proof of these allegations, and still requiring more under the law."). *Cf.* Souratgar v. Fair, 818 F.3d 72, 83 & n.1 (2d Cir. 2016) (Lohier, Cir. J., concurring) ("ICARA and the Convention have been criticized (rightly, in my view) for their complete *failure* to consider intimate partner violence as a mitigating or equitable factor in the removal of children from their countries of habitual residence. . . .  Congress can and, I

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 9 of 110

violence despite concluding that the law makes it irrelevant to the case's outcome.[34]   In 2017, Baroness Brenda Hale of Richmond, former President of the Supreme Court of the United Kingdom, captured well her own discomfort as a trial judge in these cases. She confessed, "Many years ago, when I was in the Family Division, it often felt as if my role was to oppress women, and specifically, mothers—always for a good reason, of course, but that was how it felt."  She explained that "above all," this feeling was caused by "child abduction cases, usually involving British women who had married or partnered with foreigners and [had] come back to their home country and their families with their children when the going got rough."[35]

    This discomfort is understandable because the doctrinal structure of the Hague Convention makes it difficult for judges to resolve a case in the domestic violence victim's favor, even if the domestic violence victim removed her child from the state of the child's habitual residence for reasons of safety.  Because judging involves a "dialogue between the heart and head,"[36] as Justice Bren-

---

think, should act to amend ICARA to favor respondents who are victims of intimate partner violence and who flee in part because of that violence."); Khan v. Fatima, 680 F.3d 781, 796 (7th Cir. 2012) (Hamilton, Cir. J., dissenting) ("Like some of the advocates and scholars cited by the majority, we might think that the Convention and the Congress should have made it easier to prove the defense.").

    34.   *See, e.g.*, Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 996813, at *17 (M.D. Tenn. Feb. 28, 2020) (calling the domestic violence "alarming and very regrettable," but insufficient for purpose of establishing article 13(b) defense); Valles Rubio v. Veintimilla Castro, No. 19-CV-2524(KAM)(ST), 2019 WL 5189011, at *24, *31 (E.D.N.Y. Oct. 15, 2019) (noting that the violence was "disturbing" and "very concerning," but insufficient to establish article 13(b) defense); Saada v. Golan, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868, at *1, *20 (E.D.N.Y Mar. 22, 2019) (noting the case was "heart-wrenching" and she did "not come to [the] conclusion lightly," but denying the article 13(b) defense); Neumann v. Neumann, 197 F. Supp. 3d 977, 983 (E.D. Mich. 2016), *aff'd in part, vacated and remanded on other grounds*, 684 F. App'x 471 (2017) (stating the abuse is "certainly distressing," but not sufficient to support article 13(b) defense); Rivas v. Segovia, No. 2:10-CV-02098, 2010 U.S. Dist. LEXIS 138607, at *14 (W.D. Ark. Dec. 28, 2010) (stating "the Court does not take lightly any allegation of domestic violence" but the incident was insufficient to support article 13(b) defense).

    35.   Brenda Hale, *Taking Flight—Domestic Violence and Child Abduction*, 70 Current Legal Probs. 3, 3 (2017).

    36.   William J. Brennan, Jr., *Reason, Passion, and "The Progress of the Law"*, 10 Cardozo L. Rev. 3, 12–13 (1988) (discussing the constitutional notion of "due process"). *See also* Honorable Marian Blank Horn, *A Trial Judge's Perspective—Promoting Justice and Fairness While Protecting Privilege*, 26 Fordham Urb. L.J. 1429, 1436 (1999) (noting judges generally want to adjudicate "in ways which are consistent with [their] moral and ethical obligations"); Posner,

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 10 of 110

nan once noted, these cases can feel unjust if the judge concludes that the child must be returned.

A.    *Domestic Violence Is Not Expressly Relevant to the Hague Convention*

To understand why the tension between the law and justice for victims of domestic violence exists, briefly consider the facts of a fictional, but paradigmatic, Hague Convention case:

> John is from country X and Mary is from country Y. John and Mary met in country Y when John was a graduate student. They dated, married, and decided to move to country X, where they had a child. John became physically and psychologically abusive to Mary during her pregnancy, and this behavior intensified after the child's birth. The abuse included criminal acts like physical and sexual assault, but also included calling Mary names, controlling her finances, and not allowing her to attend church. The child is now three and has been exposed to John's violence. Mary has been the child's primary caregiver for the child's entire life. Mary has thought about leaving John, but she fears his violent retaliation. She also lacks the resources to make it on her own in country X, as all of Mary's family and social support is in country Y. After John commits another act of sexual assault, Mary and the child return to her parents' home in country Y without John's permission. John is aware of Mary's whereabouts and petitions the court in country Y pursuant to the Hague Convention. He seeks the prompt return of the child to country X. Mary tells the judge that she is terrified of John and cannot imagine returning to country X. Mary wants to litigate custody in country Y, where she feels safe. She is willing to provide John supervised visitation in the interim in country Y, until a family law court can weigh all the evidence and make a custody decision.

What should the judge do? Absent any law, most judges would likely say the optimal result would be to deny John's petition for the child's return. Domestic violence is immoral and a crime, and John's actions caused Mary's flight. It is commendable for Mary to have removed herself and the child from an abusive situation.[37] It is in the

---

*supra* note 27, at 238–39, 251 (noting "[pragmatists] want very much to think that their exercise of [] power is 'just,'" and this requires attention to consequences broadly defined, including "to the parties" and the "system[,]" and the latter is the more important); Justice Stephen Breyer, *America's Courts Can't Ignore the World*, Atlantic (Oct. 2018), https://www.theatlantic.com/magazine/archive/2018/10/stephen-breyer-supreme-court-world/568360 [https://perma.cc/J5HW-4MQV] ("Law . . . embodies an ancient and universal human need, expressed in the biblical words 'Justice, justice shall you pursue.'").

37.    In fact, flight from domestic violence is a defense under the

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 11 of 110

child's best interest to stay with Mary, the primary caregiver, and to be in a place where Mary is safe, especially until a court determines custody. Returning the child to country X would elevate John's interests above Mary's and the child's.

Yet, a judge adjudicating John's Hague Convention petition must return the child unless Mary can establish that the reason for her flight is relevant to one of the Hague Convention's defenses. While John will have to make out the prima facie case, including that Mary's removal or retention of the child was "wrongful,"[38] wrongful has a technical meaning that does not include consideration of whether an abduction was morally justified. As Justice Lowell Goddard of the New Zealand Court of Appeals recently explained, "[I]t is not the court's role to judge the morality of the abductor's actions."[39] If a judge were simply empowered to determine whether the removal was justified, many respondents who are domestic violence victims would win their cases easily. As Justice Goddard noted, quoting Baro-ness Hale in the English case of *Re D*: "Sometimes, particularly when the abductor is fleeing from violence, abuse or oppression in the home country, they will not [have been morally wicked.]"[40]

The law instead focuses the judge's attention on the article 13(b) defense. This defense states that a judge need not return a child if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."[41] The defense is concerned with the reason the abductor left,[42] so domestic violence is relevant, but perpetrators of domestic violence have a significant legal advantage when the taking parent raises this defense because the court must

---

International Parental Kidnapping Crime Act of 1993, 18 U.S.C § 1204(c)(2) (1994). In addition, women are often criticized and penalized for their supposed failure to protect their children from domestic violence.

38.    Hague Convention, *supra* note 1, at art. 3, 12.

39.    LRR v. COL [2020] NZCA 209 at [91] (N.Z.).

40.    *Id.* at [91] (citing *In re* D (Abduction: Rights of Custody), [2006] UKHL 51, [2007] 1 AC 619, [56] (appeal taken from Eng.)).

41.    Hague Convention, *supra* note 1, at art. 13(b).

42.    *See* Elisa Pérez-Vera, *Explanatory Report*, *reprinted in* Hague Con-ference on Private International Law, III Actes et documents de la Qua-torzième Session October 426, 432 ¶ 25 (1980) [hereinafter Pérez-Vera, *Explanatory Report*] [https://perma.cc/WU8R-QS36] ("[I]t has to be admitted that the removal of the child can sometimes be justified by objective reasons which have to do either with its person, or with the environment with which it is most closely connected. Therefore the Convention recognizes the need for certain exceptions to the general obligations assumed by States to secure the prompt return of children who have been unlawfully removed or retained.").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 12 of 110

focus only on the *future*, the *child*, and a *grave* risk, which is even greater than a serious risk.[43]

Moreover, appellate judges have developed a number of rules that restrict article 13(b)'s breadth, thereby making a successful defense even more challenging. For example, before making a determination as to the child's return, some case law requires judges to consider ways to minimize the risk to the child, including through services available in the state of the child's habitual residence and undertakings (i.e., promises) from the abuser.[44] Other case law separates domestic violence into degrees, for example by looking at whether the violence is frequent and severe, and excludes from the defense entire categories of domestic violence deemed minor.[45] To make matters more difficult for the taking parent, the defense must be proven by clear and convincing evidence,[46] and the expedited nature of the proceedings can truncate the available evidence.[47]

The doctrinal structure—whereby removals are wrongful even though they are arguably morally justified, and return is mandated even though the petitioner is morally blameworthy and return poses a risk of harm to the mother and the child (perhaps even a serious risk)—explains some judges' considerable discomfort adjudicating these cases. That discomfort should not exist because the drafters of the Convention never intended judges to return the children of parents fleeing from domestic violence, as some high-profile judges have acknowledged.[48]

---

43.   *See* HAGUE INTERNATIONAL CHILD ABDUCTION CONVENTION: TEXT AND LEGAL ANALYSIS, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986) [hereinafter TEXT AND LEGAL ANALYSIS] ("The person opposing the child's return must show that the risk to the child is grave, not merely serious."); Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002).

44.   *See infra* text accompanying notes 145, 339–340.

45.   *See, e.g.*, Laguna v. Avila, No. 07-CV-5136, 2008 WL 1986253, at *8 (E.D.N.Y. May 7, 2008).

46.   International Child Abduction Remedies Act (ICARA) § 4, 22 U.S.C. § 9003(e)(2)(A) (2019).

47.   STANDING SENATE COMMITTEE ON HUMAN RIGHTS, ALERT: CHALLENGES AND INTERNATIONAL MECHANISMS TO ADDRESS CROSS-BORDER CHILD ABDUCTION 14 (2015) (Canada), https://sencanada.ca/content/sen/Committee/412/ridr/rep/rep13jul15-e.pdf [https://perma.cc/6SWH-5GLM] (noting article 13(b) "poses the greatest interpretive challenge to judges" because "it can be difficult to ascertain the truth of allegations of domestic abuse" during what "is supposed to be a quick process").

48.   *See* Jopie Witzand, *Dutch-Australian 'Hague Case' Reveals Flaws in International Treatment of Domestic Violence*, SBS DUTCH (Mar. 21, 2019), https://www.sbs.com.au/language/english/dutch-australian-hague-case-reveals-flaws-in-international-treatment-of-domestic-violence [https://perma.cc/4Z-BV-K3R3] (quoting Diana Bryant, Chief Justice of the Family Court in Australia). *See also* Simcox v. Simcox, 511 F.3d 594, 609 (6th Cir. 2007) (opinion by

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 13 of 110

B.    *Return of a Child Can Harm the Child, the Taking Parent, and Other Survivors*

While some judges are troubled when the law requires them to return a child after a parent has fled domestic violence, not all judges are bothered. Judge Richard Posner notes that some judges are simply hard-hearted,[49] but a more pleasant explanation is that they instead find solace in several external facts. First, the Hague Convention adjudication does not decide custody of a child,[50] and a judge in the state of the child's habitual residence can address any domestic violence when adjudicating custody after the child is returned. Second, a member of the International Hague Network of Judges (IHNJ),[51] or a foreign judge or central authority contacted via the IHNJ,[52] may have assured the judge that the country to

---

Chief Judge Danny Boggs) (citing Merle H. Weiner, *Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 33 Colum. Hum. Rts. L. Rev. 275, 278–79 (2001)) ("the Convention . . . . was never intended to be used as a vehicle to return children to abusive situations"); *In re* D (Abduction: Rights of Custody) [2006] UKHL 51, [52], [2007] 1 AC 619 (appeal taken from Eng.) (opinion by Baroness Hale) ("No-one intended that an instrument designed to secure the protection of children from the harmful effects of international child abduction should itself be turned into an instrument of harm."). *See also* Merle H. Weiner, *International Child Abduction and the Escape from Domestic Violence*, 69 Fordham L. Rev. 593, 602 (2000).

49.    Posner, *supra* note 27, at 119 ("[A]s doctors tend to be callous about sick people, judges tend to be callous about pathetic litigants because they have seen so many of them."); *id.* ("[M]ost judges are (surprisingly to nonjudges) unmoved by the equities of the individual case . . . .").

50.    Hague Convention, *supra* note 1.

51.    *See generally* Phillippe Lortie & Frédéric Breger, *The 20th Anniversary of the International Hague Network of Judges (IHNJ)*, 23 Judges' Newsl. on Int'l Child Prot., Winter 2018–Spring 2019, https://assets.hcch.net/docs/dff2c-b7c-ed66-4408-a892-2af15c664d58.pdf [https://perma.cc/TD38-ST3Q]; Hague Conference on Private International Law, Direct Judicial Communication: Emerging Guidance Regarding the Development of the International Hague Network of Judges and General Principles for Judicial Communications, Including Commonly Accepted Safeguards for Direct Judicial Communications in Specific Cases, Within the Context of the International Hague Network of Judges 7 (2013) [hereinafter Direct Judicial Communication], https://www.hcch.net/en/publications-and-studies/details4/?pid=6024&d-tid=3 [https://perma.cc/628C-4RFC] (describing role of Hague Network Judge as including "direct judicial communications with regard to specific cases, the objective of such communications being to address any lack of information that the competent judge has about the situation and legal implications in the State of the habitual residence of the child").

52.    Direct Judicial Communication, *supra* note 51, at 11 ("The Hague Network Judge may provide, or facilitate the provision of, responses to focused enquiries from foreign judges concerning legislation and Conventions on

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 14 of 110

which the child will be returned has laws to protect domestic violence victims and their children.[53]  In fact, the decisions of some judges adjudicating Hague Convention petitions specifically mention these facts.[54]  A judge might also harbor misconceptions about domestic violence,[55] such as the myth that separation ends the violence[56] or that the petitioner will honor promises to comply with court orders.[57]  A judge may further assume that the foreign court adjudicating custody will not penalize the taking parent for fleeing and will act in the child's best interest in awarding custody.

Judges who believe the outcome will ultimately be just and that the taking parent and child will be safe are typically uninformed and unjustifiably optimistic.  There is no comprehensive data detailing the outcomes in cases involving domestic violence after children are returned.[58]  Nor do judges who return children

international child protection and their operation in his / her jurisdiction.").

53.  *See* PERMANENT BUREAU, HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, DOMESTIC AND FAMILY VIOLENCE AND THE ARTICLE 13 "GRAVE RISK" EXCEPTION IN THE OPERATION OF THE HAGUE CONVENTION OF 25 OCTOBER 1980 ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A REFLECTION PAPER 30 (Preliminary Doc. No. 9 May 2011) [hereafter REFLECTION PAPER], https://assets.hcch.net/docs/ce5327cd-aa2c-4341-b94e-6be57062d1c6.pdf [https://perma.cc/X99T-YJW2] (speaking of "comfort" judge received from communication with foreign judge).

54.  *See, e.g.*, Monasky v. Taglieri, 140 S. Ct. 719, 729 (2020) ("Domestic violence should be an issue fully explored in the custody adjudication upon the child's return."); Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *1, *3–*4 (E.D.N.Y. May 5, 2020) (describing IHNJ-facilitated communication with the Italian Central Authority, the Italian Ministry of Justice, and Italian courts and concluding "the Italian legal system is capable of handling domestic violence cases involving children" and that "the Italian court will protect B.A.S.").

55.  Nicole E. Negowetti, *Judicial Decisionmaking, Empathy, and the Limits of Perception*, 47 AKRON L. REV. 693, 694 (2014) ("Decisions based on what we believe to be careful, neutral, and logical reasoning, may actually be guided by unexamined and often unseen frameworks of thinking . . . of which we are unaware.").

56.  *See, e.g.*, Souratgar v. Fair, No. 12 Civ. 7797, 2012 WL 6700214, at *11 (S.D.N.Y. Dec. 26, 2012), *aff'd* 720 F.3d 96 (2d Cir. 2013) ("The Court finds that petitioner engaged in abusive conduct toward the respondent. . . .  However, there is no credible evidence that petitioner and respondent will ever cohabit again.").

57.  Sierra v. Sierra, 2001 CarswellOnt 1869, ¶ 57–58 (Can.) (WL) (ordering the father "not to molest, annoy, harass or disturb" the mother or children pending their return to Florida and "assuming that the child and spousal support orders made in the Florida Court are being honoured").

58.  Marilyn Freeman & Nicola Taylor, *Domestic Violence and Child Participation: Contemporary Challenges for the 1980 Hague Child Abduction Convention*, 42 J. SOC. WELFARE & FAM. L. 154, 159–60 (2020) ("The paucity of data about what happens for a child after the Convention case has concluded was said to hamper Central Authorities and judges, who would also find education

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 15 of 110

despite a history of domestic violence receive feedback about what actually happens after the children depart.[59]  The lack of feedback perpetuates the myth for those adjudicating Hague Convention cases that return will not cause anyone harm.

The reality, however, is that things frequently end poorly for the domestic violence survivor and the child after the child is returned.  Media outlets, including the internet, produce a sample of anecdotal (and admittedly unconfirmed) hardship stories.[60]  Sometimes the mother and/or child are killed.[61]  Sometimes the

---

and information to assist them in developing the requisite skills and practices of paramount importance.") (reporting on conclusions from a meeting in June 2017 of fifty-seven "specialist abduction researchers, judges, legal practitioners, policy makers and NGO staff" from nineteen jurisdictions).

59.  REFLECTION PAPER, *supra* note 53, at 28 (examining ninety-two cases from various jurisdictions noting, "there . . . were very few comments regarding intentions to follow-up upon the return of the child and accompanying parent").

60.  *See, e.g.*, Gina Masterton, *Fleeing Family Violence to Another Country and Taking Your Child Is Not 'Abduction', but That's How the Law Sees It*, CONVERSATION (Jan. 20, 2019, 1:55 PM), https://theconversation.com/fleeing-family-violence-to-another-country-and-taking-your-child-is-not-abduction-but-thats-how-the-law-sees-it-109664 [https://perma.cc/E4F2-HY9W] (discussing cases of Fiona and Rita); Becka Kellaway, Comment to *Protect Victims Under the Hague Convention*, CHANGE.ORG (Aug. 2, 2019), https://www.change.org/p/in-memory-of-cassandra-hasanovic-protect-victims-under-the-hague-convention/c [https://perma.cc/G4EC-B6AT] (reporting that the judge adjudicating the mother's Hague case did not believe her testimony that courts in the child's habitual residence would not protect her as they had been unsuccessful in addressing petitioner's alleged escalating violence for four years, and further describing that upon return, "[w]e were homeless for 10 months, we were/are in terrible poverty and had to still pay for barristers and appear in court to fight to keep custody.  We need protection"); Jennifer Cragg, Comment to *Protect Victims Under the Hague Convention*, CHANGE.ORG (Aug. 3, 2019), https://www.change.org/p/in-memory-of-cassandra-hasanovic-protect-victims-under-the-hague-convention/c [https://perma.cc/G4EC-B6AT] (reporting that her friend "has been forced to return to an abusive and controlling husband in Ireland who has the advantage of wealth on his side," that the Irish courts have not helped her, and concluding that "[t]he mother seems to have no power or rights in such situations and has to acquiesce to whatever the father and courts in the habitual residence demand.  I can't believe this can still happen in Europe in 2019").

61.  *See, e.g.*, Natalie Evans, *Mum Stabbed to Death in Front of Children by Husband Warned: "I Know He's Going to Kill Me"*, DAILY MIRROR (Feb. 17, 2014, 5:42 PM), http:www.mirror.co.uk/news/uk-news/Cassandra-hasanovic-inquest-mum-stabbed-3155912 [https://perma.cc/Q3KC-N2N3] (discussing case of Cassandra Hasanovic); *Family Mourns Montreal Boy's Death in Texas*, CBC NEWS (Dec. 15, 2010, 11:59 AM), https://www.cbc.ca/news/canada/montreal/family-mourns-montreal-boy-s-death-in-texas-1.878443 [https://perma.cc/M99J-MX9E] (discussing case of Danyela and Deyen Perisic).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 16 of 110

abuse resumes with acts short of murder.[62]  Sometimes the child becomes a direct victim of abuse.[63]  Sometimes the taking parent is punished by the government of the child's habitual residence for being "an abductor," i.e., she is criminally prosecuted,[64] she loses custody in a judicial proceeding,[65] and/or her child is placed in fos-

---

62.  *See* Katie Pashley, Comment to *Protect Victims Under the Hague Convention*, CHANGE.ORG (Mar. 2019), https://www.change.org/p/in-memory-of-cassandra-hasanovic-protect-victims-under-the-hague-convention/c [https://perma.cc/2URE-QZX7] ("I am a stuck parent who is suffering at the hands of the family courts in Singapore. . . .  I had no choice but to voluntarily return under the Hague and face abuse from my nex [sic] everyday.  The impact this has on the children and my whole family is not important it seems.").

63.  *See* Juju Chang & Angela Ellis, *Exclusive: International Custody Battle Rages into 10th Year*, ABC NEWS (Apr. 26, 2010, 3:43 PM), https://abcnews.go.com/GMA/exclusive-argentine-american-custody-battle-rages-10th-year/story?id=10481955 [https://perma.cc/36P2-S7N6] (noting mother and child made such allegations after the court returned the children to Argentina, but also noting that father denied committing any such abuse).

64.  *See Angelina Maalue Avalon: 'That's Why I Abducted My Children To Brazil,'* POWER KVINDERNE, https://powerkvinderne.dk/liste/833-angelina-der-for-bortforte-jeg-mine-born?fbclid=IwAR0nSogTTgRIO5UY4Pa6rEDl89D-kDT-wZxI5MoEmC8DPnxMxrCDIcIQsJtk [https://perma.cc/UZ8B-JDR7] (reporting that mother who alleged domestic violence and abuse of her two children was sentenced to eighteen months by Danish courts for taking her children to Brazil).  *Cf.* Martin Robinson, *British Mother Who Admitted Abducting Her Two Children and Taking Them to ALASKA Without Permission Is Jailed for Three-and-a-Half Years*, DAILY MAIL (Sept. 10, 2018, 6:48 AM), https://www.dailymail.co.uk/news/article-6150895/British-mother-ADMITS-abducting-two-children-taking-Alaska.html [https://perma.cc/97CF-TKFD] (reporting that Indea Ford was sentenced to 3.5 years in prison by a U.K. court after pleading guilty to taking her children from the U.K. to the United States.).  Ford claimed that she took her children to the United States because her former spouse was abusing her and the children, including threatening to kill her, and the U.K. was not protecting them.  *See* Robert Woolsey, *For This Expat Mom, Raising Healthy Girls Means Going to Prison*, KCAW.ORG (Mar. 8, 2018), https://www.kcaw.org/2018/03/08/expat-mom-raising-healthy-girls-means-going-prison [https://perma.cc/EJ4L-2F8C].  She believed her ex-husband brought criminal charges instead of a Hague petition to punish her.  *Id.*

65.  *See, e.g.*, Ellen A., Comment to *Save the Children from the Negative Consequences That the Hague Abduction Convention Creates for Them*, CARE2 PETITIONS (July 8, 2013), https://www.thepetitionsite.com/692/647/766/save-children-from-the-negative-consequences-that-the-hague-abduction-convention-creates-for-them [https://perma.cc/9627-ZZKE] ("Today, July 8th 2013 I just lost my four year old son to an abusive ex-husband.  I couldn't afford an attorney and my ex-husband had like 8 people defending him.  My case was hopeless. . . .  The Hague Convention is nothing but poison for women who want to protect their children.  I am hopeless and I feel like I lost everything.").  *See also* EDLESON & LINDHORST, *supra* note 15, at 180 (describing case of Tamara); Monasky v. Taglieri, 140 S. Ct. 719, 724–25 (2020) (noting that after the child's removal, the Italian court terminated the mother's parental rights in an

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 17 of 110

240        *UCLA WOMEN'S LAW JOURNAL*        Vol. 28.223

ter care.[66]  In such cases, the taking parent may not even be awarded visitation.[67]  And, even if awarded visitation, she sometimes has no practical way to exercise it because the visitation must occur in the state of the child's habitual residence where she no longer resides,[68] it raises risks for herself and the children,[69] or the father refuses her

---

ex parte proceeding, and that the child was returned to the father in Italy after the Hague petition was granted).  As of January 26, 2021, the Italian courts have not assumed jurisdiction to decide whether Monasky's parental rights should be restored, let alone who should have custody.  Email from Joan Meier to Merle Weiner (Jan. 26, 2021) (on file with author).  *See also* Am. Bar Ass'n Comm'n on Domestic Violence, 10 Myths About Custody and Domestic Violence and How to Counter Them 2 (2006), *available at* http://leadershipcouncil.org/docs/ABA_custody_myths.pdf [https://perma.cc/AE2W-37PF] (noting it is a myth that abusive fathers lose custody to fit mothers).

66.  *See, e.g.*, Kristina Becker, Comment to *Face of the Crisis: Ursula*, Facebook (Dec. 4, 2019), https://www.facebook.com/TheWomensCoalition/posts/2526405690967075 [https://perma.cc/ETT5-M85A] (explaining that "I took my daughter abroad to save us from the violence, the abuse and the threats," that the child was placed in foster care upon return, that she lost sole custody, that she has "not heard or seen [her] daughter" in more than a year, and concluding, "Hell could not be worse than this, I swear").

67.  *Cf.* The Women's Coalition, *Laney USA*, Facebook (Aug. 1, 2017), https://www.facebook.com/events/315558372234493/?post_id=332208340569496&view=permalink [https://perma.cc/8X3W-YM8F] (alleging her child was the victim of physical, mental and sexual abuse, that the family courts were not protecting the child, that the mother had full custody of the child when she was caught trying to go to Canada, and that she has not been able to see her child in approximately five years).

68.  *See, e.g.*, Amy Oliver, *How CAN They Say I Abducted My Own Daughter? Heartbreak of British Mothers Forced to Send Their Children Abroad . . . to Foreign Fathers Exploiting International Child Abduction Laws in Custody Battles*, Daily Mail (Oct. 4, 2015, 7:41 PM), https://www.dailymail.co.uk/femail/article-3259069/How-say-abducted-daughter-Heartbreak-British-mothers-forced-send-children-abroad-foreign-fathers-exploiting-international-child-abduction-laws-custody-battles.html?fbclid=IwAR37rAUxeodawA-F0URBFvBBFj6Z0-KNqi1L_JuFDdYzYUrRW3LLnch_C0Rs [https://perma.cc/E9QW-XRC8] (describing the story of Anita Duncan, who lost a Hague Convention case in the United States, and now "can see [her children] three times a year but only in [the alleged abuser's] state," and reporting, "'I've lost everything' . . . I've lost my home, my belongings and my children.  I have nothing more than a huge debt.  I don't look at photos of them often — it's too painful'"); A. Gera, *BBC World Interview, 12 Oct. 2017*, YouTube (Oct. 15, 2017), https://www.youtube.com/watch?v=5OaSHxpSdAY [https://perma.cc/74DG-CRE3].

69.  *See Episode 30: #SurvivorStories Series with Anita Gera and the Misuse of the Hague Convention to Harm Children*, En(gender)ed Podcast (Nov. 15, 2018), https://engendered.us/episode-30-survivorstories-series-with-anita-gera-on-how-the-hague-convention-can-be-used-to-harm [https://perma.cc/6ZLW-6XYN].

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 18 of 110

access and she lacks the resources to enforce the order.[70]  In this way, the custody proceedings can become another tool of the abuser.[71]  Further, the domestic violence victim frequently struggles to find housing, legal assistance, and/or other types of support.[72]

Empirical work corroborates the harsh outcomes that are reflected anecdotally in media accounts and women's self-reports. Professors Jeffrey Edleson and Taryn Lindhorst's study of cases litigated in the United States found that upon return children were often physically abused, while women were revictimized, criminally prosecuted for abduction, and subjected to economic hardship.[73]  Similarly, Marilyn Freeman's study in England found that upon the return of the child, most taking parents "continued to suffer the issues which had caused them to abduct, without the support from their families that they had temporarily found in the abducted-to State," causing them stress-related health issues.[74]  Return to the child's habitual residence caused them to feel "'vulnerable and alone', . . . 'totally isolated and impoverished', and 'terrified and distraught.'"[75]

Apart from the potential hardship and despair following the return of children to their state of habitual residence in cases with domestic violence, judges should be aware of the indirect effects of their decision to return a domestic violence victim's child.  Specifically, returning a child may cause other domestic violence survivors to stay in abusive situations rather than flee with their children.  A nonprofit organization that works with U.S. survivors abroad reported

---

70.  *Id.  See also* The Women's Coalition, *Face of the Crisis: Ursula*, Facebook (Dec. 4, 2019), https://www.facebook.com/TheWomensCoalition/posts/2526405690967075 [https://perma.cc/K66Y-5JF9] (explaining the aftermath of a Hague Convention proceeding in which mother, who allegedly suffered "a long and on-going history of domestic violence" and was the primary caregiver, must now travel to children's habitual residence to see them, but cannot because father "has made it very clear he will not allow me to see them. . . .  He is concerned only with hurting and punishing me.  This Hague Court ruling does not in any way serve the best interests of my children").

71.  *See generally* Barbara J. Hart, Jennifer White & Lisa Matukaitis, *Child Custody*, *in* The Impact of Domestic Violence on Your Legal Practice: A Lawyer's Handbook 234 *(Margaret B. Drew et al., eds.,* 2d ed. *2004)* ("[C]ustody litigation often becomes a tool for batterers to maintain or extend their control and authority over the abused parent after separation.").  *See also infra* note 167.

72.  *See* Kellaway, *supra* note 60; Edleson & Lindhorst, *supra* note 15, at 185–87, 309.

73.  Edleson & Lindhorst, *supra* note 15, at 160–61, 179–87.

74.  *See* Marilyn Freeman, Reunite International, International Child Abduction: The Effects 27–28 (2006), *available at* http://takeroot.org/ee/pdf_files/library/freeman_2006.pdf [https://perma.cc/F2X8-JUGR].

75.  *Id.* at 27.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 19 of 110

this deterrent effect,[76] and women's online testimonials corroborate it.[77]  The low number of respondents alleging domestic violence at the trial court level during T2 also suggests a deterrent effect.[78]  Simply, victims are inclined to stay put when they see judges rejecting the article 13(b) defense and returning children pursuant to the Hague Convention.[79]  While the Hague Convention is meant to deter abduction and its attendant harms,[80] this general deterrent effect can harm those who need to escape domestic violence.

---

76.  Karen Lewis, *Human Rights*, FAWCO (Feb. 13, 2017), https://www.fawco.org/global-issues/human-rights/ending-violence-against-women-a-children/2967-the-hague-convention-returning-children-to-their-abusers [https://perma.cc/98ZV-2MMM] (noting "many victims are deterred from attempting to escape to safety by the Hague petition").

77.  *See, e.g.*, Plodalot, Comment to *Don't Let It Happen to You: What Every Mother Should Know Before Emigrating*, AMAZON (Apr. 20, 2014), https://www.amazon.com/Dont-Let-Happen-You-Emigrating-ebook/dp/B00FV80PTM [https://perma.cc/V8Q3-5JRV] ("How many of us are 'stuck' in a foreign country trying to do the best we can for our kids.  Only time will tell if we did the right thing by staying.  I often feel that my child has a shell of the mother I could be if I was in a safe, stable environment surrounded by friends and family.").  *See also* Ka Man Mak, *Part 3 – Family Crisis and Insights and Advice*, GUIDANCE (Mar. 8, 2020), https://oslodesk.com/part-3-family-crisis-insights-and-advice [https://perma.cc/7JAP-MF2X] (discussing parents living in domestic violence shelters long term); Carole Hallet Mobbs, *Nobody Tells You This About Moving Overseas with Your Kids*, EXPATCHILD (May 18, 2015), https://expatchild.com/nobody-tells-you-this-about-moving-overseas-with-your-kids [https://perma.cc/AB2H-BDTU] (discussing parents living in hardship because they cannot access support systems in the other country); ANNA WORWOOD & LUCY CUMMIN, PENNINGTONS MANCHES, INTERNATIONAL FAMILY LAW REPORT: CAN WE GO OR MUST WE STAY? THE INTERNATIONAL CHILD RELOCATION RANKINGS 5 (2016), *available at* https://www.penningtonslaw.com/media/1121277/international-relocation-of-children-law-report.pdf [https://perma.cc/65VJ-37YV] (discussing how obtaining permission to relocate can take years and how some countries routinely deny permission).

78.  *See supra* note 11.

79.  Personal stories, academic studies, and petitions on the Web warn domestic violence victims of the futility of abduction and the unjustness of the Hague Convention.  *See, e.g.*, *supra* notes 60–70 (personal stories); *Mothers and Children Seeking Safety in the U.S.: A Study of International Child Abduction Cases Involving Domestic Violence*, NAT'L INST. OF JUSTICE: RESEARCH FOR THE REAL WORLD (Oct. 12, 2010), https://www.nij.gov/multimedia/presenter/presenter-edleson/Pages/presenter-edleson-transcript.aspx [https://perma.cc/P6CU-5FS9] (video transcript); SUDHA SHETTY & JEFFREY L. EDLESON, SEEKING SAFETY ACROSS BORDERS: BATTERED WOMEN'S EXPERIENCES WITH THE HAGUE CONVENTION IN AMERICAN COURTS (PowerPoint presentation), *available at* http://www.courts.ca.gov/documents/BTB_23_4O_1.pdf [https://perma.cc/3FQ5-968N]; *Protect Victims Under the Hague Convention*, CHANGE.ORG, https://www.change.org/p/in-memory-of-cassandra-hasanovic-protect-victims-under-the-hague-convention [https://perma.cc/CZ3E-GZE7] (petition).

