Tammy M. Dentinger, (OSB No. 944787)
tdentinger@ghrlawyers.com
GARRETT HEMANN ROBERTSON P.C.
P.O. Box 749
Salem, Oregon 97308-0749
Tel: (503) 581-1501
Fax: (503) 581-5891

Richard Min (*pro hac vice*)
Michael Banuchis (*pro hac vice*)
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, New York 10170
Telephone: (212) 681-6400
Fax: (212) 681-6999
rmin@gkmrlaw.com
mbanuchis@gkmrlaw.com
*Of Attorneys for Petitioner, Othmane Mahjoubi*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | | |
|---|---|---|
| OTHMANE MAHJOUBI | ) | |
| | ) | |
| Petitioner, | ) | Case No. 6:24-cv-01358-AA |
| | ) | |
| v. | ) | |
| | ) | PETITIONER'S TRIAL MEMORANDUM |
| DANIELLE KATHRYN ROPER | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Petitioner Othmane Mahjoubi, by and through his undersigned counsel, hereby submits this Trial Memorandum to the Court in connection with the trial schedule for December 12, 2024 – December 16, 2024, before Honorable Judge Ann L. Aiken, in the above-captioned matter.

## I.    INTRODUCTION[1]

This case concerns the children of Petitioner Othmane Mahjoubi ("Petitioner" or "Mr. Mahjoubi") and Respondent Danielle Kathryn Roper ("Respondent" or "Ms. Roper"). The parties share two children: A.M born in May 2018, and R.M. born in December 2020 (collectively, the "Children"). The parties were married in New York in September 2017. Respondent moved to Paris, France, in January 2018. The Children were born and raised in France. The parties and the Children lived in France as a family until Respondent wrongfully retained the Children in the United States, without Petitioner's consent or acquiescence, on August 6, 2024, when she served him with divorce papers during what was supposed to be a family summer vacation in Oregon.

This case presents a clear-cut instance of child abduction and the precise type of circumstance that the Hague Convention was enacted to redress. The Children would not be at grave risk of harm if they were returned to France, and any potential risk, which Petitioner denies exists, could be ameliorated sufficiently by the French courts if they find it necessary to order measures to protect the Children. The Children should therefore be returned to France forthwith.

---

[1]    On November 26, 2024, Respondent emailed Petitioner to advise that she stipulates to Petitioner's *prima facie* case and is no longer challenging that France is the Children's habitual residence or arguing that that the Article 13 wishes of the child exception applies. These topics are briefly covered herein as notice was given the day this filing was due.

II.    **FACTUAL SUMMARY**[2]

A.    Early Relationship and Marriage

Petitioner was born in Paris, France, in 1981. He graduated with a degree in Finance in May 2006, and, in March 2007, he began working as a financial analyst in New York, where he met Respondent in June 2008. They began a romantic relationship and continued an on-and-off relationship after he left New York for France in September 2008. Petitioner subsequently worked at the Central Bank of Morocco in Casablanca from July 2009 until December 2010. In August 2011, he joined Thomson Reuters in Paris as a sales consultant.

The parties reconnected during Respondent's business and personal trips to Paris between 2014 and 2015. They began a long-distance relationship, with Petitioner regularly visiting her in New York and Respondent traveling to Paris. In 2016, they discussed the idea of living together in Paris. Respondent approached her employer, MIAC, which agreed to let her work remotely provided she maintained New York working hours. Petitioner proposed in January 2017. Respondent became pregnant in August 2017 and Petitioner and Respondent married in New York in September 2017.

B.    Establishing France as the Children's Habitual Residence

In January 2018, Respondent moved in with Petitioner in his Paris apartment to start a family. Their marriage was formalized in France and the parties lived together in Petitioner's apartment in Paris with the intention of starting a family. Their first child, A.M., was born in May 2018. In November 2019, the family relocated to a new apartment in Paris, where they lived until

---

[2]    This Factual Summary is intended to provide context for the legal analysis contained in this Pretrial Brief. It is an overview of the evidence Petitioner submits will be adduced at trial. This contextual summary is not intended to be all-inclusive, nor to limit or preclude probative evidence from being adduced at trial.

the summer of 2024.

During their time in Paris, the Respondent worked from approximately noon to midnight, Paris time, while the Petitioner, despite a recent promotion, lost his job in November 2020 due to corporate restructuring. The family welcomed their second child, R.M., in December 2020, and the couple maintained the same arrangement up until the abduction: the Petitioner took on the role of stay-at-home parent while the Respondent focused on her career.