80.  *See* Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996) ("[T]he

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 20 of 110

C.    *It's Up to Judges to Reach Just Results in These Cases*

Judges who decide Hague Convention cases occasionally call for changes to the law so it may better align with justice. For example, in speaking about the Hague Convention, Justice Breyer told interest groups "to monitor court decisions with care and, in light of those decisions, stand ready to modify treaties when that seems necessary."[81] Judges on the U.S. Courts of Appeals have called on Congress to reform the treaty's implementing legislation as it applies to domestic violence victims,[82] and other judges have noted the rumor of reform efforts.[83]

Lawmakers, however, have not made it easier for judges to refuse the child's return in cases with domestic violence. Perhaps this is unsurprising, as scholars note lawmakers are generally reluctant to heed judges' requests.[84] Lawmakers' disinterest in reform was evident from 2013 to 2015 when a group of academics and lawyers, of which this author was a part, tried to persuade Congress to improve the International Child Abduction Remedies Act (ICARA) for domestic violence victims. The last iteration of the draft legislation, called the ICARA Improvement for Victims of Domestic Violence Act of 2015, was designed "to eliminate the current unintended consequences in the implementation of the Hague Convention that result in harm to children and parents by ensuring that U.S. judges appropriately apply the exceptions to the return of an abducted child and that battered parents have access to adequate legal counsel."[85]

---

Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.").

81.    Breyer, *supra* note 36.

82.    *See* Souratgar v. Fair, 818 F.3d 72, 83 (2d Cir. 2016) (Lohier, Cir. J., concurring); Khan v. Fatima, 680 F.3d 781, 796 (7th Cir. 2012) (Hamilton, Cir. J., dissenting).

83.    Neumann v. Neumann, 684 F. App'x 471, 490–91 (6th Cir. 2017) (Daughtrey, J., concurring in part and dissenting in part) (noting "a movement to amend the Hague Convention" to address abductors who are fleeing from domestic violence); Gallegos v. Garcia Soto, No. 1:20-CV-92-RP, 2020 WL 2086554, at *4 n.1 (W.D. Tex. Apr. 30, 2020) (same).

84.    Butler, *supra* note 19, at 1806 ("When judges, after applying law they think is unjust, register some kind of protest, there is little evidence that legislators care.").

85.    The ICARA Improvement for Victims of Domestic Violence Act of 2015 (on file with author) [hereinafter ICARA Improvement Act]. Among other things, the bill would have changed the burden of proof for the article 13(b) and article 20 defenses to "a preponderance of the evidence." It would have specified that "grave risk" includes harm to a child from a reasonable likelihood of future exposure to domestic violence or child abuse, *id.* § 4(b), and that an "intolerable situation" exists if the respondent would face a reasonable

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 21 of 110

Despite the considerable work that went into the bill, it was never introduced.[86]

The futility of the reform effort is particularly disheartening when contrasted with Japan's passage of implementing legislation that addressed the topic of domestic violence after it acceded to the treaty in 2014,[87] and U.S. congressional activity on the topic of inter-

---

likelihood of domestic violence from the petitioner upon the child's return. *Id.* The law would have provided guidance to courts on factors that suggest the existence of domestic violence, including a course of conduct taken to exercise power and control over the individual, such as using behaviors that intimidate, humiliate, isolate, frighten, or coerce. *Id.* § 4(b). The law would have made clear that a court must not return a child if the article 13(b) or article 20 defense applies. *Id.* § 5(c).

The bill had some other provisions that were meant to level the playing field for the petitioner and respondent. The law would have allowed a court to award attorney fees to a successful litigant, petitioner or respondent. *Id.* § 6. A protective parent who had a good faith belief that removing the child was necessary for the parent's or child's safety could not be ordered to pay the other parent's attorney's fees. *Id.* The law would have required an applicant completing the Central Authority's application for assistance to list all arrests or convictions for domestic violence or child abuse and attach any related police reports or court records. *Id.* § 7. In addition, the Act would have required that all judges who adjudicate Hague cases, liaison judges, and staff of the Office of Children's Issues receive training on domestic violence with a curriculum approved by the federal Violence Against Women Office. *Id.* § 9. Finally, an interagency group was to meet once every three years to consider how U.S. policies and practices could better meet the safety needs of abused parents and children involved in Hague proceedings. *Id.* § 8.

86.  It had a sponsor, Representative Ileana Ros-Lehtinen, but Representative Chris Smith never cosponsored it. His participation was thought a necessary prerequisite for the bill's passage because legislators consider him an expert on child abduction. Smith sits on the House Foreign Affairs Committee and is the Chairman of the Subcommittee on Africa, Global Health, and Global Human Rights and International Organizations. He initiates many hearings on child abduction and is the architect of ICAPRA. *See infra* note 88. He aggressively advocates for left-behind parents, primarily fathers. Other members of Congress were generally uninterested in the bill, possibly because fathers left behind in the United States by a fleeing partner are vocal proponents of the Hague Convention in order to get more children returned to the United States. *See, e.g.*, *International Child Abduction: Broken Laws and Bereaved Lives: Hearing Before the Subcomm. on Africa, Global Health and Human Rights of the H. Comm. on Foreign Affairs,* 112th Cong. 112–72 (2011) (including testimony of five left-behind parents, four of whom were fathers); *see also* Yuette Lusk, *International Child Abduction – Patrick Braden – Part 1*, Dailymotion, https://www.dailymotion.com/video/x3618d2   [https://perma.cc/8VZ3-3VXQ] (describing his lobbying activities).

87.  Japan's law explicitly states that a court, in considering the article 13(b) defense, is to examine, inter alia, "(ii) Whether or not there is a risk that the respondent would be subject to violence, etc. by the petitioner in such a manner as to cause psychological harm to the child if the respondent and the

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 22 of 110

national child abduction generally. For example, in 2014, Congress enacted the Sean and David Goldman International Child Abduction Prevention and Return Act (ICAPRA) to facilitate the retrieval of more children who were abducted abroad.[88] Congress also adopted resolutions on the topic of international child abduction, both before and after the described reform effort.[89] None of the resolutions ever mentioned the injustice and harm that results when judges return children pursuant to the Hague Convention and their taking parents are victims of domestic violence.[90] Instead, witnesses before

child entered into the state of habitual residence; (iii) Whether or not there are circumstances that make it difficult for the petitioner or the respondent to provide care for the child in the state of habitual residence." Professor Barbara Stark noted that the provision is not limited to physical violence or threats of physical harm, and consequently, "may well be the most lenient standard for Article 13(b) proceedings in the world." Barbara Stark, *Foreign Fathers, Japanese Mothers, and the Hague Abduction Convention: Spirited Away*, 41 N.C. J. INT'L L. & COM. REGUL. 761, 787 (2016) (citing Act for Implementation of the Convention on the Civil Aspects of International Child Abduction, Law No. 48 of 2013, ch.3, § 1, art. 28 (Japan)). *See* Yoko Konno, *A Haven for International Child Abduction: Will the Hague Convention Shape Japanese Family Law?*, 46 CAL. W. INT'L L.J. 39 (2015) (criticizing the breadth of the provision). Other nations have also had relevant legal reform. *Cf.* Merle H. Weiner, *Intolerable Situations and Counsel for Children: Following Switzerland's Example in Hague Abduction Cases*, 58 AM. U. L. REV. 335 (2008) (describing reform in Switzerland).

88. *The Sean and David Goldman Intl Child Abduction Prevention and Return Act*, U.S. CONGRESSMAN CHRIS SMITH, https://chrissmith.house.gov/lawsandresolutions/the-sean-and-david-goldman-intl-child-abduction-prevention-and-return-act.htm [https://perma.cc/EHY9-VAUA]. *See generally* Sean and David Goldman International Child Abduction Prevention and Return Act of 2014, 22 U.S.C. §§ 9111–41 (2014). Among other things, ICAPRA requires all extraterritorial missions to designate at least one senior official to assist left-behind parents who are trying to obtain the return of, or access to, their children. *See id.* § 9112. The Act also requires the Secretary of State to report noncompliant countries to Congress. *See id.* § 9111(b)(5). The Act never mentions domestic violence.

89. *See, e.g.*, S. Res. 543, 112th Cong. (2012) (condemning international abduction of children and stating that the United States should pursue the return of all children abducted by a parent from the United States); S. Res. 431, 115th Cong. (2018) (proposing April 2018 as International Parental Child Abduction Month in order to "raise awareness of, and opposition to, international parental child abduction"); S. Res. 23, 116th Cong. (2019); S. Res. 487, 116th Cong. (2020) (proposing April as Countering International Parental Child Abduction Month in order to "educat[e] the public about the negative emotional, psychological, and physical consequences to children and parents victimized by international parental child abduction"). *See also* H.R. Res. 841, 116th Cong. (2020) (supporting recognition of International Parental Child Abduction Month to raise awareness of, and opposition to, international parental child abduction) (introduced and referred to the House Comm. on Oversight and Reform).

90. *See supra* note 89.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 23 of 110

Congress asserted that domestic violence allegations are manufactured by taking parents.[91]

The State Department has also avoided addressing the needs of domestic violence survivors by recommending changes either to the U.S. implementing legislation[92] or to the Hague Convention itself.[93] However, since 2011, the State Department has supported the development of a *Guide to Good Practice* to address domestic violence in the context of article 13(b).[94]

In March 2020, the Hague Conference did promulgate the *Guide to Good Practice*, after ten years in the making,[95] opting for this soft-law

---

91.    *See No Abducted Child Left Behind: An Update on the Goldman Act*: *Hearing Before the Subcomm. on Africa, Global Health and Human Rights of the H. Comm. on Foreign Affairs*, 112th Cong. 5–6 (2011) (written testimony of James Cook II), *available at* https://docs.house.gov/meetings/FA/FA16/20180411/108117/HHRG-115-FA16-Wstate-CookJ-20180411.pdf [https://perma.cc/F5FP-UKL2] (describing domestic violence services complex as having a financial incentive to funnel women to them and have them file claims with police as part of it). *Cf. The Goldman Act at Five Years: Hearing before the Tom Lantos Human Rights Commission*, 116th Cong. 66 (2019) (written testimony of Ravindra Parmar), *available at* https://humanrightscommission.house.gov/events/hearings/jamika-test [https://perma.cc/UWF2-7SAB] (implying that mother was deceptive and not a "victim of domestic abuse" because "she never reported this [to the police] in the U.S.").

92.    Over the years, employees at the State Department have expressed to this author their fears that ICARA might become vulnerable to unattractive initiatives once opened for amendment.

93.    U.S. Response To Preliminary Doc. No. 2, *supra* note 8, ¶ 5.1 (rejecting the idea that the Hague Conference should promulgate an international protocol to fix the Hague Convention by expressly addressing the topic of domestic violence).

94.    *Id.* The State Department's position was a notable improvement over past actions with regard to domestic violence and the Hague Convention.  *See* Merle H. Weiner, *Half-Truths, Mistakes, and Embarrassments: The United States Goes to the Fifth Meeting of the Special Commission to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction*, 1 Utah L. Rev. 221, 286–93 (2008).  Yet, the State Department's sympathy for domestic violence victims only goes so far.  For example, it labels Peru as a country showing a pattern of noncompliance with the Convention in part because Peru's Central Authority, which is housed in the Ministry of Women and Vulnerable Populations, will not help institute a case if the abductor alleges she fled for reasons of domestic violence. *See* Dep't of State, Action Report on International Child Abduction 25 (2019).  *See generally* Guide to Good Practice, *supra* note 5, at 63 n.132 (explaining that "Art. 27 of the Convention, which gives very limited discretion to the Central Authority not to accept an application for return, should not be interpreted therefore as allowing the Central Authority to refuse to accept an application for return on the basis of an allegation of grave risk").

95.    The process began in 2010, when the Permanent Bureau added questions about domestic violence to a questionnaire that was sent out to State Parties.  The answers were incorporated into an important *Reflection Paper*

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 24 of 110

approach instead of a protocol to the Hague Convention addressing the topic of domestic violence.[96] In several ways, as discussed in Part II, this *Guide to Good Practice* should help judges grant the article 13(b) defense, but the *Guide to Good Practice* is not a panacea. Although the *Guide to Good Practice* recognizes the importance of article 13(b)

---

that the Permanent Bureau authored for the 2011 Special Commission meeting. Among other things, the paper acknowledged the following: that domestic violence includes coercive control even in the absence of frequent and severe violence, REFLECTION PAPER, *supra* note 53, at 7; that children can suffer harm from exposure to domestic violence, *id.* at 9; that judges were applying article 13(b) inconsistently, *id.* at 16–27; and that public international law instruments addressed the topic of domestic violence and the Hague Permanent Bureau needed to consider States' obligations. *Id.* at 31–32. The *Reflection Paper* also recommended that State Parties create a *Guide to Good Practice* to bring harmony to this area; to this end, it suggested that a working group including interdisciplinary experts in domestic violence craft the document. *Id.* at 37–38. At the 2011 Special Commission meeting, State Parties agreed to the *Guide*'s development. *See* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS & RECOMMENDATIONS (PART II) ADOPTED BY THE SPECIAL COMMISSION, NOS. 81 and 82 at 1–2 (Jan. 2012) [hereinafter CONCLUSIONS & RECOMMENDATIONS (PART II)]. The Council on General Affairs and Policy of the Hague Conference established the working group in 2012. *See also* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS AND RECOMMENDATIONS ADOPTED BY THE COUNCIL, Nos. 5 and 6, at 1 (Apr. 2012). A draft of the *Guide to Good Practice* was considered, but not approved, at the Seventh Meeting of the Special Commission in 2017. *See also* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, [DRAFT] GUIDE TO GOOD PRACTICE ON ARTICLE 13(1)(B) OF THE HAGUE CONVENTION OF 25 OCT. 1980 ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION (Oct. 2017) [hereinafter [DRAFT] GUIDE]. State Parties suggested "much more work" was necessary. *Draft Guide to Good Practice on Article 13(1)(b) of the 1980 Convention*, 21 JUDGES' NEWSL., Winter–Spring 2018, at 17, https://assets.hcch.net/docs/58c8ddc4-c1db-4d2b-979e-f0bdeff5673a.pdf [https://perma.cc/RY42-UJVX]. They wanted the *Guide to Good Practice* to be "shorter, more concise, and substantially reduced." *Id.* The Special Commission asked the working group "to continue its work" and to make it a "priority." HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS AND RECOMMENDATIONS ADOPTED BY THE SPECIAL COMMISSION ¶ 54 (Oct. 2017). The Council on General Affairs and Policy approved the recommendation. *See* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS AND RECOMMENDATIONS ADOPTED BY THE SPECIAL COMMISSION ¶ 19 (Mar. 2018). State Parties considered a revised draft *Guide* in 2019 and submitted more comments. *See* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS & RECOMMENDATIONS ADOPTED BY COUNSEL ¶ 24 (Mar. 2019). After some last-minute changes, a finalized draft was circulated. The absence of any further objection by State Parties meant the *Guide to Good Practice* was approved. *Id.* It was posted on the Permanent Bureau's Web site in March 2020. *Id.*

96. CONCLUSIONS AND RECOMMENDATIONS (PART II), *supra* note 95 (rejecting a potential protocol to address domestic violence, but instead encouraging development of the *Guide to Good Practice* on article 13(b)).

Electronic copy available at: https://ssrn.com/abstract=3980115

to the structure of the Hague Convention,[97] it reiterates that the article 13(b) defense "must be applied restrictively,"[98] and that the defense is for "exceptional circumstances."[99]  The *Guide* also addresses none of the most challenging obstacles to a successful article 13(b) defense, including the high burden of proof in the United States, gender bias in accessing credibility, and the pervasive misarticulation of the article 13(b) defense itself.  Nor does the *Guide* even recommend that judges adjudicating a Hague petition receive training on domestic violence.  The *Guide* selectively cites case law, excluding many helpful authorities.  And, as this Article elaborates below, the *Guide to Good Practice* contains some confusing language[100] and an unfortunate commitment to the relevance of protective measures.[101]

One of the most significant and advantageous parts of the *Guide to Good Practice*, however, is its specific endorsement of the *Australian Bench Book*.[102]  The *Guide to Good Practice* authorizes the use of this resource so that judges can "acquire and enhance knowledge and understanding of the interpretation and application of Article 13(1)(b)."[103]  The *Australian Bench Book* goes into detail about the dynamics of domestic violence and addresses myths and misconceptions.[104]  It is essential reading for U.S. judges because the U.S. government provides no domestic violence training to judges hearing these cases,[105] although it trains judges generally on

---

97.  Guide to Good Practice, *supra* note 5, ¶ 27.

98.  *Id.* ¶ 25.

99.  *Id.* ¶ 28.

100.  *See infra* text accompanying note 120.

101.  Merle H. Weiner, *The Article 13(b) Guide to Good Practice*, 25 Domestic Violence Rep. 7, 21 (2019).

102.  Guide to Good Practice, *supra* note 5, ¶ 106 (citing National Domestic and Family Violence Bench Book of Australia, *infra* note 104).

103.  *Id.* ¶ 99.

104.  *See, e.g.*, Austl. Gov't Att'y Gen. Dep't, National Domestic and Family Violence Bench Book §§ 3.1, 4.1 (Heather Douglas et al. 2020) [hereinafter Austl. Bench Book], *available at* https://dfvbenchbook.aija.org.au/contents [https://perma.cc/HCD6-LRH3; https://perma.cc/2GUJ-4QW8; https://perma.cc/Q8J9-E6PU].

105.  Domestic violence was not a topic explicitly mentioned in the description of training contained in the annual report of the Federal Judicial Center.  *See* Fed. Jud. Ctr., Annual Report 2017, at 5–9 (2017).  Email correspondence with the Center confirmed that there is virtually no material available on domestic violence.  Email from Dana Chipman to Merle H. Weiner (Sept. 25, 2018) (on file with author) ("We don't have a lot of focus on domestic violence programs at the federal judicial level.").  The email mentioned that the Federal Judicial Center's manual on child abduction addresses domestic violence and, in fact, it does.  *See* Hon. James D. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 114–16 (2d ed. 2015).  However, that guide only discusses several cases

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 26 of 110

the Hague Convention,[106] and it acknowledges the need for training on domestic violence: "[T]raining for judges and mediators on domestic violence [in Hague cases] is essential [and] many judges could benefit from additional training on the issue of domestic violence."[107] While many states provide training to state judges on the topic of domestic violence,[108] federal judges hear most Hague Convention cases.[109] In fact, federal appellate courts occasional-

---

involving domestic violence and does not contain the sort of information that should be used for training judges on the topic, including dispelling myths and explaining the effect of trauma on witness testimony and credibility.

106. *See* U.S. Response to Questionnaire Concerning the Practical Operation of the 1980 Convention ¶ 4.1 (2017) ("[T]he USCA has a robust judicial training program that reaches out whenever a judge is assigned to a Convention case to provide basic information about the Convention and contact information for our office and our Hague Network Judges."), *available at* https://assets.hcch.net/docs/61a1521b-9ec4-4fda-b543-33a39266f0c5.pdf [https://perma.cc/4H8U-EGS2]; *see also id.* ¶ 4.2 ("The USCA has information specifically for judges and lawyers available on its website that details the requirements of the Convention."); *see generally id.* ¶ 13.1.

107. U.S. Response To Preliminary Doc. No. 2, *supra* note 8, § 5.1.

108. Nat'l Council of Juv. & Fam. Ct. Judges, Res. Ctr. on Domestic Violence: Child Prot. and Custody, Mandatory Domestic Violence Training for Judges (2014), https://www.rcdvcpc.org/resources/resource-library/resource/mandatory-dv-training-for-judges.html [https://perma.cc/W2D8-TU-VQ] (noting about half the states mandate such training and others make it available). Training was often prompted by recommendations from the National Council on Juvenile and Family Court Judges, the preeminent professional organization for state family law judges. *See, e.g.*, Nat'l Council of Juv. & Fam. Ct. Judges, Family Violence: A Model State Code § 510(3)-(4) (1994) [hereinafter Model Code on Family Violence] (identifying mandatory training topics for judges handling any case involving domestic or family violence, including the following: "(a) The nature, extent, and causes of domestic and family violence; (b) Practices designed to promote safety of the victim and other family and household members, including safety plans; (c) Resources available for victims and perpetrators of domestic or family violence; (d) Sensitivity to gender bias and cultural, racial, and sexual issues; and (e) The lethality of domestic and family violence."). *Cf.* The Impact of Domestic Violence on Children: A Report to the President of the American Bar Association 5 (Aug. 1994) ("It is critical that all personnel involved in domestic relations, juvenile court, family law, and criminal cases (e.g., lawyers, including . . . judges . . . ) receive training about domestic violence and how it affects children."); Rita Smith & Pamela Coukos, *Fairness and Accuracy in Evaluations of Domestic Violence and Child Abuse in Custody Determinations*, 36 Judges' J. 38, 54 (1997) ("Judicial education programs on these issues can make a difference.").

109. *See* Weiner, *supra* note 26, at 199 (conveying that in a survey of Hague Convention cases being decided in four states from 2005 to 2013, only two out of nineteen cases were filed in state court). In T2, there were eleven appellate cases in federal court, but only one appellate decision addressing the Hague Convention from all of the state courts combined. In contrast, during T1, there were five published appellate decisions in state court. *See* Weiner, *supra* note

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 27 of 110

ly chide federal trial judges who have decided Hague Convention cases for their lack of understanding about domestic violence. For example, an appellate judge noted one trial court's "thoroughly superficial analysis" and stated, "the only obvious certainty here is the district court's apparent lack of familiarity with the nature and significance of both alcoholism and domestic violence and their harmful effect on children."[110] While the *Australian Bench Book* is not a substitute for in-depth training, it is a very helpful, authoritative, and authorized resource.

## II.   Article 13(b) Is More Helpful Than Judges May Think

Case law reveals that the most prominent obstacles to granting the article 13(b) defense include the following: (1) a requirement that the child has been directly abused; (2) a requirement of severe and frequent physical violence; (3) a requirement that the violence is likely to recur in the future; (4) disregard of the harm a child experiences when separated from the taking parent; (5) disregard of the "intolerable situation" language in article 13(b) as a separate category of the defense; (6) faith in protective measures; (7) a reluctance to find the taking parent credible; (8) the clear and convincing evidence burden of proof; and (9) a misarticulation of the article 13(b) legal test that ignores "a grave risk of exposure to" harm. Batterers' attorneys emphasize all of these obstacles, but none of them should prevail. This Part discusses these obstacles seriatim.

### A.   *The Child Need Not Be the Target of the Violence*

Judges who evaluate article 13(b) in the context of domestic violence often attribute significance to the fact that the child was never directly abused.[111]  In fact, the U.S. Supreme Court recently

---

10, at 277 n.5.

110. Neumann v. Neumann, 684 F. App'x 471, 490 (6th Cir. 2017) (Martha Craig Daughtrey, J., concurring in part and dissenting in part); Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005) (calling the trial judge's decision "irresponsible" and noting that "[t]he judge inexplicably gave no weight to Davy's threat to kill the children" in light of petitioner's "propensity for violence, and the grotesque disregard for the children's welfare that he displayed by beating his wife severely and repeatedly in their presence and hurling obscene epithets at her also in their presence"). *See also In re* Application of Adan, 544 F.3d 542 (3d Cir. 2008). Anecdotal reports, as well as news reports, suggest that the Third Circuit was disgusted with the trial court's ruling in light of the evidence at trial. *See* Bob Braun, *Court Spares Girl, 8, From Deportation*, Newark Star Ledger (Sept. 23, 2008), https://www.nj.com/njv_bob_braun/2008/09/court_spares_girl_8_from_depor.html [https://perma.cc/3EJU-V5P2].

111. *See, e.g.*, Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 996813, at *15

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 28 of 110

mentioned this fact in the last of the four Hague Convention cases it has heard.[112] While the Court signaled in its first Hague Convention case that the article 13(b) defense could be appropriate if the facts of a case showed domestic violence,[113] its last case included problematic dictum suggesting that domestic violence is not necessarily relevant unless the child is also directly abused.[114]

Several judges deciding T2 cases, i.e., federal appellate cases decided from July 2017 through January 2018, mentioned this supposed requirement. For example, in *Orellana v. Cartagena*, the appellate court noted the following: "[T]he magistrate judge concluded that [the respondent] failed to clearly establish that the nature and frequency of the abuse created a grave risk to her daughter's return. The judge reasonably concluded that [the respondent's] allegations at most showed isolated incidents of abuse directed at her, not the child."[115] In *Ahmed v. Ahmed*, the appellate court did

---

(M.D. Tenn. Feb. 28, 2020) ("As discussed above, the Court finds that Respondent has established only one incident of physical abuse by Petitioner towards Respondent in 2013. And the Court finds that this sole incident is insufficient to demonstrate that returning EAST and PGST to Venezuela would expose them to a grave risk of harm. As an initial matter, Respondent did not establish that Petitioner ever threatened or abused *the Children.*")*;* Garcia v. Duarte Reynosa, No. 2:19-cv-01928-RAJ, 2020 WL 777247, at *4 (W.D. Wash. Feb. 18, 2020); da Silva v. de Aredes, 953 F.3d 67, 73 (1st Cir. 2020).

112. All of the cases involved a backdrop of domestic violence. In *Abbott v. Abbott*, the abductor mother alleged that the father was abusive. *See* Brief of the Domestic Violence Legal Empowerment & Appeals Project (DV Leap), et al., As Amici Curiae in Support of Respondent at *10–11, Abbott v. Abbott, 560 U.S. 1 (2010) (No. 08–645). In *Chafin v. Chafin*, the abductor mother was alleged to be violent. Chafin v. Chafin, 568 U.S. 165, 170 (2013). In *Lozano v. Montoya Alvarez*, the abductor mother alleged that the father was abusive. Lozano v. Montoya Alvarez, 572 U.S. 1, 6–7 (2014). In *Monasky v. Taglieri*, the mother alleged the father was abusive. Monasky v. Taglieri, 140 S. Ct. 719, 724 (2020).

113. *See Abbott*, 560 U.S. at 22 ("If, for example, Ms. Abbott could demonstrate that returning to Chile would put her own safety at grave risk, the court could consider whether this is sufficient to show that the child too would suffer 'psychological harm' or be placed 'in an intolerable situation.'").

114. *Monasky*, 140 S. Ct. at 729 ("Article 13(b) allows a court to refrain from ordering a child's return to her habitual residence if 'there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.' Monasky raised below an Article 13(b) defense to Taglieri's return petition. In response, the District Court credited Monasky's 'deeply troubl[ing]' allegations of her exposure to Taglieri's physical abuse. But the District Court found 'no evidence' that Taglieri ever abused A.M.T. or otherwise disregarded her well-being.") (alteration in original) (citations omitted).

115. Orellana v. Cartagena, No. 17-6520, 2018 U.S. App. LEXIS 1161, at *2 (6th Cir. Jan. 17, 2018).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 29 of 110

not address article 13(b), but the trial court had rejected the article 13(b) defense, stating, "While Mother has alleged that Father was physically, emotionally, and verbally abusive to her . . . , there are no allegations or evidence that he was abusive in any way to the children or that there is a threat of harm to the children in the U.K."[116]

Despite what these cases suggest, abuse against the child, either historically or in the future, is not required to establish the article 13(b) exception. In fact, several other T2 cases recognized that it is a misreading of article 13(b) to limit the defense to direct abuse of the child. In *Davies v. Davies*, the Second Circuit said, "Evidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse."[117] Similarly, in *Soto v. Contreras*,[118] the Fifth Circuit suggested that abuse to the mother could make out the defense: "[The mother] does not show the court 'labored under' the mistaken 'assumption that threats against a parent can never create a grave risk of harm to his or her children.'"[119]

The *Guide to Good Practice* also takes the position that direct abuse of the child is not required, although this resource contains some inartful language that suggests otherwise unless the language is read in context.[120] The *Guide to Good Practice* explains why abuse

---

116. Ahmed v. Ahmed, No. 3:16-CV-142, 2016 WL 4691599, at *5 n.9 (E.D. Tenn. Sept. 7, 2016).

117. Davies v. Davies, 717 F. App'x 43, 48 (2d Cir. 2017).

118. Soto v. Contreras, 880 F.3d 706 (5th Cir. 2018).

119. *Id.* at 713. *See also* Taglieri v. Monasky, 876 F.3d 868, 878 (6th Cir. 2017) (noting that the father had not been physically violent towards the child, but "[t]his is not to say that a child who is not herself subjected to physical abuse is never in grave risk of psychological harm or of being placed in an 'intolerable situation'").

120. The *Guide to Good Practice* has an inartful sentence, inserted at the eleventh hour, that, at first glance, suggests that the absence of physical abuse to the child is relevant. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 58 ("Evidence of the existence of a situation of domestic violence, in and of itself, is therefore not sufficient to establish the existence of a grave risk to the child."). The sentence is accompanied by footnote 73, which increases the chance of a misreading. That footnote cites the Second Circuit case of *Souratgar v. Fair* and its language suggesting that violence against the child is needed. When read in context, it is clear that paragraph 58 is referring to the fact that violence must have a potential effect on the child to trigger the exception, not that the violence must also be against the child. *See* Merle H. Weiner, *Hague Convention Article 13(b) Guide to Good Practice: Addendum to Weiner's Commentary,* DOMESTIC VIOLENCE REP., 93–94 (2020). *See also* Rhona Schuz & Merle Weiner, *A Small Change that Matters: The Article 13(1)(b) Guide to Good Practice,* INT'L FAM L. 87 (2020). The full case of *Sourtagar* and other parts of the *Guide* make clear that that violence against the child is not required. Weiner, *supra*, at 93–94; Schuz & Weiner, *supra*, at 90 (footnotes omitted).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 30 of 110

against the child is not required for an article 13(b) defense. First, and put simply, domestic violence against the taking parent can harm the child even if the child is not the direct victim of abuse.[121] The *Guide to Good Practice* acknowledges,[122] buttressed by overwhelming social science,[123] that children who are exposed to domestic violence can "suffer increased physical and psychological illnesses that undermine their health, social and emotional development, and interpersonal behaviors."[124] A congressional resolution details these same types of

---

121. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 57.

122. *Id.*

123. *See, e.g.*, Peter G. Jaffe, Claire V. Crooks & Samantha E. Poisson, *Common Misconceptions in Addressing Domestic Violence in Child Custody Disputes*, 54 JUV. & FAM. CT. J., 57, 60–61 (2003) (citations omitted) ("Research on children's exposure to domestic violence has consistently identified a range of negative outcomes for these children. . . . Children who are exposed to domestic violence may show comparable levels of emotional and behavioral problems to children who were the direct victims of physical or sexual abuse. . . . In addition to emotional and behavioral problems, difficulties experienced by child witnesses can encompass a variety of trauma symptoms, including nightmares, flashbacks, hypervigilance, depression, and regression to earlier stages of development. . . . Other identified difficulties include compromised social and academic development. . . . The effect of domestic violence cuts across all ages and stages of children's development. The impact of violent environments on very young children suggests that permanent negative changes in the child's brain and neural development can occur, such as altering the development of the central nervous system, predisposing the individual to more impulsive, reactive, and violent behavior. . . . Furthermore, the adverse effects of exposure to violence are not restricted to young children. In adolescence, exposure to domestic violence is associated with drug and alcohol abuse, truancy, violent dating relationships, and involvement in the juvenile justice system. . . . Exposure to domestic violence in childhood is also associated with significant problems in adult social adjustment."); Sarah E. Evans, Corrie Davies & David DiLillo, *Exposure to Domestic Violence: A Meta-Analysis of Child and Adolescent Outcomes*, 13 AGGRESSION & VIOLENT BEHAV. 131, 136 (2008) ("Results of this meta-analysis support the hypothesis of an association between childhood exposure to domestic violence and internalizing, externalizing, and trauma symptoms in children"); Tuppett M. Yates, Michele F. Dodds, L. Alan Sroufe & Byron Egeland, *Exposure to Partner Violence and Child Behavior Problems: A Prospective Study Controlling for Child Physical Abuse and Neglect, Child Cognitive Ability, Socioeconomic Status, and Life Stress*, 15 DEV. & PSYCHOPATHOLOGY 199 (2003); SHERRY HAMBY ET AL., U.S. DEP'T OF JUST., OFFICE OF JUV. JUST. AND DELINQUENCY PREVENTION, CHILDREN'S EXPOSURE TO INTIMATE PARTNER VIOLENCE AND OTHER FAMILY VIOLENCE 2 (2011) ("Exposure to IPV is distressing to children and is associated with a host of mental health symptoms both in childhood and in later life. The best documented mental health effects include symptoms of posttraumatic stress, depression, and anxiety."); MODEL CODE ON FAMILY VIOLENCE, *supra* note 108, § 301 cmt (stating "children are acutely vulnerable to the trauma of domestic or family violence").

124. Lynn Hecht Schafran, *Evaluating the Evaluators: Problems with "Outside Neutrals*,*"* 42 JUDGES' J. 10, 13 (2003). *See also* Lynn Hecht Schafran, *Domestic Violence, Developing Brains, and the Lifespan: New Knowledge from*

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 31 of 110

harms,[125] specifically noting that "children are emotionally traumatized by witnessing physical abuse of a parent" and may experience "actual and potential emotional . . . harm [and] the negative effects of exposure to an inappropriate role model."[126]  Importantly, and contrary to what some trial judges have assumed,[127] "exposure" is not limited to witnessing the abuse, but may include hearing the fighting, seeing injuries, or being told about the abuse after the fact.[128]  It also includes being aware of "abusive behaviors that stop[] short of physical violence."[129]

Second, as the *Guide to Good Practice* recognizes, domestic violence puts children in physical danger.  They can be incidentally caught between the abuser and the victim.[130]  In addition, some

---

*Neuroscience*, 53 Judges' J. 32 (2014); Ostevoll v. Ostevoll, No. C-1-99-961, 2000 WL 1611123, at *16 (S.D. Ohio Aug. 16, 2000).

125. H.R. Con. Res. 172, 101st Cong. (1990) (recommending that states should have a "statutory presumption that it is detrimental to the child to be placed in the custody of the abusive parent").