The Children were fully acclimatized, involved and integrated into all aspects of daily and cultural life in France. A.M. attended Ecole Maternelle Chapon school up until this past summer and was set to attend Ecole Vertus school for the year 2024/2025 in Paris, France. **Petitioner's Exhibits 8-9, and 41.** R.M. attends the Ecole Maternelle Publique Chapon Preschool in Paris, France. **Petitioner's Exhibit 44.**

The Children participate in extracurricular activities, playdates, and cultural activities in France. A.M. is enrolled in basketball, dance, piano lessons, and art lessons. (**Petitioner's Exhibit 6 and 11)** and the Children have friends at school and in the local community. The Children attend playdates and birthday parties with their friends and meet at the park on the weekends to play with their friends. Further, the Children receive medical care and dental care in France. **Petitioner's Exhibits 4 -5, 10, and 46 – 48.**

Mr. Mahjoubi is fully involved in all of the Children's schooling, medical care, dental care, cultural activities, extracurricular activities, and other activities in France. He provides the Children's day-to-day care in France and is the primary caretaker of the Children.

The family has taken vacations to the United States and other countries in the past; however, they have always returned to France, their habitual residence, at the end of each vacation.

C.    <u>The Wrongful Retention in Oregon</u>

Respondent and Petitioner enrolled the children in a public school in France for the start of the 2024 Academic year. **Petitioner's Exhibits 13-14, 25, 42, and 45.** All of the Children's extracurricular activities were lined up for the year before the summer; namely, the parties enrolled and paid for A.M.'s piano, art, and basketball lessons, and the couple was considering enrolling R.M. in music and dance lessons for the Fall of 2024. **Petitioner's Exhibits 11, 23, 26, and 40.**

In the late Spring of 2024, the parties had decided to spend the Summer of 2024 in the United States with Respondent's family. On June 27, 2024, Petitioner signed a Travel Authorization Form allowing the Children to remain outside of France until August 31, 2024. **Petitioner's Exhibit 24.** On June 30, 2024, Respondent flew to the United States with the Children **(Petitioner's Exhibit 19)** and Petitioner joined them in Chicago on July 11, 2024. **Petitioner's Exhibit 18.** On August 3, 2024, after traveling to Florida, the family flew to Oregon to visit Respondent's family. The parties had plans to return to Paris on August 15, 2024, which is when Petitioner had his return flight to Paris scheduled for. **Petitioner's Exhibit 18.** Substantively, he had never seen Respondent or the Children's return flights to France.

On August 5, 2024, the family celebrated Petitioner's birthday. The day after, on August 6, 2024, Petitioner went to a park intending to meet Respondent and the Children. To his surprise, Petitioner was greeted by his in-laws and served with a petition for legal separation. At that moment, Petitioner was unaware of where his children were being held.

On August 15, 2024, as originally planned, Petitioner returned to Paris. Petitioner has had minimal access to his Children since he was served in Oregon. His access is limited to 20-minute video calls three times a week.

On August 19, 2024, Petitioner filed a petition in this Court under the Hague Convention

on the Civil Aspects of Child Abduction, Oct. 25, 1980, art. 13(b), T.I.A.S. No 11670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg., 10, 494 (Mar. 26, 1986) ("Hague Convention"), implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. (formerly codified at 42 U.S.C. § 11601 et seq.) ("ICARA"), seeking return of the Children to France. [ECF No .1]. Petitioner had considerable difficulty serving Respondent as her state court lawyers would not accept service on her behalf. This Hague Convention case before this Court follows.

## III.  LEGAL FRAMEWORK AND THE REQUIREMENT FOR RETURN OF THE CHILDREN UNDER THE HAGUE CONVENTION

The Hague Convention on the Civil Aspects of International Child Abduction "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Golan v. Saada,* 596 U.S. 666, 670 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)). Its purpose is:

> to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.

Hague Convention, pmbl.

"The Convention's core premise is that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Golan*, 596 U.S. at 670 (internal quotation marks omitted). To further this principle, the Convention "generally requires the prompt return of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country." *Id*. (citing Hague Convention, arts. 1(a), 12). The Convention instructs its contracting states to "take

all appropriate measures to secure within their territories the implementation of the objects of the Convention," using "the most expeditious procedures available." Hague Convention, art. 2.