126. *Id.*

127. *See* Gil-Leyva v. Leslie, 780 F. App'x 580, 590–91 (10th Cir. 2019) (affirming a finding that no grave risk existed where the father slapped and shoved the mother several times, once choked her with his hands, and threw things, but was never physical toward the children aside from a small number of spankings, and never abused the mother in front of the children except for occasionally slapping her with force on her buttocks); Hart v. Anderson, 425 F. Supp. 3d 545, 570–71 (D. Md. 2019) (finding no grave risk of harm because abuse did not occur in front of the children).

128. Nat'l Council of Juv. & Fam. Ct. Judges, Navigating Custody & Visitation Evaluations in Cases with Domestic Violence: A Judge's Guide 9–10 (2006) ("We are using the term 'exposure' to signal that children are affected not only when they are present at the violent incident, but also when they hear it, see it, or see or feel the aftermath—such as a parent injured or in distress, furniture knocked over, things broken, blood on the wall or floor. They are affected, too, when they are forced to live in an atmosphere of threat and fear created by violence.  And they are affected, too, when they are forced to live in an atmosphere of threat and fear created by violence.  And they are affected by a parent's use of abusive behaviors that stop short of physical violence, whether those behaviors are directed primarily toward a partner, or characterize the abusive parent's relationships with partner and children alike."); Schafran, *Domestic Violence, Developing Brains, and the Lifespan, supra* note 124, at 33; Hamby et al., *supra* note 123, at 3 (noting ten different types of exposure including "seeing and hearing violent acts, seeing injuries resulting from the violence, and being told about the violence," and noting children "can also become aware of violence after it occurs, for example).

129. Nat'l Council of Juv. & Fam. Ct. Judges, *supra* note 128, at 8–9.  *See also infra* Part II.B.2.

130. Guide to Good Practice, *supra* note 5, at 38 n.71 (citing Gomez v. Fuenmayor, 812 F.3d 1005 (11th Cir. 2016)).  *See Gomez*, 812 F.3d at 1010 (citing district court's finding that the "acts of violence, although not specifically directed at the child, placed her in a perilous position with a high risk of danger");

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 32 of 110

abusers who never abused their children before will start as a way to punish their victims for ending the relationship.[131]  Courts adjudicating Hague Convention cases have taken notice of the frequent co-occurrence of domestic violence and child abuse.[132]

---

Ischiu v. Garcia, 274 F. Supp. 3d 339, 354 (D. Md. 2017) (crediting "the physical risk that W.M.L.G. would be caught up in potential violence directed at his mother"); Baran v. Beaty, 526 F.3d 1340 (11th Cir. 2008).  *See generally* Barbara J. Hart, Children of Domestic Violence: Risks and Remedies 2 (1992) ("Older children are frequently assaulted when they intervene to defend or protect their mothers.").

131.  *See* H.R. Con. Res. 72, 115th Cong. (2018) ("Whereas research confirms that a child's risk of abuse increases after a perpetrator of domestic violence separates from a domestic partner, even when the perpetrator has not previously abused the child . . . .").  *See generally* Hart, *supra* note 130, at 2 (noting that because domestic violence "is instrumental, directed at subjugating, controlling and isolating . . . ," the batterer can "turn to abuse and subjugation of the children as a tactic of . . . control" of the mother even when a victim of domestic violence finally acquires independence from her abuser) (citing social science); Meg Crager, Review of a Sample of Domestic Violence Protection Orders in King County Superior Court From April 2013: An Issue Paper 11 (2015) ("When the parties separate, batterers often escalate their use of children as a way to maintain coercive control over their former spouse or partner through visitation, as well as through frequent court actions, including requests to modify parenting plans.").  Courts adjudicating Hague Convention petitions sometimes fail to recognize that a perpetrator can start abusing a child after the child's return even if the perpetrator has never abused the child previously. *See, e.g.*, Hart v. Anderson, 425 F. Supp. 3d 545, 571 (D. Md. 2019) (rejecting defense based on risk of co-occurrence of child abuse when there was no prior history of abuse towards the children); Souratgar v. Fair, 720 F.3d 96, 106 (2d Cir. 2013) (finding no grave risk of harm to the parties' child, despite the respondent's claim that the petitioner was "likely to turn on" the child, because there was no history of child abuse and evidence instead indicated a "loving father-son relationship").

132.  Walsh v. Walsh, 221 F.3d 204, 220 (1st Cir. 2000) ("[C]redible social science literature establishes that serial spousal abusers are also likely to be child abusers.") (citing Jeffrey L. Edleson, *The Overlap Between Child Maltreatment and Woman Battering*, 5 Violence Against Women 134 (1999)); *In re* Matter of NIR, 797 F. App'x 23, 27 (2d Cir. 2019) (summary order); *In re* Application of Adan, 437 F.3d 381, 396 n.6 (3d Cir. 2006); Miltiadous v. Tetervak, 686 F. Supp. 2d 544, 554 n.12 (E.D. Pa. 2010); Tsarbopoulos v. Tsarbopoulos, 176 F. Supp. 2d 1045, 1058 (E.D. Wash. 2001).  *See also* Sherry Hamby et al., *The Overlap of Witnessing Partner Violence With Child Maltreatment and Other Victimizations in a Nationally Representative Survey of Youth*, 34 Child Abuse & Neglect 734 (2010); Anne E. Appel & George W. Holden, *The Co-Occurrence of Spouse and Physical Child Abuse: A Review and Appraisal*, 12 J. Fam. Psych. 578 (1998); John J. Wilson, Off. of Juv. Just. and Delinquency Prevention, U.S. Dep't. of Just., Safe from the Start: Taking Action on Children Exposed to Violence xiii (2000) ("There is an overlap of 30 to 60 percent between violence against children and violence against women in the same families.").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 33 of 110

Third, as the *Guide to Good Practice* recognizes, domestic violence perpetrated against the taking parent can render her a less competent parent, thereby placing the child at grave risk of exposure to harm.[133] The domestic violence victim's fear of violence, in and of itself, can have this effect and be grounds for granting the defense.[134] This effect can also result from the exhaustion that accompanies everyday vigilance and the need to protect oneself through legal action. The Hague-endorsed *Australian Bench Book* states, "For some victims their engagement with law enforcement agencies and the courts may exacerbate or prolong the trauma they have experienced as a result of the domestic and family violence."[135] The reduction in the parent's ability to care effectively for the child creates a risk to the child of physical and psychological harm as well as an "intolerable situation," as discussed below.[136]

Given the above, a trial judge should attribute no significance to the fact that the petitioner has never physically abused the child. A judge's reliance on such an irrelevant finding should be reversible error. The trial judge can and should recognize that prior abuse of

133. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 57.

134. Alistair W. MacDonald, *Article 13 Exceptions – Return and Best Interests of the Child in the Jurisdiction of England and Wales*, 23 JUDGES NEWSL., Winter–Spring 2019, at 17, 18 (mentioning that "anxieties of a respondent mother about a return with the child which are not based upon objective risk to her but are nevertheless of such intensity as to be likely, in the event of a return, to destabilise her parenting of the child . . . can found the defence under Article 13(1)(b)") (citing Re E (Children)(Abduction: Custody Appeal) [2011] UKSC 27, [2012] 1 AC 144 and Re S (A Child), [2012] UKSC 10); *Ischiu*, 274 F. Supp. 3d at 354 ("Between the potential psychological harm to W.M.L.G. that would derive from Gomez Garcia's legitimate fear for her safety if they were to return to Guatemala, and the physical risk that W.M.L.G. would be caught up in potential violence directed at his mother, the Court finds that returning W.M.L.G. to Guatemala would create a grave risk of harm to the child and place him in an intolerable situation.").

135. AUSTL. BENCH BOOK, *supra* note 104, § 5 (mentioning how, inter alia, "absence of legal representation," "lack of interpreter services," and "repeatedly return[ing] to court for motions, adjournments and hearings may contribute to a victim's revictimisation or secondary abuse through the court system"). *See also id.* § 10.1.8 (mentioning study that showed "the debilitating effects of violence may make them unavailable or unable to meet their children's needs; and frequent belittling, undermining, insulting, and physical harm by the violent partner in front of the children may affect the children's respect for their mother's authority or her ability to assert her authority" and noting "[i]f mental illness or substance are also relevant, a parent's cognition, moods, perception, self-awareness and self-esteem may be adversely affected, resulting in possible further impacts on a parent's capacity to perform basic tasks, maintain daily routines, respond to children's physical, material, and emotional needs, and provide consistent and positive parenting").

136. *See infra* text accompanying notes 217–266.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 34 of 110

the taking parent is itself a form of child abuse and creates further risks for the child.[137]

## B.    *All Types of Domestic Violence Are Relevant*

When adjudicating the article 13(b) defense, trial judges must determine when domestic violence is serious enough to trigger concerns about the child's return.  The *Guide to Good Practice* suggests that trial courts should look at "the nature, frequency and intensity of the violence, as well as the circumstances in which it is likely to be exhibited."[138]  Occasionally, appellate courts craft a rule that automatically qualifies an act as sufficiently serious, such as a credible threat of death.[139]  More often, however, there is not such a bright-line rule.  Rather, courts adopt vague tests that tend to discount the seriousness of the violence, such as holding that "sporadic,"[140] "isolated,"[141] or "not severe"[142] violence is insufficient to establish an article

137.  Daniel G. Saunders, *Child Custody and Visitation Decisions in Domestic Violence Cases: Legal Trends, Risk Factors, and Safety Concerns,* NAT'L ONLINE RES. CTR. ON VIOLENCE AGAINST WOMEN (2007) (calling exposure a "severe form of child abuse").

138.  GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 58.

139.  *See, e.g.*, Noergaard v. Noergaard, 244 Cal. App. 4th 76, 88 (Cal. Ct. App. 2015) ("As father's briefing acknowledges, a credible death threat 'automatically constitute[s] a grave risk of harm' prohibiting the child's return."); Simcox v. Simcox, 511 F.3d 594, 607–08 (6th Cir. 2007) (mentioning "sexual abuse, other similarly grave physical or psychological abuse, death threats, [and] serious neglect").

140.  *See, e.g.*, Souratgar v. Lee, 720 F.3d 96, 104 (2d Cir. 2013); Davies v. Davies, 717 F. App'x 43, 49 (2d Cir. 2017) (affirming grant of article 13(b) defense but emphasizing that the case did not involve "sporadic or isolated incidents" but "*overwhelming evidence* of Mr. Davies's extreme violence and uncontrollable anger, as well as his psychological abuse of Ms. Davies *over many years*, much of which was witnessed by K.D., and the fact that Mr. Davies frequently screamed and yelled at K.D. for no legitimate reason") (emphasis in original).

141.  *See supra* note 140 (both cases).  *See* Gil-Leyva v. Leslie, 780 F. App'x 580, 591 (10th Cir. 2019) (discounting evidence that petitioner "slapped" and "shoved" respondent and once "choked her with his hands," causing her to break a blood vessel in her eye and bruise on her neck because "isolated incidents of abuse generally demonstrate a risk of harm only to the spouse," not the child); Avendano v. Smith, 806 F. Supp. 2d 1149 (D.N.M. 2011) (calling the father's rape and abuse of the mother isolated incidents and not aimed at the children); Aly v. Aden, No. 12-1960 (JRT/FLN), 2013 WL 593420, at *17 (D. Minn. Feb. 14, 2013) (calling physical abuse on "at least four occasions—in the fall of 2010, on February 27, 2011, in July 2011, and on April 25, 2012," "isolated instances of abuse"); Monasky v. Taglieri, 876 F.3d 868, 878–79 (6th Cir. 2017) (affirming rejection of article 13(b) defense despite the fact that father's behavior was "appalling," because, inter alia, "the frequency . . . and severity of the physical violence is unclear").

142.  *See, e.g.*, Valles Rubio v. Veintimilla Castro, No. 19-CV-2524 (KAM) (ST), 2019 WL 5189011, at *24 (E.D.N.Y. Oct. 15, 2019) (crediting "most of the

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 35 of 110

13(b) defense. These tests are problematic for many reasons, as discussed below, but they are also bad policy because they encourage survivors to stay in abusive relationships until the violence is egregious enough to qualify for the defense.[143]

   Unfortunately, appellate courts' efforts to predetermine categories of relevant abuse increase the probability that trial courts will make deadly mistakes. For example, in *Simcox*,[144] the Sixth Circuit

---

child's and Respondent's testimony as to the frequency and extent of petitioner's alleged physical and verbal abuse," but then concluding the "pervasiveness and severity" did not rise "to the level of abuse and harm found to be sufficient to deny return"). In *Aly v. Aden*, the court found that the petitioner had been violent on at least four occasions, although the petitioner had alleged seven, including: 1) slapping the respondent in the face several times and damaging her laptop and cell phone; 2) assaulting her, causing a trip to the emergency room which revealed six small bruises on her wrist, two swollen and painful fingers, and two small bruises on her upper arm; 3) hitting the respondent in the head several times; 4) slapping her in the face. In addition, the respondent alleged the petitioner said he would kill her for taking away his daughter. The respondent also alleged control issues, including his control over her finances, hacking her online accounts, and viewing her as a woman of little value. The expert in the case said that the petitioner "was likely to commit physical and psychological abuse in the future." Nevertheless, the court found that the physical abuse did "not rise to the level of severity required" because "Aly's abuse was not characterized by prolonged violent outbursts." *Aly*, 2013 WL 593420, at *17.

143. *See In re* M.V.U., 2020 IL App (1st) 191762,¶ 49 (affirming trial judge's decision that article 13(b) defense was established, and rejecting that the domestic violence had to have "occurred over an extended period of time and involve vicious circumstances" because "we cannot say that a spouse must endure years of violent abuse for this exception to be established").

144. Simcox v. Simcox, 511 F.3d 594, 607–08 (6th Cir. 2007) ("Hague Convention cases dealing with abusive situations can be placed into three broad categories. First, there are cases in which the abuse is relatively minor. In such cases it is unlikely that the risk of harm caused by return of the child will rise to the level of a '*grave* risk' or otherwise place the child in an '*intolerable* situation' under Article 13b. In these cases, undertakings designed to protect the child are largely irrelevant; since the Article 13b threshold has not been met, the court has no discretion to refuse to order return, with or without undertakings. Second, at the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect. In these cases, undertakings will likely be insufficient to ameliorate the risk of harm, given the difficulty of enforcement and the likelihood that a serially abusive petitioner will not be deterred by a foreign court's orders. Consequently, unless 'the rendering court [can] satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody,' the court should refuse to grant the petition. Third, there are those cases that fall somewhere in the middle, where the abuse is substantially more than minor, but is less obviously intolerable. Whether, in these cases, the return of the child would subject it to a 'grave risk' of harm or otherwise place it in an 'intolerable situation' is a fact-intensive inquiry that depends on

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 36 of 110

identified three types of violence—minor, serious, and cases in the middle.  For cases in the middle category, trial courts have to give "careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return."[145]  The implication is that a trial court need not give careful consideration to minor violence, although the *Simcox* court never stated that expressly.  In fact, the Sixth Circuit offered its categorization not as a litmus test for which violence could trigger the article 13(b) defense, but rather to help trial judges assess whether protective measures might mitigate the risks sufficiently so that a child could be returned.  The Sixth Circuit heightened the risk that trial courts would dismiss the relevance of domestic violence altogether without any further analysis because it categorized the abuse in *Simcox* as falling into the middle category even though it was, in fact, very severe.[146]

---

careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return.  Even in this middle category, undertakings should be adopted only where the court satisfies itself that the parties are likely to obey them.  Thus, undertakings would be particularly inappropriate, for example, in cases where the petitioner has a history of ignoring court orders.  Where a grave risk of harm has been established, ordering return with feckless undertakings is worse than not ordering it at all.") (citations omitted) (emphasis in original).

145. *Id*.

146. Although there were disputes about the abuse, the appellate court stated,

> Mr. Simcox was both verbally and physically violent with his wife and children.  For example, the oldest child testified that he would call Mrs. Simcox a "f—-ing bitch [and] a c—-" in the presence of the children, and that "[h]e would maybe grab her jaw and put his finger on her neck, pulling hair."  She also stated that her father once while driving banged her mother's head against the passenger window of the vehicle in which they were traveling, and that she often had to intervene by placing herself between them.  The other children (with the exception of the youngest, who did not testify) expressed fear of their father and recounted frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and of pulling their hair and ears.  They also witnessed their father strike their mother on numerous occasions.  For example, C. Simcox, testifying *in camera,* recalled an incident in which her father "held [her mother] by the neck against the wall. [Her older sister] tried to stop him but he hit her."  Mr. Simcox himself acknowledges that he would "physically discipline" his children, but downplays the seriousness of this "discipline."

*Id*. at 598–99. The violence was "not isolated or sporadic incidents," and "all but the youngest were suffering from some level of post-traumatic stress disorder."

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 37 of 110

In fact, trial courts have applied the *Simcox* schema to evaluate the sufficiency of domestic violence for the article 13(b) defense and have arrived at some startling conclusions.[147]   For example, a trial court in the Sixth Circuit acknowledged that the respondent's allegations of physical and psychological abuse, including that the petitioner "dragg[ed] Respondent through the house by her hair resulting in three bruises[,]" and "t[old] Respondent that she can hang herself" were "alarming and very regrettable."[148]   Nonetheless, the court held that the behavior fell into "the first category of cases of relatively minor abuse" as defined by the Sixth Circuit in *Simcox* because "the nature of this alleged conduct is less serious than abuse categorized by the Sixth Circuit as [the middle category]."[149]

Instead of using the *Simcox* categorization, judges should analyze the violence following the recommendations contained in the resource recommended by the *Guide to Good Practice*, i.e., the *Australian Bench Book*.[150]   It recognizes that batterers can be dangerous even if the violence has not been frequent and severe.[151]   It also recognizes that children can be harmed from domestic violence that is not physical violence.[152]

As an initial matter, the *Australian Bench Book* explains that domestic violence is a "pattern of behavior involving a perpetrator's exercise of control over the victim."[153]   It warns trial judges not to focus exclusively on discrete incidents of physical violence.[154]   Rather, physically violent acts must be understood as part of a

---

*Id.* at 608.

147.  *See, e.g.,* Gil-Leyva v. Leslie, 780 F. App'x 580, 597 (10th Cir. 2019) (Briscoe, J., concurring and dissenting in part); Maurizio R. v. L.C., 201 Cal. App. 4th 616, 635 (Cal. Ct. App. 2011); Ross v. Worley, No. 1:13–cv–60–WSD, 2013 WL 12309782 (N.D. Ga. Feb. 19, 2013).

148.  Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 996813, at *17 (M.D. Tenn. Feb. 28, 2020).

149.  *Id.*

150.  Guide to Good Practice, *supra* note 5, ¶¶ 99, 106 (citing Austl. Bench Book, *supra* note 104).

151.  Austl. Bench Book, *supra* note 104, § 4.1, § 4.2 (citing, inter alia, work by Evan Stark), § 4.3 (rejecting typologies for assessment of risk).

152.  *Id.* § 4.4.3 (mentioning, inter alia, the batterer's efforts to undermine or destroy the relationship between mother and child and how this can "impair their physical, emotional and mental health and wellbeing"); Guide to Good Practice, *supra* note 5, ¶ 57 (mentioning how potential harm can significantly impair the ability of the taking parent to care for the child).

153.  Austl. Bench Book, *supra* note 104, § 3.1, § 5 ("In order to properly respond to domestic and family violence judicial officers will often need information presented to them, not just about individual incidents of violence, but also about the history and pattern of violence in the relationship.").

154.  *Id.* § 3.1.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 38 of 110

broader abusive pattern, including economic abuse, emotional abuse, reproductive abuse, cultural and spiritual abuse, harassing and monitoring, property damage, or animal abuse, among others.[155]  In fact, the *Guide to Good Practice* itself recognizes that there are "a range of abusive behaviours," among them "physical, emotional, psychological, sexual and financial abuse."[156]  It also cites authority where the trial court found the father's "persistent attitude of continuing to harass the mother" as relevant to the likelihood of "further incidents of violence between them."[157]

This advice is important because most physical abuse is "relatively minor, involving pushing, grabbing, holding, slapping, hair pulling, and the like."[158]  However, even "minor" abuse can cause its victims to experience "devastating fear and dependence elicited by frequent abuse over an extended period."[159]  In addition, physical violence need not be frequent if the victim fears future violence: "Sometimes, one or more episodes of severe violence early in a relationship instills enough fear of future violence in a woman to keep her under psychological control, whether or not subsequent acts of physical violence occur."[160]  The American Psychological Association emphasizes: "The acts do not necessarily have to be frequent or continuing; in specific instances, a single act or threat of abuse may be enough to establish unreasonable dominance and control over the victim."[161]

---

155. *Id.  See* Davies v. Davies, 717 F. App'x 43, 48–49 (2d Cir. 2017) (finding grave risk defense when there was psychological abuse of mother and uncontrolled anger in the presence of the child and the abuse was "primarily psychological in nature"); Sabogal v. Velarde, 106 F. Supp. 3d 689, 705–06 (D. Md. 2015) (finding grave risk defense when there was "little or no physical abuse," but "significant and unusual" verbal abuse of mother and children, including threats to kill).

156. Guide to Good Practice, *supra* note 5, at 9.

157. *Id*. at 39 n.76 (citing State Central Authority, Secretary to the Department of Human Services v. Mander, 17 September 2003, Family Court of Australia (Austl.) [INCADAT Reference: HC/E/AU 574], at ¶¶ 113–14).

158. Evan Stark, *Reframing Child Custody Decisions in the Context of Coercive Control*, *in* Domestic Violence, Abuse, and Child Custody: Legal Strategies and Policy Issues § 11–1, 11–8 (Mo T. Hannah & Barry Goldstein eds., 2010) (explaining "[o]f the 11,000 substantiated abuse cases reported to the military in 2001, for example, 57 percent involved no injury at all, another 36 percent prompted one visit to outpatient care, and only 7 percent could be classified as "severe").

159. *Id.*

160. American Psych. Ass'n, Violence and the Family: Report of the American Psychological Association Presidential Task Force on Violence and the Family 34 (1996).

161. *Id.* at 11.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 39 of 110

Instead of scrutinizing the frequency and severity of physical violence, trial judges should look for evidence of coercive control.[162] Coercive control can exist without severe, frequent, or recent physical violence.[163] Even Michael Johnson, a professor of sociology who is well known for his violence typologies, said the following:

> It is important not to make the mistake of assuming that this pattern of general control can be indexed simply by high rates of violence. Although the average frequency of violence among cases of patriarchal terrorism may be high, there may well be cases in which the perpetrator does not need to use violence often in order to terrorize his partner.[164]

Joan Meier, who persuasively criticized Johnson's typologies, noted: "Contrary to [the intimate terrorism] label's implications, coercively controlling relationships are often *not* highly violent. In fact, in upper socioeconomic status relationships, the violence is usually suppressed but control is often extreme."[165]

---

162. *See* Weiner, *supra* note 87, at 357 n.97. *See, e.g.*, Haw. Rev. Stat. § 586 –1 (2020) (defining domestic abuse to include coercive control and defining coercive control as "a pattern of threatening, humiliating, or intimidating actions, which may include assaults, or other abuse that is used to harm, punish, or frighten an individual," and includes "(1) Isolating the individual from friends and family; (2) Controlling how much money is accessible to the individual and how it is spent; (3) Monitoring the individual's activities, communications, and movements; (4) Name-calling, degradation, and demeaning the individual frequently; (5) Threatening to harm or kill the individual or a child or relative of the individual; (6) Threatening to publish information or make reports to the police or the authorities; (7) Damaging property or household goods; and (8) Forcing the individual to take part in criminal activity or child abuse").

163. Evan Stark, *Rethinking Custody Evaluation in Cases Involving Domestic Violence*, 6 J. Child Custody 287, 293–94 (2009). *See* Hernandez v. Ashcroft, 345 F.3d 824, 837 (9th Cir. 2003) (noting that "although a relationship may appear to be predominantly tranquil and punctuated only infrequently by episodes of violence, 'abusive behavior does not occur as a series of discrete events' but rather pervades the entire relationship[,]" and that "[t]he effects of psychological abuse, coercive behavior, and the ensuing dynamics of power and control" can cause the battered woman to experience "'fear, vigilance, or [the] perception that she has few options . . . even when the abusive partner appears to be peaceful and calm'") (citing Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome*, 21 Hofstra L. Rev. 1191 (1993)).

164. Michael P. Johnson, *Patriarchal Terrorism and Common Couple Violence: Two Forms of Violence Against Women*, 57 J. Marriage & Fam. 283, 287 (1995). *See also* Michael Johnson & J.M. Leone, *The Differential Effects of Intimate Terrorism and Situation Couple Violence: Findings From the National Violence Against Women Survey*, 3 J. Fam. Issues 322, 333 (2005).

165. Joan Meier, *Johnson's Differentiation Theory: Is it Really Empirically Supported?*, 12 J. Child Custody 4, 19 (2015) (emphasis in original); *id.* at 7 ("In an important caveat, Johnson also states that severity and frequency do

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 40 of 110

Actually, even the filing of the Hague Convention petition itself may be an example of contemporaneous coercive control in the relationship. The *Australian Bench Book* notes: "[A] parent may use their joint parenting role or related judicial options as a means of exercising ongoing control over their former partner."[166] While it may seem odd to call the Hague Convention petition an act of abuse when the petition is a lawful legal remedy, abusers use legal acts all the time to control their partners, e.g., repeatedly telling a survivor she is worthless, driving by a target's house, or controlling all of the money in a jointly-titled bank account. Because it is well recognized that abusers use the court system to try to control or punish their victims, often by litigating over custody,[167] the trial judge can and should consider whether the Hague Convention petition is itself evidence of an ongoing attempt to control the respondent in the context of the couple's overall relationship.

    1.   A Danger of Physical Harm Can Exist Even Without a History of Severe and Frequent Physical Violence

The amount of control exercised by the petitioner is relevant in determining the petitioner's potential to inflict physical injury. This is because the batterer can be dangerous to the taking parent's and child's physical safety even without a history of severe and frequent physical violence. As the *Australian Bench Book* notes,

> Some victims . . . may never experience any form of actual or threatened physical violence and yet may still be at risk of death; in some reported cases, the homicide is the first incident. In these cases, there may be other important signifiers of risk evident in the perpetrator's behaviour, such as: physical violence outside the intimate relationship; misuse of alcohol or drugs; intense jealousy towards the victim; or exercising a high level of prolonged control over the victim's daily activities and life.[168]

---

not exclusively *define* each type, although the types do differ 'on average.'") (emphasis in original).

    166. AUSTL. BENCH BOOK, *supra* note 104, § 4.1. *See also* Jaffe, *supra* note 123, at 59–60 (noting "threats to obtain custody are often used by abusers as weapons against the abuse victims to enhance power and control post-separation" and that abusive men referred to a parenting group "commonly identified" "the use of custody proceedings [as a strategy] to control or harass former partners").

    167. *See generally* Susan L. Miller & Nicole L. Smolter, *"Paper Abuse": When All Else Fails, Batterers Use Procedural Stalking*, 17 VIOLENCE AGAINST WOMEN 637 (May 2011); David Ward, *In Her Words: Recognizing and Preventing Abusive Litigation Against Domestic Violence Survivors*, 14 SEATTLE J. FOR SOC. JUST. 429, 434–35 (2016).

    168. AUSTL. BENCH BOOK, *supra* note 104, § 4.2.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 41 of 110

In fact, focusing solely on the severity and frequency of the physical violence can obfuscate the danger the perpetrator poses to the taking parent and child upon the child's return. Tellingly, the well-known Danger Assessment, developed by Professor Jacquelyn Campbell of the John Hopkins School of Nursing, contains twenty questions to assess the perpetrator's danger and only one of the questions asks about the frequency and severity of the violence.[169] Even that one question asks about it in relative terms: "Has the physical violence increased in severity or frequency over the past year?" Better predictors of dangerousness are the factors associated with coercive control.[170]

A judge assessing whether a child will face a "grave risk" of exposure to harm should be aware of all the markers of dangerousness. The *Australian Bench Book* identifies some of the risk factors, including but not limited to the following: domestic violence within the past year; use or threatened use of a firearm, knife, choking, strangling, or a death threat; a pregnant victim; misuse of alcohol or drugs by the perpetrator; stalking; controlling, jealous, or obsessive behaviors towards the victim; threats of suicide by the perpetrator; and children fathered by someone other than the perpetrator.[171] Judges can and should use risk assessment tools like Campbell's Danger Assessment,[172] although they should be aware that danger predictions can sometimes underestimate the potential for future harm.[173]

---

169. Jacquelyn C. Campbell, Daniel W. Webster & Nancy Glass, *The Danger Assessment, Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide*, 24 J. INTERPERSONAL VIOLENCE 653, 655 (2009). The tool has been validated. *Id.* at 667–68.

170. Stark, *supra* note 158, § 11–14 ("Several large-scale, well-designed studies have shown that control factors predict fatality and the psychological, physical, and psychosocial outcomes heretofore attributed to DV far better than do levels or frequency of physical assault and may elicit these outcomes even in the absence of physical assault or long after physical assault has ended.").

171. AUSTL. BENCH BOOK, *supra* note 104, § 4.2.

172. *See supra* text accompanying notes 169–170. *See generally* Leon Samuels, *The Danger Zone: Domestic Violence Risk Assessment Tools*, THE ADVOCATE 29 (Aug. 2018). *See also* AM. JUDGES' FOUND., DOMESTIC VIOLENCE AND THE COURT HOUSE: UNDERSTANDING THE PROBLEM, KNOWING THE VICTIM 4 (2012), *available at* http://aja.ncsc.dni.us/domviol/page4.html [https://perma.cc/HQV4-XDWT].

173. *See* Editorial, *A Tragic End. Our View: In Custody Disputes, Protect Children First*, BALTIMORE SUN (Apr. 3, 2008) (describing murder of three children by father following judge's misjudgment as to father's dangerousness; law required mother to show "clear and convincing" evidence of abuse or harm to the children, and two mental health professionals testified that father was not dangerous).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 42 of 110

The best indicator of continuing danger is the simple fact that that the petitioner has abused the taking parent in the past.[174]

It is worth emphasizing that a domestic violence victim's separation from her abuser heightens her danger.[175] Judges adjudicating the article 13(b) defense sometimes have the common misconception that separation reduces the risk of domestic violence.[176] On the contrary, as the *Australian Bench Book* notes, "it is common for perpetrators to continue or escalate the violence after separation in an attempt to gain or reassert control over the victim, or to punish the victim for leaving the relationship."[177] The *Australian Bench Book*

---

174. *In re* E.B., 184 Cal. App. 4th 568, 576 (Cal. Ct. App. 2010) (noting "'Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of those relationships . . . Even if a batterer moves on to another relationship, he will continue to use physical force as a means of controlling his new partner.' [Citation.]"); Van de Sande v. Van de Sande, 431 F.3d 567, 570 (7th Cir. 2005). *See also* text accompanying note 205.

175. *See generally* HART, *supra* note 130, at 4 ("[H]alf of the homicides of female spouses and partners were committed by men after separation or divorce." (citing George W. Bernard et al., *Till Death Do Us Part: A Study of Spouse Murder*, 10 BULL. AM. ACAD. PSYCH. & L., 271–80 (1982)).

176. *See* Souratgar v. Fair, No. 12 Civ. 7797, 2012 WL 670021, at *11 (S.D.N.Y. Dec. 26, 2012), *aff'd* 720 F.3d 96 (2d Cir. 2013). *Cf.* Aly v. Aden, 2013 WL 593420, at *17 n.17 (D. Minn. Feb. 14, 2013) ("Finally, the Court rejects as a basis for its decision Dr. Edelson's reliance on 'estrangement' as a factor contributing to a finding of grave risk, as nearly every Convention case, by its very nature, involves some estrangement of the parents."). *See also* AUSTL. BENCH BOOK, *supra* note 104, § 4.1 (noting as a myth and misunderstanding the idea that "[t]he domestic and family violence will stop when the victim and perpetrator separate"). *See generally* Mike Brigner, *Why Do Judges Do That?*, *in* DOMESTIC VIOLENCE, ABUSE, AND CHILD CUSTODY: LEGAL STRATEGIES AND POLICY ISSUES § 13–1, 13–10 (Mo T. Hannah & Barry Goldstein eds., 2010) ("Judges sincerely but wrongly believe that DV will end when a couple becomes legally divorced or separated. This misconception is as dangerous as it is widespread.").

177. AUSTL. BENCH BOOK, *supra* note 104, § 4.2. *Cf.* Ann E. Freedman, *Fact-Finding in Civil Domestic Violence Cases: Secondary Traumatic Stress and the Need for Compassionate Witnesses*, 11 AM. U. J. GENDER SOC. POL'Y & L. 567, 584 (2003) (footnote omitted) (noting "widespread agreement that the abusive behavior of a substantial proportion of batterers will escalate in seriousness and frequency over time, particularly in response to efforts by the victim to change or end an intimate relationship with the abuser"). *See also* Jaffe, *supra* note 123, at 59 ("Researchers who have tried to identify risk markers associated with recidivism, dangerousness, and lethal violence in domestic relationships have consistently identified the process of separation as a critical period. These researchers have noted that domestic violence is more about one person's attempt to control and dominate his partner, rather than about isolated acts of abuse. Thus during separation, when a perpetrator's perceived grasp on his intimate partner is weakening, he may be most dangerous and extreme in his attempts to regain control. Attempts to leave a violent partner, with children, is one of the most significant factors associated with severe domestic violence and

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 43 of 110

reports that "the violent response may be severe, life threatening or lethal" when the batterer experiences "an intense sense of loss of control."[178] Predictably, the batterer may experience an intense sense that he has lost control if the courts in the state of habitual residence award custody to the mother.[179] The National Council on Juvenile and Family Law judges recognizes that the "elevated risk" towards the child and battered parent after separation "often continues after legal interventions."[180]

Another important risk factor is the perpetrator's response to the allegations of domestic violence. Many judges mention that when a perpetrator denies or minimizes the violence, he is less trustworthy and more likely to be dangerous.[181] Judges should always consider this common response when assessing not only the

---

death.").