To implement the Convention, Congress enacted the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-11, in 1988. Pursuant to ICARA,

> [a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child ... may do so by commencing a civil action by filing a petition for the relief sought in any court ... which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

22 U.S.C. § 9003(b). In adjudicating a Hague Convention petition, "[t]he court in which [the] action is brought .... [must] decide the case in accordance with the Convention." *Id*. § 9003(d). To that end, the court must "determine only [the parties'] rights under the Convention and not the merits of any underlying child custody claims." *Id*. § 9001(b)(4); *see also* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

Under ICARA, Petitioner must show that Respondent wrongfully removed or retained the Children away from the country of their habitual residence. *See* 22 U.S.C. § 9003(e)(1)(A). In determining whether the removal or retention of the Children was "wrongful" under the Convention, the Court must answer four questions: (1) when the removal or retention at issue took place;[3] (2) which state the child was habitually a resident of immediately prior to the removal or retention; (3) whether the removal or retention breached the rights of custody attributed to the petitioner under the law of habitual residence; and (4) whether the petitioner was exercising such custody rights at the time of the removal or retention. *Papakosmas v. Papakosmas*, 483 F.3d 617, 621 (9th Cir. 2007).

---

[3]      This query would only be relevant in the context of challenging habitual residence which is no longer an issue in this proceeding.

As stated in fn. 1, Respondent advised Petitioner by email on November 26, 2024, that she does not challenge Petitioner's *prima facie* case. The Court may only decline, in its discretion, to return the children to France if the Respondent establishes the Article 13(b) defense which provides that return is not required if "[t]here is a grave risk that ... return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." This defense must be proven by clear and convincing evidence. *Colchester v. Lazaro*, 16 F.4th 712, 718 (9th Cir. 2021), citing 22 U.S.C. § 9003(e)(2)(A).

**A.     France is the Children's Habitual Residence**

"[A] child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 140 S. Ct. at 723. In *Monasky*, the Supreme Court articulated several principles for determining habitual residence. "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.* at 726.  In its discussion of habitual residence, the *Monasky* Court explained that in general, a child "resides where she lives." *Monasky*, 140 S. Ct. at 726. "Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id.* (citing Redmond, 724 F.3d at 744). The Supreme Court has instructed that:

> Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because the caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus.

*Monasky*, 140 S. Ct. at 727 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3rd Cir. 2006). Ultimately, the question is, "[w]as the child at home in the particular country at issue?" *Id.* at 730.

Habitual residence is determined as of the time of removal or retention. *Monasky,* 140 S. Ct. at 726; *see* also Hague Convention, art. 3 (the wrongful removal inquiry concerns custody rights under "the law of the State in which the child was habitually resident immediately before the removal or retention").

This case is the type of straightforward case contemplated by the *Monasky* court. A habitual residence inquiry in this case would be whether France, where the Children had lived for their entire lives, was their home on August 6, 2024, when they were retained in the United States. There should have never been a dispute that the Children's habitual residence was France. Until Respondent abducted the Children in Oregon, the Children had only ever lived in France, and they attended school exclusively in France. **Petitioner's Exhibits 7-9, 13-14, 25, 41, 42, 44, and 45.** Substantively, the parties registered and paid enrollment fees for the Children to attend school and extra-curricular activities in France for the 2024-2025 Academic year. **Petitioner's Exhibits 11, 26, and 40.** The Children had one home in the world, and it was in France.

In order for Respondent to have established that the United States is the Child's habitual residence, she relies upon the legal concept of acclimatization. The concept of acclimatization was succinctly discussed in a case from the Northern District of California in 2019:

> Acclimatization occurs only in a limited set of circumstances. *First*, "[w]hen a child has no clearly established habitual residence elsewhere, it may become habitually resident even in a place where it was intended to live only for a limited time." *Mozes*, 239 F.3d at 1082. *Second*, a child's residence may change by the passage of time "if the child's prior habitual residence has been effectively abandoned by the shared intent of the parents." *Id.* In the absence of either of these circumstances, however, "a prior habitual residence should be deemed supplanted only where "the objective facts point unequivocally" to this conclusion." *Id.* To satisfy this test, the Court must be able to "say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child 'out of the family and social environment in which its life has developed.'" *Id.* at 1081 (citing Elisa Perez–Vera, Explanatory Report ¶ 11, in 3 Hague Conference on

Private International Law, Acts and Documents of the Fourteenth Session, Child
Abduction 426 (1982)).