178. Austl. Bench Book, *supra* note 104, § 4.2.

179. Acosta v. Acosta, 725 F.3d 868 (8th Cir. 2013) ("Ricardo's testimony and voice messages indicate that he wants the children returned to his care. A Peruvian court's order to the contrary likely could cause Ricardo to become violent and harm the children."). *Cf.* Rodriguez v. Rodriguez, 33 F. Supp. 2d 456, 462 (D. Md. 1999) (noting that "the risk to his wife and children has increased exponentially as a result of these proceedings").

180. Model Code on Family Violence, *supra* note 108, § 405 cmt. *See also id.* § 301 cmt. The Model State Code on Domestic and Family Violence was crafted with "expert assistance of an advisory committee composed of leaders in the domestic violence field including judges, prosecutors, defense attorneys, matrimonial lawyers, battered women's advocates, medical and health care professionals, law enforcement personnel, legislators, educators and others." *Id.* at v.

181. *See, e.g.*, *Rodriguez*, 33 F. Supp. 2d at 461 ("Petitioner's deportment in the courtroom and his complete denial of any culpability in this matter leaves little doubt that he would make no effort to alter the destructive manner in which he interacts with his family."); Reflection Paper, *supra* note 53, at 18 (noting that the court in S.E.H. v. H.E.H., 21 December 1998, (Norway), placed "significant weight on the fact that the father 'appeared unwilling to admit his behaviour towards his family or to appreciate the difficulties for the children'"). *Cf. In re* Amber, No. B287403, 2019 WL 1123000 (Cal. Ct. App. Mar. 12, 2019) ("The court rejected father's blanket denial that he ever committed physical violence against mother. Indeed, the court implicitly found that father's refusal to acknowledge his propensity for physical violence made it more likely such behavior would recur. Past violence in a relationship is a good predictor of similar behavior in the future. . . . Furthermore, 'denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' . . . see *In re* Gabriel K. (2012) 203 Cal. App. 4th 188, 197 ["One cannot correct a problem one fails to acknowledge"]; *In re* Giovanni F., 184 Cal. App. 4th at p. 594, 601 (2010) [parent's denial of domestic violence increases risk]; *In re* J.N. (2010) 181 Cal. App. 4th 1010, 1025–26 (2010) [in assessing risk, court should consider "parent's current understanding of and attitude toward the past conduct that endangered a child"]").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 44 of 110

petitioner's credibility but also the petitioner's dangerousness if the children are returned.

The bottom line is that judges who require the respondent to face a risk of serious physical violence in the future, in order to establish the defense, must not simply look at the type, frequency, and severity of past abuse. Trial judges should embrace a more comprehensive approach for predicting dangerousness, as implied in the *Australian Bench Book* and already implemented by some appellate courts.[182]

### 2. All Forms of Domestic Violence Can Cause Harm to the Taking Parent and Child

Further, coercive control also has great importance for the application of the article 13(b) defense for other reasons. Specifically, coercive control can continue and even intensify after separation, targeted at either the parent, the child, or both.[183] This behavior can harm children, as described below, whether it is targeted at their caregivers or themselves, and even if the taking parent is not the victim of future physical violence.[184] Judges should consider whether the taking parent or the child, or both, will be the target of the petitioner's coercive control if the child is returned and whether this behavior satisfies the requirements of article 13(b).

First, coercive control of a parent can cause a child psychological harm.[185] In fact, coercive control between parents can be as traumatic to a child as child abuse.[186] This is true even if the child's

---

182. *See, e.g.*, *Acosta*, 725 F.3d at 876 (noting a variety of risk factors, including a history of abuse, escalation of abuse over time, threats to kill, threats of suicide, and the respondent's attempt to leave the relationship).

183. Emma Katz, Anna Nikupeteri, Merja Laitinen, *When Coercive Control Continues to Harm Children: Post-Separation Fathering, Stalking and Domestic Violence*, 29 CHILD ABUSE REV. 310, 312 (2020) (citing research).

184. *Id.* at 311.

185. Aly v. Aden, No. 12-1960 (JRT/FLN), 2013 WL 593420, at *18. (D. Minn. Feb. 14, 2013).

186. *See* Testimony of Dr. Peter Favaro, Grano v. Martin, 442 F. Supp. 3d 510, 532 (S.D.N.Y. 2020) ("Dr. Favaro noted that a child who witnesses coercive control or lives in a coercively controlling environment receives the same type of emotional trauma as a child who is directly abused. In fact, even in utero, a child's brain may develop differently if his mother is the victim of coercive control."). *See also* Emma Katz, *Beyond the Physical Incident Model: How Children Living with Domestic Violence are Harmed By and Resist Regimes of Coercive Control*, 25 CHILD ABUSE REVIEW 46, 52 (2016) (conducting qualitative study of fifteen mothers and children and noting that "children had experienced the same negative impacts (e.g. internalising and externalising behaviours, mental health difficulties)" from coercive control without frequent violence "as those who had lived with frequent and sometimes severe physical violence"); *id.* at 56 ("Shifting from the physical incident model to the concept

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 45 of 110

parent, the direct victim, does not experience frequent and severe physical harm.[187]  A study by Jane Callaghan found that the coercive relational dynamics were the "most troubling and distressing for children."[188]  Callaghan refused to call children "indirect victims" when a parent experiences coercive control because the children are affected "just as much as adult victims are."[189] Psychologist Evan Stark—noting that the vast majority of relationships with a history of physical or sexual assault also involve "acts to intimidate, humiliate, exploit, isolate, and control a partner"—concluded that "nonviolent forms of coercion and control are at least as harmful as violence."[190] He reported that the consequences of coercive control for children include "depression, suicidality, aggression, delinquency, anxiety, development delay, substance abuse, and inappropriate behavior at school."[191]  He explained that standard psychological tests often miss the long-term effects of such exposure.[192]

Second, coercive control of the child can harm the child by making the "children's lives frightening, constrained and unpredictable."[193]  Behavior targeted at the child can include hitting walls, threatening pets, threatening people whom the parent does not like, and excessively punishing children to maintain strict control over their lives.[194]  Such frightening behavior can "severely harm [children's] emotional/psychological, social and physical wellbeing, and their educational achievement."[195] Fathers who are coercively controlling sometimes combine their frightening behavior with

of coercive control . . . . may also help to dispel the myths that . . . . unless children have witnessed physical violence between their parents, then they have not been impacted by domestic violence.").

187. *See generally* Jane E.M. Callaghan et al., *Beyond "Witnessing": Children's Experiences of Coercive Control in Domestic Violence and Abuse*, 33 J. INTERPERSONAL VIOLENCE 1551 (2018).

188. *Id.* at 1571 (finding "children are fully aware of coercive control in their family [and] are affected by controlling dynamics within the family").

189. *Id.*

190. Stark, *supra* note 158, § 11–11.  There is now recognition that coercive control can exist without any physical violence and it can be just as harmful for victims' mental health.  *See, e.g.*, Kimberly A. Crossman et al., *"He Could Scare Me Without Laying a Hand on Me": Mothers' Experiences of Nonviolent Coercive Control During Marriage and After Separation*, 22 VIOLENCE AGAINST WOMEN 454, 456–57 (2016).

191. Stark, *supra* note 158, § 11–20.

192. *Id.* § 11–19.  *See also id.* (noting "many of the harms attributed to physical violence alone are actually elicited by exposure to a combination of abusive tactics among which assault (because it is often low level) may not be the most important").

193. Katz et al., *supra* note 183, at 317.

194. *Id.* at 317–18.

195. *Id.* at 322.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 46 of 110

"[p]erformances of 'admirable' fathering," allowing the father to hide the controlling behavior from others and manipulate the child, similar to how batterers combine abusive behavior against their adult victims with protestations of love.[196]  A study that explored the ways in which abusers exercise coercive control over their children post-separation found that children living with their nonviolent parent sometimes experienced an "ever-present" father post-separation.[197]  These children were scared that their father might appear at any time "to harass, manipulate, upset, kidnap and/or attack them or their mothers," and exhibited "anxiety, panic attacks, bed-wetting and nightmares."[198]  Some children experienced this fear even though the last incident of violence was years ago.[199]

Third, a broader understanding of domestic violence—one that focuses on control as well as physical violence—is relevant to assessing whether return will be an "intolerable situation" for the child.[200]  A child may experience the petitioner's coercive control directed at him or her as an intolerable situation.  In addition, the child may experience the petitioner's coercive control directed at the mother as an intolerable situation, especially if it diminishes her ability to provide adequate caregiving.  After all, coercive control can be "profoundly damaging" to its target even without frequent and severe violence.[201]  In fact, "women report that psychological abuse is by far the greatest source of their distress, regardless of the frequency or severity of the physical harm they've experienced."[202]  Such behavior can have profound implications for the parent's ability to care for the child upon return.  This unfortunate result is often the perpetrator's purpose: a common control tactic is to undermine a victim's ability to parent.[203]

---

196. *Id.* at 318–19.

197. *Id.* at 317.

198. *Id.* at 319.

199. *Id.* at 319–20.

200. *See infra* text accompanying notes 217–266.

201. Joan S. Meier, *Domestic Violence, Child Custody and Child Protection: Understanding Judicial Resistance and Imagining the Solutions*, 11 Am. U. J. Gender Soc. Pol'y & L. 657, 685 (2003).  *See also* Melena Ryzik and Katie Benner, *What Defines Domestic Violence?  Survivors Say It's More than Assault*, N.Y. Times (Jan. 22, 2021).

202. Deborah Epstein & Lisa A. Goodman, *Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences*, 167 U. Pa. L. Rev. 399, 417–18 (2019) (footnotes omitted) (discussing ways in which a batterer can increase his control over her life, including "by sabotaging her efforts to find or keep a job," by "refusing to allow her to sleep the night before a job interview," and "harassing her at work").

203. Stark, *supra* note 158, § 11–20.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 47 of 110

In sum, the judge should consider all the evidence of domestic violence, broadly understood, and assess the danger of future harm to the taking parent and child from the totality of circumstances.

## C.    *The Domestic Violence Need Not Recur in the Future*

Because article 13(b) is future-oriented, trial judges often want to know if the alleged domestic violence will continue.[204] To the extent that this fact is a prerequisite to a successful article 13(b) defense (and I argue in this Part that it is not), judges should presume that the violence will continue. The mere fact of past violence is itself evidence that future violence is likely.[205] The National Council of Juvenile and Family Court judges reports: "The risks of recidivism and harm are high in the context of domestic and family violence."[206] In fact, physical abuse can resume even when it last occurred in the distant past.[207]

Judges can use common sense to reach the conclusion that "[P]ast violent behavior in a relationship is 'the best predictor of future violence.'"[208] In fact, the Federal Rules of Evidence recognize that perpetrators of gender-based violence are likely to commit the crime again. Rules 413 and 415 explicitly depart from the ordinary presumption against propensity evidence to permit the introduction of prior sexual assaults in criminal and civil cases pertaining to sexual assault.[209] The departure was prompted by the inherent evidentia-

---

204. *See, e.g.*, Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 9996813, at *17 (M.D. Tenn. Feb. 28, 2020).

205. *See In re* T.G.R.-M., 404 S.W.3d 7, 14 (Tex. Ct. App. 2013) ("Another factor that may contribute to an environment that endangers a child's well-being is a parent's abusive or violent criminal conduct. . . . Evidence that a parent previously has engaged in abusive conduct allows an inference that the parent's violent behavior will continue in the future."); *In re* S.M., 389 S.W.3d 483, 492 (Tex. Ct. App. 2012) ("Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future."). *See supra* note 174.

206. Model Code on Family Violence, *supra* note 108, § 306 cmt.

207. American Psych. Ass'n, *supra* note 160, at 34 (explaining that while abuse tends to escalate in frequency and severity over time, the violence can stop for a while if others become aware of it and the violence can resume "after a period during which no violence occurs").

208. *In re* E.B., 184 Cal. App. 4th 568, 576 (Cal. Ct. App. 2010).

209. The prohibition in Federal Rule of Evidence 404 on the introduction of propensity evidence applies to a trial before a jury. The judge is the factfinder in a Hague Convention proceeding, making the proceeding a "miscellaneous proceeding" for purposes of the evidence rules. *See* Fed. R. Evid. 1101(d)(3). In addition, propensity evidence is only prohibited by Rule 404(b) when it is used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The inquiry here is not backward looking, i.e., whether the person acted in accordance with the

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 48 of 110

ry difficulties of proving sexual offenses because these acts typically occur in private.[210]  Some states extend such rules to domestic violence generally.[211]  While it is possible that the petitioner has changed and will be peaceable in the future, it is not probable.  The National Council on Juvenile and Family Courts reports, "Most perpetrators who stop violent, coercive, or threatening conduct do so after long-term intervention services."[212]

Although a trial court should assume the violence will recur, the violence need not recur for the article 13(b) defense to be successful.  For example, some children can experience post-traumatic stress disorder (PTSD) from returning to the place of the abuse even if the abuse does not resume.[213]  Courts adjudicating Hague cases have recognized this fact and used it to grant the defense,[214] citing expert testimony that PTSD can, inter alia, cause a child to "feel like it is happening again."[215]  In addition, as previously discussed in Part II.B.2, coercive control of the taking parent or the child independent of physical violence can also create psychological harm for the child and expose the child to an intolerable situation.  The next Part elaborates on the usefulness of the intolerable situation language, noting that judges have underutilized this language despite the common-sense interpretation of what should be considered an "intolerable situation" under article 13(b).

---

character, but forward looking, i.e., whether the person will act in accordance with the character. FED. R. EVID. 404(b)(1).  In fact, FED. R. EVID. 405(b) allows the introduction of specific acts of character when character is in issue.  Since propensity for violence is an issue, a party can in fact prove it.

210. Frank v. County of Hudson, 924 F. Supp. 620, 627 (D. N.J. 1996) (discussing history of provision).

211. *See, e.g.*, Cal. Evid. Code § 1109 (West 2020); *see* ALASKA R. EVID. 404(b)(4); Colo. Rev. Stat. Ann. § 18–6–801.5 (West 2020); 725 III. Comp. Stat. Ann. 5/115–7.4 (West 2020); Mich. Comp. Laws Ann. § 768.27b (West 2020); Minn. Stat. Ann. § 634.20 (West 2020).

212. MODEL CODE ON FAMILY VIOLENCE, *supra* note 108, § 221 cmt.

213. *See* Blondin v. Dubois, 238 F.3d 153, 160 (2d Cir. 2001) (citing testimony of Albert J. Solnit).

214. *See, e.g.*, Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 400, 409 (E.D.N.Y. 2005); Rodriguez v. Rodriguez, 33 F. Supp. 2d 456, 461 (D. Md. 1999) ("Returning the children to Venezuela, even if it did not result in the children's physical abuse at the hands of their father, would result in psychological trauma because of the children's fear of physical harm, a fear well grounded in their experience.").

215. *Elyashiv*, 353 F. Supp. 2d at 400.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 49 of 110

D.    *An Intolerable Situation Differs From Physical or Psychological Harm*

Article 13(b) allows a judge to deny the return of a child if return would create "a grave risk" of exposure to "physical or psychological harm or otherwise place the child in an intolerable situation."[216] I explained in a 2008 article that (1) the "intolerable situation" language in article 13(b) is a different concept than "psychological or physical harm;" (2) U.S. courts have largely ignored the "intolerable situation" language; and (3) the "intolerable situation" language deserves more attention.[217] After all, the drafters of the Hague Convention added the "intolerable situation" language, at least in part, to address the situation of domestic violence that might not expose the child to physical or psychological harm.[218]

An intolerable situation is a flexible concept. The *Guide to Good Practice* explains that an intolerable situation is "a situation that an individual child should not be expected to tolerate."[219] No child should be expected to tolerate the abuse of his or her taking parent, regardless of the harm it causes the child.[220] Similarly, no child should be expected to tolerate a situation in which the taking parent suffers considerable hardship in the child's state of habitual residence because of that parent's past victimization, regardless of the harm it causes the child, when a better option for the taking parent is available.

U.S. courts have increasingly acknowledged the independent character of the "intolerable situation" language.[221] Most notably, in *Pliego v. Hayes*, the Sixth Circuit held that an intolerable situation

---

216.  Hague Convention, *supra* note 1, at art. 13(b).

217.  Weiner, *supra* note 87. *But see Rodriguez*, 33 F. Supp. 2d at 462 (saying the domestic violence created an intolerable situation).

218.  Fourteenth Session of the Hague Conference on Private International Law (1980), *Actes et documents de la Quatorzième session*, Tome III, *Enlèvement d'enfants*, *Child Abduction* 302 ("Mr. Jones (United Kingdom) . . . . [I]t was necessary to add the words 'or otherwise place the child in an intolerable situation' since there were many situations not covered by the concept of 'physical and psychological harm'. For example, where one spouse was subject to threats and violence at the hands of the other and forced to flee the matrimonial home, it could be argued that the child suffered no physical or psychological harm, although it was clearly exposed to an intolerable situation.").

219.  GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 34.

220.  *See* Pollastro v. Pollastro [1999] 43 O.R. (3d) 497 (C.A.) (noting "as a matter of common sense that returning a child to a violent environment places that child in an *inherently* intolerable situation, as well as exposing him or her to a serious risk of psychological and physical harm").

221.  Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 9996813, at *15 (M.D. Tenn. Feb. 28, 2020) (citing Pliego v. Hayes, 843 F.3d 226, 233 (6th Cir. 2016)).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 50 of 110

can exist if the courts in the state of the child's habitual residence are practically or legally unable to adjudicate custody.[222]

U.S. judges should continue to expand their application of the intolerable situation defense, particularly when the taking parent is a domestic violence victim. After all, the *Guide to Good Practice* makes clear that the "intolerable situation" language creates a separate defense from article 13(b)'s language about "physical or psychological harm,"[223] and endorses its use specifically in the context of domestic violence when return of the child would cause an "extreme deterioration of [the taking parent's] psychological health."[224]

In addition, judges in other countries utilize the "intolerable situation" portion of the article 13(b) defense in cases with a history of domestic violence, recognizing that the child is negatively affected by the taking parent's inability to cope in the state of the child's habitual residence. For example, in *Re S*, the U.K. Supreme Court held that judges must consider not only the history of domestic violence but also the litany of related facts that will contribute to the taking parent's potential hardship.[225] In that case, the issue was not only that the father had "behaved very badly towards" the mother.[226] The mother also anticipated struggling greatly upon her return with the child because the father had descended into alcohol and drug abuse, he had contemplated suicide, she would likely need to enforce a protection order, she would be financially insecure, and the parties would be forced to have ongoing contact to coordinate visitation and to attend court proceedings for the child's relocation.[227] These facts lent credence to the mother's subjective belief about the difficulty of her life if the child were returned.[228] Consequently, the court found that her "merely subjective perception of risks could, as a matter of logic, found the defense."[229] The court concluded: "If the [High court] concludes that, on return, the mother will suffer such anxieties that their effect on her mental health

---

222. *Pliego*, 843 F.3d at 232–33.

223. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 30.

224. *Id.* at 47 n.105. *See also* Hale, *supra* note 35, at 7 ("Nowadays, we also understand that domestic violence directed towards a parent can be seriously harmful to the children who witness it or who depend upon the psychological health and strength of their primary carer for their health and well-being.").

225. *See* Re S (A Child) [2012] UKSC 10, [2012] 2 AC 257, ¶ 30.

226. *Id.*

227. *Id.*

228. *Id.* ¶¶ 30–31, 35 ("As we have explained, the Court of Appeal failed to appreciate that the mother's fears about the father's likely conduct rested on much more than disputed allegations.").

229. *Id.* ¶¶ 31–32.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 51 of 110

will create a situation that is intolerable for the child, then the child should not be returned."[230]

Similarly, in the recent case of *LRR v. COL*, the Court of Appeal of New Zealand found that the article 13(b) defense was established when a mother with a history of mental illness and substance abuse—likely "caused or exacerbated" by the father's domestic violence against her[231]—would encounter a bleak and stressful life if she and the child returned to Australia, and this stress would impede her care of the child.[232] The family court had granted the article 13(b) defense,[233] but not because of possible physical or psychological harm to the child as court orders could address the safety concerns related to domestic violence.[234] Rather, the family court found that returning the child would create a grave risk of exposure to an intolerable situation.[235] Return would compromise the mother's ability to parent the child because of her fear for her safety,[236] her psychological issues,[237] and some "uncertainty" about her entitlement to benefits, including legal aid to pursue a relocation

---

230. *Id.* ¶ 34.

231. LRR v. COL [2020] NZCA 209 at [5].

232. *Id.* at [138–40].

233. *Id.* at [31–32]. The mother emphasized the physical and psychological abuse against her, the psychological violence against the child, and the physical and psychological violence against a child from a previous relationship.

234. *Id.* at [48–50]. The court was unable to resolve the contested issues of fact about direct physical or psychological abuse of the child or another child from a previous relationship on the basis of affidavit evidence, without cross-examination.

235. *Id.* at [54–55].

236. The Court of Appeals found the mother "fears for her safety in Tasmania," and that "[t]his fear is well grounded in fact." *Id.* at [135]. In Australia, the father had been physically and psychologically abusive. *Id.* at [11-12]. When the father was arrested for violating a restraining order, *id.* at [24], the mother entered a women's shelter because she was fearful for her safety if the father was released. *Id.* at [25]. The mother fled with the child to New Zealand shortly after the father was released on bail. *Id.* at [27]. The father, who denied all allegations of violence, filed a Hague Convention petition in family court. *Id.* at [33].

237. The Court of Appeal explained that the mother's frail mental health created a "very high" risk that she would relapse, both in terms of her mental health and substance abuse. *Id.* at [138]. A relapse would significantly impair her parenting capacity. *Id.* at [7]. An expert explained that the mother's condition, including her depression and stress, "can have a negative impact on parenting and healthy child development." *Id.* at [139]. The fact that the parents would be living apart did not address these risks. *Id.* at [140].

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 52 of 110

petition.[238]  In light of the mother's vulnerability, she would not be able "to cope and provide appropriate care" for the child.[239]

The Court of Appeal of New Zealand affirmed, disagreeing with the intermediate High Court's conclusion that no intolerable situation would exist because the child could live with the father.[240] Even if the child could be cared for by the father or paternal grandparents,[241] the child could experience the loss of his mother "because she [could be] rendered incapable of caring for him by mental illness and/or substance abuse."[242]  The mother's inability to function as an effective parent would be intolerable for the child as she "has been his primary [caregiver] throughout his life."[243]  The court concluded, "This young child cannot be expected to tolerate the loss of effective parental care from his mother."[244]  Even if the Australian court allowed the mother to retain custody, she might not be able to relocate with the child back to New Zealand and might instead be in Australia "for a substantial period," contributing to the risk of becoming overwhelmed and ineffective.[245]  While it was possible that none of it would occur, the court said the article 13(b) defense did not require the mother to prove this worst-case scenario to a certainty.[246]  Rather, it was sufficient that "there is a very significant risk that these concerns will materialize, and they will have a very serious adverse effect" on the child.[247]

While *Re S* and *LRR v. COL* are very significant authority, judges should not assume that an intolerable situation can only exist if the taking parent's situation rises to the level of the dire circumstances evident in those cases.  No child should be expected to

---

238. *Id.* at [51, 53] (citing [COL] v. [LRR] [2018] NZFC 4040 [Family Court judgment] at [113-15]).

239. *Id.* at [54] (citing [COL] v. [LRR] [2018] NZFC 4040 at [117-20]).

240. *Id.* at [60]. While the court acknowledged that the mother might not be able to tolerate the situation and care for the child, it concluded, "[t]he primary risks are to her, not [the child]."  *Id.* at [63] (citing COL v. LRR [2018] NZHC 2902 [High Court judgment] at [35] (N.Z.)).

241. *Id.* at [143].

242. *Id.* at [7].  Moreover, if the mother lost her status as primary caregiver in court, she might have no contact with her child because she would not be entitled to government benefits, *id.* at [144], and her significant risk of suicide would increase further.  *Id.* at [138, 144].  Although the court recognized the risk that the mother might be totally eliminated from the child's life, it instead based its decision on the mother's potential inability to be a "functioning and effective parent."  *Id.* at [144].

243. *Id.* at [143].

244. *Id.* at [142].

245. *Id.* at [134].

246. *Id.* at [144].

247. *Id.* at [141].

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 53 of 110

tolerate the further abuse of his or her parent, period. As such, the case of *Al-Hadad v. Al Harash* is a significant decision.[248] In this 2020 case, the Ontario Court of Justice granted the article 13(b) defense on the basis that there would be an "intolerable situation" if the child were returned to Germany, even though there was not evidence that the mother would be debilitated.[249]

Specifically, in *Al-Hadad*, none of the father's violent incidents were "severe," but the "cumulative pattern" was severe and significant.[250] The violence had been escalating, the father denied and minimized it,[251] there were many markers of coercive control,[252] and the court recognized that this was a "very concerning form of family violence."[253] The mother alleged her life with the father had been a "living hell" punctuated by verbal, physical, and sexual abuse.[254] The incident precipitating the child's removal involved the father punishing the mother for hanging up the phone on him.[255] The mother alleged that "[h]e shoved her to the ground and began kicking her. When she ran to another room, he kept hitting her and said 'I am the only one who gets a say in this house.'"[256]

The trial court noted that the mother would be safer in Canada than in Germany, the state of the child's habitual residence.[257] Although Germany "has all of the institutional and legislative protections found in Canada,"[258] the family lived within a Syrian community in Germany.[259] The Syrian culture and the mother's fear of authority inhibited her from calling the police or contacting local children's aid authorities about the violence.[260] It was an environment that magnified the father's control, unlike in Canada.[261]

The trial court granted the article 13(b) defense despite the fact that there was no evidence that the violence had or would cause the

---

248. Al-Hadad v. Al Harash (2020) ONCJ 269 (Can.).

249. *Id.* ¶ 74.

250. *Id.* ¶ 55.

251. *Id.* ¶¶ 55–56.

252. *Id.* ¶ 61. It chronicled the facts, including his control of the mother's movement, his control over finances, his anger "if he perceives the mother is not being readily obedient," and the verbal, physical and sexual abuse. *Id.* ¶¶ 25, 28, 61.

253. *Id.* ¶ 62.

254. *Id.* ¶¶ 28, 29.

255. *Id.* ¶¶ 29–30.

256. *Id.* ¶ 29. The father admitted the pushing but denied the hitting. *Id.* ¶ 31.

257. *Id.* ¶ 69.

258. *Id.* ¶ 68.

259. *Id.* ¶ 69.

260. *Id.* ¶¶ 69, 34.

261. *Id.* ¶ 69.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 54 of 110

mother's psychological deterioration or undermine her ability to parent her child. Rather, it noted that the "[o]n going abusive conduct by the father towards the mother and the child is more than likely and would place the child in an intolerable situation."[262] That is, the likelihood of future abusive conduct was itself an intolerable situation.

*Al-Hadad v. Al Harash* is an outlier but is consistent with the fact that the drafters of the Hague Convention added the "intolerable situation" language, at least in part, to address the situation of domestic violence.[263] The drafting history does not limit the defense to instances when the mother's psychological situation would deteriorate so much that she could not care for the child.[264] Rather, the defense is broad enough to encompass a situation in which the petitioner is more likely to abuse the respondent if the child is returned than if the child remains in the abducted-to state.

At a minimum, trial judges in the United States should follow the lead of foreign courts and recognize that when there has been domestic violence, the taking parent's life upon return can negatively affect her, and derivatively, the child.[265] At least one trial judge in the United States subscribes to this reading of article 13(b). In *In re Tsarbopoulos*, the federal judge acknowledged that domestic violence and harsh circumstances upon return—or alternatively, the child's separation from the mother and siblings after a history of abuse if the mother did not return with the child—would be an intolerable situation.[266]

The intolerable situation provision gives judges more flexibility when applying the article 13(b) defense. It permits a judge to

---

262. *Id.* ¶ 74.

263. *See supra* note 218.

264. *See* Weiner, *supra* note 87, at 342–43.

265. *See* Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995) (noting U.S. courts "should give considerable weight to these well-reasoned opinions of other Convention signatories").

266. Tsarbopoulos v. Tsarbopoulos, 176 F. Supp. 2d 1045, 1061 (E.D. Wash. 2001) ("As for Jason, not only is he bonded with his two siblings, his mother has been his primary care giver for virtually all of his four years. Separating him or Hari or Joanna from each other or from their mother would be an intolerable situation. Kristi Tsarbopoulos has no resources which would enable her to live in Greece; she lacks language skills, would be quite likely unemployable, has no place to live and there is no evidence that there are government benefit programs which would supply financial or other support for her as a spouse who has been subject to spousal abuse. Additionally, Dr. Tsarbopoulos has provided no financial support to Kristi Tsarbopoulos or the children since they left Greece which added to their dependence on her family and their integration into that home and community. Finally, there was no evidence of undertakings, offers of support in Greece, or other services available to ensure the safety of the children if they were returned to Greece.").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 55 of 110

consider the potential for future domestic violence, but also a wide range of lingering repercussions from past domestic violence that can affect the child upon return. It, as well as the psychological harm portion of article 13(b), can also be used to refuse return of the child when the child will be separated from the taking parent after a history of abuse. The next Part explains that article 13(b) provides a defense in this situation, as recognized by the trial judge in *In re Tsarbopoulos*.

E.    *The Harm Caused By Separating the Child From the Taking Parent Is Relevant*

While most taking parents who are domestic violence victims will return with the child to the state of the child's habitual residence if the court grants the batterer's petition, not all will. This is especially true if the taking parent has other children who will remain with her in the requested state, or if she is driven primarily by concerns about her own safety. This fact pattern raises the question of whether the separation of the taking parent and child, because of the child's return and the taking parent's refusal to return, can itself establish the article 13(b) defense.

Courts have repeatedly held that the article 13(b) defense cannot rest on any harm to the child attributable to the child's separation from the abducting parent,[267] as the abductor should not be allowed to benefit from the abduction.[268] Some trial courts mistakenly apply this logic to the separation of a child from a taking parent who has fled for reasons of domestic violence.[269]

The cases in which the taking parent has fled from domestic violence differ significantly from other abduction cases. Children who have been exposed to domestic violence are particularly reliant upon their protective parent for healing, and they need continuity

---

267. *See, e.g.*, *In re* Koc, 181 F. Supp. 2d 136, 155 (E.D.N.Y. 2001).

268. *See* Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996) ("A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted. Under the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return. The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be a 'grave' risk of harm for the purposes of the Convention.").

269. *See, e.g.*, Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *2-3 (E.D.N.Y. May 5, 2020); Diagne v. Demartino, No. 18-11793, 2018 WL 6064965, at *3 (E.D. Mich. Nov. 20, 2018); Maurizio R. v. L.C., 201 Cal. App. 4th 616, 642 (Cal. Ct. App. 2011). *But see* Blondin v. Dubois, 78 F. Supp. 2d 283, 295–96 (S.D.N.Y. 2000), *aff'd*, 238 F.3d 153 (2d Cir. 2001) (acknowledging that stability can be relevant to the article 13(b) inquiry when domestic violence existed); *Tsarbopoulos*, 176 F. Supp. 2d at 1061.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 56 of 110

with their safe caregiver for their recovery.[270]  Judges have acknowl-edged the harm from separation for these children in numerous contexts.  For example, the National Council of Juvenile and Fam-ily Court Judges recommends that state welfare administrators and juvenile court judges keep children in their non-offending parent's custody whenever possible to ensure "stability and permanency for children."[271]

A landmark case by a federal trial court, *Nicholson v. Williams*, contains a considerable amount of expert testimony that speaks to the harm children experience when separated from their abused parents.[272]  The case challenged New York City's policy of removing children from their abused mothers as a way to protect the children. Witnesses testified that the practice is traumatic,[273] and, in both a lit-eral and legal sense, intolerable for the child.  One witness testified that the separation from the non-abusive parent is the child's "worst nightmare" and "tantamount to pouring salt on an open wound."[274] The federal court granted the petitioners a preliminary injunction, finding New York City's practices violated parents' and children's fundamental liberty interests and "harm children much more than they protect against harm."[275]

In light of this science, judges should regard the child's separa-tion from a taking parent as evidence of a grave risk of exposure to psychological harm or an intolerable situation if the child has pre-viously been exposed to abuse.  The harm caused by separating a child from a taking parent who has experienced domestic violence is

---

270. Heather C. Forkey, *Children Exposed to Abuse and Neglect: The Ef-fects of Trauma on the Body and Brain*, 30 J. Am. Acad. Matrimonial L. 307, 322 (2018) ("For children, the pathways to resilience are rooted in the give and take of safe, stable, and nurturing relationships that are continuous over time.").

271. Susan Schechter & Jeffrey L. Edleson, Effective Intervention in Domestic Violence and Child Maltreatment Cases: Guidelines for Policy and Practice, Recommendations from the National Council of Juvenile and Family Court Judges 19 (1999), *available at* https://www.ojp.gov/pdffiles1/Digitization/180603NCJRS.pdf [https://perma.cc/T55N-QAR7].

272. Nicholson v. Williams, 203 F. Supp. 2d 153 (E.D.N.Y. 2002).

273. *Id.* at 199 (citing multiple experts who explained "disruption of that bond [with the primary caregiver] can be even more traumatic than situations where there is no domestic violence"); *id.* (noting testimony of Dr. David Pel-covitz who said "children exposed to domestic violence are at a significantly above-normal risk of suffering separation anxiety disorder if separated from their mother" and that "taking a child whose greatest fear is separation from his or her mother and in the name of 'protecting' that child [by] forcing on them, what is in effect, their worst nightmare, . . . is tantamount to pouring salt on an open wound").