*Adkins v. Adkins*, No. 19-CV-05535-HSG, 2019 WL 4933571, at *7 (N.D. Cal. Oct. 7, 2019)

Acclimatization is not applicable in this very case because Petitioner had only authorized
the Children to be outside of France until August 31, 2024, for their summer holidays. **Petitioner's
Exhibit 24.** In fact, the parties had enrolled the Children in school and extracurricular activities
for the 2024-2025 Academic Year. **Petitioner's Exhibits 11, 13-14, 25, 26, 40, 42, and 45.**
Therefore, as both a practical matter and a matter of law, the Children could not have been
acclimatized to Oregon as of the date of retention as they had only been there for three days from
the time they arrived on August 3rd until Respondent served Petitioner with divorce papers on
August 6th. *See, e.g. McElligott v. McElligott*, No. CV233175RKRLS, 2023 WL 5932947, at *20
(D.N.J. Sept. 12, 2023) (court analyzes and rejects respondent's argument that child acclimatized
in six weeks petitioner consented for her to stay in New Jersey for a holiday).

**B.    There is No Grave Risk of Harm**

i. The Allegations Do Not Rise to the Level of Grave Risk

Under Article 13(b), a district court has "the discretion to ... deny return" where it finds,
"by clear and convincing evidence," that there is a "grave risk" that a child's "return would expose
the child to physical or psychological harm or otherwise place the child in an intolerable situation."
*Golan,* 142 S. Ct. at 1892; Convention, Art. 13(b); 22 U.S.C. 9003(e)(2)(A). This defense is to be
interpreted narrowly, and even if proven, "a federal court retains, and should use when appropriate,
the discretion to return a child ... if return would further the aims of the Convention." *Asvesta v.
Petroutsas,* 580 F.3d 1000, 1003-04 (9th Cir. 2009).

The grave risk defense applies to situations when the risk to the child is "grave, not merely
serious." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg.

10494, 10510 (March 26, 1986). *See also Norden-Powers v. Beveridge*, 125 F. Supp. 2d 634, 640 (E.D.N.Y. 2000) ("The level of risk and danger required to trigger this exception has consistently been held to be very high.") (collecting cases).

The Ninth Circuit has emphasized that the grave-risk exception must be "drawn very narrowly" and "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Gaudin v. Remis,* 415 F.3d 1028, 1035-36 (9th Cir. 2005) (citations and internal quotation marks omitted). "Rather, the question is whether the child would suffer 'serious abuse' that is 'a great deal more than minimal.'" *Id.* at 1035 (citations omitted). Additionally, "because the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future." *Id.* at 1037. Therefore, "even a living situation capable of causing grave psychological harm over the full course of a child's development is not necessarily likely to do so in the period necessary to obtain a custody determination." *Id.*

Also relevant here as Respondent alleges she was subject to coercive control rather than physical abuse, "[t]he Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm." *Souratgar v. Lee,* 720 F.3d 96, 104 (2d Cir. 2013). In determining whether domestic violence between parents creates a grave risk of harm, "the proper inquiry focuses on the risk faced by the child, not the parent." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1010 (11th Cir. 2016).

Ms. Roper alleges in her Answer that 1) "A.M. has disclosed multiple incidents of abuse and a fear of Petitioner"; and 2) "Petitioner exerts extensive power over Respondent by way of

manipulation, coercion, and control, to which both children have been directly exposed to." **Petitioner's Proposed Exhibit 3, at Page 9.** Respondent's allegations, even if true, would not be sufficient to trigger the grave risk of harm exception. *Porretti v. Baez*, No. 19-CV-1955, 2019 WL 5587151, at *9 (E.D.N.Y. Oct. 30, 2019) ("Evidence of sporadic or isolated incidents of abuse ... have not been found sufficient to support application of the grave risk exception.").