274. *Id.*

275. *Id.* at 253.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 57 of 110

not equivalent to the harm caused by separating a child from a taking parent who was not abused.  Trial judges should not assume that they can protect the child from such widely recognized harm, at least not without expert testimony.[276]  Rather, trial judges should carefully consider the potential harm to children from separation in cases with domestic violence, as the trial judge did in *In re Tsarbopolous*.[277]

Even if there is general appellate case law to the contrary, trial judges can and should consider the harm from separation when the taking parent is a domestic violence victim.  The U.S. Supreme Court recently implied that attorneys representing domestic violence victims should challenge the assumption that the harm caused by the separation of the child from the taking parent is irrelevant to the article 13(b) defense.[278]  Moreover, the *Guide to Good Practice* recognizes that separation can be relevant to the article 13(b) defense in this context.  While the *Guide to Good Practice* reiterates the position that parents who abduct should not be permitted to rely on their child's harms from separation to support the article 13(b) defense,[279] it simultaneously acknowledges that separation can sometimes rise to the level of a grave risk.[280]  The *Guide to Good Practice* thereby provides an important inroad on the position that the harm from separation is always irrelevant to article 13(b).

However, the *Guide to Good Practice* also suggests that judges should explore means to reduce obstacles to the parent's return rather than grant the article 13(b) exception,[281] and it condemns a taking parent's unequivocal refusal to return.[282]  Its reliance on protective measures is unfortunate, as Part II.F. discusses, and its condemnation

---

276. Maurizio R. v. L.C., 201 Cal. App. 4th 616, 642 (Cal. Ct. App. 2011) ("[W]e look to the courts and agencies like DCFS to provide the child with the counseling, support, and environment to ensure that potential psychological harms are averted.").

277. *See supra* text accompanying note 266.  *See also* Jacquety v. Baptista, No. 19-CV-9642, 2021 WL 1885263, at *37, *41 (S.D.N.Y. May 11, 2021) (granting article 13(b) defense and recognizing that separation of child from primary caregiver could exacerbate child's PTSD).

278. *See* Monasky v. Taglieri, 140 S. Ct. 719, 729 (2020) ("That court also followed Circuit precedent disallowing consideration of psychological harm A.M.T. might experience due to separation from her mother.  Monasky does not challenge those dispositions in this Court.").

279. GUIDE TO GOOD PRACTICE, *supra* note 5, at ¶ 72.

280. *Id.* ¶ 64 ("The primary focus of the grave risk analysis in these instances is the effect on the child of a possible separation in the event of an order for return or of being left without care, and whether the effect meets the high threshold of the grave risk exception . . . .").

281. *Id.* ¶¶ 64–65.  It also suggests returning the child to someone else in the habitual residence until a court there can make a custody decision.

282. *Id.* ¶ 72.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 58 of 110

of the survivor is entirely unwarranted, especially in this context. The taking parent has a right to stay in a place where she feels safe. Moreover, the policy reasons that led courts to disregard the harm from separation simply do not apply here: the emotional connection between the respondent and the child is not established by the abduction, as the taking parent is often the primary caregiver before flight,[283] and it was the petitioner's bad acts that caused the flight. The taking parent and the child should not be punished by disregarding the harm to the child from separation when the taking parent reasonably elects to live in a safer location. Rather, the court should consider the impact of separation on the child because that harm satisfies the article 13(b) defense.[284]

Fortunately, even the *Guide to Good Practice* recognizes that it is not always appropriate to expect the taking parent to return. It encourages judges to consider whether the taking parent's return would cause "an extreme deterioration" in the taking parent's health.[285] It specifically cites two domestic violence cases in which the courts found the article 13(b) defense established. In one case, the court found that the mother might commit suicide if she returned with the child[286] and, in the other case, the court found that the mother's PTSD might be triggered if compelled to return.[287] In both cases, the children would have been deprived of their mother's care; either the children would have returned without their mother or their mother would have returned but the psychological strain would have killed or debilitated her. As the U.K. Supreme Court stated in *Re S*, one of the cases cited in the *Guide to Good Practice*, "If the court concludes that, on return, the mother will suffer such anxieties that their effect on her mental health will create a situation that is intolerable for the child, then the child should not be returned."[288]

To be clear, while the *Guide to Good Practice* contains a limited acknowledgement that the taking parent cannot always be expected to return and that separation from the taking parent can establish the article 13(b) defense, article 13(b) itself is not as limited as the *Guide* suggests: it does not require that a child face a grave risk of exposure

---

283. LOWE & STEPHENS, *supra* note 12, at ¶ 11.

284. RHONA SCHUZ, THE HAGUE CHILD ABDUCTION CONVENTION: A CRITICAL ANALYSIS 302 (2013) ("[I]gnoring harm caused to the child by separation from the abducting primary [caregiver] is inconsistent with the objective of protecting the child.").

285. *See, e.g.*, GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 70.

286. *See, e.g.*, *id.* at 47 n.105 (citing Director-General, Department of Families v. R.S.P. [2003] FamCA 623 (Austrl.)).

287. *See, e.g.*, *id.* (citing Re S. (A Child) (Abduction: Rights of Custody) [2012] UKSC 10, [2012] 2 AC 257 (appeal taken from Eng.)).

288. Re S. (A Child) (Abduction: Rights of Custody) [2012] UKSC ¶ 34.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 59 of 110

to harm both from return with and without the taking parent. It only requires that the facts—as they are—establish the requisite level of potential harm. Consequently, a trial court can and should grant the article 13(b) defense when a domestic violence fact pattern exists, the taking parent refuses to return to the child's habitual residence because it is less safe, and the child's return without the parent would cause the child a grave risk of exposure to physical or psychological harm or otherwise place the child in an intolerable situation. The time is right for trial judges to credit the harm to children from separation from an abused parent.

As mentioned, the *Guide to Good Practice* puts faith in protective measures when assessing whether the taking parent should return with the child. The next Part specifically addresses protective measures, which some courts also use as a basis for determining whether the article 13(b) defense is made out at all, even when the taking parent is planning to return.

F.    *Protective Measures Are Generally Unhelpful*

Trial judges face pressure to consider protective measures before granting the article 13(b) defense. This pressure comes from the *Guide to Good Practice* as well as some appellate case law. However, this requirement is ill-advised because protective measures are generally ineffective, although it is very hard for a victim of domestic violence to demonstrate this fact in court. This Part first suggests some general reasons why protective measures may not work in a particular case. It then notes that trial judges may not need to consider protective measures because precedent in their jurisdiction may disapprove of the inquiry. It concludes by cautioning trial courts about the limits of expert testimony with respect to the availability and efficacy of protective measures.

1.    Protective Measures Do Not Eliminate the Risk of Exposure to Harm

In 2007, an Australian judge adjudicating a Hague Convention petition against Cassandra Hasanovic, a victim of domestic violence,[289] found:

> The Court should not and would not on the facts of this case presume the authorities in the United Kingdom [the state of the child's habitual residence] would not protect the mother and children if the children returned with the mother to the United Kingdom. In this case, the mother knows that she can be protected because the father was removed from the home

---

289. Department of Community Services v. Hadzic (2007) FamCA 1703 (Austl.).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 60 of 110

by police and charged with serious criminal charges in May of this year. That enabled the mother to escape to Australia. . . . There are a number of actions the mother could take to protect herself and the children from the violence of the father. Those actions would be invoked by her making applications to courts and authorities in the United Kingdom to assist in her protection and the protection of the children.[290]

The judge then had the father agree in writing to certain conditions to assure Hasanovic's safety until a U.K. court was seized of the matter, including the following: not coming within 250 meters of Hasanovic or the children; not contacting Hasanovic in any way; vacating the home so that Hasanovic and children could live there; and not seeking any court order that would prevent the children from living with Hasanovic.[291]

Hasanovic and her children then returned to England. Hasanovic secured a nonmolestation order,[292] the U.K. court awarded her custody,[293] the police gave her a panic alarm, and the police responded to several violent confrontations between the couple.[294] However, the police refused to give Hasanovic a police escort when she feared for her life and decided to move into a women's shelter.[295] When Hasanovic, her mother, and her two children got in the car to leave for the shelter, the father dragged Hasanovic out of the car and stabbed her to death.[296] An investigation into her killing found that the police failed "to arrest [the abusive spouse] for breaching bail conditions that prevented him from having contact with his wife."[297]

The tragic case of Cassandra Hasanovic illustrates the point that trial judges' predictions about the efficacy of protective measures can be wrong. A New Zealand court called it an "obvious point that no legal system can provide an assurance of protection against

290. *Id.* ¶ 6.
291. *Id.* ¶ 9.
292. *Man 'Killed Wife After Losing Custody Battle,'* METRO UK (Apr. 15, 2009, 1:16 PM), https://metro.co.uk/2009/04/15/man-killed-wife-after-losing-custody-battle-30492 [https://perma.cc/6DM4-TJD3].
293. *Id.*
294. Paola Totaro, *Young Mother Fled to Sydney to Save Her Life*, SYDNEY MORNING HERALD (May 2, 2009, 12:00 AM), https://www.smh.com.au/world/young-mother-fled-to-sydney-to-save-her-life-20090501-aq5z.html [https://perma.cc/96S6-ZPAP].
295. Sandra Laville, *Woman's Murder Could Have Been Prevented, Says Jury*, GUARDIAN (Feb. 26, 2014), https://www.theguardian.com/society/2014/feb/26/cassandra-hasanovic-murder-domestic-violence [https://perma.cc/5MN2-KY3T].
296. *Id.*
297. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 61 of 110

family violence if the perpetrator is not willing to comply with court orders."[298]    Numerous family court judges have miscalculated an abusive parent's willingness and ability to be law-abiding,[299] and the same is true for judges deciding Hague cases specifically.    Research by Edleson and Lindhorst found that seven of twelve women who were domestic violence survivors and whose children were returned pursuant to the Hague Convention continued to experience physical harm in the state of the child's habitual residence; some of the children were also subject to physical abuse upon return.[300]    These abusive acts were often illegal; sometimes undertakings specifically proscribed them.[301]    Nonetheless, these acts occurred and some batterers even went to great lengths to find their victims, such as the batterer who successfully tracked down the mother at a domestic violence shelter.[302]    Judges bear partial responsibility for the harm inflicted on parents and children when they send children back because it is always foreseeable that protective measures, including the criminal law, will be potentially insufficient to protect victims.[303]    In fact, judicial assurances that the taking parent and child will be safe upon return can cause the parent and child further harm in the form of institutional betrayal when the batterer reoffends.[304]

If a trial judge must consider the available protective measures (and a trial court need not always do so, as Part II.F.2 argues), what should a trial judge look for when evaluating their adequacy?    The *Guide to Good Practice* notes that the state of the child's

---

298.  LRR v. COL [2020] NZCA 209 at [128].

299.  *See* H.R. Con. Res. 72, 115th Cong. (2018) (noting "researchers have documented a minimum of 653 children murdered in the United States since 2008 by a parent involved in a divorce, separation, custody, visitation, or child support proceeding, often after access was provided by family courts over the objections of a protective parent"); Editorial, *supra* note 173.

300.  Edleson & Lindhorst, *supra* note 15, at 180–81.

301.  *See, e.g.*, *id.* at 163–64 tbl.6.2, 179–81.

302.  *Id.* at 182–83.

303.  *See* Marilyn Freeman, Reunite, The Outcomes For Children Returned Following An Abduction, at 31 (2003), http://takeroot.org/ee/pdf_files/library/freeman_2003.pdf [https://perma.cc/M68K-CEY4].    *See also* Edleson & Lindhorst, *supra* note 15, at 256 (quoting attorney who said, "These undertakings — that are given — are flouted all the time.").

304.  *See generally* Carly Parnitzke Smith & Jennifer J. Freyd, *Institutional Betrayal*, 69 Am. Psych. 575, 578 (2014) ("Institutional betrayal occurs when an institution causes harm to an individual who trusts or depends upon that institution."); Carly P. Smith et al., *The Psychology of Judicial Betrayal*, 19 Roger Williams Univ. L. Rev. 451, 455 (2014) (describing the effects of such betrayal, including "poorer physical health, anxiety, depression, dissociation, borderline personality disorder characteristics, shame, hallucinations, self-harm, and revictimization," and PTSD).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 62 of 110

habitual residence must be capable of actually protecting the taking parent and child.[305]  That necessitates two levels of inquiry: (1) whether there are protective measures available in the habitual residence and (2) whether they will be effective.

First, as to the availability of protective measures, a judge will often receive information from a foreign law expert on that topic.  Apart from an expert hired by the petitioner to testify to this issue, the source of the information is typically a representative from the central authority or a foreign judge responding to the trial judge's inquiry about protective measures.  The European Union, in connection with Brussells IIa, highlighted the need for this inside information:[306]

> It will generally be difficult for the judge to assess the factual circumstances in the Member State of origin.  The assistance of the central authorities of the Member State of origin will be vital to assess whether or not protective measures have been taken in that country and whether they will adequately secure the protection of the child upon his or her return.[307]

A judge should be skeptical of the information received, despite the temptation to accept it at face value because of norms of collegiality and because the treaty is "based on mutual trust between States."[308]  Foreign judges and representatives from a central authority are biased—not in a partisan way, but rather with regard to the tendency to overstate the efficacy of their legal system.[309]  A government official's admission that his or her country has inadequate laws, processes, and protections for domestic violence would be embarrassing and tantamount to conceding that

---

305. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 59.  *See also* LRR v. COL [2020] NZCA 209 at [113] (noting the habitual residence must be able to protect the child from the relevant harm "in practice").

306. *See* Council Regulation (EC), No. 2201/2003 (Nov. 27, 2003) Concerning Jurisdiction and the Recognition and Enforcement of Judgments in Matrimonial Matters and the Matters of Parental Responsibility, repealing Regulation (EC), No. 1347/2000, 2003 O.J. (L338) 1 [hereafter Brussels IIa Regulation], at art. 11(4) ("A court cannot refuse to return a child on the basis of Article 13b of the 1980 Hague Convention if it is established that adequate arrangements have been made to secure the protection of the child after his or her return.").  Moreover, Article 11 § 8 provides that the state of habitual residence can override a decision refusing to order a child's return, pursuant to article 13(b) of the Hague Convention, and the requested state has to enforce it.

307. *See* DIRECTORATE-GENERAL FOR JUSTICE AND CONSUMERS, PRACTICE GUIDE FOR THE APPLICATION OF THE BRUSSELS IIA REGULATION 54 (2016).

308. *See, e.g.*, GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 69.

309. Part of these observations were shared previously by this author with the U.S. State Department.  *See* Letter from Merle H. Weiner to Mr. Michael Coffee (Sept. 2, 2017) (on file with author).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 63 of 110

the country violates public international law.[310]  In addition, such an admission would reduce the number of children returned to the jurisdiction, contrary to politicians' interests.  Politicians care greatly about the return rate.  For example, Congress considers the return rate of children to the United States as a criterion in assessing the competency of the State Department's Office of Children's Issues, the United States' central authority under the Hague Convention.[311]

Moreover, a respondent rebutting evidence about the availability of protective measures in the state of a child's habitual residence faces a difficult task.  While a respondent might be able to "adduce evidence regarding the condition of the legal and social service systems in a country she has fled," doing so "creates difficult problems of proof."[312]  General information about the inadequacies of law enforcement, protective orders, or shelter in the state of the child's habitual residence is probative, but often discounted for lack of specificity.[313]

A judge should not be so demanding of a respondent's evidence, however.[314]  After all, the judge's own sources of information

310.  [DRAFT] GUIDE, *supra* note 95, at Annex III ¶¶ 30–35.

311.  It is therefore no surprise that in its 2018 *Report to Congress*, the State Department included a section labelled "Domestic Violence Resources Available in IPCA cases" and cited the Violence Against Women Act as evidence of "the U.S. government's continued commitment to helping victims of violence." U.S. DEP'T OF STATE, ANNUAL REPORT ON INTERNATIONAL CHILD ABDUCTION 6 (2018), https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html (choose "For additional reports, click here"; then choose "2018" under "Annual Reports on IPCA 2020–2015") [https://perma.cc/Z5CB-BVFT].  It very generally describes potential services for survivors in the United States.  It also provides the phone number of the National Domestic Violence Hotline.  Its 2019 report repeated much of this information. *See* U.S. DEP'T OF STATE, ANNUAL REPORT ON INTERNATIONAL CHILD ABDUCTION 7 (2019), https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html (choose "For additional reports, click here"; then choose "2019" under "Annual Reports on IPCA 2020–2015") [https://perma.cc/N7DC-T853] [hereinafter 2019 ANNUAL REPORT].

312.  *See* Baran v. Beaty, 526 F.3d 1340, 1348. (11th Cir. 2008).

313.  *See, e.g.*, Saada v. Golan, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868, at *13 (E.D.N.Y. Mar. 22, 2019) ("Although Dr. Biaggioni credibly testified about certain shortcomings in the Italian legal system, she spoke in broad terms, citing anecdotal evidence, but few specifics.").

314.  The trial judge has broad discretion in determining relevance for purposes of admissibility. CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, 1 FEDERAL EVIDENCE § 4:3 (4th ed. May 2020 update) (discussing rule 401).  It also has broad discretion in deciding what weight the evidence receives. *See, e.g.*, JOHN BOURDEAU ET AL., 55A FLA. JUR. 2D TRIAL § 341 (Mar. 2021 update) ("In a nonjury trial, the credibility of witnesses and the weight of their testimony are

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 64 of 110

may speak in generalities. Moreover, the respondent typically cannot probe the accuracy of any specific information from the foreign judge or central authority representative because they are not considered fact witnesses subject to cross-examination.[315] Consequently, the judge should recognize the impediments to accurate factfinding when assessing the availability and adequacy of protective measures. Relatedly, the judge should take judicial notice of this fact: "There is a difference between the law on the books and the law as it is actually applied, and nowhere is the difference as great as in domestic relations."[316]

    Second, a trial judge must consider whether available measures will be effective in a particular case. Sometimes protective measures are simply irrelevant because the child's emotional condition will make return harmful or intolerable regardless of whether violence recurs.[317] Similarly, the taking parent's life may be so difficult upon return regardless of protective measures that the child's situation will be intolerable.[318] In other cases, however, the inquiry focuses on whether the batterer will comply with the law. Numerous courts in the United States have found protective measures inadequate for this reason.[319]

---

questions for the determination of the trial judge, whose function it is to draw all reasonable deductions from the evidence, within its sound discretion as fact finder.").

    315. There is some question about the propriety of a trial judge soliciting and considering information from a foreign judge or central authority. Judges have broad latitude to consider a range of information when deciding "issues of foreign law" under Federal Rule of Evidence 44.1, including information that is not admissible under the Federal Rules of Evidence or submitted by a party. However, the reference to "foreign law" in Rule 44.1 may not encompass empirical questions about the effectiveness of those laws and the legal system more broadly. Similarly, the Hague Convention allows a court to "take notice directly of the law of, and of judicial . . . decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." *See* Hague Convention, *supra* note 1, at art. 14. However, the language suggests courts can take notice of positive law, but not empirical questions about effectiveness.

    316. Van de Sande v. Van de Sande, 431 F.3d 567, 570–71 (7th Cir. 2005).

    317. *See, e.g.*, Miltiadous v. Tetervak, 686 F. Supp. 2d 544, 557 (E.D. Pa. 2010); Reyes Olguin v. Cruz Santana, No. 03-CV-6299, 2005 WL 67094, at *11–12 (E.D.N.Y. Jan. 13, 2005); Blondin v. Dubois, 238 F.3d 153, 168 (2d Cir. 2001); *In re* D.T.J., 956 F. Supp. 2d 523, 547 (S.D.N.Y. 2013).

    318. *See supra* Part II.D.

    319. *See, e.g.*, Ischiu v. Garcia, 274 F. Supp. 3d 339, 354–55 (D. Md. 2017); Walsh v. Walsh, 221 F.3d 204, 220–21 (1st Cir. 2000); Simcox v. Simcox, No. 07CV96, 2008 WL 2924094, at *4 (N.D. Ohio July 24, 2008); Davies v. Davies, 717 F. App'x 43, 49 (2d Cir. 2017). This is also true abroad. *See* REFLECTION

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 65 of 110

The *Guide to Good Practice* identifies one red flag with regard to effectiveness: if a petitioner has "repeatedly violated protection orders," then protective measures may not be adequate.[320]  Inexplicably, this language gives the benefit of the doubt to the contemnor.  Of course, *any* disregard of a court order is a red flag, even if it occurred once before—as is any other disregard of the law.  Law violations portend a failure to comply with protective measures in the future. In this vein, the past violence itself demonstrates the petitioner's disregard of criminal law, as well as the petitioner's propensity to be abusive in the future.[321]  Similarly, a petitioner's denial that he perpetrated the violence may constitute perjury.[322]

As part of assessing the petitioner's likely compliance, the judge should also consider other facts that are relevant to the likely effectiveness of protective measures.  These include any factors that predict dangerousness, including coercive control.[323]  They also include the petitioner's propensity to engage in activities that correspond with the violence, such as drinking or drug use.[324]  Judges can and should take judicial notice of the fact that a high percentage of

---

PAPER, *supra* note 53, at 25 (citing foreign cases and noting "a number of judges found that, given the severity of the abuse alleged (which they had found to be credible), possible undertakings, conditions and protective facilities, even if they were offered or existed, would be insufficient to protect the returning child and / or accompanying parent").

320. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 44.  *See also* LRR v. COL [2020] NZCA 209 at [114] (noting a court cannot assume court orders will be effective in the future if a parent has breached them in the past).

321. *See supra* text accompanying notes 205–212.

322. *Davies*, 717 F. App'x at 49 (upholding the district court's finding that there were no ameliorative measures to protect the child because the father's deceit, manipulation, unwillingness to accept responsibility, and escalating threats indicated he was unlikely to respect a stay-away order); Sabogal v. Velarde, 106 F. Supp. 3d 689, 706 (D. Md. 2015) (refusing to conclude that father's abusive conduct was in the past because, inter alia, father's "testimony was internally inconsistent and defiant at times, such as when he denied past psychiatric treatment, and he did not present a uniform picture of someone who has acknowledged and corrected past misbehavior"); Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 398 (E.D.N.Y. 2005) ("Mr. Elyashiv's wholesale denial of any abuse of his wife is simply not credible, and clouds his entire testimony.").

323. *See supra* notes 168–180.

324. *See Sabogal*, 106 F. Supp. 3d at 706–07.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 66 of 110

batterers violate restraining orders[325] as well as undertakings,[326] and that batterers, more frequently than other criminals, retaliate against their victims for sharing the details of violence with the justice system.[327] A judge can notice the difficulty a respondent would have enforcing a protective measure because she would need to obtain legal representation.[328] Finally, a judge can observe that enforcement occurs only after the protective measures have failed and harm has already been inflicted.

Because the petitioner's veracity is such an important factor in determining the viability of protective measures,[329] courts should never short circuit the inquiry into the allegations of domestic violence underlying the article 13(b) defense. The *Guide to Good Practice* allows for such a shortcut,[330] and some courts take this route—i.e., they assume that the risk to the child is a grave one and only explore the adequacy of protective measures.[331] However, this approach deprives a judge of information about the petitioner's response to the allegations. That response is relevant to the petitioner's likely future compliance with the law. This truncated approach also leaves the judge guessing if protective measures can fully address the dynamics in the particular family.[332]

---

325. *See* TK LOGAN ET AL., THE KENTUCKY CIVIL PROTECTIVE ORDER STUDY: A RURAL AND URBAN MULTIPLE PERSPECTIVE STUDY OF PROTECTIVE ORDER VIOLATION CONSEQUENCES, RESPONSES, AND COSTS 116 (2009), https://www.ncjrs.gov/pdffiles1/nij/grants/228350.pdf [https://perma.cc/JZ5S-7B2C] (finding approximately half of restraining orders were violated); Christopher T. Benitez et al., *Do Protection Orders Protect?*, 38 J. AM. ACAD. PSYCHIATRY & L. 376, 384 (2010) ("[A]vailable research supports the conclusion that there is a substantial chance that a protection order will be violated . . . .").

326. *See, e.g.*, FREEMAN, *supra* note 74, 39–40; FREEMAN, *supra* note 303, at 31 ("Undertakings were broken in 66.6% (8) cases out of the 12 cases in which they were given."); EDLESON & LINDHORST, *supra* note 15, at 169 ("In all four cases where undertakings were agreed to by the parties in the U.S. courts, none of these agreements were carried out in the other country by the left-behind parent.").

327. *Cf.* MODEL CODE ON FAMILY VIOLENCE, *supra* note 108, § 208 cmt.

328. *See* Jaffe, *supra* note 123, at 63–64 (noting "limited access to legal representation may be a factor for abused women remaining or returning to abusive relationships in as many as half of the cases").

329. *See supra* note 322.

330. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 45.

331. Return Order ¶ 53, H v. K [2017] EWHC (Fam) 1141 (Eng.). *But see* Simcox v. Simcox, 511 F.3d 594, 608 (6th Cir. 2007) (noting a judge only has the legal authority to impose protective measures once a grave risk is found to exist).

332. SCHUZ, *supra* note 284, at 290 (suggesting that the court has a duty to ensure the protective measures actually eliminate the risk to the child).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 67 of 110

In the end, judges need to heed the lesson of Cassandra Hasanovic's death. Because no judge is clairvoyant, judges must recognize the inherent risks in assessing the batterer's future behavior. Judges should not rely on protective measures to defeat an otherwise established article 13(b) defense because the petitioner's compliance with the law cannot be assured. As the next Part suggests, some judges will be able to avoid the impossible task of determining the adequacy of protective measures because precedent recognizes that the Hague Convention does not require it.

### 2.  Protective Measures Need Not Necessarily Be Canvassed

Courts are divided on whether a trial court should consider protective measures at all. Baroness Hale reports that the vast majority of countries that are party to the Hague Convention do not consider protective measures in assessing the merit of the article 13(b) defense.[333] In addition, many appellate courts in the United States do not require trial courts to consider protective measures. The Eleventh Circuit noted,

> Relying on the plain language of Article 13(b), many courts hold when a respondent proves returning a child would expose him to a grave risk of physical or psychological harm, the reviewing court has discretion to deny the petition for return outright [without consideration of protective measures]. That position is consistent with the Convention's official commentary and with directives from the United States State Department.[334]

While some countries tout the practice of considering protective measures, including the notable example of the U.K., these

---

333. Baroness Hale states: "[O]ne of my tasks on the working group [is] to preserve this approach as acceptable good practice because *it is not what most other countries do*." Hale, *supra* note 35, at 12 (emphasis added). She concedes, "[judges] may well have to take the effectiveness of protective measures largely on trust," and speculates that "[w]hether our extensive reliance on protective measures is one reason why our return rate is so much higher than many other countries' is hard to say." *Id.* at 13. The *Guide* admits, "[T]he Guide is not intended to describe the legal position in all Contracting Parties and, of necessity, contains only limited references to national jurisprudence and comparative law." GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 8.

334. Baran v. Beaty, 526 F.3d 1340, 1347–48 (11th Cir. 2008). *See also* Danaipour v. McLarey, 386 F.3d 289, 303–04 (1st Cir. 2004); Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995) (finding the defense was not established, but rejecting that article 13(1)(b) applies only if the Mexican government and courts cannot protect the child); Acosta v. Acosta, 725 F.3d 868, 877 (8th Cir. 2013) (noting "[o]nce a district court concludes that returning a child to his or her country of habitual residence would expose the child to a grave risk of harm, it has the discretion to refuse to do so"); Wigley v. Hares, 82 So. 3d 932 (Fla. Dist. Ct. App. 2011).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 68 of 110

countries' reasons for examining protective measures have no applicability in the United States. First, courts in the U.K. are constrained in their factfinding about the violence. They typically decide Hague Convention cases on the basis of affidavits, without oral evidence and cross-examination.[335] As a result, resolving conflicting evidence can be particularly difficult. A superficial way around holding an oral hearing to determine the merits of the underlying allegations is to ask whether there are protective measures that would protect the child from the grave risk, assuming a grave risk exists.[336] Second, the U.K. has historically been bound by the law of the European Union,[337] which governs the adjudication of child abduction cases involving two European Union countries. The Brussels IIa Regulation requires the consideration of protective measures.[338] In the United States, these same forces do not exist: a hearing is typically held to determine the underlying facts in a Hague Convention petition, and the Brussels IIa Regulation is not the law.

Nonetheless, some appellate courts have required consideration of protective measures,[339] often repeating the precept that the United States can trust its treaty partners to protect people threatened with harm.[340] However, as the European Court of Human

335. *See* Re E [2011] UKSC 27, [32] (appeal taken from Eng.).

336. LRR v. COL [2020] NZCA 209 at [108–12].

337. For the position in the U.K. after Brexit and the final accord, see LEXIS LEGAL NEWS, COMMENT—EU-UK TRADE AND COOPERATION AGREEMENT IMPACT ON FAMILY LAW (Dec. 29, 2020), https://www.lexisnexis.co.uk/legal/news/impact-of-the-eu-uk-trade-cooperation-agreement-on-family-law [https://perma.cc/9N7P-F7HW].

338. Brussels IIa Regulation, *supra* note 306, at art. 11(4) ("A court cannot refuse to return a child on the basis of Article 13b of the 1980 Hague Convention if it is established that adequate arrangements have been made to secure the protection of the child after his or her return."). Brussels IIa also allows a court in the state of the child's habitual residence to make an order of return that prevails over the order of another court from an EU state that grants the article 13(b) defense. See *id.* at art. 11(8). Experts call this override system "ineffective" and suggest it should be "scrapped." *See, e.g.*, PAUL BEAUMONT, PRIVATE INTERNATIONAL LAW CONCERNING CHILDREN IN THE UK AFTER BREXIT: COMPARING HAGUE TREATY LAW WITH EU REGULATIONS, CPIL WORKING PAPER No. 2017, p. 3.

339. *See, e.g.*, Blondin v. Dubois, 189 F.3d 240, 249 (2d Cir. 1999); Blondin v. Dubois, 238 F.3d 153, 163 (2d Cir. 2001). *See also* Gaudin v. Remis, 415 F.3d 1028 (9th Cir. 2005); *In re* Application of Adan, 437 F.3d 381, 395 (3d Cir. 2006).

340. *See, e.g.*, Saada v. Golan, 930 F.3d 533, 539–40 (2d Cir. 2019) ("'[T]he exercise of comity that is at the heart of the Convention' requires us 'to place our trust in th[ose] court[s] . . . to issue whatever orders may be necessary to safeguard children who come before [them].'"); *Blondin*, 189 F.3d at 248–49 ("In the exercise of comity that is at the heart of the Convention (an international agreement, we recall, that is an integral part of the "supreme Law of the

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 69 of 110

Rights has recognized, "trust" should not be a reason to negate the article 13(b) defense when violence to the child is at issue.[341] "Trust" is not an enumerated exception to the article 13(b) defense. Moreover, this chimera is simply beside the point: perpetrators of domestic violence are independent actors who can render protection measures illusory despite any trust that exists between treaty partners. This fact has caused several appellate courts to suggest that whatever the merit of protective measures otherwise, they are simply inappropriate in cases with domestic violence.[342] Finally, to the extent that trust is an important consideration, it operates in both directions. That is, the state of the child's habitual residence should trust the state adjudicating the Hague Convention petition to apply the article 13(b) defense as written.

Moreover, the minority's approach of allowing protective measures to negate the article 13(b) defense is not an approach mentioned in the Hague Convention or its *travaux préparatoires*. Judge Posner explained that a focus on protective measures is, in fact, inconsistent with the text of the Hague Convention:

> [T]o define the issue not as whether there is a grave risk of harm, but as whether the lawful custodian's country has good laws or

---

Land," U.S. Const., art. VI), we are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it."); Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996) ("[C]ourts in the abducted-from country are as ready and able as we are to protect children. . . . When we trust the court system in the abducted-from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—evaporate."). *See also* Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001) (same).

341. *See* Case of O.C.I. and Others v. Romania, App. No. 49450/17, ¶ 45 (May 19, 2019), https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-193069%22]} [https://perma.cc/8AJR-YFLF] ("[T]he existence of mutual trust between child-protection authorities does not mean that the State to which children have been wrongfully removed is obliged to send them back to an environment where they will incur a grave risk of domestic violence solely because the authorities in the State in which the child had its habitual residence are capable of dealing with cases of domestic child abuse. Nothing in the Hague Convention or in the Brussels II bis Regulation allows the Court to reach a different conclusion.") (finding a violation of the European Convention on Human Rights when Romanian courts refused to grant the article 13(b) defense when there were credible allegations of corporal punishment).

342. Simcox v. Simcox, 511 F.3d 594, 608 (6th Cir. 2007) (expressing doubt about the appropriateness of undertakings in many domestic violence cases); Van De Sande v. Van De Sande, 431 F.3d 567, 569, 572 (7th Cir. 2005) (noting if the court "is presented with unequivocal evidence that return would cause the child a 'grave risk' of physical or psychological harm, . . . then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 70 of 110

even as whether it both has and zealously enforces such laws, disregards the language of the Convention and its implementing statute; for they say nothing about the laws in the petitioning parent's country. The omission to mention them does not seem to have been an accident—the kind of slip in draftsmanship that courts sometimes correct in the exercise of their interpretive authority. If handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over, however severely the law of the parent's country might punish such behavior.[343]

Proponents of protective measures claim that the inquiry is consistent with the text of the Hague Convention because judges have discretion under article 13(b) to return a child even when the defense is established.[344] Yet the drafters intended for this discretion to be exercised sparingly,[345] not as a matter of course as advocates of protective measures propose. In fact, courts historically treated this discretion as having marginal significance. Professors Paul Beaumont and Peter McEleavy, private international law experts and authors of the first scholarly book about the Hague Convention, stated: "[I]n relation to Article 13(1)(b) the discretion has been relegated to a position of nominal importance and in many instances has been ignored entirely."[346] They explain why: "The assumption must be that, given the rigorous test imposed in interpreting what constitutes a grave risk, a positive result will indicate such an overwhelming possibility of serious harm that a judge would find it very difficult, if not impossible, to make a return order."[347]

---

343. *Van De Sande*, 431 F.3d at 571. *See also* Khan v. Fatima, 680 F.3d 781, 788 (7th Cir. 2012) ("The Convention says nothing about the adequacy of the laws of the country to which the return of the child is sought—and for good reason, for even perfectly adequate laws do not ensure a child's safety."). *See also* Noergaard v. Noergaard, 244 Cal. App. 4th 76, 88 (Cal. Ct. App. 2015) (same); Danaipour v. McLarey, 286 F.3d 1, 21 (1st Cir. 2002) (discussing undertakings); Baran v. Beaty, 526 F.3d 1340, 1349 (11th Cir. 2008) (same).