Petitioner denies Respondent's abuse allegations in their entirety. Petitioner had regular contact with the Children prior to the wrongful abduction, to the extent he was the primary caretaker of the Children and spent every single day with them. Further, Petitioner was with the Children on their summer holidays in the United States from July 11, 2024, to August 6, 2024, when the Children were retained by Respondent. It is also worth noting that Respondent had not sought protection against Petitioner in France. **Petitioner's Exhibit 49.**

To the extent that Respondent claims she was abused by Petitioner by coercive control, that is not the same as physical abuse or threats towards a child. *See Nunez Escudero v. Tice-Menley*, 58 F.3d 374, 375-78 (8th Cir. 1995); *Tabacchi v. Harrison*, No. 99-C-4130, 2000 WL 190576, at *12-16 (N.D. Ill. Feb. 10, 2000) ("Although [Petitioner's abusive] behavior toward his wife is unacceptable, to qualify as a grave risk of harm under the convention, the risk must be to the child."); *see also Asumadu v. Baffoe,* No. CV-18-01418-PHX-DLR, 2018 WL 3957696, at *4 (D. Ariz. Aug. 17, 2018), aff'd, 765 F. App'x 200 (9th Cir. 2019).

To that point, in *Grano v. Martin,* 443 F. Supp. 3d 510, 542 (S.D.N.Y.), aff'd, 821 F. App'x 26 (2d Cir. 2020) the district court found that while Respondent was a victim of Petitioner's coercive control, that did not pose a grave risk of harm to the child. Here, even if Respondent's allegations of coercive control were true, though Petitioner denies them, they would still not meet the standard required to establish a grave risk of harm.

Respondent's expert Dr. Poppleton's report describes the alleged abuse in this case. Some of these allegations are that Mr. Mahjoubi: 1) kicked an elevator door in 2015 before they were married; 2) broke a window in the home; 3) was "aggressive" towards a waiter for not receiving his steak medium rare; 4) criticized her parenting; 5) told their son he would leave him at his after school program as punishment; 6) would guilt A.M. for kissing Respondent but not him in the morning when he would climb into their bed; and 7) generally yelling when angry.

Regarding allegations of physical abuse, Respondent alleges that on occasion Petitioner would squeeze their son's hand to discipline him and that he hit his head on two occasions.

The types of situations where courts have found grave risk of harm involve physical abuse which is far more severe than anything alleged by Respondent. *See, e.g.*, *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007) ("The nature of abuse here was both physical (repeated beatings, hair pulling, ear pulling, and belt-whipping) and psychological *544 ...."); *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000) ("[Petitioner] has demonstrated an uncontrollably violent temper, and his assaults have been bloody and severe."); *Mohacsi v. Rippa,* 346 F. Supp. 3d 295, 321 (E.D.N.Y. 2018), aff'd sub nom. *In re Matter of NIR,* 797 F. App'x 23 (2d Cir. 2019) ("Petitioner admitted to physically assaulting Respondent on more than one occasion, and his physical abuse includes one incident in which he nearly choked her to death."); *Ischiu v. Garcia*, 274 F. Supp. 3d 339, 353 (D. Md. 2017) ("[Respondent] also suffered physical abuse at the hands of her husband," including "smashing her in the face and knocking her to the ground"); *Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 554 (E.D. Pa. 2010) ("Petitioner beat [respondent] repeatedly and, at one point, broke her nose.") (footnote omitted).

Respondent's allegations of corporal punishment, even assuming arguendo that they were true, on their face simply do not rise to the level of grave risk of harm sufficient to defeat the

Petition. *See Vera Revelo v. Canizalez Cedeno*, 625 F. Supp. 3d 529, 539 (W.D. La. 2022) (W.D. La. 2022) ("sporadic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." (quoting *Souratgar,* 720 F.3d at 104)); *McManus v. McManus*, 354 F. Supp. 2d 62 (D. Mass. 2005) (holding that "two incidents" of a mother striking two of her four children and a generally chaotic home environment was insufficient to establish a grave risk of harm because it did not show "a sustained pattern of physical abuse"); *Gil-Leyva v. Leslie,* 780 F. App'x 580, 590 (10th Cir. 2019) (finding that spanking by the petitioner of the minor children did not rise to the level of constituting grave risk under Article 13b); *Castro Sarabia v. Ruiz Perez*, 225 F. Supp. 3d 1181, 1191-92 (D. Or. 2016) ("While I am reluctant to describe the corporal punishment ... in this case as 'minimal,' I conclude [the respondent] has failed to demonstrate by clear and convincing evidence that these facts fit the grave risk exception.... On a few occasions, [the child] appears to have been hit with a belt. On two other occasions, [the child] may have been hit with a branch or switch.... Th[ose] instances ... cause the court some concern. But they do not rise to the level of ... clear and convincing evidence of a 'grave risk.'"), appeal dismissed, slip op. (9th Cir. May 23, 2017); *Diaz Lopez v. Rios Alcala*, 547 F. Supp. 2d 1255, 1257, 1261-62 (M.D. Fla. 2008) ("[T]he [subject] children stated that the [petitioner] had hit them with his hand and a belt.... This evidence only indicates that [he] has used corporal punishment to discipline the children .... [T]he alleged abuse ... is not so severe that it rises to the level of an intolerable situation.").