344. Hague Convention, *supra* note 1, at art. 13 ("Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . .").

345. SCHUZ, *supra* note 284, at 300 ("[I]t would not have occurred to the drafters that courts would be prepared to return children in cases where this would jeopardise their safety.").

346. PAUL R. BEAUMONT & PETER E. MCELEAVY, THE HAGUE CONVENTION ON INTERNATIONAL CHILD ABDUCTION 155 (1999).

347. *Id. See also* Re S. (A Child) (Abduction: Rights of Custody) [2012] UKSC 10, [5], [2012] 2 AC 257 (appeal taken from Eng.) ("[I]t is impossible to conceive of circumstances in which . . . it would be a legitimate exercise of the discretion nevertheless to order the child's return."); *In re* D (Abduction:

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 71 of 110

The same sentiment cautions against a judge using his or her discretion to return a child because of protective measures. The assessment of the effectiveness of protective measures is so fraught with uncertainties that reliance on protective measures undermines the hierarchy of values expressed in the Hague Convention and should be considered antithetical to it. The reason for article 13(b)'s existence is that the Hague Convention places a "higher premium on children's safety than on their return."[348] A court that relies on protective measures subordinates the safety of a parent and child to a vague sentiment of international trust.

It is also poor policy to rely on protective measures. Adjudicating the availability and effectiveness of protective measures requires courts to delve deep into issues that are more appropriate for a court adjudicating custody. Courts must also resolve new legal issues related to protective measures, thereby delaying proceedings. For example, who bears the burden of proof regarding the efficacy of protective measures?[349] Is foster care a protective measure?[350] How likely must it be that protective measures will restrain this petitioner and protect this child? The required intensiveness of the inquiry has led the U.S. State Department to suggest that reliance on ameliorative measures is inappropriate "because to do otherwise could embroil the court in the merits of the underlying custody issues" and "would tend to dilute the force of the [grave risk] exception."[351]

---

Rights of Custody) [2006] UKHL 51, [55], [2007] 1 AC 619 (appeal taken from Eng.).

348. *See Baran*, 526 F.3d at 1348. *See also* Simcox v. Simcox, 511 F.3d 594, 604 (6th Cir. 2007).

349. The answer is unclear even in those jurisdictions that require an examination of protective measures. Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *2 (E.D.N.Y. May 5, 2020). *Compare, e.g., Simcox*, 511 F.3d at 611(suggesting petitioner bears the burden of proof) *and* Danaipour v. McLarey, 286 F.3d 1, 21 (1st Cir. 2002) (same) *with In re* Application of Adan, 437 F.3d 381, 395 (3rd Cir. 2006) (suggesting respondent bears the burden). The *Guide to Good Practice* does not provide an answer. There is some language that suggests the burden may be on the respondent. *See* Guide to Good Practice, *supra* note 5, ¶ 41–42, ¶ 51. The final version omitted a footnote from an earlier draft that discussed the unfairness of putting the burden on the respondent. *See* [Draft] Guide, *supra* note 95, at 36 n.155 (citing two articles by author that emphasized it is hard to prove a negative, i.e., that the batterer will not comply with the law and that the state of habitual residence will not protect children).

350. Something is terribly wrong with the Convention if children end up in foster care when they have loving caregivers who, in fact, have already protected them by removing them from the grave risks that existed in the state of habitual residence. *See* Weiner, *supra* note 87, at 349–50 (arguing that foster care is an intolerable situation for the child).

351. Petition for Writ of Certiorari at *6–7, Golan v. Saada, (No. 20-1034), 2021 WL 1240917 (U.S. 2021) (citing Letter from Catherine W. Brown, Assistant

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 72 of 110

For all the aforementioned reasons, the *Guide to Good Practice's* emphasis on protective measures is a disappointment.[352] Fortunately, trial courts need not follow the *Guide to Good Practice's* approach to protective measures. The *Guide to Good Practice* explicitly says in bold lettering that it is "*not intended* to direct the interpretation of Article 13(1)(b) in individual cases."[353] It continues, "nothing in this Guide may be construed to be binding upon Contracting Parties to the 1980 Convention . . . and their judicial or other authorities."[354] In fact, there are currently six different Guides to Good Practice for the Hague Abduction Convention,[355] and as of July 2020, only five opinions in the United States refer to one of them.[356] Even the U.S. State Department dislikes the position taken in the *Guide*. The State Department's comments to the Permanent Bureau about protective measures said:

> The United States is concerned that it is not clear in all parts of the Guide that protective measures or "undertakings" are not to be imposed as a matter of regular course and are not required by the Convention . . . . We are concerned about an overemphasis on the value of protective measures . . . [W]e are concerned that a judge might order a return based on that judge's discretion, where an Article 13(b) defense has been established, in reliance on the general availability in a country of a particular type of protective measure, rather than on the particular accessibility of a protective measure for a particular child or parent.[357]

---

Legal Adviser for Consular Affairs, United States Dep't of State, to Michael Nicholls, Lord Chancellor's Dep't, Child Abduction Unit, United Kingdom (Aug. 10, 1995)).

352. *See* GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 41, and at 33.

353. *Id*. ¶ 7.

354. *Id.* ¶ 8

355. *See Child Abduction Section*, HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction [https://perma.cc/3VMJ-87J2].

356. Westlaw search on July 30, 2020 for "Hague w/s Abduction and Guide w/s Good." *See* Abbott v. Abbott, 560 U.S. 1, 18 (2010); Chafin v. Chafin, 568 U.S. 165 (2013) (Ginsburg, J., Scalia, J., and Breyer, J., concurring); Madrigal v. Tellez, 848 F.3d 669, 674 n.3 (5th Cir. 2017); Chafin v. Chafin, 742 F.3d 934, 936 n.4 (11th Cir. 2013); Gil-Leyva v. Leslie, 780 F. App'x 580, 598 (Brisco, C.J., concurring in part). That is not to say that these guides are unimportant. The Supreme Court has cited a guide in *Abbott* to support its position that ne exeat clauses establish rights of custody, *Abbott*, 560 U.S. at 18, and the concurrence in *Chafin* cited a guide to emphasize the need for expedition. *See Chafin*, 568 U.S. 165 (Ginsburg, J., Scalia, J., and Breyer, J., concurring). Moreover, trial courts may refer to them without ever citing them in their decisions.

357. GENERAL COMMENTS OF THE UNITED STATES OF AMERICA ON THE 13(B) GUIDE TO GOOD PRACTICE 2–3 (2019) (on file with author). The State Department was also concerned "that requiring extensive undertakings as a

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 73 of 110

As discussed above, there are plenty of reasons to doubt the efficacy of protective measures in all cases, and consequently, to reject this part of the *Guide to Good Practice*. If, however, a judge must assess their adequacy, it is essential that a judge recognize the inherent limitations of such an exercise, as discussed next.

### 3. Experts Can Help, But Not By Assessing the Effectiveness of Protective Measures

Expert testimony has become fairly ubiquitous in Hague Convention proceedings. A study by the Permanent Bureau of ninety-two cases involving domestic violence found that thirty-nine featured expert testimony.[358] Richard Min and Alberto Yohananoff recently argued that forensic mental health experts have become "integral" to these proceedings because the respondent seeks to establish "the presence of domestic violence and its impact on children's development and overall well-being," while the abuser seeks to establish the availability of "protective measures that could reduce any risk of harm to children."[359]

The *Guide to Good Practice* recognizes a role for experts in Hague Convention cases but suggests ways to reduce their number and limit their testimony.[360] This is sound advice because trial judges will usually find expert testimony useful only to establish the presence of domestic violence and its effect on the parent and child, and not to determine the effectiveness of protective measures.[361] Expert testimony is helpful when experts have examined the parties and can

---

pre-condition for return of a child allows an abducting parent to benefit from his or her wrongdoing, and this is even more true if the Article 13(b) exception has not been properly established." *Id.* It also asked that this language be added to the *Guide to Good Practice*: "Protective measures or 'undertakings' are not to be imposed as a matter of course and should be of a time-limited nature that ends when the country of habitual residence is able to determine what, if any, protections are appropriate for the family." *Id.* at 5. *See also* Danaipour v. McLarey, 286 F.3d 1, 25 (1st Cir. 2002) (citing U.S. State Department position on undertakings that "[i]f the requested . . . court is presented with unequivocal evidence that return would cause the child a 'grave risk' of physical or psychological harm, . . . then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request. The development of extensive undertakings in such a context could embroil the court in the merits of the underlying custody issues and would tend to dilute the force of the Article 13(1)(b) exception.").

358. Reflection Paper, *supra* note 53, at 24.

359. Richard Min and Alberto Yohananoff, *The Hague Convention and Its Grave Exceptions: An Overview*, N.Y.L.J. 4 (Apr. 13, 2020).

360. Guide to Good Practice, *supra* note 5, ¶ 90.

361. See Fed. R. Evid. 702(a) (requiring that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 74 of 110

diagnose PTSD or psychosis,[362] although a judge should not draw an adverse inference from the absence of such testimony.[363]  It can also help educate a judge about domestic violence if the judge has not had training.[364]  However, expert testimony can have the adverse effect of fostering factfinding mistakes about whether a taking parent and child will be safe upon return.  An expert can make an inherently uncertain exercise seem more certain than it is.  Moreover, when there are experts on both sides, trial judges may resolve the conflict about the effectiveness of protective measures with tools that are poor proxies for assessing the underlying truth about whether protective measures will work, such as by comparing the testimonies' detail or the expert witnesses' potential biases.

The case of *Saada v. Golan* illustrates the varying helpfulness of expert testimony as well as the distraction caused by needing to resolve the conflict between experts.  In that case, the judge's resolution of the conflict between the experts ultimately lead the judge astray from a common-sense assessment about the availability and efficacy of protective measures.  Over the course of the nine-day bench trial, the petitioner called four experts and the respondent called three.[365]  Four of the expert witnesses—two for each side—addressed domestic violence and its effects on children.[366]  Four of the experts addressed the availability and effectiveness of protective measures.[367]  The trial judge found extensive domestic violence and potential harm to the child, but also found "that there are measures that can be taken to ameliorate the risk"[368] and therefore ordered the child's return to Italy.[369]

---

362.  *See, e.g.*, *In re* D.T.J., 956 F. Supp. 2d 523, 547 (S.D.N.Y. 2013); Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 400 (E.D.N.Y. 2005); Ischiu v. Gomez Garcia, 274 F. Supp. 3d 339, 354 (D. Md. 2017).

363.  *See In re* M.V.U., 2020 IL App (1st) 191762, ¶ 50 (noting that requiring expert testimony would undermine the defense).  In addition, the National Council of Juvenile and Family Court Judges (NCJFCJ) noted "psychological testing is not appropriate in domestic violence situations" because it may "misdiagnose the non-abusive parent's normal response to the abuse or violence as demonstrating mental illness, effectively shifting the focus away from the assaultive and coercive behaviors of the abusive parent."  Nat'l Council of Juv. and Fam. Ct. Judges, *supra* note 128, at 20.

364.  *See* Kohn, *supra* note 28, at 742–43; Mohacsi v. Rippa, 346 F. Supp. 3d 295, 303, 321–22 (E.D.N.Y. 2018).

365.  Saada v. Golan, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868, at *1 (E.D.N.Y. Mar. 22, 2019).  Min and Yohananoff, authors of the aforementioned article, participated in the case.  *See* text accompanying note 359, *supra*.

366.  *Saada*, 2019 WL 1317868, at *11.

367.  *Id.* at *12–*13.

368.  *Id.* at *1.

369.  *Id.* at *20.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 75 of 110

The experts ostensibly helped the judge understand that children are harmed from exposure to domestic violence, and that was because all of the experts agreed that a risk of harm existed.[370] The experts disagreed about whether there were measures that could protect the child given the history of domestic violence.[371] The trial judge could have, and should have, relied on common sense to reject the adequacy of the protective measures, but instead the judge got caught up in selecting between the experts.

An expert for the petitioner pointed to the availability of protective measures in Italy, the state of the child's habitual residence, including orders of protection, supervised visitation, and psychologists and psychiatrists in custody proceedings.[372] An expert for the respondent spoke to the countervailing problems facing domestic violence victims in Italy, including how Italian courts "often award custody to abusive fathers, sometimes at the expense of children's safety or without sufficient protections surrounding visitation," and noted that Italian courts and prosecutors have been criticized by multiple international bodies for "systemic failures" to protect victims of domestic violence.[373] The judge chose to believe that the Italian legal system was able to handle domestic violence cases involving children because the expert for the respondent, while credible, "spoke in broad terms, citing anecdotal evidence, but few specifics."[374] However, both experts spoke in broad terms, and neither were able to predict what a court would actually do in this particular case once the child was returned.[375]

On the more important question of whether the protective measures would be effective, the judge similarly credited the petitioner's mental health expert, Dr. Yohananoff, because the respondent's expert, Dr. Brandt, "appeared to accept everything [the respondent] said at face value, without consulting any independent sources."[376]

---

370. *Id.* at *12. ("The experts also agreed that exposure to Mr. Saada's undisputed violence toward Ms. Golan—including verbal, emotional, psychological, and physical abuse—posed a significant risk of harm to B.A.S.").

371. *Id.* ("Dr. Brandt took the position that there were no measures that could protect B.A.S. given Mr. Saada's history of violence not to B.A.S., but to Ms. Golan. . . . Dr. Yohananoff, on the other hand, thought that any risk would be mitigated if Mr. Saada's visits with B.A.S. were supervised, and if Mr. Saada got parental coaching and psychoeducational training.").

372. Another expert for the petitioner testified about a specialized hospital for domestic violence victims in Milan that provides medical care, and psychological and social counseling for victims. *Id.* at *14.

373. *Id.* at *13.

374. *Id.* at *14.

375. *Id.* at *13.

376. *Id.* at *12.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 76 of 110

Because Dr. Brandt attributed problems in the mother's testimony to childhood trauma instead of intentional misrepresentation, the trial judge thought she was "more of an advocate[.]"[377]  In contrast, the judge found that Dr. Yohananoff "did not hesitate to point out areas of concern" about the petitioner.[378]

The trial judge's characterization of Dr. Brandt as an advocate appears unfounded considering another district court judge found her credentials "impeccable,"[379] but, more importantly, it distracted from the evidence before the judge that the petitioner posed a serious risk of harm to the mother and child that exceeded the mitigating capacity of protective measures.  For example, Dr. Yohananoff, the only expert who examined the petitioner,[380] found unnamed "areas of concern[.]"[381]  Moreover, the record contained numerous red flags suggesting a real risk to the mother and child regardless of any protective measures,[382] including the following: the petitioner's lack of impulse control;[383] a failure to appreciate the severity, consequences, and wrongfulness of his behavior;[384] lies about the violence;[385] blaming the victim;[386] being unrestrained even in the presence of others, including the child, family, friends, and police officers;[387] a pattern of giving empty promises about changing his ways and going to counseling;[388] and, the fact that he has "to date not demonstrated a capacity to change his behavior."[389]  One commentator, aghast at the trial court's decision, noted: "When a domestic violence victim responds 'yes' to danger assessment questions about strangulation, attacks

---

377. *Id.* at *13.  The judge also noted, "Dr. Yohananoff . . . provided the clearest and most objective evaluation of the parties' relationship, and the potential risks to [the child].  As part of his evaluation, he not only interviewed Mr. Saada, he consulted collateral sources and made use of psychological testing." *Id.* at *12.  In contrast, "Dr. Brandt relied only on her interviews of Ms. Golan and her observations of B.A.S., and on Ms. Golan's account of her experience." *Id.*

378. *Id.* at *12.

379. Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 397 (E.D.N.Y. 2005).

380. The principal expert witnesses on each side interviewed their client and watched their client's interaction with the child.  *Saada*, 2019 WL 1317868, at *12.

381. *Id.*

382. The undertakings included funding for housing so the petitioner would not know where the respondent was living and a mutual stay-away agreement until the Italian courts addressed the issue.  *Id.* at *19.

383. *Id.* at *4, *12.

384. *Id.* at *1, *18.

385. *Id.* at *8, *10.

386. *Id.* at *8, *18.

387. *Id.* at *4, *7–8 & n.11.

388. *Id.* at *3, *7, *13.

389. *Id.* at *18.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 77 of 110

during pregnancy and overt threats to kill, and provides extensive testimony about forced sex, these are the reddest of red flags for escalating violence and femicide."[390]  Instead of recognizing these red flags, the judge reiterated a basic misconception about domestic violence: "Ms. Golan and Mr. Saada will no longer be living together, and eliminating the element of proximity will reduce the occasions for violence."[391]

Given the evidence in the record, the trial judge in *Saada* could have concluded there was no guarantee that protective measures would be effective.  Dr. Yohananoff testified that undertakings would reduce the risk that the child would be subjected to harm upon his return to Italy,[392] but he never said undertakings or other protective measures would eliminate the risk.  All the experts in the case agreed that any re-exposure to violence could harm the child.[393]  In light of this testimony in *Saada*, the reduction of risk provided by protective measures should have been inadequate to defeat the article 13(b) defense.[394]  Instead, the trial judge in *Saada* allowed her preference

---

390. Lynn Hecht Schafran, Saada v. Golan*: Ignoring the Red Flags of Domestic Violence Danger and What Is Required to Protect a Child From "Grave Risk"*, 25 DOMESTIC VIOLENCE RPT. 15 (2019).        `

391. *Saada*, 2019 WL 1317868, at *19.

392. *Id.* at *12.

393. *Id.* at *11–12.

394. The Second Circuit remanded after Golan appealed, telling the district to consider whether there were alternatives to unenforceable undertakings, i.e., "ameliorative measures that are either enforceable by the District Court or, if not directly enforceable, are supported by other sufficient guarantees of performance."  Saada v. Golan, 930 F.3d 533, 540–41 (2d Cir. 2019).  Regrettably, the Second Circuit did not focus on the petitioner's characteristics and the nature of the underlying violence, both of which raised consequential questions about the adequacy of any protective measures.  I have criticized the courts in the Second Circuit before and have suggested that a trial court can often assess the inadequacy of protective measures without an expert so long as the judge is aware of markers of dangerousness.  *See* Weiner, *supra* note 10, at 351.  Unfortunately, on remand, the trial judge felt "confident" that the Italian courts would "ensure B.A.S.'s safety and well-being."  Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *1 (E.D.N.Y. May 5, 2020).  The Italian court was already involved, had imposed a protection order, had required supervised visitation, and told the petitioner that failure to go to treatment could harm him in the custody proceedings.  *Id.* at *4.  The trial court found, "[t]his order provides a sufficient guarantee that the petitioner will undergo appropriate treatment, and that B.A.S. will be safe in Italy."  *Id.*  The trial court dismissed concerns about whether the petitioner would comply with the Italian court orders, noting that the petitioner had complied in the past with investigations prompted by the respondent's call to the police, had complied with the district court's orders in the current matter, and would suffer "significant consequences" in Italy if he didn't comply with its court orders.  *Id.*  Time will tell if these examples are more probative of Dr. Saada's trustworthiness than all the other contrary evidence in

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 78 of 110

for one expert to serve as a proxy for the truth of the matter—i.e., whether the petitioner would comply with the law in the future.

Had the trial judge instead granted the defense, the judge would have been using common sense. Common sense is an important and permissible factor for a factfinder to consider,[395] including in a Hague Convention case. Lawyer Barry Goldstein observed that judges sometimes ignore common sense when considering which of two versions of the facts related to alleged domestic violence is more realistic.[396] For example, Goldstein has witnessed a judge acknowledging that domestic violence is a pattern of behavior, but nevertheless concluding that "the father abused the mother only once or twice and then, for some unknown reason, stopped on his own."[397] While the judge's conclusion is possible, common sense dictates that it is highly improbable that the abuser stopped on his own.[398] Similarly, common sense dictates that there is a high likelihood protective measures will fail.

Of course, common sense will not help a judge if the judge harbors misconceptions about the underlying facts. That can occur when the trial judge believes the parents' separation will stop the violence. It can also occur, as the next Part discusses, when a judge assumes certain facts are indicia of veracity when they are not.

G.    *Survivors are Usually Truthful Despite Credibility Concerns*

Determining the facts about domestic violence is often challenging for a factfinder. Cases with domestic violence allegations "are not necessarily clear-cut," and "a high proportion" of proceedings "are murky, ambiguous, and difficult—cases that any decisionmaker, no matter how wise or experienced, would find challenging to

---

the record. At the time of writing, Golan had petitioned the Supreme Court to hear the case.

395. Ronald J. Allen & Alex Stein, *Evidence, Probability, and the Burden of Proof*, 55 Ariz. L. Rev. 557, 577 (2013); Posner, *supra* note 27, at 207 (explaining that when a judge decides which outcome is the most sensible, the judge is considering not only the statutes and precedents, but "common sense, policy preferences, and often much else"). *See, e.g.*, Vermont Civil Jury Instruction Committee, Plain English Jury Instructions: General Jury Instructions, D. Inferences from the Evidence, at http://www.vtbar.org/UserFiles/Files/WebPages/Attorney%20Resources/juryinstructions/civiljuryinstructions/generaljury.htm [https://perma.cc/KAX3-GVHT] ("In considering the evidence, you are not limited to what the witnesses said. You may draw reasonable conclusions from the testimony and exhibits based on common sense and experience.").

396. Barry Goldstein, *Recognizing and Overcoming Abusers' Legal Tactics, in* Domestic Violence, Abuse, and Child Custody: Legal Strategies and Policy Issues § 18–1, 18–4 (Mo T. Hannah & Barry Goldstein eds., 2010).

397. *Id.*

398. *Id.*

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 79 of 110

resolve."[399]  A trial court noted that these contests can feel like a "he said/she said hearing," and it is difficult "to say categorically one side is telling the truth and one side is not telling the truth."[400]

Judges adjudicating Hague Convention petitions sometimes resolve these disputes by drawing erroneous conclusions.  Contrary to some judges' reasoning, conflicting testimony in and of itself—whether from the respondent herself or from other witnesses—does not mean that the respondent has failed to meet her burden of proof.[401]  The court must decide who is telling the truth by making a credibility assessment.  This step is required by due process,[402] not to mention Federal Rule of Civil Procedure 52(a).[403]

When making a credibility assessment, judges sometimes refuse to credit the respondent's testimony regarding the violence because of inconsistencies.  For example, in the T2 case of *Orellana v. Cartagena*,[404] the respondent alleged that the petitioner physically abused her "on a few occasions and that he yelled at her in front of the daughter."[405]  In denying a stay of the return order pending appeal, the appellate court noted that the magistrate judge found "internal inconsistencies in [the mother's] testimony and inconsistencies among her testimony, immigration interview, and police report she had filed in Honduras."  Therefore, the appellate court concluded that "credibility was an issue in this case."[406]

Some judges also refuse to credit a survivor's testimony when the survivor lacks certain corroborating evidence, such as a police

399. Freedman, *supra* note 177, at 580.

400. Khan v. Fatima, 680 F.3d 781, 786 (7th Cir. 2012).  This can be attributable, in part, to the reality that facts are not always either true or false, but can occupy a middle ground.  Kevin M. Clermont, *Trial by Traditional Probability, Relative Plausibility, or Belief Function?*, 66 Case W. Res. L. Rev. 353, 360–62 (2015).  This can be caused by matters of degree, incomplete information, or conflicting evidence.  *Id.* at 361.

401. Monroy v. de Mendoza, No. 3:19-cv-1656-B, 2019 WL 7630631, at *12 (N.D. Tex. Sept. 20, 2019); Soto v. Contreras, 880 F.3d 706 (5th Cir. 2018).

402. Noergaard v. Noergaard, 244 Cal. App. 4th 76, 86 (Cal. Ct. App. 2015) (ruling that the trial court's failure to resolve the authenticity of email containing father's alleged death threats was a violation of due process).

403. Fed. R. Civ. Proc. 52(a)(1).  *See generally Khan*, 680 F.3d at 785–86 ("[T]here is no rule exempting the judge from the duty of finding the facts in cases in which the plaintiff has a higher burden of proof than the usual civil burden of the preponderance of the evidence.").

404. Orellana v. Cartagena, No. 17-6520, 2018 U.S. App. LEXIS 1161, at *2 (6th Cir. Jan. 17, 2018).

405. *Id.*  The mother was requesting a stay of the trial court's return order pending resolution of her appeal.  An applicant for a stay must have, inter alia, a strong showing that she is likely to succeed on the merits of the appeal.  *Id.* at *1.

406. *Id.* at *3.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 80 of 110

report. In *Rath v. Marcoski*,[407] the respondent alleged "Petitioner assaulted her physically on multiple occasions," including by kicking her in the stomach when she was pregnant and pushing her face into the floor at her grandfather's house.[408] These allegations were "echoed" by the respondent's mother and grandfather.[409] Yet the court noted that the testimony was "conflicting" and that there was "little other evidence" to support the allegations.[410] The record contained a medical record and a photograph, but the parties disputed that the evidence was probative.[411] The court further found it compelling that "there was never any report filed with any law enforcement agency."[412] Following these observations, the court ruled for the petitioner on the article 13(b) defense.[413]

*Orellena* and *Rath* are not aberrations as respondents are plagued by adverse credibility determinations when they try to invoke the article 13(b) defense both in the United States[414] and abroad.[415] This reality aligns with the extensive credibility discounting survivors of domestic violence and sexual assault experience in court generally.[416] Task forces throughout the United States have documented the bias that women face in court when they raise such allegations.[417]

---

407. Rath v. Marcoski, 2016 U.S. Dist. LEXIS 167685 (M.D. Fla. Oct. 3, 2016).

408. *Id.* at *67.

409. The case suggests it was "petitioner's mother and grandfather," but a close reading suggests it was, in fact, respondent's mother and grandfather. *Id.* at *68.

410. *Id.*

411. *Id.*

412. *Id*. at *69.

413. *Id.*

414. *See, e.g.*, Soto v. Contreras, 880 F.3d 706 (5th Cir. 2018); Mauvais v. Herisse, 772 F.3d 6 (1st Cir. 2014); Norinder v. Fuentes, 657 F.3d 526, 535 (7th Cir. 2011).

415. REFLECTION PAPER, *supra* note 53, at 23 ("Credibility issues of the relevant parent or other witness (especially when a family member) were often important and commented upon in case law.").

416. *See generally* Epstein & Goodman, *supra* note 202, at 418; Dragiewicz, *supra* note 28, at 5–8. *Cf.* U.S. DEP'T OF JUSTICE, IDENTIFYING AND PREVENTING GENDER BIAS IN LAW ENFORCEMENT RESPONSE TO SEXUAL ASSAULT AND DOMESTIC VIOLENCE 7 (2016), https://www.justice.gov/opa/file/799366/download [https://perma.cc/V49J-XMUE] ("Explicit and implicit biases, including stereotypes about gender roles, sexual assault, and domestic violence, are embedded in our culture and can affect people in all different professions.").

417. *See, e.g.*, MARYLAND SPECIAL JOINT COMMITTEE, GENDER BIAS IN THE COURTS (1989), https://www.ncjrs.gov/pdffiles1/Digitization/118392NCJRS.pdf [https://perma.cc/F7KB-662W] ("[T]he Committee learned that the attitudes and lack of understanding of many judges and court employees about the nature of domestic violence are the most pervasive and difficult problems facing victims of domestic violence."). *See* COURTWATCH MONTGOMERY, CIRCUIT

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 81 of 110

Courts "consistently [hold] mothers to higher standards of proof than fathers"[418] due to implicit gender bias and misconceptions about domestic violence.[419]

While the *Guide to Good Practice* itself says nothing about this important and uncomfortable topic, earlier versions of the *Guide to Good Practice* did,[420] and the *Australian Bench Book* has some useful information, as discussed below. This topic is important because judges evaluate the evidence through their own "experience about how the world works,"[421] assessing the "relative plausibility" of each story.[422] Unless a judge recognizes that his or her own understanding may be influenced by misconceptions and biases, a judge is less likely to get the answer right. Once a judge recognizes his or her implicit biases, the judge should be better able to assess credibility and adjudicate the contested facts.[423]

---

COURT PROTECTIVE ORDER PRACTICES IN DOMESTIC VIOLENCE CASES: IN THE BEST INTERESTS OF THE CHILD? (May 2014), http://archive.mnadv.org/_mnadvWeb/wp-content/uploads/2014/06/CWM-CC-Children-rept-5.28.14-exec-summ.pdf [https://perma.cc/GY7Q-F8TZ]. *Cf. The Effects of Gender in the Federal Courts: The Final Report of the Ninth Circuit Gender Bias Task Force*, 67 SO. CALIF. L. REV. 727, 949–50 (1994).

418. Meier, *supra* note 201, at 687.

419. Freedman, *supra* note 177, at 580 (noting these cases are hard to resolve, in part, because of inadequate "fact-finding resources" and "the biases and reactivity of factfinders").

420. *See* [DRAFT] GUIDE, *supra* note 95, at 75 (explaining that there are psycho-social effects from violence that can affect "credibility or believability of their testimony and the existence or non-existence of evidence"); *id.* at 13 ¶ 20 ("[D]elays in or non-reporting of domestic violence incidents to the police could be caused by lack of receptivity of relevant police officials, intimidation, lack of autonomy, 'learned helplessness' due to abuse, or cultures of secrecy around domestic violence.").

421. Allen & Stein, *supra* note 395, at 576 (noting factfinders "do not consider the probability of various elements of a story being true, but look instead to it holistically"). *See also* Maggie Wittlin, *Hindsight Evidence*, 116 COLUM. L. REV. 1323 (2016).

422. Allen & Stein, *supra* note 395, at 567. Factfinders employ a system of "inference to the best explanation." *Id.* at 574.

423. *See* DP v. Commonwealth Central Authority [2001] HCA 39 at [7] ("The nature of the issue, and the context in which it arises, may be significant in considering the sufficiency of evidence."); LRR v. COL [2020] NZCA 209 at [108] ("[T]he evidence that is provided by the parties should be evaluated having regard to the timeframes involved, and the ability of each party to offer evidence on the issue" (citing DP v. Commonwealth Central Authority, *supra*)). *See* Vermont Civil Jury Instruction Committee, *supra* note 395, at F (instructing jurors that in assessing credibility they may consider, inter alia: "did the witness have an interest in the outcome of the case?," "how did the witness behave while testifying?," "did the witness seem candid?," "did the witness seem to have a bias?," "does the other believable evidence in the case fits [sic] with the witness's testimony, or is it inconsistent with it?," and "whether an omission or

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 82 of 110

Fortunately, judges typically want to confront their implicit biases,[424] although most think they have none.[425] It is promising that mere attentiveness to the potential for implicit bias and misconceptions about domestic violence can increase the fairness of a proceeding. Acknowledging the problem is the first step to combatting its effects, especially in "complex settings where individuals have to make intricate judgments," such as judicial fact-finding.[426] Decision-makers who think about implicit bias can question their own objectivity, try harder to be fair,[427] and employ practices that reduce the chance of bias, including "effortful, deliberative processing" instead of "snap judgments."[428]

Combatting the problem of implicit bias requires judges first to identify the ways that they may be unfairly discounting a respondent's credibility. Four sources of implicit bias are evident in domestic violence cases. First, a domestic violence victim's affect may cause a judge to disbelieve her. Domestic violence victims often "appear

---

a mistake is innocent or minor, or whether it is something more serious that affects the rest of their testimony").

424. Judicial training on implicit bias is now quite popular. *See, e.g., Helping Courts Address Implicit Bias: Resources for Education*, NAT'L CTR. FOR STATE CTS., https://www.ncsc.org/ibeducation [https://perma.cc/WTD4-TD85] (last visited July 12, 2020) (providing resources); Natalie Carrillo, *Teaching Implicit Bias to Court Employees: Lessons from the Field*, NAT'L ASS'N OF STATE JUD. EDUCATORS (Feb. 3, 2016), https://nasje.org/teaching-implicit-bias-to-court-employees-lessons-from-the-field [https://perma.cc/8MUT-RKZM]; Matthew Estes & Nancy Smith, *#IAmFruitvale#: An Approach to Teaching Court Staff About Racism, Prejudice and Implicit Bias*, NAT'L ASS'N OF STATE JUD. EDUCATORS (Nov. 12, 2015), https://nasje.org/iamfruitvale-an-approach-to-teaching-court-staff-about-racism-prejudice-and-implicit-bias [https://perma.cc/9K-BV-LQS8].

425. Jerry Kang et al., *Implicit Bias in the Courtroom*, 59 UCLA L. REV. 1124, 1172–73 (2012).

426. Cynthia Lee, *Awareness as a First Step Toward Overcoming Implicit Bias*, *in* ENHANCING JUSTICE: REDUCING BIAS 289, 295–96 (Sarah Redfield et al. eds., 2017). *But see id.* at 295–97 (noting that telling people not to rely on stereotypes can be counterproductive especially for quick decisions; therefore, people must have a desire to overcome implicit bias and tools to do so).

427. Kang, *supra* note 425, at 1172, 1174.

428. *Id.* at 1177. Federal and European judges are required to give specific reasons. FED. R. CIV. PROC. 52(a)(1); Vladimir Ushakov v. Russia, App. No. 15122/17, ¶ 83 (Sept. 18, 2019), http://hudoc.echr.coe.int/spa?i=001-193878 [https://perma.cc/2HMB-VF4F] (discussing procedural obligation imposed by Article 8 to give "specific reasons in the light of the circumstances of the case" and noting that judges must engage in reasoning that is not automatic or stereotyped when adjudicating article 13(b)). *See also In re* Application of Adan, 437 F.3d 381, 398 n.8 (3rd Cir. 2008) (remanding for written, detailed findings of fact).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 83 of 110

unappealing, disorganized or emotionally unstable."[429]   However, these behaviors should not be surprising or undercut the respondent's credibility because the respondent may be suffering the effects of the trauma, the stress of the high-stakes proceedings, and/or fear from encountering her abuser in the courtroom.[430]   Similarly, if the judge views the domestic violence episodically and ignores evidence of coercive control, the judge may fail to understand why victims are so afraid or traumatized.  This may "[lend] credibility to a perpetrator's insistence that [the respondent is] exaggerating, lying, crazy, or trying to 'alienate' their children."[431]   In contrast, the batterer may simply appear more reliable because batterers are "skillfully dishonest."[432]  The *Australian Bench Book* identifies ways that perpetrators can make themselves appear credible, such as by emphasizing flaws in the survivor's character or minimizing the abuse.[433]

Second, judges often discount the respondent's story because of internal inconsistencies.[434]   However, internal inconsistency is common with the retelling of traumatic experiences and by itself says nothing about veracity.[435]  Judges also discredit a domestic violence victim's testimony when her actions seem inconsistent with her

429.  Nat'l Council of Juv. & Fam. Ct. Judges, *supra* note 128, at 8.

430.  Epstein & Goodman, *supra* note 202, at 406–12 (explaining how trauma can cause inconsistencies).  *See* Jaffe, *supra* note 123, at 62; Nancy S. Erickson, *Use of the MMPI-2 in Child Custody Evaluations Involving Battered Women: What Does Psychological Research Tell Us?* 39 Fam. L. Q. 87, 104 (2005).