These cases stand in sharp contrast to the abuse allegations presented in the current case. Dr. Stoltzfus, Petitioner's forensic expert, conducted a video evaluation of the Petitioner, administered the Minnesota Multiphasic Personality Inventory-III (MMPI) with the assistance of

a French-speaking interpreter, held a brief discussion with the Respondent, and performed a 90-minute evaluation of the children.

Based on this evaluation, Dr. Stoltzfus found that the children's presentation was not consistent with the allegations of domestic violence within the family. **Petitioner's Exhibit 2.** The Children displayed no signs of trauma, and their descriptions of their father's behavior, such as occasional yelling, were inconsistent with Respondent's claims of severe abuse. Additionally, the MMPI results revealed no significant psychological distress or psychopathology in the Petitioner. *Id.* As a result, Dr. Stoltzfus concluded that the Children would benefit from regular contact with both parents and that the allegations of domestic violence were not substantiated by the available evidence.

Notably, the Children both reported to Dr. Stoltzfus that they missed their father and wanted their father and mother to live together. *Id.* Dr. Stoltzfus characterized the Children's accusations regarding Petitioner to be "well rehearsed:"

> When the subject of the father was initially introduced in the session, [R.M.] immediately sang out "dad yells all the time." [A.M.'s] terminology always included "crushing" and "hitting," though when asked to demonstrate both experiences, the demonstrations were characterized by a firm squeeze and a tap to the back of his head. At no point did he accuse his father of striking him severely nor did he demonstrate such behavior.

*Id.*

It is also worth noting that when a child observed parental abuse in the past, if the parents' current living situation makes it unlikely that the child will do so again, that circumstance cuts against a finding of grave risk of harm. *See Souratgar v. Fair,* 12 CIV. 7797 PKC, 2012 WL 6700214, at *11 (S.D.N.Y. Dec. 26, 2012), aff'd sub nom. *Souratgar,* 720 F.3d 96 (noting that the fact that parents will never cohabitate again and there is no credible evidence that the child would have a negative reaction to being returned weighs against a finding of grave risk of harm based on

the child's past observation of one parent abusing the other). As applicable here, the parties are going to get divorced would not continue living together if the children were ordered back to France, eliminating the risk of them witnessing any alleged psychological abuse, notwithstanding that witnessing arguments does not rise to the level of grave risk.

    ii. <u>France Can Protect A.M. and R.M. If Necessary</u>

    Before it can conclude that Respondent has sufficiently invoked the grave risk defense, the Court may still order the child's return with ameliorative measures[4] that would "allow both the return of the children to their home country and their protection from harm." *Gaudin*, 415 F.3d at 103, abrogated on other grounds by *Golan*, 596 U.S. at 676 n.6 (2022); *See also Golan,* 596 U.S. at 682 ("[A] district court must exercise its discretion to consider ameliorative measures in a manner consistent with its general obligation to address the parties' substantive arguments and its specific obligations under the Convention."). In this regard the Court should be guided by "the exercise of comity that is at the heart of the Convention" which makes courts "required to place [their] trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it." *Blondin v. Dubois,* 189 F.3d 240, 248 (2d Cir.1999).

    In *Golan,* 596 U.S. at 679, the Supreme Court held that considering ameliorative measures was discretionary, but that courts "should address ameliorative measures raised by the parties or obviously suggested by the circumstances of the case." Petitioner sets forth that the French legal system can mitigate any grave risk of harm to the Children.