431.  Stark, *supra* note 158, § 11–8, 11–9.

432.  Meier, *supra* note 201, at 690 (citing Lundy Bancroft & Jay G. Silverman, The Batterer as Parent: Addressing the Impact of Domestic Violence on Family Dynamics 124 (2002)); Freedman, *supra* note 177, at 581 (describing techniques of batterers, including "projecting a non-abusive image" and "making false or exaggerated defensive accusations against the other parent").

433.  Austl. Bench Book, *supra* note 104, § 5 (citing Linda C. Neilson, Domestic Violence Electronic Bench Book (2017) (ebook)).  *Cf.* Crager, *supra* note 131, at 9 ("[A] common tactic of batterers is to minimize and deny the violence, divert attention away from their own acts of violence and to focus the attention on alleged flaws in the survivor/petitioner's character.").

434.  Orellana v. Cartagena, No. 17-6520, 2018 U.S. App. LEXIS 1161, at *3 (6th Cir. Jan. 17, 2018); Rath v. Marcoski, 2016 U.S. Dist. LEXIS 167685 (M.D. Fla. Oct. 3, 2016).

435.  *See* Jim Hopper, *Sexual Assault and Neuroscience: Alarmist Claims vs. Facts*, Psych. Today (Jan. 22, 2018), https://www.psychologytoday.com/us/blog/sexual-assault-and-the-brain/201801/sexual-assault-and-neuroscience-alarmist-claims-vs-facts [https://perma.cc/K4D3-MTEK] (citing research) ("Remembering always involves reconstruction and is never totally complete or perfectly accurate.  Such gaps and inconsistencies are simply how memory works—*especially* for highly stressful and traumatic experiences, . . . where the differential encoding and storage of central versus peripheral details is the greatest.  Such gaps and inconsistencies are never, on their own, proof of *anyone's* credibility . . . .").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 84 of 110

claims of abuse, such as staying in a relationship with her batterer or allowing him to watch their children unattended.[436] Yet, these actions are also not probative of veracity once one has a thorough understanding of the dynamics of the abusive relationship and the options available to the victim.

Third, judges discount victims' testimonies if there is no corroborating evidence. Specifically, judges in Hague Convention cases have discounted a survivor's testimony if she did not go to the doctor, call the police, or tell someone else about the violence.[437] The demand for corroboration reflects an inherent distrust of a woman's testimony, captured in an Italian judge's comments to the Hague Permanent Bureau: "What I find more frustrating is when I have the feeling that the mother is telling the truth and actually suffered violence (or risk of violence) but I have no evidence of it to support my decision."[438]

Yet, corroboration of abuse often does not exist. Violence tends to occur in private and, most of the time, there are no witnesses.[439] Further, domestic violence victims often do not call the police for many reasons, including fear of retaliation by the abuser. Psychologist Peter Jaffe explained that "domestic violence is notoriously difficult to substantiate," and there is usually "insufficient corroborating evidence," in part because "the majority of abuse victims do not contact the police."[440] Similarly, medical reports are typically nonexistent or unhelpful. They can be unhelpful because domestic

---

436. Epstein & Goodman, *supra* note 202, at 418. Epstein and Goodman have explained that there is an "experiential gap," i.e., an "epistemic asymmetry," between the judge and the survivor that makes it hard for the judge to understand why these things occur. *Id.* at 413, 418. *See also* Susan A. Bandes, *Moral Imagination in Judging*, 51 WASHBURN L.J. 1, 13 (2011) ("Judges, like other humans, are situated in a tradition and a culture replete with expectations about how the world ought to work. They make assumptions about how domestic violence victims or rape victims . . . ought to act.").

437. *See, e.g.*, Mendoza v. Esquivel, No. 2:16-cv-0001, 2016 WL 1436289, at *11 (S.D. Ohio Apr. 12, 2016) ("And the facts that Respondent never filed a police report, received medical care, sought social services, or took other action to document the alleged abuse weighs against a finding that any abuse exceeded the 'relatively minor' category set forth in *Simcox*."); Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 9996813, at *9 (M.D. Tenn. Feb. 28, 2020); *Rath*, 2016 U.S. Dist. LEXIS 167685.

438. Onyoja Momoh, *The Interpretation and Application of Article 13(1) b) of the Hague Child Abduction Convention in Cases Involving Domestic Violence: Revisiting* X v Latvia *and the Principle of "Effective Examination"*, 15 J. PRIV. INT'L L. 626, 645–46 (Dec. 16, 2019) (citing ITALY: JUDGES' QUESTIONNAIRE: Q3.2.4).

439. Mildred Daley Pagelow, *Justice for Victims of Spouse Abuse in Divorce and Child Custody Cases*, 8(1) VIOLENCE & VICTIMS 69, 70–71 (1993).

440. *See* Jaffe, *supra* note 123, at 62.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 85 of 110

violence victims "frequently lie to medical providers, either because their abusers are with them when they are seeking treatment, or because of shame and embarrassment at their situations."[441] Documentation may not exist even when a victim calls the police or visits the doctor if domestic violence is sometimes "tolerated or ignored" in the country where it occurred.[442] In addition, even if there is corroborating evidence, the respondent may have no ability to obtain it from abroad because of the expedited nature of Hague Convention proceedings, among other things.[443]

Fourth, some judges have a "discriminatory disbelief of the storyteller herself, independent of the story she tells."[444] This would include "cultural tropes about women's motives to lie."[445] For example, Professor Deborah Tuerkheimer explained that courts are generally disinclined to believe survivors when they allege sexual assault,[446] even though the rate of fabrication is very low.[447] Some judges think domestic violence allegations are opportunistic even though evidence suggests domestic violence perpetrators are much more likely to lie than victims.[448] Moreover, the Hague Convention proceeding may be the first time the survivor has told someone about the violence because it is the first time the benefits of doing so have

---

441. Lois Schwaeber, *Recognizing Domestic Violence: How to Know It When You See It and How to Provide Appropriate Representation, in* Domestic Violence, Abuse, and Child Custody: Legal Strategies and Policy Issues § 2–11 (Mo T. Hannah & Barry Goldstein eds., 2010).

442. Carolyn A. Kubitschek, *Failure of the Hague Abduction Convention to Address Domestic Violence and Its Consequences*, 9 J. Comp. L. 111, 125 (2014).

443. *See* Hague Convention, *supra* note 1, at art. 11.

444. Epstein & Goodman, *supra* note 202, at 420.

445. *Id.* at 425.

446. *See* Deborah Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount*, 166 U. Pa. L. Rev. 1, 56 (2017) (noting "credibility discounting" on issues of "plausibility" and "trustworthiness"); Anoosha Rouhanian, *A Call for Change: The Detrimental Impacts of* Crawford v. Washington *on Domestic Violence and Rape Prosecutions*, 37 B.C. J.L. & Soc. Just. 1, 36–38 (2017) (discussing disbelief of rape victims in criminal justice system).

447. Kaarin Long, Caroline Palmer & Sara G. Thome, *A Distinction Without a Difference: Why the Minnesota Supreme Court Should Overrule Its Precedent Precluding the Admission of Helpful Expert Testimony in Adult Victim Sexual Assault Cases*, 31 Hamline J. Pub. L. & Pol'y 569, 589–90 (2010) (discussing rape allegations).

448. Austl. Bench Book, *supra* note 104, § 4.1 (noting it is a myth that "[w]omen often make false or exaggerated claims of domestic and family violence to obtain a tactical advantage in parenting proceedings" and explaining "that false denials of true allegations are more common"); *id.* ("Domestic and family violence is often minimised by perpetrators attempting to shift the blame to the victim and others.").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 86 of 110

outweighed the potential harm. That is not mendacity, but rather rational behavior.

Apart from implicit bias, a judge may experience reactivity that can both contribute to credibility discounting and have other harmful repercussions for respondents. Reactivity is "an automatic, anxiety-driven response" that often results in psychological reactions that try to lessen the discomfort.[449] Professor Ann Freedman explains that there is a strong tendency for a judge hearing evidence of domestic violence to act as a reactive bystander.[450] That is, the judge will subconsciously try to avoid vicariously experiencing the respondent's trauma because that produces unwelcome feelings of "fear, anger, grief and despair."[451] The judge will substitute other feelings such as "boredom, impatience, frustration, irritation, a vague sense of discomfort, blame, judgment, or loss of energy."[452] Predictably, "to abandon the burden of vicarious trauma [a judge may] turn against women who have been victimized."[453] Reactivity can also lead a judge to avoid addressing the violence in detail.[454] The judge's "feelings of anger, disgust, or resentment" can exacerbate implicit bias.[455]

The trial judge's comments on remand in *Saada v. Golan* provide an example of a judge who may have been experiencing reactivity.[456] By the end of the case, the trial judge was blaming the mother for electing to go back to Italy with the child. The judge thought it was the mother's presence in Italy that caused the risk that she would be abused, and while her safety was important, "it is B.A.S.'s safety and well-being that is paramount—not the respondent's."[457] The

---

449. Freedman, *supra* note 177, at 576 & n.24 (citing HARRIET GOLDHOR LERNER, THE DANCE OF INTIMACY: A WOMAN'S GUIDE TO COURAGEOUS ACTS OF CHANGE IN KEY RELATIONSHIPS 36 (1989)).

450. *Id.* at 582–83.

451. *Id.* at 610.

452. *Id.*

453. *Id.* at 632.

454. *Id.* at 583. This is evident in some Hague Convention cases. *See, e.g.*, Khan v. Fatima, 680 F.3d 781, 786–88 (7th Cir. 2012) ("Very little of the wife's testimony was so much as mentioned by the judge, even though the wife had testified that she'd been beaten with a pillow . . . , knocked down by him in front of ZFK, hit in the chest by a heavy wallet that he had hurled at her, choked by him twice . . . when she was pregnant with her second child, threatened . . . with having her eyeballs yanked out, and dragged bodily from the backyard into a room in the house. . . . The essential point is that the evidentiary hearing was inadequate."); Noergaard v. Noergaard, 244 Cal. App. 4th 76, 94 (Cal. Ct. App. 2015) (chastising trial judge for excluding most evidence).

455. Kang, *supra* note 425, at 1177.

456. *See supra* text accompanying notes 391, 394.

457. Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *2 (E.D.N.Y.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 87 of 110

judge then concluded, "There is no evidence in the record that the petitioner was abusive to B.A.S. or that B.A.S. would be unsafe with the petitioner. In fact, the respondent frequently left B.A.S. with the petitioner when she lived in Italy . . . . Accordingly, B.A.S.'s return to Italy is not necessarily contingent on the respondent also living there."[458] The judge's visceral rejection of the domestic violence victim's claims—evident in the judge's victim-blaming, minimization of the mother's importance to the child, misconceptions about domestic violence, and discounting of potential harm to the child despite protective measures—illustrates what appears to be judicial reactivity.

To avoid reactivity, Freedman suggests that judges should engage in "compassionate witnessing."[459] These are techniques that help decision-makers "remain present to the painful truths" of victims' experiences with domestic violence.[460] Among other techniques, judges should simply be aware that secondary traumatic stress makes one reactive,[461] and then use their emotions to stay intellectually present,[462] including by consciously letting go of the "strategies for coping with distress" such as impatience or frustration.[463]

Finally, to combat credibility discounting from implicit bias and reactivity, a trial court should start with a readiness to credit the taking parent as an expert on her own experiences and then ask questions to gain a deeper understanding. Judge Marjory D. Fields of the Family Court of the State of New York, Bronx County, gave this advice to other judges adjudicating issues of domestic violence: "The judge's initial step is to accept that the woman may have been subjected to prolonged physical and psychological abuse. Her story may seem fantastic, but it is likely to be entirely true. She is an expert concerning her husband's behavior patterns . . . ."[464] She then encouraged

---

May 5, 2020) (stating "'[A] respondent should not be rewarded for declining to ameliorate the risk' to her child . . . and harm that is 'a consequence of choices made by [the] respondent' should not affect the Court's repatriation decision.") (alterations in original) (citation omitted).

458. *Id.* at *2 n.4.

459. Freedman, *supra* note 177, at 609.

460. *Id.* at 614. The nine techniques include: "conscious engagement, adopting a moral stance as a witness, reckoning with secondary traumatic stress, integrating reason and emotion, maintaining appropriate boundaries, and exploring one's personal connections to what one encounters as a witness." *Id.* at 622.

461. *Id.* at 612, 618.

462. *Id.* at 619.

463. *Id.* at 619–20. This may require confronting one's own experiences with violence. *Id.* at 620. Freedman explains that this approach is consistent with judge's professional obligations. *See id.* at 618.

464. Marjory D. Fields, *Practical Ideas for Judges in Domestic Violence Cases*, Judges' J. 32, 32–33 (1996).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 88 of 110

judges to ask questions even when the parties are represented.[465] The judge can resolve any doubts about the respondent's credibility by encouraging the respondent to provide more information.

There are other good reasons to believe and inquire. First, as Judge Fields suggests, the trial judge should obtain more detail because "[p]ainting a picture of the complainant and defendant, so that the appellate court sees what the trial judge observed, is essential in family violence cases."[466] Second, the child should not be disadvantaged by having to rely only on the respondent as the child's advocate.[467] After all, the child rarely has an attorney.[468] Third, the failure to believe and inquire undermines survivors' faith in the legal system and causes its own harm. A survey of ten Australian survivors who lost their Hague Convention cases found, "All felt their voices were not heard and their domestic violence experiences not believed by the courts. They felt they were treated like criminals."[469] When a judge discounts a woman's experience of violence, the judge "closely replicates the dynamics of abuse [the victim] endures at home. Perpetrators of intimate partner violence . . . often discredit both the plausibility of a survivor's story and her trustworthiness as a truth teller."[470]

Unless the factfinder believes the domestic violence victim, the article 13(b) defense will be of no help to her. However, even if the trial judge believes her, the respondent will likely be denying or minimizing some of the violence and its effects. As the next Part suggests, a trial judge can and should use a preponderance of the evidence standard to resolve the conflict as well as determine other historical facts.

---

465. *Id.* at 33–34 ("When cases proceed to trial, judges may use their expansive role permitted in nonjury trials. The judge may ask questions to obtain information not elicited by counsel, or call witnesses in civil proceedings.").

466. *Id.*

467. *See* LRR v. COL [2020] NZCA 209 at [106] (recognizing that "it will often be unsatisfactory to determine issues that arise . . . by reference to the burden of proof, or one party's failure to adduce evidence in a timely way . . . . This is not a context in which a court can properly proceed on the basis that a party who fails to provide relevant evidence to support their case must bear the consequences of that failure. That approach would risk compromising the interests of the child because of deficiencies in the way in which one or other parent has conducted the litigation.").

468. *See generally* Weiner, *supra* note 87 (arguing children should have their own attorneys in Hague Convention cases).

469. Masterton, *supra* note 60.

470. Epstein & Goodman, *supra* note 202, at 446.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 89 of 110

H.    *Clear and Convincing Evidence Only Needs to Exist for the Ultimate Issue, Not for Predicate Facts*

Judges in the United States who may otherwise be inclined to rule for the respondent are sometimes hampered by the burden of proof attending the article 13(b) defense. U.S. law requires that a respondent prove the article 13(b) defense by clear and convincing evidence.[471] The burden of proof has a psychological effect on the factfinder: it serves as an "anchoring heuristic" that "lowers the willingness of the factfinder to determine that the burdened party has prevailed."[472]

Congress should change the burden of proof for the defense from a clear and convincing standard to a preponderance standard. The Hague Convention itself does not specify the burden of proof, and the Explanatory Report merely says that the burden should be placed on the abducting parent, without specifying its nature.[473] The *Guide to Good Practice* similarly takes no position on the burden of proof other than to say the burden is on the respondent.[474] Most countries do not use such a high burden.[475]

While the burden of proof is not something trial judges can alter when it is set out in statute, trial judges can use the preponderance of the evidence standard for finding predicate facts related to the article 13(b) defense, such as whether or not the domestic violence occurred. Unfortunately, some U.S. judges use the clear and convincing standard to determine predicate facts,[476] although nothing requires that they do so. The better approach, and one followed by many judges, is to use the heightened burden of proof only for the ultimate legal issue of whether there is a grave risk of exposure and to use a preponderance of the evidence standard for the predicate

---

471. *See* International Child Abduction Remedies Act (ICARA) § 4, 22 U.S.C. § 9003(e) (2)(A) (2019). Clear and convincing evidence means that the factfinder is clearly convinced. Clermont, *supra* note 400, at 376.

472. Clermont, *supra* note 400, at 371. *See also* John Leubsdorf, *The Surprising History of the Preponderance Standard of Civil Proof*, 67 FLA. L. REV. 1569, 1579 (2015) (juries typically require the plaintiff's evidence to be "considerably more likely to be correct than the defendant's").

473. *See* Pérez-Vera, *Explanatory Report*, *supra* note 42, ¶ 114.

474. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶¶ 50–51.

475. [DRAFT] GUIDE, *supra* note 95, at 43 n.194 ("The standard of proof applied by Contracting States may differ. E.G. many Contracting States apply a general civil standard of proof 'preponderance of evidence' or 'balance of probabilities'; a few States require the exception to be proved by a higher standard, e.g., 'by clear and convincing evidence.'").

476. Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 9996813, at *14 (M.D. Tenn. Feb. 28, 2020); Matas-Vidal v. Libbey-Aguilera, No. 2:13CV422 DAK., 2013 WL 3995300, at *9 n.47 (D. Utah Aug. 5, 2013).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 90 of 110

facts.[477]  A bifurcated approach to the burden of proof is consistent with what courts sometimes do in other types of proceedings with heightened burdens for the ultimate issue, such as termination of parental rights proceedings and criminal proceedings.[478]

The bifurcated approach for the article 13(b) defense is highly preferable to requiring that the respondent prove predicate facts by clear and convincing evidence.  The latter approach makes the defense much more difficult to establish.[479]  For example, if a court requires the respondent to prove by clear and convincing evidence on a seriatim basis that the domestic violence occurred, that the child will be exposed to it, and that domestic violence causes children psychological or physical harm or places them in an intolerable situation, then the respondent has to surmount the "clear and convincing" hurdle three times, not just once.[480]

Applying the proper burden of proof to predicate facts is very important because factfinding for the article 13(b) defense is prone to error due to the evidentiary challenges discussed in Part II.G.  In the Hague Convention case *Khan v. Fatima*, the Seventh Circuit observed: "The process of factfinding in such a situation is inexact and the findings that result are doubtless often mistaken."[481]  Moreover, federal judges find family law matters outside their wheelhouse.  Justice Breyer said the following about deciding Hague Convention cases: "[O]ur lack of expertise means a high possibility of error."[482]  While the burden of proof does not affect the absolute number of errors in factfinding, it does determine which party bears the impact of those mistakes.[483]

The purpose of a burden of proof is to allocate the risk of error.[484]  Use of the clear and convincing evidence standard for determining

---

477. *See, e.g.*, Yaman v. Yaman, 730 F.3d 1, 11 (1st Cir. 2013); Souratgar v. Lee, 720 F.3d 96, 103 (2d Cir. 2013); Danaipour v. McLarey, 183 F. Supp. 2d 311, 315 (D. Mass.  2002), *rev'd on other grounds*, 286 F.3d 1, 13 (1st Cir. 2002); Didur v. Viger, No. 05-2188-JWL-DJW, 2005 WL 8160585, at *9 (D. Kan. Aug. 12, 2005).

478. *See, e.g.*, Care and Protection of Laura, 610 N.E.2d 934, 937 (Mass. 1993); Doe v. Sex Offender Registry Board, 120 N.E.3d 1263, 1270–71 (Mass. App. Ct. 2019).

479. *Cf.* Clermont, *supra* note 400, at 359 (speaking about elements of a claim).

480. *Cf.* Leubsdorf, *supra* note 472, at 1579 (employing analysis in context of preponderance of the evidence).

481. Khan v. Fatima, 680 F.3d 781, 785 (7th Cir. 2012).

482. Breyer, *supra* note 36.

483. Richard A. Posner, *An Economic Approach to the Law of Evidence*, 51 Stan. L. Rev. 1477, 1507 (1999) ("Burden of persuasion has less to do with the number of errors than with the distribution of errors between sides.").

484. Allen & Stein, *supra* note 395, at 590–91.  *See* Leubsdorf, *supra* note

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 91 of 110

predicate facts means the mistakes will fall on the shoulders of the respondent. These mistakes are rarely corrected on appeal, in part because the burden of proof and risk of error is placed on the losing party— again the respondent.[485] In contrast, the typical burden of proof for civil cases—a preponderance of the evidence[486]—creates a "roughly equal allocation of the risk of error between litigants."[487] That burden of proof reflects a "fundamental" principle that "the parties should ordinarily receive equal treatment and bear equal risk."[488] Courts typically "presume that this standard is applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake."[489]

The petitioner's interest in accurate factfinding in a Hague Convention case is no weightier than the respondent's, especially considering the subject matter of the article 13(b) defense. If anything, the respondent's interest in protecting the child from a grave risk of exposure to physical or psychological harm or an intolerable situation is weightier than the petitioner's interest in the location of a custody proceeding. After all, the Hague Convention prioritizes children's safety over children's return by virtue of including the article 13(b) defense.[490]

The benefit of the preponderance standard for factfinding in this context is revealed by considering closely the "comparative cost of errors."[491] There are two types of errors in connection with article 13(b): false positives and false negatives. A false positive is when a

---

472, at 1580.

485. Clermont, *supra* note 400, at 376 (noting that for the review of judge-found facts, "the reviewer must think there was a serious error"). *See, e.g.*, Ortiz v. Martinez, 789 F.3d 722, 729 (7th Cir. 2015) (noting determinations of credibility are factual findings subject to review only for clear error); Davies v. Davies, 717 F. App'x 43, 46 (2d Cir. 2017) (noting appellate court gives "particularly strong deference where the district court premises its findings on credibility determinations"); da Silva v. de Aredes, 953 F.3d 67, 72 (1st Cir. 2020) (reviewing trial court's article 13(b) determination for clear error because that "accords with the goals of the Convention," including expeditious return).

486. Ronald J. Allen, *How Presumptions Should Be Allocated: Burdens of Proof, Uncertainty and Ambiguity in Modern Legal Discourse*, 17 Harv. J.L. & Pub. Pol'y 627, 633 (1994) (calling preponderance of the evidence "nearly universal").

487. Grogan v. Garner, 498 U.S. 279, 286 (1991).

488. Clermont, *supra* note 400, at 375.

489. *Grogan*, 498 U.S. at 286.

490. Pérez-Vera, *Explanatory Report*, *supra* note 42, ¶ 29 ("Thus, the interest of the child in not being removed from its habitual residence without sufficient guarantees of its stability in the new environment, gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.").

491. Leubsdorf, *supra* note 472, at 1581.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 92 of 110

court grants the article 13(b) defense when there is not a grave risk of exposure to psychological or physical harm or an intolerable situation. A false negative is when a court denies the article 13(b) defense and returns a child when there is a grave risk.[492] A preponderance of the evidence standard says that the two errors are roughly equivalent, but creates a slight tendency to cause false negatives.[493] A clear and convincing evidence standard magnifies the tendency to make false-negative errors and suggests a false positive is much worse than a false negative.

Yet judges should prefer a false positive to a false negative when adjudicating the article 13(b) defense. Kenneth Klein used pregnancy tests as a helpful example of why false positives are sometimes preferable to false-negative results. False negatives in the pregnancy test context present a public health concern because people may act as if they are not pregnant, when in fact they are. Consequently, "a pregnancy test is intentionally biased to produce more false positives than false negatives."[494] Similarly, a false negative in the Hague context represents a poor policy choice because courts act as if the child will not face a grave risk of exposure to harm when the child will, in fact, be endangered by the return. In addition, while a false positive error can be readily addressed in the subsequent custody proceeding, a false negative error may result in a tragedy, rendering the custody proceeding irrelevant. The appropriateness of favoring a false positive error is evident by the universal use of a preponderance of the evidence standard for civil protective order proceedings involving domestic violence. Maryland, the last state to change to a preponderance of the evidence standard for civil protective orders, did so because "the standard of evidence for protective orders was 'clear and convincing evidence,' and many judges cited the lack of clear and convincing evidence when denying orders."[495]

Judges should not enhance the possibility of false-negative errors in light of all the other factors that already contribute to their likelihood in these cases, including implicit bias and misconceptions about domestic violence. Trial judges can and should use the preponderance of the evidence standard when they determine the predicate facts.

---

492. Kenneth S. Klein, *Truth and Legitimacy (in Courts)*, 48 Loy. U. Chi. L.J. 1, 32-33 (2016).

493. Leubsdorf, *supra* note 472, at 1595 (It "tell[s] the tier of fact that if the evidence leaves the trier in equilibrium, the party bearing that burden must lose.").

494. Klein, *supra* note 492, at 33.

495. CourtWatch Montgomery, *supra* note 417.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 93 of 110

Just as an unnecessarily high burden of proof compounds all the previous obstacles, so too does an unnecessarily restrictive interpretation of the article 13(b) defense. The next Part addresses this final issue, i.e., the actual legal test embodied within article 13(b).

I.    *Only a Grave Risk of Exposure, Not a Grave Risk of Harm or a Grave Harm, Is Required*

Judges often misstate the legal test embodied in article 13(b), which states that the judge is not bound to order the return of the child if "there is a *grave risk* that his or her return would *expose* the child to physical or psychological harm or otherwise place the child in an intolerable situation."[496]  There are several common misarticulations of the legal test, including the following: (1) courts require a "grave risk of harm," even though the defense only requires a grave risk of "exposure" to physical or psychological harm or an intolerable situation;[497] or (2) courts require the potential outcome to be a

---

496.  Hague Convention, *supra* note 1, at art. 13(b) (emphasis added).

497.  See Taglieri v. Monasky, 876 F.3d 868, 879 (6th Cir. 2017) ("[B]ut we must acknowledge that the facts before us, while demonstrating that [the father] engaged in appalling and justly censurable activity, do not 'show that the risk to the child is grave, not merely serious' . . .  As a result, [the mother] has failed to meet her burden to show by clear and convincing evidence *that a grave risk of harm to [the child] exists* or that there is a grave risk that [the child] would be placed in an intolerable situation.") (emphasis added); Soto v. Contreras, 880 F.3d 706, 712 (5th Cir. 2018) (affirming the trial court's articulation of the legal standard, that "Lemus had to 'prove[ ] by clear and convincing evidence that . . . [Ontiveros] seriously abused or neglected [A.O.L.], or that there is otherwise *a grave risk of harm* to [him] if [he] returns to Mexico for a custody determination'") (emphasis added); Ermini v. Vittori, 758 F.3d 153, 164 (2d Cir. 2014) ("Spousal violence, in certain circumstances, can also establish a grave risk of harm to the child, particularly when it occurs in the presence of the child."); Walsh v. Walsh, 221 F.3d 204 (1st Cir. 2000) ("The risk must be 'grave,' and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention."); Gomez v. Fuenmayor, 812 F.3d 1005, 1010 (11th Cir. 2016) ("The sole issue we face is whether Salvi proved by clear and convincing evidence that M.N. would face a grave risk of harm were she returned to Venezuela."); Acosta v. Acosta, 725 F.3d 868, 876 (8th Cir. 2013) ("The proper focus under Article 13b is whether returning the children to Peru would expose them to a grave risk of harm."). *Cf. Acosta*, 725 F.3d at 875 (noting "The proper focus under Article 13b is whether returning the children to Peru would expose them to a grave risk of harm."); Kim v. Ferdinand, 287 F. Supp. 3d 607, ¶ 61 (E.D. La. 2018) ("[T]he return would expose the child to 'grave risk' of harm."). *But see* DP v. Commonwealth Central Authority [2001] HCA 39 at [42] ("[T]he risk that is relevant is not limited to harm that will actually occur, it extends to a risk that the return would *expose* the child to harm.") (emphasis in original); *id.* ¶ 61 ("The difference between a grave risk of *exposure* to harm and a grave risk of harm may be important.") (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 94 of 110

"grave harm" when "grave" only modifies risk, not harm.[498]  These types of errors compound all of the obstacles to a successful article 13(b) defense mentioned previously.

It is easy to get the words in article 13(b) mixed up—even the State Department has done so[499]—but the locution matters.  To see the difference in meaning, consider an analogy to the coronavirus.  A child who lives in a place where the infection rate is low but would be returned to a place where the infection rate is high would face a "grave risk of exposure . . . to . . . harm" even if the child is statistically unlikely to become severely sick given his or her age.[500]  A "grave risk of exposure to . . . harm or an intolerable situation" merely requires a very high probability of encountering something that can cause physical or psychological harm, which would exist in the COVID example.  The result can be different, however, if the test requires "a grave risk of harm" or "a risk of grave harm."  A "grave risk of harm" entails a very high probability of actual harm, and that is unlikely given the child's age.  A "risk of grave harm" necessitates some probability of a grave harm, such as severe injury or death, which is theoretically possible, albeit unlikely.  These variations in phraseology produce differences in the required certitude of the harm and the required seriousness of the harm.  Either mistake creates a much more stringent standard than the defense actually embodies.  Article 13(b) was not meant to require certainty of outcome or very severe physical or psychological harm.

---

498. *See, e.g.*, Baran v. Beaty, 526 F.3d 1340, 1347-48 (11th Cir. 2008) (reasoning "return need not be ordered when the risk of grave harm exists"); Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996) (noting "[t]he exception for grave harm to the child").

499. 2019 Annual Report, *supra* note 311 (describing article 13(b) as requiring a "grave risk of harm").

500. *Cf.* Guerra v. Rodas, No. CIV-20-96-SLP, 2020 WL 2858534, at *7 (W.D. Okla. June 2, 2020) (staying order to return child until it is safe to travel in light of COVID-19); Gallegos v. Garcia Soto, No. 1:20-CV-92-RP, 2020 WL 2086554, at *8 (W.D. Tex. Apr. 30, 2020) (same).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 95 of 110

In fact, in terms of certitude, when read carefully, article 13(b) requires nothing of the sort.[501]  Rather it requires that children face a *grave risk of a risk of harm*—not a grave risk of harm.  That is because "expose" means to "subject to *risk* from a harmful action or condition."[502]  Therefore, a risk of exposure to physical or psychological harm is plainly a risk of a risk of harm or, to put it another way, a risk of danger.  This interpretation is supported by language in the Hague Convention's *Explanatory Report*, which states that the purpose of the Hague Convention must "give[] way before the primary interest of any person in not being exposed to physical or psychological *danger* or being placed in an intolerable situation."[503]  Danger is not the harm itself, but rather a risk of harm.  A contrary interpretation renders the word "expose" mere surplusage.[504]

Courts that require the child to face a grave, or even serious, harm ignore that "grave" only modifies the word risk.  Sometimes courts sneak in the requirement of a grave harm by saying that a "grave risk" necessitates assessing the seriousness of the potential harm too. For example, the Eighth Circuit said: "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes."[505]  This judicial gloss is inconsistent with the wording of article 13(b). Article 13(b) expressly sets forth what kind of harm is sufficient: "physical or psychological harm" or an "intolerable situation."  It does not say "grave harm" or even "serious physical or psychological harm."  Moreover, the U.S. State Department did not further define "harm" in its report to the Senate at the time of ratification.[506]  The drafters consciously chose the phrase "grave risk" to mean that the risk is more than substantial,[507] but the phraseology is agnostic as to the severity of the harm

---

501. *LRR v. COL* [2020] NZCA 209 at [90] (noting "certainty is not required; what is required is that the court is satisfied that there is a risk which warrants the qualitative description 'grave'") (citations omitted).

502. *Expose*, Merriam-Webster, https://www.merriam-webster.com/dictionary/expose [https://perma.cc/Y2ZJ-HDXH] (last visited Apr. 22, 2021) (emphasis added).

503. Pérez-Vera, *Explanatory Report*, *supra* note 42, ¶ 29 (emphasis added). The Explanatory Report is relevant to the Hague Convention's interpretation. *See* Vienna Convention on the Law of Treaties, art. 32, May 23, 1969, 1155 U.N.T.S. 331.

504. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 178 (2012) (arguing it "should be regarded as the exception rather than the rule" that a word in a statute would have "no meaning").

505. Acosta v. Acosta, 725 F.3d 868, 875 (8th Cir. 2013). *See also LRR v. COL* [2020] NZCA 209 at [88]; Re E [2011] UKSC 27, [2012] AC 133 [33] (appeal taken from Eng.).

506. Text and Legal Analysis, *supra* note 43, at 10510.

507. Fourteenth Session of the Hague Conference on Private International

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 96 of 110

because, as described further below, harm has a particular meaning that suggests any physical or psychological harm is unacceptable.