    As applicable here, this Court should feel confident that the French court system is capable of issuing any protective orders necessary for the welfare of the children, including issuing orders

---

[4]    The Court is free to contact the U.S. State Department and French Central Authority regarding issues of French law. *See Radu v. Shon*, 62 F.4th 1165, 1170 (9th Cir. 2023).

of protection and for supervised visits, as significantly noted by Petitioner's French law expert, Ms. Gaelle Bonnet. **Petitioner's Exhibit 1.** Ms. Bonnet notes that an order of protection, which is the equivalent of a restraining order in France, "can be ordered against a party to forbid contact with the spouse and can determine if certain protective measures need to be taken for the contacts between the parent and child." ***Id* at Page 3.** Further, the spouse "must be served within 2 days after the order, which allows the judge to issue an order granting or refusing the [order of protection] within six days of the initial petition…Once the order is issued, it is effective immediately notwithstanding a potential appeal." ***Id* at Page 5.** Notably, Respondent has not sought any protective measures to date, which greatly undermines any grave risk argument she offers in this Court. In any event, the French legal system will mitigate any potential risk of harm to the Children if Respondent makes the appropriate application and the French court deems protective measures necessary.

**C.    The Mature Child Exception Should Not Apply**

An unnumbered provision in Article 13 of the Hague Convention provides that a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. This "mature child" exception must be "construed narrowly so [its] application does not 'undermine the express purposes of the Convention.'" *Yang v. Tsui*, 499 F.3d 259, 278 (3d Cir. 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)).

Here, the subject Children are three and six years old. Petitioner found no reported cases where a court has found the mature age affirmative defense to apply to children of such young ages. There are, however, several reported cases finding a seven-year-old child to be insufficiently mature for this exception to apply. *See Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 915 (N.D. Ill.

2015) (seven-year-old subject child not of sufficiently mature); *See also, Rivera Rivas v. Segovia*, No. 2:10–CV–02098, 2010 WL 5394778, at *6 (W.D. Ark. Dec, 28, 2010) (finding that a seven-year-old girl was "not of sufficient age and maturity to warrant the application of the exception"); *Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1259 (M.D. Fla. 2008) (same).

## IV. FURTHER EVIDENTIARY ISSUES

### A. Estimate on the total length of the trial

The Petitioner estimates that the trial will last a total of three (3) days.

### B. Objections to Exhibits

The Petitioner has no objections to any of the Respondent's exhibits but reserves the right to object based on hearsay depending on the purpose for which Respondent offers her exhibits.

### C. *Motions in Limine*

Petitioner moves to exclude the Respondent's proposed expert, Dr. Jeffrey L. Edelson. Respondent has designated Dr. Edelson as an expert witness to serve as a "court educator" on the impact of adult violence on children. The opinions of the proposed expert fail the Rule 702 standards for admissibility of expert testimony. The proffered testimony by Dr. Edelson is not relevant to this proceeding as he has not interviewed either of the parties, nor the Children, nor does he have any knowledge of the French legal system. [5] Further, Dr. Edelson did not produce an expert report for Respondent.

---

[5]    Dr. Edelson has testified in a similar capacity to what Respondent offers here in several other Hague convention cases. In *Oliva v Espinoza*, the Court found that his testimony was not relevant and that "while [the] negative psychological ramifications are serious, [his testimony is] merely theoretical as applied to […] Respondent's evidence and testimony only tenuously supports the application of this exception, at best, much less does she meet the requisite standard by clear and convincing evidence." *Oliva v. Espinoza,* No. 20CV1133-JAH-DEB, 2021 WL 4554579, at *6 (S.D. Cal. Oct. 5, 2021). Further, in *Aly v. Aden*, the Court notes that Dr. Edelson testified to the statistical likelihood of abuse, but the Court "is tasked with determining whether [the child] will be subjected to a grave risk of harm,

Expert testimony is only admissible if: (A) the expert's scientific, technical, or other specialized knowledge will be helpful to the court in understanding the evidence or determining a fact in issue; (B) the expert testimony is provided by a qualified witness; (C) the expert testimony is relevant; and (D) the expert testimony is reliable. Fed. R. Evid. 702. The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence that the testimony is competent, relevant, and reliable" and therefore admissible under Rule 702. *Perkins v. Origin Medsystems, Inc.*, 299 F.Supp.2d 45, 52 (D. Conn. 2004) (citations and quotations omitted); *see also Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592 n. 10 (1993); *Blanchard v. Eli Lilly & Co.,* 207 F. Supp. 2d 308, 314 (D. Vt. 2002).

If the proffered expert is "deemed competent (also referred to as "qualified") . . . the trial court must then determine, pursuant to its gatekeeping function, whether the proffered expert testimony is relevant and reliable." *Perkins,* 299 F. Supp. 2d at 52 (citing Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702)(noting that trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony")). In *Kumho Tire*, the Supreme Court "confirmed that *Daubert's* general holding—trial judges must perform a gatekeeping function in determining admissibility of expert testimony—applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *Blanchard*, 207 F.Supp. 2d at 316 (internal quotations omitted)(citing *Kumho Tire v. Carmichael* 526 U.S. 137, 141 (1999)); *see also* Fed.R.Evid. 702); *see also Daubert*, 509 U.S. at 588.