Some courts have asserted that physical or psychological harm to the child must be serious because of the language that follows "physical or psychological harm" in article 13(b): "or otherwise place the child in an intolerable situation."[508] Yet, if the drafters had intended such an interpretation, they surely would have made that clear by qualifying the harm with an adjective like "serious" or "intolerable." Instead, the drafters chose the connecting term "otherwise," suggesting that they thought any physical or psychological harm is already intolerable.[509] If only "intolerable" physical or psychological harm could establish the defense, then only exposure to torture would suffice.[510] That is a preposterous interpretation and contrary to the drafters' actual orientation. Looking at the legislative history, Professor Rhona Schuz explains, "it would not have occurred to the drafters that courts would be prepared to return children in cases where this would jeopardise their safety."[511]

Proponents of a "grave harm" requirement have expressed concern that "harm" is too broad of a concept, and could include the "rough and tumble, discomfort and distress" from "growing up."[512] Yet the word harm has a narrow definition that would exclude such an application.[513] The Oxford English Dictionary defines harm as

---

Law, *supra* note 218, at 362. Sometimes courts impose an even higher requirement, unfortunately. *See, e.g.*, Vujicevic v. Vujicevic, No. C13-0204RSL, 2013 WL 2627132, at *3 n.2 (W.D. Wash. June 11, 2013) (although the mother would be in "grave danger of physical harm if she were to return to Croatia and attempt to work cooperatively with" the father, and even though the father "plainly showed that he is willing to strike not only his wife, but his children," and even though the father's "yelling and criticizing" of the child "put [the child] at risk of certain psychological problems," "the mere possibility of harm does not establish an Article 13(b) defense").

508. *See Re E* [2011] UKSC 27 at [34]; DP v. Commonwealth Central Authority [2001] HCA 39 at [8].

509. *See* Letter to Mr. Michael Coffee from Merle H. Weiner 12 (Sept. 2, 2017) (on file with author).

510. Occasionally courts have accepted, or ventured toward, such a preposterous position. *See, e.g.*, Thomson v. Thomson, [1994] 3 S.C.R. 551, para. 82 (Can.) (rejecting that separation from primary caregiver met this test); *Re E* [2011] UKSC 27 at [34] (stating that the phrase physical or psychological harm "gain[s] colour from" the intolerable situation language).

511. Schuz, *supra* note 284, at 300.

512. *Re E* [2011] UKSC 27 at [34] (citing this example to show the potential expansiveness of article 13(b) without considering the magnitude of harm).

513. "Discomfort and distress from growing up" is not even as harmful as outcomes categorically excluded as constituting sufficient harm. *See* Text and Legal Analysis, *supra* note 43, at 10510 ("A review of deliberations on the Convention reveals that 'intolerable situation' was not intended to encompass

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 97 of 110

"[e]vil (physical or otherwise) as done to or suffered by some person or thing; hurt, injury, damage, mischief."[514]  "Discomfort and distress from growing up" is not harm.  In contrast, "physical abuse" is harm and it is per se sufficient for the defense, regardless of the degree of abuse.[515]  Since "exposure" to domestic violence is also a harm, the defense would exist if there were a grave risk that the child would face a danger of such exposure.[516]  Similarly, since PTSD is also a harm, a grave risk that the child might be exposed to something that would trigger a relapse should qualify for the defense.  There is no need to determine how bad the harm would be as children should not suffer "evil."

Some will argue that my literal reading of article 13(b) is inconsistent with the idea that 13(b) should be "narrowly" or "restrictively" construed.[517]  However, the Permanent Bureau has noted that there is no indication of what "restrictively" means in the Explanatory Report.[518]  In fact, judges around the globe have noted that article 13(b) should be accurately construed, not narrowly construed.  The New Zealand Court of Appeals usefully explained: "[T]he exceptions to the obligation to return are by their very nature restricted in scope.  They do not need any extra interpretation or gloss . . . .  It adds nothing but confusion to say that the [article 13(b)] exception should be 'narrowly construed.'"[519]

---

return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State.").

514.  *Harm*, Oxford English Dictionary, https://www.oed.com/view/Entry/84259?rskey=fZMonK&result=1&isAdvanced=false#eid [https://perma.cc/KG9D-LMSZ] (last visited Apr. 22, 2021).

515.  *See Re E* [2011] UKSC 27 at [34].

516.  *Id.*; Van De Sande v. Van De Sande, 431 F.3d 567, 571 (7th Cir. 2005) ("If handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over . . . ."); Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001) (identifying a spectrum for the "grave risk of harm" that excludes "situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences" but includes "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation").

517.  *See, e.g.*, Danaipour v. McLarey, 286 F.3d 1, 13–14 (1st Cir. 2002) ("The Convention establishes a strong presumption favoring return of a wrongfully removed child.  Exceptions to the general rule of expedient return, including Article 13(b), are to be construed narrowly.") (citations omitted).

518.  Reflection Paper, *supra* note 53, at 12.

519.  *LRR v. COL* [2020] NZCA 209 at [81, 87] (noting that extends to the "interpretative, fact finding and evaluative exercises involved").  *See also Re E* [2011] UKSC 27 at [31]; Re S (A Child) [2012] UKSC 10, [2012] 2 AC 257 at [6]; DP v. Commonwealth Central Authority [2001] HCA 39 at [9], [44].  Moreover,

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 98 of 110

Instead, respecting the actual language in article 13(b) honors the purpose of the defense.[520] The drafters were concerned about children experiencing "physical or psychological danger or being placed in an intolerable situation."[521] The Hague Convention was designed to protect children's "true interests."[522] A statement in the *travaux préparatoires* from Mr. Jones, a U.K. delegate to the drafting sessions, indicates that exposure to domestic violence was considered a sufficient harm to trigger the defense.[523]

In sum, the Hague Convention permits a court to deny return if there is a more than serious risk that the child would face a danger of physical or psychological harm or an intolerable situation due to domestic abuse.

## III. JUDGES SHOULD OFTEN GRANT THE ARTICLE 13(B) DEFENSE EVEN WHEN THE LAW REQUIRES OTHERWISE

Thus far, this Article has offered legal guidance and tools to encourage trial courts to rule in a domestic violence victim's favor when adjudicating the article 13(b) defense. Part II argued that this result is usually possible through judges' exercise of legally authorized discretion, such as in the following ways: (1) understanding that domestic violence is relevant even if the child is not a direct victim of abuse; (2) acknowledging that perpetrators can be dangerous even when the physical violence is not frequent and severe; (3) recognizing that domestic violence short of physical attacks is harmful to direct victims and their children when there is coercive control; (4) appreciating that domestic violence need not always recur for harm to materialize, but that it probably will recur; (5) using the "intolerable situation" language in article 13(b) when appropriate; (6) considering the harm to the child from separation from the protective parent; (7) acknowledging that protective measures are often a chimera; (8)

---

as Rhona Schuz has argued, it is wrong to worry that an approach addressing the prevalence of domestic violence will undermine the Hague Convention because such a view will "undermine the struggle against domestic violence" and it is wrong to think "combatting international abduction should take precedence over that of combatting domestic violence." SCHUZ, *supra* note 284, at 314.

520. Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) ("The risk must be 'grave,' and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention.").

521. Pérez-Vera, *Explanatory Report*, *supra* note 42, ¶ 29; Baran v. Beaty, 526 F.3d 1340, 1348 (11th Cir. 2008) ("[T]he text of the Convention and the commentaries on it place a higher premium on children's safety than on their return.").

522. Pérez-Vera, *Explanatory Report*, *supra* note 42, ¶ 24.

523. *See supra* note 218.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 99 of 110

finding a survivor's testimony credible even when not corroborated or consistent; (9) using a preponderance of the evidence standard to find predicate facts; and (10) applying the article 13(b) standard as written, without unwarranted gloss.

Despite these tips and tools, a judge may still believe that the law in the jurisdiction requires the child's return. For example, appellate courts might have set a precedent that requires domestic violence to be severe and frequent to satisfy the article 13(b) defense,[524] or requires reliance on protective measures.[525] While trial judges may still be able to rule for the respondent by massaging the facts, distinguishing precedent, and engaging their moral imagination,[526] the trial judge may feel boxed in by the law even though it dictates a result that he or she believes is unjust.

This Part argues that a judge who encounters such a situation should still grant the article 13(b) defense, assuming there is no other legally authorized way to rule in the respondent's favor.[527] Building upon Jeffrey Brand-Ballard's excellent book, *Limits of Legality: The Ethics of Lawless Judging*,[528] I argue that judges in this situation are morally authorized to disregard the law. Brand-Ballard draws on common morality and practical philosophy to argue that "judges sometimes have the moral right, and moral reasons, to disregard clear legal mandates, and not only when the law is extremely unjust."[529]

---

524. *See, e.g.*, text accompanying notes 140–142, *supra*.

525. *See, e.g.*, text accompanying notes 339, *supra*.

526. Bandes, *supra* note 436, at 24 (defining "moral imagination" as "the ability to understand one's own limitations, the limitations of perspective, the range of values at stake, and the possibilities for change inherent in the situation" in order to move away from "arid formalism and closed systems" and pay more attention to "justice").

527. There may be other ways to rule in the domestic violence victim's favor that this Article does not discuss, such as finding that returning the child would violate "higher level rules, constitutional provisions, or (arguably) sufficiently important legal principles." Brand-Ballard, *supra* note 18, at 45. *See generally* Merle H. Weiner, *Using Article 20*, 38 Fam. L. Q. 583 (2004); Merle H. Weiner, *Strengthening Article 20*, 38 U.S.F. L. Rev. 701 (2004). *See also Sustainable Development Goals: Ending Violence Against Women and Girls*, United Nations, https://www.un.org/sustainabledevelopment/ending-violence-against-women-and-girls [https://perma.cc/Y5FT-RLPK] (last visited, Oct. 27, 2018) ("Violence against women and girls is one of the most widespread, persistent and devastating human rights violations in our world today."). In addition, domestic violence can be very relevant to issues such as the child's habitual residence as well as the other defenses. A discussion of these issues is beyond the scope of this Article.

528. Brand-Ballard, *supra* note 18.

529. *Id.* at 13. *See also* Zev J. Eigen, David S. Sherwyn & Nicholas F. Menillo, *When Rules Are Made to Be Broken*, 109 Nw. U. L. Rev. 109, 110–11 (2014) ("There are no formal or moral guidelines for judges to follow when applying

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 100 of 110

A.    *The Justification for Deviation*

Brand-Ballard argues that judges are ethically permitted to deviate from the law in a "suboptimal-result case"—that is, a case in which the law favors a party, but the party has no moral right to prevail.[530]  These are cases where "the law . . . requires the judge to reach a result that she would have an all-things-considered reason to avoid if the law permitted her to do so."[531]  It is a suboptimal result when a judge has to return a child to the state of the child's habitual residence because the article 13(b) defense is unavailable, even though the taking parent fled domestic violence.[532]

Judges' moral reasons to deviate from the law stem from the fact that judges are autonomous moral agents who exercise state-authorized power.[533]  Judges, like all humans, have a moral duty of nonmaleficence: "the duty not to use physical force against other human beings without justification."[534]  In addition, judges, like others, have a "widely-recognized" Samaritan duty that gives them the right to help others or not to harm them.[535]  While the law authorizes the judge to abrogate these moral duties by virtue of the judge's position,[536] individuals "ordinarily need moral justification, not just legal authorization," to violate them.[537]  Stated another way, just because the law might require a judge to rule in a certain way does not erase the moral reasons not to do so.[538]

A judge who grants the Hague Convention's remedy of return to a domestic violence perpetrator is violating the aforementioned moral duties.  The judge is exercising force, or at least the threat of force, against a respondent who is a domestic violence victim by virtue of the order's coercive effect and the emotional distress it will

---

rules perceived to lead to unjust results.").  I extract from Brand-Ballard's 314 pages those parts that best support my own argument, but encourage people to read the entire book to see his full logic.  I do not defend his book or even the parts I extracted, although I obviously have found the book compelling.  I will, however, raise some questions about his argument as I apply it to the Hague Convention context.

530.  BRAND-BALLARD, *supra* note 18, at 10, 16, 170.

531.  *Id.* at 90.  *See also id.* at 96–97.

532.  *Id.* at 303 ("All unjust results are suboptimal, but not all suboptimal results are unjust.").

533.  *Id.* at 30 ("Judges are in the force business."); *id.* at 175 ("[J]udges threaten and/or use force with virtually every ruling.").

534.  *Id.* at 23.

535.  *Id.* at 24.

536.  *Id.* at 32.

537.  *Id.* at 30.

538.  *Id.* at 309.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 101 of 110

inflict on the respondent.[539] Granting a petition for a child's return in this context is unjust because the batterer has no moral right to win. The batterer has violated the moral duty to refrain from harming others. The abduction, potentially also a violation of this moral duty, falls within an exception to the duty—the ability to use reasonable force for the purpose of defending oneself or others from culpable aggressors.[540] The domestic violence victim's action also falls within her Samaritan duty in that she is protecting her child from exposure to domestic violence.

On balance, ordering a child's return violates a judge's moral duty to avoid causing harm much more than does denying a Hague Convention petition. The child's return will likely subject the domestic violence victim and the child to severe hardship,[541] as well as a risk of further abuse.[542] The domestic violence victim who does not return with her child suffers the loss of her child, and the child suffers the loss of his or her protective parent. The loss may be temporary, but it may end up being much longer than anticipated, and any loss causes pain and potential harm. In contrast, a batterer who loses a Hague Convention proceeding is only inconvenienced by having to litigate custody in the state to which the taking parent fled.[543] In addition, the judge's decision to order the child's return will deter other domestic violence victims from leaving abusive situations with their children.[544] The net harm gives the judge moral permission to rule for the respondent-victim.

Admittedly, there are prudential reasons for a judge to adhere to the law, but they are too weak in the context of the Hague

---

539. *Id.* at 23.

540. *Id.* at 24. The abduction is per se reasonable when the state is unable or unwilling to defend the citizens against violence. *Id.* at 27.

541. *See supra* text accompanying notes 60–75.

542. *See supra* Part II.B.1–2.

543. The judge's moral authority to deviate from an unjust law does not depend upon the domestic violence victim's moral authority to violate an unjust law, as some theorists contend. Brand-Ballard differentiates the two situations: while an unjust law might violate the individual's rights, "it does not require them to perform immoral positive actions or to violate anyone else's rights. So they have no countervailing moral reason to undermine the putative *pro tanto* moral duty to obey the law." Brand-Ballard, *supra* note 18, at 170. The factual scenario of domestic violence discussed in this Article, however, reveals an atypical unjust law that actually gives the abductor a moral reason to disregard the law too, assuming the law prohibits the abduction because the recognized defenses are so narrow. The domestic violence victim has a positive moral obligation to protect her child from harm. The Hague Convention requires her to take no action, or less effective or timely action than the abduction. Second, some say it is not immoral to violate an unjust law. *Id.* at 37, 39 (citing scholars).

544. *See supra* text accompanying notes 76–80.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 102 of 110

Convention to obviate the moral case for deviation. Consider, for example, the importance of separation of powers. Brand-Ballard suggests, inter alia, that a judge's deviation from the law does not violate the separation of powers doctrine because lawmaking power is supposed to be shared between branches of government.[545] In fact, there is a strong expectation of shared lawmaking in Hague Convention cases, as the *Guide to Good Practice* suggests. More importantly, lawmaking in the United States is necessarily a shared power in Hague Convention cases. Neither Congress nor the Executive Branch can easily correct the injustice done to domestic violence victims by the Hague Convention. Congress's lawmaking is constrained by the United States' treaty obligations, as well as the strong sentiment among politically active left-behind fathers that abduction is always wrong.[546] The Executive Branch is constrained by the reality that treaty amendment is near impossible; State Parties to the Hague Convention have already rejected the prospect of a protocol to address the topic of domestic violence.[547] The other branches' inability to provide a solution necessitates that judges deviate in suboptimal-result cases. Moreover, separation of powers is not a trump card when the law violates fundamental human rights,[548] which arguably occurs when domestic violence victims and their children are separated or forced to encounter danger pursuant to the Hague Convention and its implementing legislation.[549]

Brand-Ballard does identify one moral reason why judges might adhere to the law in suboptimal-result cases: there may be

---

545. BRAND-BALLARD, *supra* note 18, at 141 ("Deviating in a single case usurps relatively little lawmaking authority."); *id.* at 141 (arguing that a judge who deviates isn't making law, but is simply not applying the law). Even if this and other prudential concerns deserve consideration, they must be balanced against the injustice in a particular case. *Id.* at Chapter 8.

546. *See supra* text accompanying notes 85–86.

547. Weiner, *supra* note 10, at 292 n.54 (citing Eck v. United Arab Airlines, 360 F.2d 804, 812 n.18 (2d Cir. 1966) (noting that "language of [a treaty] is less likely to be modified in the light of changing conditions than is the language passed by a legislative body that convenes regularly"). In terms of the Hague Abduction Convention, the proposal for a protocol did not advance. *See supra* note 96. *See also* Natalia Camba Martin & Gustavo Ferrera Ribeiro, *The "Grave Risk Exception," Efficiency and the Hague Convention on Child Abduction: A Law and Economics Approach*, 24 R. OPIN. JUR., FORTALEZA 177, 195, 197 (2019) (positing that "specification costs [i.e., "the costs associated with drafting, negotiating, assembling, deliberating, and discussing"] of a new binding international treaty were considered so high by the State-Parties—or at least to some of them—that even the discussions on a possible new treaty" was not worth it).

548. Butler, *supra* note 19, at 1824.

549. *See supra* note 527.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 103 of 110

systemic effects from deviation that would cause harm.[550] In particular, other judges might mimic the act of deviation but deviate in cases with optimal results.[551] This act of deviation would cause the same moral wrong as when a judge adheres to the law in a suboptimal-result case.[552] Moreover, if judges were deviating frequently, then further deviation might cause "mimetic failure." Mimetic failure exists when the deviation in optimal-result cases exceeds the deviation in suboptimal-result cases.[553] If the frequency of deviation rises to the point that it causes an irreversible cascade of mimetic failure, it could "destroy[] the rule of law indefinitely."[554] This is a variant of the slippery slope argument.[555] In the context of the Hague Convention, this could mean the collapse of the treaty's regime.

While the likelihood of judicial mimicry is an empirical question for which no data exists,[556] the Hague Conference has established mechanisms that make it more likely that judges would actually be aware of deviant decisions. These mechanisms include the INCADAT case law database, questionnaires that ask State Parties to report on notable judicial decisions, the International Network of Hague Judges, specialized Hague Convention benches and bars in some countries, and a judicial newsletter disseminated by the Permanent Bureau.

Yet, the Hague Convention regime also has features that make mimetic failure extremely unlikely. The argument about mimetic failure assumes "that judges cannot distinguish the optimal from the suboptimal-result case."[557] But the risk of deviation in optimal-result cases seems low in the Hague Convention context because State Parties from the beginning have been attentive to the possibility of an interpretation of article 13(b) that is too expansive,[558] and have fostered a fairly firm consensus about cases that are inappropriate

---

550. Brand-Ballard, *supra* note 18, at 188.

551. *Id.* at 181.

552. *Id.* at 187.

553. Brand-Ballard, *supra* note 18, at 310.

554. *Id.* at 236. Such a result requires a "high-level of deviant density." *Id.* at 198.

555. *See id.* at 200 (explaining how this "moral-moral prisoner's dilemma" argument differs from the traditional "slippery slope" argument).

556. *Id.* at 182, 186–87, 213.

557. *Id.* at 198, 207.

558. Text and Legal Analysis, *supra* note 43, at 10509 ("In drafting Articles 13 and 20, the representatives of countries participating in negotiations on the Convention were aware that any exceptions had to be drawn very narrowly, lest their application undermine the express purposes of the Convention—to effect the prompt return of abducted children.").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 104 of 110

for the article 13(b) defense.[559]  For example, it is very clear that the defense is inappropriate for cases in which "money is in short supply, or where educational or other opportunities are more limited than in the requested State."[560]  It is also irrelevant when the respondent makes only general assertions about differences in the relative level of safety between the two countries, due to political or economic forces.[561]  Moreover, the mechanisms mentioned above, which might enhance the visibility of deviant decisions to other judges, should also help judges differentiate between suboptimal and optimal-result cases.  In addition to those mechanisms already mentioned in the previous paragraph, there are the Explanatory Report, periodic Special Commission meetings with Conclusions and Recommendations, and the *Guide to Good Practice*.  Further, the Permanent Bureau coordinates the implementation of the Hague Convention[562] and could rally the Hague Network of International Judges, State Parties at a Special Commission meeting, and some prominent judges to provide counsel on the correct interpretation of article 13(b) if too many judges started granting the article 13(b) defense in optimal-result cases.[563]

While the risk of an unwarranted expansion of the article 13(b) defense seems very low if judges deviate in domestic violence cases, a judge who perceived a higher risk would still have a moral basis to deviate from the law.  Brand-Ballard gives four reasons why this is true.  First, "unintended effects provide weaker reasons than

559. BRAND-BALLARD, *supra* note 18, at 231.

560. *See, e.g.,* TEXT AND LEGAL ANALYSIS, *supra* note 43, at 10510.  *See also* GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 60 ("The court is not to embark on a comparison between the living conditions that each parent [or each State] may offer.").

561. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 61 ("Assertions of a serious security, political or economic situation in the State of habitual residence are therefore generally not sufficient to trigger the grave risk exception.").

562. BRAND-BALLARD, *supra* note 18, at 217, 235 (speaking of the difficulty of coordinated judicial action to monitor deviation density).

563. The power of these forces was obvious after the European Court of Human Rights decided the *Nuerlinger* case.  Neulinger and Shuruk v. Switzerland, 54 Eur. Ct. H.R. 31, ¶ 138 (2010) (holding that a child's best interests must be assessed in every Hague Convention case).  Hague Convention purists managed to get the European Court on Human Rights to pull back on its holding. X v. Latvia, Eur. Ct. H.R., 356, ¶¶ 106–08 (2013) (holding Hague exceptions are the way a national court can consider the child's best interest, but the exceptions must be "genuinely . . . taken into account" and "effectively examined" and the court must "make a ruling giving specific reasons," ensure adequate safeguards are provided in that country, and put in place protection measures). For a discussion of the politics involved in getting the European Court to retreat from its holding in *Neulinger*, *see generally* Peter McEleavy, *The European Court of Human Rights and the Hague Child Abduction Convention: Prioritising Return or Reflection?*, 62 NETH. INT'L L. REV. 365 (2015).

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 105 of 110

intended effects."[564] Judges who would deviate in suboptimal-result cases would have no intention of encouraging other judges to deviate in optimal-result cases, although they may foresee this result.[565] While a judge adjudicating a Hague Convention petition who intentionally adheres in a suboptimal-outcome case involving domestic violence may also not intend any harmful effects, that judge has a much greater chance of causing harm to the taking parent and child and, in some instances, that result is substantially certain.

Second, "[h]arm caused as a side effect or aspect of action provides weaker [moral] reasons than harm caused as a means to an end."[566] Mimetic failure, whether generally or for the Hague Convention specifically, would be a side effect of the judge deviating in a suboptimal-result case.[567] In contrast, the judge who denies the article 13(b) defense in a case with domestic violence uses the taking parent and the child as a means to an end. The child is returned to the habitual residence, even though that is a very bad outcome for them, in order to deter abduction generally.

Third, "[r]emote effects provide weaker reasons than local effects."[568] The effects of deviation, namely the weakening of the Hague Convention, is "spatiotemporally remote."[569] After all, many things can happen in the interim that may interrupt the realization of this more remote consequence, including more education on what constitutes an optimal-result case. In contrast, the harm from returning the child is immediate.

Fourth, a judge is not responsible for the acts of an autonomous posterior judge who deviates in an optimal-result case. The judge has not in any way coerced or commanded the posterior judge to make a suboptimal decision.[570] Brand-Ballard argues that "[e]ffects mediated by subsequent voluntary interventions provide weaker reasons than unmediated effects."[571]

Although a judge has moral reasons to deviate even acknowledging the prospect of mimetic failure, Brand-Ballard ultimately concludes that the morality of the judicial decision to adhere will turn on the likelihood of mimetic failure. "[S]ince the judge has *pro*

---

564. BRAND-BALLARD, *supra* note 18, at 204.

565. *Id.*

566. *Id.* at 204. *See, e.g.*, LRR v. COL [2020] NZCA 209 at [100] ("The interests of the child in not being exposed to that risk [of an intolerable situation] cannot be outweighed by the goal of deterring future would-be abductors.").

567. BRAND-BALLARD, *supra* note 18, at 204–05.

568. *Id.*

569. *Id.* at 203.

570. *Id.* at 203–04.

571. *Id.* at 204.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 106 of 110

*tanto* moral reasons to adhere," i.e., to avoid inflicting imperceptible systemic effects, or to avoid "expos[ing] others to *unjustifiable* risks of harm—even miniscule risks,"[572] the morality of the decision will depend upon the risk of undermining, here, the Hague Convention.[573] If a ruling for a domestic violence victim has no perceptible systemic effects and the child's return creates a serious or non-negligible risk of harm to the parent or child, then the judge who deviates is not acting immorally or irrationally in terms of consequences.[574]

Hence, Brand-Ballard's analysis demonstrates that judges can and should grant the article 13(b) defense when raised by domestic violence victims, even if the strict requirements of the law dictate otherwise. Judges need not adhere in suboptimal-result cases because there is a minuscule risk that the Hague Convention will actually suffer harm.[575] Further, while judges may be concerned about their reputation and their judicial oath, "reputational risk" is not something that can outweigh "a moral reason against using force,"[576] nor does a judicial oath to uphold the law provide a moral reason to apply the law when the result is unjust.[577] Even "[a] promise to perform an otherwise immoral act does not give the promisor a reason to perform it."[578]

In sum, judges should do all they can to reach a just result within the bounds of the law. Most of the time, it is possible to do so. However, if a judge cannot arrive at a just result within the bounds of the law, the judge can and should deviate from the law. This outcome is especially warranted because the Hague Convention will not be negatively affected by his or her decision.

---

572. *Id.* at 224.

573. *Id.* at 227–28.

574. *Id.* at 221, 223–24.

575. *See id.* at 223 (calling the risk of triggering mimetic failure from a deviant decision miniscule in "realistic, stable legal systems"). Brand-Ballard does not come right out and blame judges who adhere in suboptimal-result cases, but only argues that "they are morally permitted" to deviate. *Id.* at 286. Yet, he thinks they are arguably blameworthy if they refuse to deviate but think the system will not suffer from their decision to deviate. *Id.* at 269.

576. *Id.* at 269. Brand-Ballard's example here is helpful: "A teenager has an all-things-considered moral reason not to vandalize windows, even if his friends will ostracize him for refusing." *Id.*

577. He first questions, however, whether a judge promises to resolve cases according to the law when the law produces "results that are unjust, bad, immoral, inequitable, or wrong." Brand-Ballard, *supra* note 18, at 145.

578. *Id.* at 142. *See also id.* at 147 ("Promises make morally optional actions morally obligatory. They do not make morally impermissible actions morally permissible, much less obligatory."); *id.* at 146 (noting "[a]n oath cannot override or attenuate one's natural duty of nonmaleficence").

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 107 of 110

B.    *The Method of Deviating*

Assuming a judge decides to deviate in a suboptimal-result case, how should the judge do it?  Brand-Ballard recommends that judges should deviate surreptitiously in suboptimal-result cases.[579]  Brand-Ballard suggests that judges should engage in fallacious legal reasoning, as the trial judge's decision will never become a precedent.[580]  Paul Butler, in *When Judges Lie (and When They Should)*, suggests that judges should "pretend" that their decisions comport with the law.[581]  The judge should be "outcome-determinative and crafty,"[582] and "make[] findings of fact to insulate her decision, to the extent that she can, from appellate review."[583]  Judge Richard Posner admonishes trial judges never to falsify facts, or consciously twist the facts to minimize the chance of being reversed,[584] but rather to partake in "a fuller engagement with the facts of the case, a greater willingness to knead rules into standards, and a looser interpretation of rules that were created without reference to the situation presented[.]"[585] All of these recommendations are worth heeding.

There are moral reasons to deviate surreptitiously, including the risk that the judge would "be replaced by someone who would instead reach a suboptimal result."[586]  Perhaps a more salient concern is that candor may "exacerbate[] mimetic failure, . . . encouraging subpar judges to deviate in optimal-result cases."[587]  Consequently,

---

579. *Id.* at 286.

580. *Id.* at 283–85 (discussing how appellate courts can ensure these decisions are weak precedent, such as with an unpublished opinion).

581. Butler, *supra* note 19, at 1792.  Butler, too, suggests that "subversive" judging occurs when the judge "believes that the outcome is unsupported by law," but the "correct legal response conflicts with the correct moral response." *Id.*  However, he focuses on outcomes that are extremely unjust. *Id.* at 1786.

582. *Id.* at 1817–18.

583. *Id.* at 1792 ("[S]ubversive judges are double agents.  Everyone thinks they work for law, but their true boss is justice.").

584. Posner, *supra* note 27, at 69.

585. *Id.* at 240.

586. Brand-Ballard, *supra* note 18, at 27.

587. *Id.*  Brand-Ballard recognizes that "judges have a *pro tanto* moral duty to be candid about the law in their public statements" *Id.* (citing, inter alia, Deborah Hellman, *The Importance of Appearing Principled*, 37 Ariz. L. Rev. 1108 (1995)).  However, if judges were totally transparent about the rules that influenced their decision to deviate in a particular case, such as the notion of "selective optimization" and "tokenism" that Brand-Ballard promotes, the public might be upset because the rules do not rely on "case-type-specific" factors. *Id.* at 279.  Yet Brand-Ballard reminds the reader that anyone with an understanding of what a judge is actually doing when the judge follows his recommendations would understand that the judge is minimizing unfairness in the aggregate. *Id.* at 280.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 108 of 110

"[a] judge who deviates has a . . . moral reason to write an opin-ion that causes minimal failure."[588]  Surreptitious deviation is also preferable because it is more likely to spare the prevailing party the expense and angst of an appeal and subsequent reversal.

My proposal in Part III will undoubtedly sound radical to some people, but scholars report that judges deviate all the time.[589]  In fact, empirical evidence reveals that judges are more apt to deviate when Congress and the Executive Branch are unlikely to fix problematic law.  In *When Rules are Meant to be Broken*,[590] authors Zev Eigen, David Sherwyn, and Nicholas Menillo found that judges were much more likely to deviate in the context of applying the law of sexual harassment when they thought neither the legislature nor an appel-late court would fix the unjust rule if the judge called attention to it.[591]  The judges' assessment of the justness of the rule involved atten-tion to the policy, or consequences, as well as "the frequency of cases and the relative harm to litigants and society."[592]  This study suggests that U.S. judges in Hague cases may be particularly willing to deviate, absent a strong moral reason to adhere, because neither Congress nor the Executive Branch is likely to change the law.[593]  In fact, some judg-es may have already reached just results by deviating surreptitiously.

Judge Posner observes that judges typically delude themselves into thinking that the law permits what they are doing when they deviate.  He claims judges never really say, "This is an awful rule but it is the law, so I have a dilemma—can I get around it?"[594]  Rather, they believe their actions are permitted:

---

588. *Id.* at 272.

589. *Id.* at 130 ("Despite the virtual consensus that judges have strong rea-sons to adhere, few deny that judges do, in fact, deviate from the law, sometimes knowingly."); Posner, *supra* note 27, at 2 ("They tend to parrot an official line about the judicial process (how rule-bound it is), and often to believe it, though it does not describe their actual practices."); Butler, *supra* note 19, at 1785 (claiming "judicial 'subversion' or lying . . . is far more common than is openly acknowl-edged"); *id.* at 1821 (noting "subversive judges are all around us").

590. Eigen, Sherwyn & Menillo, *supra* note 529, at 109.

591. *Id.* at 113.  These were cases that dealt not with the most extreme injustice, such as "whether to execute an innocent person," but rather "whether to impose a financial penalty on a party that can bear it."  *Id.*

592. *Id.* at 170 ("All else equal, rules are more likely to be applied [assum-ing that is the goal], even when application will have harmful results, when the target population of the rule's application is small, and the probability of the harm is relatively low."); *id.* at 167–68 (judges "will consider the frequency of cases and the relative harm to litigants and society caused by strict application of the rules").

593. *See* text accompanying notes 84–86, *supra*.

594. Posner, *supra* note 27, at 213.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 109 of 110

> When a judge does bend a rule to avoid an awful result, he does not feel that he is engaging in civil disobedience; he thinks the rule does not *really* compel the awful result. He will have rejected, probably unconsciously . . . the crabbed view of "law" that would if adopted make much of what American judges do be classified as lawless.[595]

It would be very advantageous if judges did have a false consciousness about what they are doing when they deviate, as Judge Posner suggests. Brand-Ballard's system of deviation requires a certain psychological wherewithal.[596] He says that whether a judge will deviate in a suboptimal-result case depends on the judge's "self-confidence, humility, intelligence, initiative, and willingness to risk one's reputation for the sake of others."[597] That describes an exceptional person. Yet, if Judge Posner is correct and judges engage in deviation "unconsciously," then even the average judge may be able to rule for the respondent who is a domestic violence victim in a Hague Convention case.[598]

## Conclusion

Judges judge. Judges need not shrink away from doing the task for which they were appointed or elected. Attorneys representing batterers will raise all of the obstacles to the article 13(b) defense identified in this Article and argue that judges must find for the batterer. Judges need not yield their power to these attorneys. Judge come to the job with their own morality, compassion, and ingenuity. The arguments of the batterer's attorney are refuted by this Article, which relies on social science, the new *Guide to Good Practice*, its sanctioned *Australian Bench Book*, case law, and common sense. Contrary to what the batterer's attorney might suggest, the law of the Hague Convention does not tie the judge's hands. The trial judge can and should grant the article 13(b) defense.

---

595. *Id.* at 213–14.

596. Brand-Ballard, *supra* note 18, at 286 (mentioning the work involved in deciding when to deviate, living with the realization that the opinion may "misrepresent his actual reasoning," and recognizing that any deviation may be limited to token cases).

597. *Id.*

598. Brand-Ballard believes that his work does not conflict with Posner's because, as Brand-Ballard describes it, Posner is talking about cases in which "judges have legal authority to choose or modify rules." *Id.* at 305. Brand-Ballard based his assessment on Posner's work that predates *How Judges Think*. Email from Jeffrey Brand to Merle H. Weiner (Sept. 28, 2020) (on file with author). However, *How Judges Think* is about both trial judges and appellate judges, and the former are likely to be legally constrained.

Electronic copy available at: https://ssrn.com/abstract=3980115

EXHIBIT 17
Page 110 of 110