The starting point for the Court's analysis is whether the proffered expert's testimony is relevant. "Evidence is relevant if the testimony has any tendency to make the existence of any

---

not whether [Petitioner] is statistically likely to continue to abuse [Respondent] if their relationship continues." *Aly v. Aden*, No. CIV. 12-1960 JRT/FLN, 2013 WL 593420, at *17 (D. Minn. Feb. 14, 2013).

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Perkins,* 299 F. Supp. 2d at 52 (cleaned up)(citing *Amorgiamos v. National R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002)); *see also Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful . . . Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition admissibility.")).

If the evidence is relevant, the court must then determine "whether the proffered expert testimony has a sufficiently reliable foundation to permit it to be considered by the trier of fact." *Perkins,* 299 F.Supp.2d at 52 (citations omitted). Federal Rule of Evidence 702 provides guidance to trial courts in determining whether the proffered expert testimony is sufficiently reliable. *Id*. at 53. It provides that expert testimony may be considered reliable if: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed.R.Evid. 702.; *see also Perkins,* 299 F.Supp.2d at 53. The proffered expert testimony is only admissible if all three components of Rule 702 are met. *Id*.

There is no single factor is necessarily dispositive of the reliability of any particular expert's testimony. *Perkins,* 299 F. Supp. 2d at 53. Rather, the test of reliability is a flexible one that depends on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. (quoting *Daubert*, 509 U.S. at 593). If the court finds an expert's methodology reliable, it must also then determine if the methodology was reasonably applied to the facts of the case. *Perkins,* 299 F. Supp. 2d at 53-54 (citing *Daubert*, 509 U.S. at 595). The court's assessment "must focus not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology." *Perkins,* 299 F. Supp. 2d at 54

(quotations and citations omitted). An expert's testimony must be excluded if "there is simply too great an analytical gap between the data and the opinion proffered, such that the opinion is connected to the data only by the ipse dixit of the expert." *Perkins,* 299 F. Supp. 2d at 54 (cleaned up)(quoting *Amorgiamos*, 303 F.3d at 266). "Expert testimony *should be excluded if it is speculative or conjectural* . . ." *Mancuso v. Consolidated Edison Co. of New York, Inc.,* 967 F.Supp. 1437, 1441 (S.D.N.Y. 1997) (emphasis added).

The expert testimony proffered by the Respondent does not meet the required standards. It is speculative and conjectural and not based on any reliable methodology or reliably applied to the facts of this case. Further, as a practical matter this Court does not need to expend trial time being educated on the effects of domestic violence, particularly given the nature of the allegations in this case.

Petitioner further objects to the following fact witnesses on the grounds that A.M's disclosures constitute hearsay: Ta Adams, Matt Haning, and Anja Andrade. Respondent has disclosed that the named fact witnesses will testify about the Children's disclosures regarding Petitioner.

Petitioner further objects to Respondent's witness, Molly Becker, on the grounds of relevance. Petitioner understands that Ms. Becker is to testify regarding the "DHS Process and Procedure," yet it is not clear how this proffered testimony is relevant to the current proceedings as the French legal system is relevant to this proceeding, not the Oregon legal system.

## III.    <u>CONCLUSION AND RELIEF SOUGHT</u>

A.M. and R.M. have been wrongfully retained by Respondent in the United States. For the foregoing reasons, they should be returned forthwith to their habitual residence of France.

Dated: November 26, 2024

Respectfully submitted,

/s/ Tammy M. Dentinger
Tammy M. Dentinger
OSB944787
Tdentinger@ghrlawyers.com
GARRETT HEMANN ROBERTSON P.C.
P.O. Box 749
Salem, Oregon 97308
Tel: (503) 581-1501
Fax: (503) 581-5891

Richard Min (*pro hac vice*)
Michael Banuchis (*pro hac vice*)
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, New York 10170
Telephone: (212) 681-6400
Fax: (212) 681-6999
rmin@gkmrlaw.com
mbanuchis@gkmrlaw.com

*Of Attorneys for Petitioner, Othmane Mahjoubi*